UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION
_____

JOEL GOLDMAN,

             Plaintiff,                          Case No. 1:05CV0035

                                               Hon. Richard Alan Enslen

v.

HEALTHCARE MANAGEMENT
SYSTEMS INC. and
THOMAS E. GIVENS,                  **ORAL ARGUMENT REQUESTED**

             Defendants.

| | |
|---|---|
| Dykema Gossett PLLC | Bone McAllester Norton PLLC |
| By:    Bradley L. Smith (P48138) | By:    Keith C. Dennen |
|          Krista L. Lenart (P59601) |          Sharon Jacobs |
| Attorneys for Plaintiff | Attorneys for Defendants |
| 2723 S. State Street, Suite 400 | 511 Union Street, Suite 1600 |
| Ann Arbor, Michigan  48104 | Nashville, TN  37219 |
| (734) 214-7660 | (615) 238-6340 |
| | |
| | Varnum, Riddering, Schmidt and Howlett, LLP |
| | By:    Ronald G. Dewaard (P44117) |
| |          Adam J. Brody (P62035) |
| | Co-Counsel for Defendants |
| | 333 Bridge Street NW |
| | P.O. Box 352 |
| | Grand Rapids, MI 49501-0352 |
| | (616) 336-6000 |

**PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON LIABILITY**

      Plaintiff Joel Goldman moves pursuant to Federal Rule of Civil Procedure 56(a) for

partial summary judgment against both defendants for liability on all counts asserted in the First

Amended Complaint:  copyright infringement, unfair competition, and destruction of copyright

management information.  In support, plaintiff relies on his accompanying brief.

On July 31, 2006, undersigned sought concurrence from opposing counsel pursuant to Local Rule 7(d), which concurrence was denied.

Respectfully submitted,

DYKEMA GOSSETT PLLC

By:   s/ Bradley L. Smith
      Bradley L. Smith (P48138)
      Krista L. Lenart (P59601)
      2723 South State Street, Ste. 400
      Ann Arbor, MI  48104
      (734) 214-7697
Dated:  July 31, 2006                     bsmith@dykema.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2006, I electronically filed the foregoing paper, Plaintiff's Motion for Partial Summary Judgment on Liability, with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  Ronald G. DeWaard and Keith Dennen.

s/ Bradley L. Smith
Bradley L. Smith (P48138)
Krista L. Lenart (P59601)
2723 South State Street, Ste. 400
Ann Arbor, MI  48104
(734) 214-7697
bsmith@dykema.com

AA01\175135.1
ID\BLS

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION
_____

JOEL GOLDMAN,

                    Plaintiff,                         Case No. 1:05CV0035
                                                              Hon. Richard Alan Enslen

v.

HEALTHCARE MANAGEMENT
SYSTEMS INC. and
THOMAS E. GIVENS,                    **ORAL ARGUMENT REQUESTED**

                  Defendants.

| | |
|---|---|
| Dykema Gossett PLLC | Bone McAllester Norton PLLC |
| By:    Bradley L. Smith (P48138) | By:    Keith C. Dennen |
|         Krista L. Lenart (P59601) |         Sharon Jacobs |
| Attorneys for Plaintiff | Attorneys for Defendants |
| 2723 S. State Street, Suite 400 | 511 Union Street, Suite 1600 |
| Ann Arbor, Michigan  48104 | Nashville, TN  37219 |
| (734) 214-7660 | (615) 238-6340 |
| | |
| | Varnum, Riddering, Schmidt and Howlett, LLP |
| | By:    Ronald G. Dewaard (P44117) |
| |         Adam J. Brody (P62035) |
| | Co-Counsel for Defendants |
| | 333 Bridge Street NW |
| | P.O. Box 352 |
| | Grand Rapids, MI 49501-0352 |
| | (616) 336-6000 |

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT ON LIABILITY**

**INTRODUCTION**

This case presents the rare circumstance of a defendant admitting to wholesale copying of a plaintiff's written work and to marketing the copied work and close derivations of it without the author's permission.

Defendant Tom Givens received a copy of plaintiff Joel Goldman's computer software source code for evaluation purposes.  Mr. Givens did far more than evaluate the software.  He removed all identification of Mr. Goldman's name, copied the software, and installed the copies without Mr. Goldman's consent at numerous hospitals his then-employer owned.  Within a year or two after copying the software, Mr. Givens had started a new business in direct competition to Mr. Goldman, marketing and selling the program to hospitals.  In 1994, his company registered a copyright in the code, claiming to be the author.  That company, Healthcare Management Systems, Inc. (HMS), continues to market Mr. Goldman's software as its own.  The copied software remains an integral part of the software suite that HMS sells to healthcare facilities throughout the United States.

Defendants and their witnesses have admitted to all of these astounding facts.  There is no genuine issue of material fact as to defendants' joint liability for copyright infringement, unfair competition, placement of false copyright notices on HMS software, and removal of Mr. Goldman's copyright management information pursuant to the copyright act.

**FACTS**

**Background of Goldman and His Software**

Joel Goldman learned to write programs for computer software while serving in the United States Air Force in the late 1960s.  Goldman dep. p. 5 (Ex. A).  Following his military service, Mr. Goldman honed his computer programming skills working for several companies, eventually specializing in computer programming for the management of hospitals and

1

healthcare applications.  In late 1978, after leaving his employment with Dynamic Control, Inc.
where he had been designing and writing software for hospital clients, he started working directly
for a hospital as a contractor writing computer programs.  Id. p. 18.  Within a short time, he was
working as an independent contractor for several hospitals in Florida and Puerto Rico.  Id. at 20-
23.

     During this time he conceived and wrote a software program for hospital management
incongruously known throughout the industry as "medical records."[1]  The purpose of the
program was not primarily directed to the "clinical" aspects of patients' health (e.g., information
kept on a patient's medical chart), but to managing the business of running a hospital.  The
medical records program maintained a master patient index, tracked patient visits, admissions,
discharges, utilization rates and doctor patient loads.  It assembled and processed this mass of
information to produce a large variety of printed reports for hospital management.  See Ex. K
(report printouts).

     Once installed, the medical records program was critical to hospital operations.  Not only
was it key to properly managing a hospital, but it kept track of the services provided to the
patient – information that the hospital used to produce bills to patients and third-party payers
(such as Medicare or insurance companies).  It interacted closely with patient accounting and
other financial software used in hospitals, particularly accounts receivable systems.  "[Y]ou
couldn't really produce a bill without having the medical records information."  Goldman dep. at
81.

---

[1] In recent years both parties have renamed the medical records program to distinguish it
from clinical-based software.  HMS at one point referred to the program as "Monitor Medical
Records," and now refers to it as its "Health Information Management" software module.  Mr.
Goldman now calls his program "Health Information Services."  This brief refers to the software
as it was originally known to the parties:  "medical records," or "the software at issue."

Goldman successfully marketed his medical records software, together with other software programs he programmed and/or marketed, to small- and medium-sized hospitals around the country.  Between 1979 and 1999, Mr. Goldman licensed and installed his medical records software in approximately 21 hospitals.[2]  Goldman Decl. ¶ (Ex. B).

**1983 Meeting with Tom Givens**

In spring 1983, Mr. Goldman met with defendant Tom Givens in Nashville for the purpose of demonstrating his medical records software and related financial applications.  Givens dep. pp. 50-51 (Ex. C).  Mr. Givens was then a systems analyst for a healthcare company called American Medical Centers (AMC), which owned and operated 17 hospitals.  Id. p. 19, 29.  (It appears that around this time AMC promoted Mr. Givens to Area Vice President for three hospitals, responsible for their business and financial operations.  Id. p. 20.)  Mr. Goldman installed a copy of his software package on AMC's computer, including his medical records program, and also provided Mr. Givens a copy of his programs on 8-inch floppy diskettes.  Id. pp. 54-55.

Mr. Givens was impressed with the software demonstration, id. p. 56 (the software was "nice"), and was particularly interested in working with the medical records program.  Id. pp. 58-59.  Mr. Givens knew that Mr. Goldman regarded the software as valuable and was not interested in giving it away.  He testified that Mr. Goldman proposed a fee to AMC of $14,000 per installation for all of the software, but that no agreement was reached.  Id. at 55, 58-59 (no agreement reached).  Mr. Goldman was under the impression that AMC would install a test copy of his medical records software at an AMC hospital, and if successful pay him $10,000 for that

---

[2] At various time periods Mr. Goldman licensed his software solutions directly or through third-party resellers with whom he contracted.

installation and other AMC installations that might follow.  Goldman dep. pp. 158-59.  It

undisputed that Goldman never received any payments from Givens, AMC, or HMS.

**Givens Erases Goldman's Name, Copies Software, and Sells it for Profit**

Givens remained at AMC for only a short time after the meeting with Goldman.  Givens

dep. at 95 (began AIC in 1984).  He admits that Mr. Goldman's name originally appeared on the

source code, Givens dep. at 63, 91-92, but testified that he deleted all traces of Mr. Goldman's

name from the source code while at AMC.  Id. At 187-88.  Before leaving AIC, he copied Mr.

Goldman's software and installed the program in about five of AMC's hospitals.  Id. at 47, 68.

In 1984, Givens started a new consulting company, Advanced Information Concepts (AIC).  Id.

pp. 64-65, 95.  The first product Mr. Givens offered for sale through his new company was

software for hospitals, including Mr. Goldman's medical records software.  Id. at 74-75

(referenced in this transcript excerpt as "the source code at issue in this lawsuit").  AIC's name

changed to HMS in about 1986.

Since 1984, Mr. Givens, AIC and HMS have sold and installed Mr. Goldman's software

at well over 300 locations.  John Doss dep. p. 45 (Ex. D).[3]  There is no issue that Mr. Goldman

did not authorize defendants to copy his software.  Mr. Givens forthrightly admits that neither

AIC nor HMS ever obtained Mr. Goldman's consent to copy and distribute the medical records

software.  Givens dep. p. 107.  Mr. Goldman obviously agrees that he never gave AIC or HMS

permission to copy his software.  Goldman Decl. ¶ (Ex. B).[4]

---

[3] Mr. Doss and Mr. Givens started AIC together in 1984.  Givens dep. p. 95.  Doss
recently retired and sold his 50% interest in HMS.

[4] The parties disagree whether Goldman gave implied, limited consent to AMC in 1983
beyond one test hospital.  Givens testified that he had two or more telephone conversations with
Mr. Goldman following the 1983 Nashville meeting to discuss functionality and integration
issues related to the medical records program and a subprogram called "DRG grouper."  Givens
dep. at 61-62.  He has only a vague recollection of those phone calls and cannot recall any
specific items discussed.  Id. at 60, 69.  Goldman has no recollection of such conversations.

4

Mr. Givens and his companies (AMC, AIC, and HMS) have paid Mr. Goldman nothing for using his software.  Yet Givens acknowledges that Goldman would expect to be paid for Givens's use of the Goldman software, as shown in this remarkable exchange at his deposition:

> Q.   Did AMC ever provide any compensation to Mr. Goldman for the software?
>
> A.   I don't recall.
>
> Q.   Other than the $14,000 figure that you discussed earlier, were there any preliminary discussions on what a price might be for installing the software at different hospitals?
>
> A.   No.
>
> Q.   Did you have an understanding that Mr. Goldman would expect to be paid if this software was installed?
>
> A.   If we had acquired his software, I would expect he would expect payment.
>
> Q.   Well, AMC did acquire the software; correct?
>
> A.   No.
>
> Q.   Okay.  In what way did AMC not acquire the software?
>
> A.   We didn't purchase the applications.

Givens dep. p. 71.

**HMS Registers False Copyright in the Software**

In 1994, HMS filed an application for copyright registration for "Monitor Medical Records," and received a certificate of registration for that program.  HMS copyright registration certificate TX 3-950-119 (Ex. E).  HMS falsely stated that it was the author of the software.  Id.

---

Goldman dep. p. 160-61.  Givens asserts, however, that from these conversations he formed an "opinion" and "belief" that Goldman understood that AMC would be "moving forward" with enhancing the medical records package.  Id. at 69; see generally id. pp. 60-62, 69-70.  Mr. Goldman strongly disputes that he ever agreed to let AMC modify or otherwise utilize his software beyond limited evaluation, and certainly not without compensation.  None of this is relevant to this motion, however, because Givens does not contend that the implied consent extended beyond a few test AMC hospital locations.  Id. p. 71 (admitting Goldman would expect to be paid for software if AMC acquired it); p. 107 (admitting no contact with Goldman after 1983-1984 DRG discussions concerning functionality).

(at box 2 and 10).  The following year, HMS registered the Monitor Medical Records module

(again) as a derivative work.  HMS copyright registration certificate TX 4-199-339 at box 6 and

continuation sheet (Ex. F).  HMS again falsely represented that it was the author of the medical

records module.

**Goldman Discovers the Infringement**

Mr. Givens has admitted that he and his companies have continuously, but secretly,

infringed on Goldman's copyrighted computer source code since 1983.  Like virtually every

software company, HMS has closely guarded its source code, making it virtually impossible for

plaintiff to discover defendants' infringement.  For example, AIC and HMS both elected to

install object code (unintelligible binary bits of "1"s and "0"s) at its hospitals, rather than its

source code, which is legible to humans.  Givens dep. p. 80, 179.

Mr. Goldman had no cause to suspect defendants' infringement until 2004.  In about

April of that year, one of Goldman's customers in Rawlins, Wyoming, decided to change its

hospital management software system to the HMS system.  Mr. Goldman received an email from

an HMS employee involved in the conversion, which attached a spreadsheet relating to database

file conversion.  4/5/04 Eckler email to Goldman (Ex. G); Goldman dep. pp. 164, 193-94.  He

immediately noted that the HMS "abstract" database file had virtually the same structure and file

names as the abstract database he designed in 1979.  Mr. Goldman investigated the company and

within weeks ascertained that the president of HMS was Tom Givens, to whom he had provided

a demonstration copy of his software in 1983.

Copyright registration is usually a prerequisite for filing a copyright infringement suit.  17

U.S.C. § 411(a).  Accordingly, in September, 2004, Mr. Goldman applied for and was granted

copyright registration for his "Health Information Services" computer software program, *i.e.*, his

medical records program,[5] and received a certificate of registration.  Certificate of Copyright

Registration TX 6-023-458 (Ex. H).  With his registration, Mr. Goldman deposited copies of

several program components from his 1979 medical record source code.  1979 Copyright Deposit

materials (program components "HMRAE7" and "HMRY50") (Ex. I).

**Procedural History**

In January 2005, plaintiff filed suit alleging copyright infringement and common law

unfair competition.  In June 2006, Goldman amended his claims to add a claim for unlawful

removal or alteration of copyright management information under 17 U.S.C. § 1202-1203.

Substantial discovery has been completed, including depositions of the primary fact witnesses,

Joel Goldman and Tom Givens.[6]  Contemporaneous with this motion, plaintiff has moved for a

preliminary injunction against defendants and for sanctions related to their destruction of

evidence.

Other relevant facts are discussed in the argument.

## ARGUMENT

There is no genuine issue that Givens and his companies, AIC and HMS, improperly

copied Goldman's medical records software, removed copyright management information from

the source code, and have continuously copied and sold it as their own since that time without

Goldman's permission or payment of royalties.  This Court should grant plaintiff summary

judgment as to liability on all three counts in the First Amended Complaint pursuant to Rule 56

and issue a preliminary injunction pending a jury trial to determine plaintiff's damages.

---

[5] See footnote 1, supra.

[6] The parties have agreed to produce these witnesses for additional questioning at a
continued deposition, scheduled to occur in August 2006.

## I.       DEFENDANTS INFRINGED PLAINTIFF'S COPYRIGHTED SOFTWARE.

To establish copyright infringement, a plaintiff must prove two elements:  (1) plaintiff's ownership of a valid copyright, and (2) the defendant's copying of the constituent elements of the work that are original.  Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991); Lexmark International v. Static Control Components, 387 F.3d 522, 533 (6th Cir. 2004).  Plaintiff's certificate of registration is strong evidence of the first element, to which this Court may give prima facie weight.  Moreover, the undisputed evidence strongly supports the ownership and validity of plaintiff's copyright.  Most copyright cases hinge on factual disputes over the second element.  In this case, however, defendants forthrightly admit they copied Mr. Goldman's original computer program.

### A.       Element 1:  Goldman Owns a Valid Copyright.

In most copyright cases, a plaintiff's certificate of copyright registration is prima facie proof of valid ownership of a copyright.  E.g. Lexmark, 387 F.3d at 533-34.  In this case, the Court may choose to give prima facie weight to the registration or accord lesser evidentiary weight to the certification because Mr. Goldman registered his copyright more than five years after publication of his work.  17 U.S.C. § 410(c) (evidentiary weight to be accorded certificate of a registration five years after publication within the discretion of the court).

If the Court does not give prima facie weight to the certificate, establishing valid ownership in an infringement action is determined by examining three constituents:  1) originality in the author; 2) copyrightability of the subject matter; and 3) compliance with applicable statutory formalities.  Atari, Inc. v. Amusement World, Inc., 547 F. Supp. 222 (D. Md. 1981) citing 4 Nimmer on Copyright § 13.01[A] (May 2005) (hereafter Nimmer).[7]  Regardless of

---

[7] Two other "valid ownership constituents" are not relevant in this case.  Goldman is a citizen of the United States, so there is no requirement that he prove "a point of national attachment" that foreign authors must satisfy.  17 U.S.C. § 104(b)(1).  Further, as the original

whether the Court considers Mr. Goldman's certificate of registration <u>prima facie</u> evidence of valid copyright ownership or whether it accords that document less evidentiary weight, there is no genuine dispute that Mr. Goldman owns a valid copyright in the medical records software copied by defendants.

### 1.    Joel Goldman is the Original Author

It is undisputed that Joel Goldman is the original author of the medical records software. <u>E.g.</u> Goldman Decl. ¶ (Ex. B); Goldman dep. pp. 116-18, 128, 147 (Ex. A).  Mr. Goldman's certificate of copyright application lists him as the original author of the medical records code published in 1979.  <u>See</u> Certificate of Copyright Registration TX 6-023-458 (Ex. H).

Tom Givens admits that HMS's medical records software is derived directly from a copy of the source code Mr. Goldman provided for Givens's evaluation in 1983.  <u>E.g.</u>, Givens dep. at. at 106-07 (first version of HMS source code came from code provided by Mr. Goldman); <u>id.</u> at 111 (HMS source code "was the software that was delivered to AMC by Mr. Goldman"); <u>id.</u> at 114 (HMS source code part of the source code provided by Goldman to Givens in 1983).

At one point in his deposition, Mr. Givens testified that Goldman authored an important file currently used by HMS called the "Abstract Database File."  <u>Id.</u> at 88.  At other points, he professed not to know whether Mr. Goldman personally authored the medical records software. <u>Id</u>. at 111.  However, defendants have not seriously questioned Mr. Goldman's claim of authorship.  Plaintiff's original authorship of the medical records program is undisputed.

### 2.    Computer Software is Copyrightable

Although at one time the issue was debated, there remains no doubt that copyright protection extends to computer software programs, including computer source code, as "literary

---

author of the work, he need not prove valid transfer of rights from the author to the plaintiff. Nimmer, <u>supra</u>.

works" under 17 U.S.C. § 101.  Lexmark, supra, 387 F.3d at 533.  Copyrighted computer

programs are protected from infringement under 17 U.S.C. § 106.  Id.  Accordingly, the

Copyright Office routinely registers copyrights in computer source code (including copyrights in

computer programs that HMS claimed to have authored).  See Exs. E, F, H.

### 3.    Goldman Complied with Statutory Formalities

The fact that the copyright office examined Mr. Goldman's copyright application and

then granted a registration is itself strong evidence that he complied with the statutory formalities

examined by that office.  Certainly of the three constituents for valid copyright ownership

applicable here, the copyright office is in a far better position to assess compliance with statutory

formalities than, for example, whether the applicant is truly the original author.

For works first published after January 1, 1978 but before 1989, the statutory formalities

necessary for maintaining an infringement action are 1) proper notice of copyright; 2) registration

of the copyright; and 3) deposit of required materials with the copyright office.  See generally 2

Nimmer § 7 (statutory formalities).  Regardless of the evidentiary weight this Court may give to

plaintiff's registration certificate, the evidence is clear that plaintiff complied with statutory

formalities.

### a.    Goldman Affixed Proper Notice of Copyright on the Medical Records Program Provided to Givens.

In general, a copyright notice consists of the word "Copyright" or the © symbol, the name

of the copyright owner, and in most instances the first year of publication.  17 U.S.C. § 401(b);

see also 2 Nimmer, § 7.05 (discussing general requirements).  The word or © symbol ordinarily

comes first, followed by the year of first publication and name of the copyright owner.  The year

and identification of the copyright owner may appear in any order.  Id.  The notice must be

affixed to copies so as to give reasonable notice.  17 U.S.C. § 401(c).

10

The source code that Mr. Goldman provided to Mr. Givens contained the necessary copyright notices.  Goldman dep. pp. 147, 161-62.  In the years since Mr. Goldman provided copies of his medical records source code to Mr. Givens, and consistent with industry practice, Mr. Goldman has updated and modified his source code extensively.  Regrettably, therefore, neither plaintiff nor defendants possess an intact copy of the source code that Mr. Goldman provided to Mr. Givens in 1983.  Though most of the 200 or so program components that comprised the 1983 medical records source code are no longer available, Mr. Goldman was able to recover (from an old computer) several components from his old medical records program dating from the 1979-1984 time period that survived the passage of time intact and unaltered.  Goldman Decl. ¶ (Ex. B).  These recovered components prove that Mr. Goldman included notice of copyright on the medical records program that he provided to Mr. Givens in 1983.

When Mr. Goldman applied for copyright registration for his 1979 medical records program, and pursuant to the statute and copyright office policy, he deposited with his application the actual source code for several components of that program.  Copyright Office Deposit Materials (Ex. I).  At the top of the first page of these deposited components, which are self-identified as "HMRAE7" and "HMRY50,"  Mr. Goldman affixed a prominent notice of his copyright in the medical records source code:

WRITTEN BY JSM COMPUTER SYSTEMS KEY WEST FLA. BY J.G.
COPYRIGHT JOEL GOLDMAN 1979

Two other medical records program components from around the same time period confirm that Mr. Goldman included notice of copyright on the medical records software provided to Mr. Givens.  The first of these is a component that Mr. Goldman wrote in 1979 identified as "UGDRG."  This component may have been modified as late as 1983 or 1984.[8]  Goldman

_____

[8] Note that the copyright notice is valid even if the notice states a date of publication

Decl. ¶ .  This medical records component is thus especially relevant because it dates to the exact time period when Mr. Givens acquired the medical records software from Mr. Goldman.  Since registering his work, Mr. Goldman located a second component identified as "HMRA95."  On both of these components, Mr. Goldman inserted a prominent notice of copyright:

> THIS PROGRAM ALLOWS UPDATING OF THE ABSTRACT MASTER FILE
> COPYRIGHT JOEL GOLDMAN 1979

UGDRG and HMRA95 Medical Records Program Components (Ex. J).

 In addition to this compelling documentary evidence of copyright notices, the circumstances surrounding his creation of the software strongly support Mr. Goldman's sworn testimony that he included the notice in the software he provided to Mr. Givens.  First, immediately prior to creating the medical records software in 1979, Mr. Goldman programmed software for a private software design firm, Dynamic Control.  Goldman dep. p. 16 (Ex. C).  Dynamic Control strongly emphasized to Mr. Goldman the importance of including a copyright notice identifying Dynamic Control as the owner.  Goldman Decl. ¶ .  Mr. Goldman continued the same practice when he wrote his medical records program in 1979, immediately after leaving Dynamic Control.  Id.

 Second, beginning in 1979 and continuing through the time he met with Givens, Mr. Goldman's livelihood was based almost entirely on the development, marketing and sale of his hospital management software.  He is certain that he inserted a copyright notice similar to the attached exhibits in many, if not most, of the medical records software components he provided to Givens, as he had been trained to do, because he regarded his medical records program as the most valuable aspect of his hospital management software.  Goldman Decl. ¶ .  Finally, Mr. Goldman cannot recall a single instance where he has deleted a copyright notice from an active

---

earlier than the date of actual publication of the version at issue.  17 U.S.C. § 406(b).

working component of his medical records program, except in cases where he replace a notice with an updated notice (as he did later in the 1980s and thereafter). Id. ¶ . It is ludicrous to suggest that Mr. Goldman would meticulously delete every copyright notice within his medical records program before he provided that valuable software to Givens for evaluation.

Any attempt by defendants to challenge notice of copyright should be rejected. Mr. Givens testified that he did not observe a notice of copyright when he reviewed Mr. Goldman's medical records source code in 1983 or 1984 while employed at AMC. Givens dep. pp. 63, 91. This testimony has little evidentiary weight and fails to raise a genuine issue. First, the medical records code was comprised of hundreds of program components, Goldman Decl. ¶ , but Givens only looked at some of the programs Goldman provided, not all of them. Givens dep. p. 92. Second, and more important, Givens freely admitted that Mr. Goldman had placed his name on the source code. Id. at 63, 91. Indeed, Givens admitted that he was sure that he probably personally removed Mr. Goldman's name every time it appeared in the source code. Id. at 188. Mr. Givens' testimony that he observed Mr. Goldman's name but somehow missed the accompanying copyright notice is blatantly self serving, is directly rebutted by the 1979 – 1984 source code components appended to this brief, and is not credible.

**b.**     Mr. Goldman Properly Registered his Copyright

Registration of copyright is entirely permissive. Failure to register does not affect the validity of the copyright. "Such registration is not a condition of copyright protection." 17 U.S.C. § 408(a). There is no need for an author to register his work to obtain the protection; many authors license and distribute their works without registration. Proper registration is necessary, however, for maintaining an infringement action. 17 U.S.C. § 411(a) (no action for infringement shall be instituted "until registration of the copyright claim has been made in accordance with this title").

13

It is undisputed that Mr. Goldman registered his 1979 medical records computer program. It should also be undisputed that the source code that he provided to Mr. Givens in 1983 is a derivation of that registered 1979 work.  This is easily confirmed by a visual comparison between reports generated by the Goldman software and the current HMS software.  For example, Mr. Goldman submitted the source code for medical records program component "HMRAE7" to the copyright office to fulfill the deposit requirement.  (Ex. I).  That source code produces the medical records management report shown in exhibit K.  The second half of exhibit K is the report produced by the HMS software.  The HMS report is almost exactly like the Goldman report because they share the same source code.  Despite the best efforts of his attorney, Mr. Givens eventually conceded that the Goldman and HMS reports were substantially similar. Givens dep. at 108-110.

The fact that Mr. Givens copied Mr. Goldman's 1983 source code and not the source code from the registered 1979 program is irrelevant; all works based on modifications of the 1979 program are protected by the 1979 program's copyright registration.  17 U.S.C. § 103(a) (copyright in underlying work extends to derivative works); see also, e.g., Montgomery v. Noga, 168 F.3d 1282, 1293 (11th Cir. 1999) (registration of underlying work allows author to maintain suit for infringement of any derivative work by author); 2 Nimmer § 7.16[B][2][b] (registration of underlying work alone confers jurisdiction for suit based on infringement of author's later derivative work).  The 1979 medical records program has been properly registered, conferring proper jurisdiction on this Court to adjudicate this infringement action.

        **c.**      Mr. Goldman Deposited all Required Materials
                   with the Copyright Office.

The last requisite for proving valid ownership in an infringement action is actually a subset of the registration requirement just discussed:  deposit of all required materials.  See 17

U.S.C. § 411(a).  Again, the fact that the copyright office granted a certificate of registration should alone suffice to meet plaintiff's evidentiary burden.  In any case, Mr. Goldman deposited the required source code with the copyright office as required by copyright office guidelines.  <u>See</u> Copyright Office Circular 61 (June 1999) (addressing deposit requirements for computer programs); deposit materials (Ex. I).  Mr. Goldman also remitted the required fees, whereupon the copyright office issued its certificate of registration.[9]  There should be no serious debate that Mr. Goldman has satisfied these ministerial registration requirements.

**B.      <u>Element 2:  Defendants Copied Plaintiff's Copyrighted Work</u>**

As noted above, copyright infringement disputes commonly involve the issue of whether the defendant actually copied the author's work.  Usually direct evidence of copying is unavailable, requiring the fact finder to assess whether copying occurred by examining "access" and "substantial similarity" of the competing works.  <u>E.g.</u> <u>Lexmark</u>, 387 F.3d at 534.  In this case, defendants admit they literally copied Mr. Goldman's original computer source code and installed it on four to five AMC hospital systems.  Givens dep. pp. 47, 68.  Defendants further admit that AIC and HMS copied and marketed derivations of this same source code since at least 1986.  <u>Id</u>. at 66-67, 74-75, 88.  Defendants' literal copying is undisputed in this case.

In sum, Goldman's certificate of copyright registration should alone suffice to prove his ownership of a valid copyright in his medical records computer program.  Regardless of the weight given the certificate, there is no serious doubt that he is the original author of the 1979 medical records code, that his computer source code is copyrightable, and that the notice of

---

[9] The Copyright Office issued a corrected registration in early April, 2006, granting Mr. Goldman's request for special relief from the standard 50-page source code deposit requirement pursuant to 37 C.F.R. § 202.20(d).  The office accepted the source code for the two program components discussed above, HMRAE7 and HMRY50, as satisfying its deposit requirement.

copyright and all other statutory formalities have been met.  Since literal copying is undisputed, this Court should grant summary judgment as to liability in favor of plaintiff.

## II.     THERE IS NO GENUINE ISSUE THAT DEFENDANTS' COPYING AND SALE OF GOLDMAN'S PROGRAMS CONSTITUTE UNFAIR COMPETITION.

Unfair competition is an elastic term that encompasses a variety of distinct business torts, including misappropriation of trade secrets, palming off, and false advertising.  E. H. Pappas, *et al.*, Michigan Business Torts, § 5.1 (2d. ed. Mich. I.C.L.E. 2003).  Michigan's common law of unfair competition extends beyond the palming-off cases; it prohibits unfair and unethical trade practices that are harmful to one's competitors or to the general public.  A & M Records, Inc. v. M.V.C. Dist. Corp., 574 F.2d 312 (6th Cir. 1978); Clairol, Inc., v. Boston Discount Center, Inc., 608 F.2d 1114, 119-20 (6th Cir. 1979) (clear that Michigan follows general principles of unfair competition and that action is not limited to palming off).

The A & M Records case is exactly on point.  In that case, the Sixth Circuit affirmed a judgment of unfair competition against defendants who had duplicated and distributed copies of plaintiff's musical recordings without plaintiff's authorization.  574 F.2d at 313.  (A gap of coverage in the copyright act at the time precluded a copyright infringement action.  Id.)  The court affirmed that there was a common law right under Michigan law of unfair competition against such unauthorized duplication and distribution, and that its decision was "fully consistent with Supreme Court decisions concerning unfair competition and commercial misappropriation." 574 F.2d at 314 (citing cases).  The A & M Records court also soundly rejected the defendants' claim that the copyright act occupied the field and preempted unfair competition claims. "[A]lthough we may and do assume that neither party has any remaining property interest as against the *public* . . . , it by no means follows that there is no remaining property interest in it as

between *themselves*."  Id. at 314 (emphasis added), quoting International News Service v. Associated Press, 248 U.S. 215, 236, 39 S.Ct. 68, 71 (1918).

The facts in this case are much stronger than the facts in A & M Records.  In that case, there were no circumstances of "palming off."  Here, Givens and HMS have testified that they copied the Goldman software, removed his name, and marketed it as their own creation.  HMS even falsely registered a copyright to the medical records program, claiming HMS had authored it.  Exs. E, F.  HMS then falsely affixed a copyright notice to Goldman's source code, claiming to be the author.  Continuing the sample reports addressed earlier, attached as exhibit L is the printout of the HMS source code, identified as "MROE80."  HMS prominently placed a copyright notice on this and all of the other infringed programs falsely claiming authorship: "Healthcare Management Systems, Inc., (c) Copyright 1994 HMS Monitor."  Ex. L.

## III.   GIVENS AND HMS ARE JOINTLY LIABLE UNDER 17 U.S.C. § 1202 FOR KNOWINGLY PROVIDING FALSE COPYRIGHT MANAGEMENT INFORMATION AND FOR REMOVING GOLDMAN'S COPYRIGHT MANAGEMENT INFORMATION.

The Digital Millennium Copyright Act prohibits the distribution of copyright management information that is false, and further prohibits the removal or alteration of copyright management information.  17 U.S.C. §§ 1202(a), (b).  The act defines "copyright management information" to include *not only information in the copyright notice, but also the name of the author and the copyright owner*:

> As used in this section, the term "copyright management information" means any of the following information conveyed in connection with copies . . . of a work, including in digital form:
>
> (1) The title and other information identifying the work, including the information set forth on a notice of copyright.
>
> (2) The name of, and other identifying information about, the author of a work.

17

(3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

* * *

(7) Identifying numbers or symbols referring to such information or links to such information.

17 U.S.C. § 1202(c).

In this case, Givens and HMS have admitted to removing Joel Goldman's name from the medical records source code.  There is no genuine issue of fact that Givens or others at AMC also removed Mr. Goldman's copyright notices.  See Goldman 1979-84 source code (Exhibits I, J). HMS compounded its wrongful conduct when it falsely asserted authorship of the medical records program in its applications to the copyright office (Exs. E, F), and affixed false statements of copyright management information on the medical records source code it distributed (Ex. L).

Such activity is precisely the conduct prohibited by 17 U.S.C. § 1202.  Defendants knowingly, and with intent to facilitate and conceal their infringement, placed false copyright management information on the software they distributed, and intentionally removed copyright management information from the source code that Mr. Goldman provided.  All of this conduct was designed to conceal their infringement of Goldman's copyright while they used his software to compete against him.  Indeed, defendants' intentional conduct for commercial advantage raises serious questions of felony criminal liability.  17 U.S.C. §§ 506 & 1204 (crime to willfully and for commercial advantage to infringe, place false copyright management information, remove or alter copyright management information, to knowingly place false copyright notice on an article, to remove or alter any notice of copyright with fraudulent intent, or to knowingly falsely represent a material fact in an application for copyright).

**IV.**     **DEFENDANTS HAVE NO VIABLE AFFIRMATIVE DEFENSES.**

It is difficult to predict which of their numerous affirmative defenses defendants will

seriously press, if any.  Plaintiff here will briefly address one defense raised in discovery:  the

Copyright Act's three-year statute of limitation.  The statute of limitations for copyright

infringement provides:  "No civil action shall be maintained under the provisions of this title

unless it is commenced within three years after the claim accrued."  17 U.S.C. § 507(b).  The key

issue under the statute is when a claim accrues.  Does it accrue at the time of the infringement, or

at some other time?

The Sixth Circuit has adopted the Ninth Circuit's test for determining when a copyright

infringement claim accrues:  "A cause of action accrues when a plaintiff knows of the

infringement or is chargeable with such knowledge."  Bridgeport Music Inc. v. Diamond Time,

Ltd., 371 F.3d 883, 889 (6th Cir. 2004), citing Roley v. New World Pictures, Ltd., 19 F.3d 479,

481 (9th Cir. 1994).  Roley unquestionably permits recovery for infringement outside the three-

year limitations window if the infringement occurred without the plaintiff's knowledge –

precisely the circumstances alleged by Goldman in this case.  In Polar Bear Productions, Inc. v.

Timex Corp., 384 F.3d 700 (9th Cir. 2004), the Ninth Circuit first cited the "general rule" of

Roley, that a plaintiff's right to damages is limited to those suffered during the statutory period

for bringing claims, then squarely addressed delayed accrual of claims where a plaintiff lacked

knowledge of past infringement:

> [U]nder Roley, the statute of limitations does not prohibit recovery of damages
> incurred more than three years prior to filing of suit if the copyright plaintiff was
> unaware of the infringement, and that lack of knowledge was reasonable under the
> circumstances.  Without the benefit of tolling this situation, a copyright plaintiff
> who, through no fault of its own, discovers an act of infringement more than three
> years after the infringement occurred would be out of luck.  Such a harsh rule
> would distort the tenor of the statute. . . . It makes little sense, then, to bar
> damages recovery by copyright holders who have no knowledge of the

infringement, particularly in a case like this one, in which much of the infringing material is in the control of the defendant.

384 F.3d at 706-07; see also 3 Nimmer on Copyright §12.05[B] (tolling statute of limitations until moment of discovery is better view of §507(b)).

Mr. Givens has admitted that he and his companies have continuously, but secretly, infringed on Goldman's copyrighted computer source code since 1983.  HMS does not distribute its products to the public but to a narrow segment of health care customers – hospitals in rural areas and small cities.  Givens dep. p. 173-74.  Like virtually every software company, HMS has closely guarded its source code, making it virtually impossible for plaintiff to discover defendants' infringement.  E.g., Givens dep. p. 80, 179 (AIC and HMS both elected to install object code, not source code, at hospitals).  Goldman had no cause to suspect defendants' infringement until 2004, when by chance he received an email from a customer-hospital revealing that one HMS database closely resembled a database designed by Goldman many years earlier.  Ex. G.

The Sixth Circuit has adopted the Ninth Circuit's Roley test for accrual, embracing equitable tolling (also known as the "discovery rule") for copyright infringement actions.  Under that test, Goldman's infringement claims for the entire period of HMS's secret infringement remain actionable because they did not accrue until he learned of defendants' infringement in 2004.

## CONCLUSION

Defendants admit that they copied Mr. Goldman's source code, removed all traces of authorship from the code, and distributed it for commercial gain.  There is no genuine issue that Mr. Goldman's copyright is valid.  Even if recovery were for some reason unavailable under the copyright act, the undisputed facts state a compelling claim for unfair competition.  Finally,

defendants are liable for placement of false copyright management information on the medical records software the have distributed and for removing Mr. Goldman's copyright management information.  This Court should enter partial summary judgment as to liability on all three counts, grant plaintiff's requested preliminary injunction, and set a jury trial to determine damages and other remedies.

Respectfully submitted,

DYKEMA GOSSETT PLLC


By:   s/ Bradley L. Smith
      Bradley L. Smith (P48138)
      Krista L. Lenart (P59601)
      2723 South State Street, Ste. 400
      Ann Arbor, MI  48104
      (734) 214-7697
Dated:  July 31, 2006        bsmith@dykema.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2006, I electronically filed the foregoing paper, Plaintiff's Brief in Support of Motion for Partial Summary Judgment on Liability, with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  Ronald G. DeWaard and Keith Dennen.

s/ Bradley L. Smith
Bradley L. Smith (P48138)
Krista L. Lenart (P59601)
2723 South State Street, Ste. 400
Ann Arbor, MI  48104
(734) 214-7697
bsmith@dykema.com

AA01\175135.1
ID\BLS