Case No. 1:05-CV-0035
Joel Goldman
v.
Healthcare Management Systems, Inc.
and Thomas E. Givens

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT D

```
1              IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF MICHIGAN
2                        SOUTHERN DIVISION

3

4    JOEL GOLDMAN,                    )
                                      )
5                      Plaintiff,     )
     vs.                              ) CASE NO.
6                                     )  1:05 CV 0035
     HEALTHCARE MANAGEMENT SYSTEMS, INC.)
7    and THOMAS E. GIVENS,            )
                                      )
8                      Defendants.    )
                                      )
9    _____)

10        THE DEPOSITION OF

11        THOMAS E. GIVENS

12        Taken on Behalf of the Plaintiff

13        April 20, 2006

14

15              C O N F I D E N T I A L
                ========================
16

17

18

19

20   _____

21

22   ATKINSON-BAKER, INC.
     COURT REPORTERS
23   (800) 288-3376
     www.depo.com
24   REPORTED BY: EDWARD F. KIDD, REGISTERED PROFRESSIONAL
                   REPORTER AND NOTARY PUBLIC
25   FILE NO.: A002A65
```

**Page 2**

```
1   APPEARANCES:
2   For the Plaintiff:
3       BRADLEY L. SMITH, ESQ.
        Dykema Gossett
4       2723 South State Street, Suite 400
        Ann Arbor, Michigan 48104
5       (734) 214-7697
6
7   For the Defendants:
8
        KEITH C. DENNEN, ESQ.
9       Bone McAllester Norton
        511 Union Street, Suite 1600
10      Nashville, TN 37219
        (615) 238-6340
11
12  Also Present:  Joel Goldman
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1           The deposition of THOMAS E. GIVENS, taken
2   on behalf of the Plaintiff, on the 20th day of April,
3   2006, in the offices of Bone, McAllester, Norton, 511
4   Union Street, Nashville, Tennessee, for all purposes
5   under the Michigan Rules of Civil Procedure.
6           The formalities as to notice, caption,
7   certificate, et cetera, are waived.  All objections,
8   except as to the form of the questions, are reserved to
9   the hearing.
10          It is agreed that Edward F. Kidd, RPR,
11  being a Notary Public and Court Reporter for the State
12  of Tennessee, may swear the witness, and that the
13  reading and signing of the completed deposition by the
14  witness are not waived.
15
16
17                      * * *
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                 I N D E X      Page
2   WITNESS: THOMAS E. GIVENS
3   By Mr. Smith                    5
4   Designated confidential; attorneys'
5   eyes only                       159-162
6
7
8                 E X H I B I T S
9   No. 2     Retained by Mr. Smith    99
    No. 3     Retained by Mr. Smith    103
10  No. 4     Retained by Mr. Smith    104
    No. 5     Retained by Mr. Smith    108
11  No. 6     Retained by Mr. Smith    108
    No. 7     Retained by Mr. Smith    110
12  No. 8     Retained by Mr. Smith    111
    No. 9     Retained by Mr. Smith    112
13  No. 10    Retained by Mr. Smith    112
    No. 39    Retained by Mr. Smith    113
14  No. 38    Retained by Mr. Smith    114
    No. 40    Retained by Mr. Smith    114
15  No. 41    Retained by Mr. Smith    116
    No. 42    Retained by Mr. Smith    124
16  No. 43    Retained by Mr. Smith    124
    No. 46    Retained by Mr. Smith    127
17  No. 47    Retained by Mr. Smith    148
    No. 48    Retained by Mr. Smith    154
18  No. 51    Retained by Mr. Smith    166
    No. 55    Retained by Mr. Smith    175
19  No. 49    Retained by Mr. Smith    177
    No. 50    Retained by Mr. Smith    189
20  No. 52    Retained by Mr. Smith    190
    No. 53    Retained by Mr. Smith    191
21  No. 51    Retained by Mr. Smith    197
    No. 56    Retained by Mr. Smith    203
22
23
24
25
```

**Page 5**

```
1   THEREUPON,
2           THOMAS E. GIVENS,
3   called as a witness, and after having been first duly
4   sworn, testified as follows:
5           E X A M I N A T I O N.
6   Q.    Good morning, Mr. Givens.  We have just met,
7   but I'm Brad Smith.  I represent the plaintiff, Joel
8   Goldman, in this case, and you are, I presume, well
9   aware what all this case is about.
10          MR. SMITH:  Before we get into the guts of
11  the deposition, I would like to have an understanding
12  with opposing counsel that we are -- we talked about
13  continuing the deposition and having Mr -- you are
14  willing to produce Mr. Givens for a second day of
15  depositions if we don't conclude today; is that right?
16          MR. DENNEN:  That's fine.
17  BY MR. SMITH:
18  Q.    Have you ever been deposed before, Mr. Givens?
19  A.    No.
20  Q.    Let me just briefly go over some of the rules
21  that I'd ask you to follow.  First, if I ask you a
22  question it's important that you give an audible answer
23  back because the court reporter can't take down a shake
24  or a nod of the head.  Sometimes uh-huh or huh-uhs
25  don't read very well on a transcript.
```

**Page 6**

1  A.  Uh-huh.
2  Q.  So try to remember that. Keith will probably
3  give you a reminder, perhaps, if that happens. Second
4  is I ask that you let me finish the question before
5  giving an answer. When we're talking over each other
6  it's hard for the court reporter to take it all down.
7  If you don't understand a question, let me know
8  and I'll rephrase. What this whole exercise is about
9  is finding out what you know and making sure that we're
10  both clear on our communications back and forth.
11  And, finally, if you need to take a break, we
12  have a lot to cover, but this is not a marathon. Just
13  let me know and you can take a break. My only caveat
14  to that is I'd like you, if there is a pending
15  question, I need your answer before you take a break.
16  A.  (Witness nods head).
17  Q.  So is that all understandable and clear and
18  okay?
19  A.  That suits me.
20  Q.  Okay. Let's start with the easy stuff. What
21  did you do after high school?
22  A.  Went to college.
23  Q.  Where was that?
24  A.  Middle Tennessee State University.
25  Q.  Say that one more time?

**Page 7**

1  A.  Middle Tennessee State University.
2  Q.  Okay. And did you receive a degree there?
3  A.  Yes.
4  Q.  What was it?
5  A.  BA, business.
6  Q.  What year?
7  A.  '71, 1971.
8  MR. DENNEN: Tom, I'm going to interrupt.
9  If you would, could you speak just a little bit louder
10  because Sheri and I --
11  MS. JACOBS: Keith has a hearing problem.
12  MR. DENNEN: This noise makes it kind of
13  disappears here.
14  THE WITNESS: All right.
15  BY MR. SMITH:
16  Q.  Second, what did you do after graduating from
17  Middle Tennessee State University?
18  A.  I became employed for about six months, and
19  then went into the Army, National Guard.
20  Q.  So you were six months in private employment
21  and then you went to the Army National Guard?
22  A.  Right.
23  Q.  How long did you serve in the guard?
24  A.  Eight months.
25  Q.  And did you receive honorable or dishonorable

**Page 8**

1  discharges --
2  A.  Yes.
3  Q.  Did you receive an honorable --
4  A.  Yes.
5  MR. DENNEN: Tom, let him finish his
6  question before you answer. That way the court
7  reporter's job is a little easier.
8  THE WITNESS: Okay.
9  BY MR. SMITH:
10  Q.  And then what did you do after leaving the
11  Guard?
12  A.  I became employed.
13  Q.  Where was that?
14  A.  Marlin Industries.
15  Q.  Could you spell that, please?
16  A.  M-A-R-L-I-N.
17  Q.  How long were you there?
18  A.  Six months.
19  Q.  What did you do there?
20  A.  I was a personnel manager and internal auditor.
21  Q.  Why did you leave?
22  A.  Better opportunity.
23  Q.  So where did you go next?
24  A.  To Costco.
25  Q.  Is this the retail chain we're familiar with?

**Page 9**

1  A.  No.
2  Q.  What was Costco when you were there?
3  A.  It was a manufacturer of office furniture.
4  Q.  How long were you there?
5  A.  Three years.
6  Q.  What did you do there?
7  A.  Cost accountant.
8  Q.  Anything else?
9  A.  And controller.
10  Q.  What was your title at the time you left?
11  A.  Controller.
12  Q.  Of the entire company?
13  A.  The division.
14  Q.  How many people reported to you?
15  A.  Ten.
16  Q.  What were the years you were employed at
17  Costco, approximately?
18  A.  1971 to -- no, excuse me. '73 to '75.
19  Q.  And why did you leave Costco?
20  A.  Better opportunity.
21  Q.  Where was that?
22  A.  Better Built Aluminum.
23  Q.  Let me back up. Marlin Industries, where was
24  that located?
25  A.  Hartsville, Tennessee.

| | | | | |
|---|---|---|---|---|
| 1 | Q. | Where was Costco, your division located? | 1 | A. | No. |

1  Q.   Where was Costco, your division located?
2  A.   Gallatin, Tennessee.
3  Q.   And where was Better Built Aluminum located?
4  A.   Smyrna, Tennessee.
5  Q.   What?
6  A.   Smyrna, S-M-Y-R-N-A.
7  Q.   Dealing with a novice to Tennessee geography.
8  What did you do at Better Built Aluminum?
9  A.   Controller.
10  Q.   How long were you there?
11  A.   Two years.
12  Q.   So approximately '75 to '76, '77?
13  A.   Uh-huh.
14  Q.   That was a yes?
15  A.   Yes.
16  Q.   And where did you go after Better Built
17  Aluminum?
18  A.   Back to Costco.
19  Q.   And, again, that was because it was a better
20  opportunity?
21  A.   Yes.
22  Q.   The same division, with their office furniture
23  division?
24  A.   Yes.
25  Q.   What was your title when you returned to

Page 10

1  Costco?
2  A.   Controller.
3  Q.   You seem -- there may be more to the story?
4  Was it more than returning to your old job, did you
5  have additional responsibilities.
6  A.   Costco had sold and it had multiple divisions,
7  it had desks, filing cabinets and office chairs, if you
8  will. It had sold to GF Fire Proofing. So the desk
9  and file division spun off to the chair division. So I
10  went to the new chair division.
11  Q.   The new chair division?
12  A.   Yes. It wasn't really part of Costco. It
13  became Globe Industries, Costco Globe.
14  Q.   Lobe, L-O-B-E?
15  A.   G-L-O-B-E.
16  Q.   Okay. So who signed your paycheck, was it
17  Costco or somebody else?
18  A.   Costco Globe.
19  Q.   And how long did you stay at Costco Globe?
20  A.   Two years.
21  Q.   And you left for a better opportunity, I
22  presume?
23  A.   Yes.
24  Q.   All of these earlier terminations, were any of
25  them poor terms, were --

Page 11

1  A.   No.
2  Q.   -- they other than amicable?
3  A.   No.
4  Q.   What did you do after you left Costco Globe the
5  second time?
6  A.   I became a partner in a CPA firm.
7  Q.   How long were you a partner with that firm?
8  A.   Two years.
9  Q.   What was the name of that firm?
10  A.   Johnson and Winter.
11  Q.   And where was that located?
12  A.   Gallatin.
13  Q.   And just stepping back for a second, when you
14  were with Costco Globe, was that also still in
15  Gallatin?
16  A.   It was in Hendersonville.
17  Q.   Why did you leave the partnership of the CPA
18  firm?
19  A.   It sold.
20  Q.   Was that parting with your partners, was that
21  dissolution on amicable terms?
22  A.   No.
23  Q.   No?
24  A.   We sold it.
25  Q.   It was an amicable --

Page 12

1  A.   Yes.
2  Q.   -- dissolution of the partnership?
3  A.   Yes.
4  Q.   No litigation or anything resulted from that?
5  A.   No.
6  Q.   Where did you go after leaving Johnson and
7  Winters?
8  A.   I worked for the acquirers.
9  Q.   Who acquired the company?
10  A.   Daniel and Henderson.
11  Q.   For how long did you work for Daniel and
12  Henderson?
13  A.   One year.
14  Q.   Did you retain equity in the company?
15  A.   No.
16  Q.   Or were you an employee?
17  A.   Employee.
18  Q.   What did you do after leaving Daniel and
19  Henderson?
20  A.   Worked for Glass Unlimited.
21  Q.   For how long were you with Glass Unlimited?
22  A.   Two years.
23  Q.   What was your title there?
24  A.   Systems analyst.
25  Q.   What did Glass Unlimited do?

Page 13

4 (Pages 10 to 13)

1   A.    It wholesaled auto glass.
2   Q.    What timeframe are we talking now?  For what
3   years were you at Glass Unlimited?
4   A.    We were probably at '85.  No.  Yeah.  No, it
5   couldn't be there.
6   Q.    Just by frame of reference, I believe the
7   answer to the complaint admits that you were at
8   American Medical Centers in 1983?
9   A.    Right.  I was at American Medical Centers from
10  '81 to '84.  So probably it would have been '79, '80
11  timeframe with Glass Unlimited.
12  Q.    Okay.  Where did you go after Glass Unlimited?
13  A.    Advanced Information Concepts.
14  Q.    Before American Medical Centers?
15  A.    No.  I'm sorry.  American Medical Centers was
16  after Glass Unlimited.
17  Q.    Okay.  So let me just run down my notes here?
18  A.    Okay.
19  Q.    It appears that you were -- not appears, you
20  testified that after leaving the Guard you worked for
21  Marlin Industries for about six months, then Costco
22  Manufacturing for about three years where you were its
23  controller.  And then moved to Better Built Aluminum
24  for better opportunities as its controller for two
25  years.  Then went back to your previous employer, which

Page 14

1   had undergone some structural transformation?
2   A.    Uh-huh.
3   Q.    Costco Globe, and you were that entity's
4   controller for about two years.  And then you had a bit
5   of a change and became a partner in a private public
6   accounting firm?
7   A.    (Witness nods head).
8   Q.    In Gallatin for about two years.  That firm
9   sold, you worked for the acquirers, Daniel and
10  Henderson, for about a years and then in around 1979
11  you went to work for Glass Unlimited as a systems
12  analyst?
13  A.    (Witness nods head).
14  Q.    And then following that you went to American
15  Medical Centers; is that correct?
16  A.    That's correct.
17  Q.    Okay.  Now, out of all of those things I've
18  just discussed can you tell me when you began
19  programming computers?
20  A.    With the CPA firm, Johnson and...
21  Q.    What sort of programs did you create while at
22  Johnson and Winters?
23  A.    Basically accounting client writeup
24  applications.
25  Q.    Did you take any classes to prepare you to do

Page 15

1   this programming?
2   A.    Yes.
3   Q.    Where were those?
4   A.    IBM.
5   Q.    When was that?
6   A.    It was during the time I was at Globe.  So what
7   was that, '76.
8   Q.    While you were at Globe the second time?
9   A.    Yes.
10  Q.    Do you remember the name of the class?
11  A.    Not specifically.  It was RPG programming.
12  Q.    It was RPG programming?
13  A.    Yes.
14  Q.    How long was the class?
15  A.    A week.
16  Q.    One week?
17  A.    Uh-huh.
18  Q.    Do you remember where it was?
19  A.    Atlanta.
20  Q.    So you went up and stayed in a hotel and took a
21  class for a week?
22  A.    Went down and stayed in a hotel.
23  Q.    Down.  Did you have any other classes in
24  computer programming other than that one-week class in
25  Atlanta?

Page 16

1   A.    No.
2   Q.    During this time have you attended any other
3   institutions or received any other degrees; I'm talking
4   education?
5   A.    Yes.
6   Q.    Where was that?
7   A.    I have no idea.
8   Q.    I'm sorry.  May I -- maybe I should rephrase.
9   A.    Okay.
10  Q.    Have you formally pursued further education
11  after graduating from Middle Tennessee State University
12  other than the IBM classes?
13  A.    Yes.
14  Q.    Where was that?
15  A.    University of Tennessee.
16  Q.    And what was the course work there?
17  A.    Accounting.
18  Q.    And was that a -- when was this?
19  A.    '68 to '70.
20  Q.    This was before graduating from Middle
21  Tennessee State University?
22  A.    Yes.  Excuse me.
23  Q.    Shortly after your graduating did you take
24  accounting classes?
25  A.    Yes.

Page 17

5 (Pages 14 to 17)

1  Q.    After you graduated from Middle Tennessee State
2  University -- was it before or after you were in the
3  Guard?
4         MR. DENNEN:  If you are saying did he go
5  to the University of Tennessee before or after he was
6  in the National Guard, is that -- I assume that's the
7  question.
8  BY MR. SMITH:
9  Q.    That's the question, yes.
10 A.    I went to Middle Tennessee before I was in the
11 Guard.
12 Q.    Maybe I'm confused.  Middle Tennessee State is
13 different from the University of Tennessee; correct?
14 A.    Yes.
15 Q.    When did you attend the University of
16 Tennessee?
17 A.    I took courses while I was at Globe Costco.
18 Q.    Okay.
19 A.    Whenever that was.
20 Q.    Now, that would have been, according to my
21 timeline, after Better Built Aluminum and before your
22 partnership in the CPA firm?
23 A.    It was before Better Built Aluminum.  I was at
24 Costco.
25 Q.    Costco the first time, '73 to '75?

Page 18

1  A.    Yes.
2  Q.    Okay.  And did you receive any degree as a
3  result of those accounting classes?
4  A.    No.
5  Q.    Did those accounting classes involve computer
6  programming?
7  A.    No.
8  Q.    And I may have already asked this, but I want
9  to make sure, other than that one week of computer
10 programming classes in Atlanta at IBM, since that time
11 have you taken any formal classes in computer
12 programming?
13 A.    No.
14 Q.    Any informal classes, seminars, things like
15 that?
16 A.    No.
17 Q.    Okay.  Let's focus on what you did at American
18 Medical Centers, which I will call AMC.  Why did you go
19 to American Medical Centers?
20 A.    Better opportunity.
21 Q.    What was your title there?
22 A.    Systems analyst.
23 Q.    Did you have any other titles during the time
24 you were there?
25 A.    I was area VP, or AVP.

Page 19

1  Q.    What is that, area AVP or just AVP?
2  A.    AVP.
3  Q.    Would that be area vice president?
4  A.    Yes.
5  Q.    Of what were you vice president?
6  A.    Financials, operations for three hospitals.
7  Q.    Now, at American Medical Centers, did you have
8  any responsibilities with respect to financial
9  operations?
10 A.    Area vice president.
11 Q.    Okay.
12 A.    For three hospitals.
13 Q.    But your title was systems analyst?
14 A.    Yes.
15 Q.    Did you ever carry the title chief financial
16 officer?
17 A.    No.
18 Q.    What were those three hospitals that you were
19 in charge of their financial operations?
20 A.    Ocala Medical Center.
21 Q.    Where was that?
22 A.    Ocala, Florida.
23 Q.    What was the second one?
24 A.    Grant Medical Centers.
25 Q.    Where was that?

Page 20

1  A.    Miami.
2  Q.    What about the third one?
3  A.    I don't remember.
4  Q.    Was it also in Florida?
5  A.    I believe it was in Georgia.
6  Q.    Were these three hospitals owned by a common
7  entity?
8  A.    American Medical Centers.
9  Q.    How many hospitals did American Medical Centers
10 own?
11 A.    Seventeen.
12 Q.    And you managed the financial operations of
13 these three hospitals from Tennessee?
14 A.    No.
15 Q.    Was AMC based here in Nashville?
16 A.    Yes.
17 Q.    Did you supervise people on site at these
18 hospitals from Nashville?
19 A.    Yes.
20 Q.    And did those people whom you supervised have
21 day-to-day responsibility for managing financial
22 affairs for those hospitals?
23 A.    Yes.
24 Q.    Your operations as an AVP, did they include --
25 what did they include other than managing financial

Page 21

6 (Pages 18 to 21)

1  operations?
2  A.    That was it.
3  Q.    Okay.  What percentage of your time, roughly --
4  well, let me back up.
5        When you came on with American Medical Centers
6  were you brought in as a systems analyst?
7  A.    Yes.
8  Q.    And, at that time that you began, were you
9  brought in as an AVP for these three hospitals?
10  A.    No.
11  Q.    When did your responsibilities come to include
12  AVP for the three hospitals?
13  A.    Probably '83.
14  Q.    And, again, you were at American Medical
15  Centers from 1981 to 1984?
16  A.    Uh-huh.
17  Q.    Prior to 1983?
18        MR. DENNEN:  One moment, Tom.  You need to
19  remember to answer so he can take that down.
20        THE WITNESS:  Yes.
21        MR. SMITH:  Thank you, Keith.
22  BY MR. SMITH:
23  Q.    Prior to 1983 were your duties substantially
24  concentrated on systems analysis?
25  A.    Yes.

Page 22

1  Q.    What does a systems analyst do or more
2  specifically, what did you do as a systems analyst at
3  American Medical Centers?
4  A.    I implemented the computer systems.
5  Q.    Which computer systems?
6  A.    The IBM Hospital Financial Management System.
7  Q.    The IBM Hospital?
8  A.    Financial Management System.
9  Q.    And you implemented them where?
10  A.    To the hospitals.
11  Q.    At the hospitals?
12  A.    That were owned by AMC.
13  Q.    At all 17 of the hospitals?
14  A.    Yes.
15  Q.    Do you recall the name of the IBM Hospital
16  Financial Management Software?
17  A.    Hospital Financial -- HFMS.
18  Q.    Did you have experience in hospitals and
19  hospital finance before taking this job?
20  A.    No.
21  Q.    You mentioned that you began doing computer
22  programming while at Johnson and Winters; is that
23  correct?
24  A.    Yes.
25  Q.    And then when you went to work for the

Page 23

1  acquirers, Daniel and Henderson, did you continue doing
2  systems analysis work?
3  A.    Yes.
4  Q.    Now, just to make sure I understand, I said
5  systems analysis work.  Were you also doing actual
6  programming at Daniel and Henderson?
7  A.    Yes.
8  Q.    So the answer is you were doing both systems
9  analysis and programming?
10  A.    Yes.
11  Q.    At Glass Unlimited your title, I believe you
12  said, was systems analyst; correct?
13  A.    Yes.
14  Q.    Were you also doing actual programming at Glass
15  Unlimited?
16  A.    Yes.
17  Q.    In what language were you programming at Glass
18  Unlimited?
19  A.    RPG.
20  Q.    What kind of reports were you programming to
21  create?
22  A.    General ledger, accounts payable, accounts
23  receivable, inventory control, fixed assets.
24  Q.    The same question for Daniel and Henderson.
25  What sort of applications did you program?

Page 24

1  A.    Writeup.
2  Q.    What does that mean?
3  A.    Accounting, balance sheet, income statements.
4  Q.    Were you working from some other vendor's
5  off-the-shelf system?
6  A.    Yes.
7  Q.    What vendor was that?
8  A.    IBM.
9  Q.    They had a software program for accounting?
10  A.    Client Accounting Financial Systems, CAFRS, I
11  think was the acronym.
12  Q.    And you would take that, you are familiar with
13  the term off the shelf?
14  A.    Yes.
15  Q.    You would take that off-the-shelf program and
16  modify it or adapt it in ways that furthered Daniel and
17  Henderson's goals?
18  A.    Yes.
19  Q.    Same question with Glass Unlimited, did you
20  program from scratch or did you work with something
21  that was preexisting?
22  A.    Preexisting.
23  Q.    Was what the name of the preexisting program
24  and where did it come from?
25  A.    I don't know.

Page 25

7 (Pages 22 to 25)

1  Q.    It was something that was available free or was
2  it something that Glass Unlimited purchased?
3  A.    It was purchased.
4  Q.    And at Glass Unlimited you would take that
5  purchase code and modify it to further the interests
6  and needs of Glass Unlimited?
7  A.    Yes.
8        MR. DENNEN:  Object to the form of the
9  question.
10 BY MR. SMITH:
11 Q.    At American Medical Centers you testified you
12 worked with the HFMS software provided by IBM. Can you
13 explain in layman's terms the difference between a
14 systems analyst and programmer for me, please?
15 A.    Analysis looks at the business process and
16 determines computer requirements, programming needs for
17 the business.
18 Q.    Uh-huh.
19 A.    A programmer actually writes the code to
20 execute, to perform those business processes.
21 Q.    As a systems analyst at AMC did you program?
22 A.    Yes.
23 Q.    What percent of your time was spent
24 programming, and before you answer, you've also
25 testified that you were also doing systems analysis,

Page 26

1  HFMS foundation?
2  A.    Yes.
3  Q.    You mentioned DRG, that stands for Diagnosis
4  Related Group?
5  A.    That's correct.
6  Q.    With the DRG programming, was that related to
7  HFMS?
8  A.    No.
9  Q.    When did you first begin programming for DRG
10 applications?
11 A.    In '83.
12 Q.    Why?
13 A.    Because DRGs were being implemented.
14 Q.    Did you take an existing program from another
15 source and modify it?
16 A.    Yes.
17 Q.    Where did you get that?
18 A.    I believe the company was HSI.  It came out of
19 the Yale study.
20 Q.    Was the name of that application called a DRG
21 grouper?
22 A.    Yes.
23 Q.    And what did you do with HSI's program, if you
24 recall?
25 A.    I converted it from OS assembler to RPG.

Page 28

1  and you've also testified you were an AVP with
2  financial operations. So taking that into account,
3  what percent of your time was spent programming while
4  at AMC?
5  A.    Can I put this in context?
6  Q.    Please.
7  A.    Okay. The first, prior to becoming AVP, which
8  was only for six months, probably 80 percent was in
9  analysis and programming.
10 Q.    Is it possible for you to further break that
11 down as between analysis and programming, what that
12 breakdown is?
13 A.    It would be -- I have no idea.
14 Q.    Okay. Was the programming that you were doing
15 at AMC, was that -- I'll ask it differently.
16       What was your programming, what were you
17 programming while at AMC?
18 A.    Primarily corporate consolidation, general
19 ledger statistics, DRGs, fixed assets and various
20 enhancements to the HFMS.
21 Q.    When you say corporate consolidation, that
22 would be using the HFMS system?
23 A.    Yes.
24 Q.    The same with general ledger and statistics and
25 fixed assets, would all those be based on or employ the

Page 27

1  Q.    Were you aware of any source that had a DRG
2  grouper that was already running on RPG?
3  A.    No.
4  Q.    You testified that AMC owned 17 hospitals.
5  Were these for profit hospitals?
6  A.    Yes.
7  Q.    And was the primary business purpose of AMC to
8  make money by owning and operating hospitals?
9  A.    No.
10 Q.    What was the primary purpose of AMC?
11 A.    To provide healthcare.
12 Q.    It would be providing healthcare to its 17
13 hospitals?
14 A.    Yes.
15 Q.    It's business purpose was to own and operate
16 hospitals?
17 A.    That's correct.
18 Q.    Did it manage any hospitals that were owned by
19 other entities?
20 A.    No.
21 Q.    During the time you were there did the number
22 of hospitals that it owned fluctuate?
23 A.    Yes.
24 Q.    How did that fluctuate?
25 A.    We were acquiring hospitals.

Page 29

8 (Pages 26 to 29)

1  Q.    Do you remember how many you had when you
2  began?
3  A.    Five.
4  Q.    And it had 17 when you left?
5  A.    Yes.
6  Q.    And so the customers of AMC were individual
7  patients; is that correct?
8  A.    That's correct.
9  Q.    Who was the person to whom you reported at
10  American Medical Centers?
11  A.    Paul Agee.
12  Q.    Throughout the whole time?
13  A.    Yes.
14  Q.    How many people did you supervise while at AMC?
15  A.    Directly, two.
16  Q.    Who were they?
17  A.    Mike Hayes and Mary Lee Bunch.
18  Q.    What was Mike Hayes' title?
19  A.    Programmer.
20  Q.    And what was Mary Lee Bunch's title?
21  A.    Documentation specialist.
22  Q.    Did they do any programming?
23  A.    No.
24  Q.    Were there other people who programmed at AMC
25  other than you and Mike Hayes?

Page 30

1  A.    No.
2  Q.    When did Mike Hayes begin, if you recall?
3  A.    '83.
4  Q.    When did you leave AMC?
5  A.    '84.
6  Q.    Do you remember the month?
7  A.    No.
8  Q.    Do you remember the time of year?
9  A.    Spring.
10  Q.    When you programmed at AMC, in what languages
11  did you program?
12  A.    RPG.
13  Q.    In what languages did Mike Hayes program?
14  A.    RPG.
15  Q.    What programs, what applications did Mike Hayes
16  work on while you were there?
17  A.    All the applications I mentioned.
18  Q.    Did you write a medical records software
19  program?
20  A.    Yes.
21  Q.    When did you first conceive a medical records
22  program?
23  A.    '82.
24  Q.    When did you begin to program it?
25  A.    '82.

Page 31

1  Q.    Was this as part of your responsibilities at
2  AMC?
3  A.    Yes.
4  Q.    You didn't mention medical records before.  Was
5  that an oversight?
6  A.    Well, DRGs, in essence, was a part of the
7  Medical Records product, if you will.
8  Q.    So while you were at AMC you worked on
9  corporate consolidation, general ledger, statistics,
10  DRGs, as part of a larger medical records, fixed assets
11  and various enhancements to the HFMS financial
12  management system.  Is there any other application that
13  you worked on while at AMC other than the ones I said?
14  A.    Say those again.
15  Q.    Corporate consolidation, general ledger, I'm
16  sure accounts payable, all the HFMS functions,
17  statistics, DRGs, medical records, fixed assets and
18  various enhancements to HFMS?
19  A.    Yes.
20  Q.    What other applications did you work on other
21  than those I just said?
22  A.    Did you say fixed assets?
23  Q.    Yes, sir.
24  A.    I don't know.
25  Q.    Or you can't recall?

Page 32

1  A.    Yeah.
2  Q.    Realizing that many years have passed, but how
3  much time between the responsibilities that we talked
4  about earlier, how much time did you devote to Medical
5  Records as a percent of the time you were devoting to
6  programming generally?
7  A.    I don't know.
8  Q.    Was it more than half?
9  A.    No.  Again, can I put it in context?
10  Q.    Yes.
11  A.    The period when DRGs were announced, that
12  timeframe was post four months, probably 75 percent of
13  my time was on DRGs.
14  Q.    This was immediately after it was announced
15  that Medicaid or Medicare --
16  A.    Medicare --
17  Q.    -- was going to require DRGs?
18      MR. DENNEN:  Let him finish his question
19  before you start to answer his question, Tom.
20      THE WITNESS:  I'm sorry.  Go ahead.
21  BY MR. SMITH:
22  Q.    Did the news that DRGs were going to become an
23  integral part of hospital finance, is that what
24  prompted you to begin looking at DRGs and Medical
25  Records?

Page 33

9 (Pages 30 to 33)

1    A.    Yes.
2    Q.    Was this your idea to pursue this or was it
3    someone else's at AMC?
4          MR. DENNEN:  When you say this, I don't
5    think that's clear.
6          MR. SMITH:  Thank you.
7    BY MR. SMITH:
8    Q.    Was it your idea to pursue DRG in Medical
9    Records applications at AMC or was it someone else's
10   idea to program these applications?
11   A.    It was a group decision.
12   Q.    Would Paul Agee have been in that group?
13   A.    Yes.
14   Q.    Anyone else?
15   A.    Yes.
16   Q.    Who?
17   A.    I don't recall.
18   Q.    What was Paul Agee's title while at AMC?
19   A.    Chief financial officer.
20   Q.    Would this have been a decision that had the
21   attention of the president?
22   A.    Yes.
23   Q.    Would the president have been in the group as
24   well that decided to pursue this?
25   A.    Not directly.

Page 34

1    A.    No.
2    Q.    Was this something that was a project that you
3    undertook as a champion, as an independent effort, or
4    was this something that you were instructed to do or
5    some combination?  Did you understand the question?
6    A.    I'm not sure I did.
7    Q.    I'm trying to get a feel for whose idea this
8    was and who spearheaded it, and were you being pushed
9    to do this or were you independently in the lead doing
10   it yourself, and when I say this, I'm talking about the
11   medical records in DRG applications?
12   A.    Again, it was a group effort.
13   Q.    You believed it was the right thing to do;
14   correct?
15         MR. DENNEN:  Object to the form of the
16   question.  I don't believe that's been his testimony.
17   BY MR. SMITH:
18   Q.    Did you believe it was the right thing to do?
19   A.    Yes.
20   Q.    When you began programming DRG grouper in the
21   medical records applications, how did you begin?  Let
22   me rephrase.
23         Did you begin with the DRG grouper program?
24   A.    Yes.
25   Q.    What did you do in terms of the process?  What

Page 36

1    Q.    All right.  That person may have had knowledge
2    of it?
3    A.    That's correct.
4    Q.    Is it fair to say that that AMC endorsed the
5    decision to pursue DRG in medical records applications?
6          MR. DENNEN:  Object to the form of the
7    question.  You can testify if you know the answer.
8    BY MR. SMITH:
9    Q.    Do you want me to repeat the question?
10   A.    Yes.
11   Q.    Did AMC endorse the effort to develop a medical
12   records and DRG application?
13         MR. DENNEN:  Same objection.  Counsel, I
14   think when you say did AMC, you are referring to a
15   corporation.  If there is a specific body within that
16   corporation you wish to specify, I think that may make
17   it easier to answer the question.
18   BY MR. SMITH:
19   Q.    Did AMC's management know that you were
20   pursuing DRG in medical records applications?
21   A.    Yes.
22   Q.    Were they supportive of your efforts?
23   A.    I assume.
24   Q.    Did they say anything to lead you to believe
25   they did not support your efforts?

Page 35

1    was the process in programming the DRG in medical
2    records applications?
3    A.    I'm not sure I know how to answer that
4    question.  I will respond based off what I... the
5    process, when you say medical records, it's abstracting
6    the statistical system that captures diagnosis and then
7    is able to sort those diagnoses in order to list
8    patients with those diagnoses.
9    Q.    Uh-huh.
10   A.    That was really a part of our patient
11   accounting system.
12   Q.    Uh-huh.
13   A.    As it began.
14   Q.    Uh-huh.
15   A.    DRGs would capture those diagnoses, and through
16   the grouper process --
17   Q.    Uh-huh.
18   A.    -- convert those to a diagnosis related group.
19   Q.    Uh-huh.
20   A.    Diagnosis related groups then determined the
21   payment system.  So then there was a pricer program.
22   Q.    The medical records programs that you worked on
23   while at AMC, did they include management reports?
24   A.    Yes.
25   Q.    Did they include management reports providing

Page 37

1  statistics of the number of patients that had been
2  admitted by, say, financial class?
3  A.    Yes.
4  Q.    And did it include the same sort of summary
5  information by physician?
6  A.    Yes.
7  Q.    And did it include the same sort of summary
8  information by, say, service code, the service that was
9  provided?
10  A.    Yes.
11  Q.    And did it include an executive summary,
12  summarizing in perhaps one page --
13  A.    No.
14  Q.    -- things that were happening at the hospital?
15  A.    No.
16  Q.    Before leaving AMC did you have a functional
17  medical records program that would perform the
18  applications that you have just testified were
19  included?
20        MR. DENNEN:  I'm going to object to the
21  form of the question.  I don't know that the word
22  functional, I think it's meaningless.  You can answer
23  the question.
24  BY MR. SMITH:
25  Q.    Well, I can clarify it.  By functional, I mean
                                                    Page 38

1  that it could be installed in a hospital and would
2  produce reports.
3  A.    It produced what we wanted, what AMC wanted.
4  Q.    So it was able to provide enough data that you
5  could read the reports?
6  A.    That's correct.
7  Q.    Did AMC install the DRG grouper at any of its
8  hospitals?
9  A.    Yes.
10  Q.    How many of them?
11  A.    Nine.
12  Q.    Including all three that you were in charge of?
13  A.    Yes -- no.
14  Q.    Okay.  Which one was --
15  A.    I apologize.
16  Q.    Which one was omitted from the three or how
17  many?
18  A.    The Ocala and the Grant.
19  Q.    Ocala and Grant were omitted or they were
20  installed?
21  A.    They were not installed with the DRG group.
22  Q.    Okay.  So the one we can't remember the name is
23  the one where it was installed?
24  A.    I assume it was installed.
25  Q.    You say assume.  You don't have personal
                                                    Page 39

1  knowledge?
2  A.    I'm sorry.  I don't recall.
3  Q.    Were you the main programmer on the DRG
4  grouper.
5  A.    Yes.
6  Q.    Do you know why the DRG grouper was not
7  installed at Ocala and Grant?
8  A.    Yes.
9  Q.    Why?
10  A.    They were psychiatric hospitals.
11  Q.    Okay.  The nine hospitals in which the DRG was
12  installed, were those hospitals not focused on
13  psychiatry?
14  A.    That's correct.
15  Q.    And by psychiatry, is it fair to classify that
16  as rehabilitation, is that a class of hospitals that is
17  treated differently by DRGs?
18  A.    Yes.
19  Q.    Now, we talked about the DRG grouper.  Did AMC
20  also install the medical records reporting programs at
21  any of its hospitals?
22  A.    Yes.
23  Q.    Would those have been installed at the same
24  nine hospitals?
25  A.    They would have been in all hospitals.
                                                    Page 40

1  Q.    All 17?
2  A.    All 17.
3  Q.    When was that installed?
4        MR. DENNEN:  When you say that, what do
5  you mean?
6  BY MR. SMITH:
7  Q.    When was the medical records application
8  installed at the 17 AMC hospitals?
9  A.    '82.
10  Q.    Earlier you testified that you began working on
11  the program in 1982.  Does that change your answer?
12  A.    No.
13  Q.    Did AMC install its DRG grouper at any other
14  hospital other than the nine that you've testified?
15  A.    I don't recall.
16  Q.    Did it market its DRG grouper to any other
17  hospital other than the ones it owned?
18  A.    No.
19  Q.    Same question with the Medical Records, did AMC
20  market its Medical Records applications to any hospital
21  that was not owned by AMC?
22  A.    No.
23  Q.    What happened to AMC?
24  A.    It sold.
25  Q.    To whom?
                                                    Page 41

11 (Pages 38 to 41)

1   A.      Forum Group.
2   Q.      And was the Forum Group affiliated with another
3   entity?
4   A.      Yes.
5   Q.      With what entity was it affiliated?
6   A.      Let me ask you to repeat the question.
7   Q.      Okay.
8   A.      Explain to me affiliated.
9   Q.      Do you recall reviewing some interrogatories
10  that were questions that were asked in the form of
11  interrogatories in this case, providing answers in
12  about the middle of March?
13  A.      I don't recall a specific date; I recall some
14  questions.
15  Q.      One of the questions was, identify every
16  hospital that installed medical records software
17  provided by you or American Medical Centers prior to
18  1986. And you answered Givens does not possess
19  American Medical Centers' records nor possess
20  sufficient information or knowledge after 20 years to
21  recall the names of these hospitals. In approximately
22  1984, '85, Givens believes Advanced Information
23  Concepts, AIC, was contracted to provide some support
24  for four or five hospitals which had been sold to HCA.
25  These hospitals had some but not all of the medical

1   records code?
2           MR. DENNEN: Answer the question. Do you
3   recall that, Tom?
4   BY MR. SMITH:
5   Q.      Do you recall that question?
6   A.      Yes.
7   Q.      And that answer?
8   A.      Yes.
9   Q.      And what I would like to do is reconcile, if
10  possible, or give you an opportunity to correct the
11  record, if there is any inconsistency or confusion.
12  You testified that medical records was installed at all
13  17 of AMC's hospitals prior to 1983; is that correct?
14  A.      I'm afraid we've got a definition problem.
15  Q.      Okay. Let's fix it.
16  A.      Okay.
17  Q.      Better to fix it right here.
18  A.      Yeah. I used the term medical records to
19  describe a system that reported statistics, number of
20  admissions by financial class, number of admissions by
21  hospital service.
22  Q.      Right?
23  A.      Number of admissions by doctor.
24  Q.      Right.
25  A.      Diagnosis --

1   Q.      Right.
2   A.      -- by doctors.
3   Q.      Right.
4   A.      That is also included as a part of the
5   financial package, when you admit a patient by its
6   nature, you capture that information. So statistically
7   reporting that data came out of the financial system.
8   Medical records, per say, in that we took the HFMS
9   product where that data was being captured and sorted
10  those reports down to give us that information.
11  Q.      Okay. That's what AMC did for its 17
12  hospitals?
13  A.      Uh-huh, that's correct. And I'm using the term
14  medical records to describe that particular function.
15  Q.      Okay. The answer to the interrogatory, what
16  did you mean by medical records in that instant?
17          MR. DENNEN: I'm going to object. If you
18  want to have him review the interrogatory and
19  definition of medical records.
20          MR. SMITH: Sure.
21          MR. DENNEN: We're happy to take that
22  time.
23          MR. SMITH: Sure. Can we go off the
24  record, please?
25          (Discussion off the record.)

1   BY MR. SMITH:
2   Q.      While we were on the break, Mr. Givens, you had
3   an opportunity to review your interrogatories, and let
4   me re-ask my question, which was, can you explain the
5   inconsistency in your answers here today and your
6   answer on the interrogatories with respect to the
7   hospitals which installed medical records?
8   A.      The items that we were discussing there were
9   how many.
10  Q.      When you say there, forgive me for
11  interrupting, you are talking about in the
12  interrogatories?
13  A.      The definition of the medical records, I assume
14  in this question related to the software in dispute,
15  and that there were about five, or some number in some
16  hospitals that was installed, you know, sometime, you
17  know, late '83 or so in some of the hospitals.
18  Q.      Okay.
19          MR. DENNEN: Now, Counsel, I'm going to
20  make a further statement which is one of our objections
21  was, the meaning of the words or term medical records
22  software as it is currently defined in the hospital
23  industry can have a meaning of any software ever
24  applying to medical records because it's all medical
25  records. It also has a meaning commonly now referred

1  to as what would be the patient record, which obviously
2  I think we have to separate ourselves from what is
3  understood to be medical records today, and remember
4  that in 2006 electronic medical records means something
5  totally different from what it meant in 1982 and '83
6  because of the lack of sophistication of the systems.
7  With that statement, I'm going to also object to the
8  use of the word inconsistency because the terms are not
9  inconsistent. I think you have a definition,
10 Mr. Givens has a definition and we merely have a
11 situation where the definitions utilized are not
12 consistent. However, he's explained his understanding
13 of the definition and you have the opportunity to
14 provide your definition and ask him questions.
15      MR. SMITH: Well enough.
16 BY MR. SMITH:
17 Q.    Before we take a break, let me just finish up
18 this issue and then I think we can move on to a new
19 topic. The medical records which your interrogatory
20 answer refers to, just to be clear, that refers to the
21 software that plaintiff claims was infringed?
22 A.    That's correct.
23 Q.    In your earlier answers when you were talking
24 about the medical records that were installed at 17
25 hospitals, that relates to software that processes some

Page 46

1  of the statistics and produces reports on these
2  statistics, but all of those answers, all of your
3  answers do not relate to the software that Mr. Goldman
4  claims is infringed; is that correct?
5  A.    That's correct.
6  Q.    So the software that was installed at these 17
7  AMC hospitals, did that -- did any of that medical
8  records code include any of the code that plaintiff
9  claims is infringed in this lawsuit?
10 A.    In '83 after the group was finished is when we
11 began to install software that is in dispute.
12 Q.    Okay. So it was installed at -- was it
13 installed at all 17 hospitals?
14 A.    No.
15 Q.    Was it installed at approximately five
16 hospitals, then?
17 A.    To the best of my recollection.
18 Q.    That's a yes?
19 A.    No, that's to the best of my recollection.
20 Q.    But the answer is affirmative, is a yes, to the
21 best of your recollection it was installed at
22 approximately five hospitals?
23 A.    That's correct.
24 Q.    And those five hospitals were sold to a company
25 called HCA?

Page 47

1  A.    In a subsequent event, yes.
2  Q.    Who owned them before they were sold to HCA?
3  A.    Forum Group.
4  Q.    And who owned them before Forum Group?
5  A.    American Medical Centers.
6  Q.    And at what stage was the software, the medical
7  record software in dispute installed? Was it while the
8  hospitals were owned by AMC, while the hospitals were
9  owned by the Forum Group, or while the hospitals were
10 owned by HCA?
11 A.    By the Forum Group.
12 Q.    How long did the Forum Group own these
13 hospitals?
14 A.    I can't give you a definite time.
15 Q.    When did the Forum Group acquire the hospitals?
16 A.    I can't give you an exact date.
17 Q.    Was it while you were at AMC?
18 A.    Yes.
19 Q.    So it was sometime between '81 and '84?
20 A.    Yes.
21 Q.    And you have an approximate year when HCA
22 acquired the hospitals?
23 A.    Yes.
24 Q.    Approximately what year?
25 A.    '85.

Page 48

1  Q.    Going back to -- we should get a new term for
2  this.
3  A.    When were we going to take that break?
4  Q.    It's a famous lawyer's statement, I have one
5  last question, but we will.
6       The medical records that you worked on while at
7  AMC that were not part of the software at issue in this
8  lawsuit, maybe we call that AMC's -- we call that AMC's
9  self-developed medical records.
10 A.    Okay.
11 Q.    Is that an apt description?
12 A.    However you define it.
13 Q.    So AMC's self-developed medical records
14 programs, was that basically an enhancement of the
15 capabilities of patient accounting and HFMS?
16 A.    Yes.
17 Q.    Just a second.
18      (Recess taken.)
19 BY MR. SMITH:
20 Q.    Mr. Givens, we're back from our break and we
21 would like to move to a slightly different topic, your
22 interactions with Joel Goldman before today.
23 A.    Okay.
24 Q.    Have you met Mr. Goldman before this morning?
25 A.    Yes.

Page 49

13 (Pages 46 to 49)

1  Q.   Do you recall when you first met him?
2  A.   No.
3  Q.   Do you recall meeting in Miami?
4  A.   No.
5  Q.   Do you recall perhaps being in a bar in Miami
6  meeting with a fellow -- Joel Goldman and a fellow
7  named Tom McDougal?
8  A.   No.
9  Q.   Conversations about prisons and the medical
10  records system being necessary in prisons?
11  A.   No.
12  Q.   Do you recall -- what is the first event that
13  you recall between you and Mr. Goldman?
14  A.   The AMC office in Nashville.
15  Q.   Who set that up?
16  A.   I don't recall.
17  Q.   When was that?
18  A.   I don't recall.
19  Q.   Over what span of time did you meet with
20  Mr. Givens in Nashville -- I'm sorry -- Mr. Joel
21  Goldman?
22  A.   I don't recall.
23  Q.   Was it more than one day?
24  A.   Yes.
25  Q.   Do you have any reason to believe it was not

Page 50

1  Spring 1983?
2  A.   No.
3  Q.   What was the purpose of the meeting?
4  A.   To review a software application.
5  Q.   What software application?
6  A.   Patient accounting, general ledger, accounts
7  payable, medical records defined as medical records.
8  Whatever the second definition is, the Joel Goldman
9  medical records.
10       MR. GOLDMAN: JGMR.
11  BY MR. SMITH:
12  Q.   The purpose of the meeting was to view these
13  software applications, patient accounting, general
14  ledger, accounts payable, presumably all of the things
15  that HFMS performed as well as medical records that are
16  at issue in this lawsuit; correct?
17       MR. DENNEN: I guess I'm going to object
18  to the general statement of all the things that HFMS
19  did perform. I don't know that's important, but I
20  think you are making an overgeneralization.
21  BY MR. SMITH:
22  Q.   Okay. I'm trying to use shorthand for the
23  financial side of the software versus what used to be
24  known, at least in the early 1980s, as the medical
25  records side.

Page 51

1       Were you interested at this meeting in the idea
2  of integrating the financial aspects of the financial
3  application programs such as HFMS, integrating those
4  financial applications more closely with medical
5  records applications as that term was understood in
6  1983?
7  A.   Repeat that question again.
8  Q.   Were you interested in exploring ways to better
9  integrate medical records with the financial
10  applications --
11  A.   No.
12  Q.   -- when you met in 1983?
13  A.   (Witness shakes head).
14  Q.   Your answer is no. Let me just follow up on
15  that. My understanding is that you were pursuing, at
16  this time, medical records enhancements based on HFMS
17  at AMC, correct, medical records meaning definition
18  one?
19  A.   No.
20  Q.   Okay. Let me back up, then. Maybe it's faster
21  if you tell me where I'm wrong.
22  A.   We were looking for DRG, our main interest was
23  DRGs.
24  Q.   This is the time you met with Mr. Goldman?
25  A.   And several vendors.

Page 52

1  Q.   Okay. So you met with Mr. Goldman and you met
2  with other vendors?
3  A.   Yes.
4  Q.   And you were mainly interested in acquiring DRG
5  processing capability?
6  A.   That was the hot topic.
7  Q.   And, at that time that you met Mr. Goldman, had
8  you already developed your DRG grouper that we've
9  discussed previously?
10  A.   No.
11  Q.   Who were the other vendors with whom you spoke,
12  if you recall?
13  A.   Amhurst.
14  Q.   Anyone else?
15  A.   Saint.
16  Q.   S-A-I-N-T?
17  A.   -- N-T.
18  Q.   Anyone else?
19  A.   There were others. I don't recall.
20  Q.   Did you invite these vendors in?
21  A.   Yes.
22  Q.   At the time that you invited these vendors in,
23  did AMC have its own DRG grouper up and running?
24  A.   No.
25  Q.   Had you commenced work on programming a DRG

Page 53

14 (Pages 50 to 53)

1  grouper at this time?
2  A.    No.
3  Q.    So was the primary purpose of the meeting with
4  Mr. Goldman to review a DRG application that he was
5  able to provide?
6  A.    No.
7  Q.    What was the primary purpose of the meeting
8  with Mr. Goldman?
9  A.    He wanted to present his software.
10  Q.    And when you say his software, to the best of
11  your recollection, what software did he present?
12  A.    Patient accounting, accounts payable, payroll,
13  medical records, general ledger, maybe -- let me stop
14  there, because I can't recall the other ones. I think
15  there were some additional.
16  Q.    Did Mr. Goldman demonstrate his software for
17  you at that meeting?
18  A.    Yes.
19  Q.    In order to demonstrate the software did he
20  install the software on a computer at AMC?
21  A.    Yes.
22  Q.    Do you recall what style or the name of the
23  computer?
24  A.    Yes.
25  Q.    What was it?

Page 54

1  A.    IBM 34.
2  Q.    Did he also provide you with any floppy disks
3  in addition to installing it on the computer?
4  A.    Yes.
5  Q.    Were those eight inch diskettes?
6  A.    Yes.
7  Q.    Do you recall how many?
8  A.    No.
9  Q.    Did Mr. Goldman identify or propose any terms
10  that AMC might acquire the software?
11  A.    Yes.
12  Q.    What were those terms?
13  A.    Approximately $14,000 for all the applications.
14  Q.    And what would AMC receive for that $14,000
15  that it received, a perpetual license?
16  A.    That was not discussed.
17  Q.    Did you discuss, was that per installation?
18  A.    Yes.
19  Q.    And when you say all applications, that would
20  include all of the financial applications that he
21  demonstrated as well as medical records?
22  A.    Yes.
23  Q.    Do you recall any breakdown of what the
24  different components might be?
25  A.    No.

Page 55

1  Q.    For example -- let me finish my question.
2      For example, a breakdown as between a financial
3  program that he presented versus the medical records
4  programs that he presented, do you recall any sort of a
5  breakdown between those two groups?
6  A.    No.
7  Q.    What was your impression of the software that
8  he demonstrated?
9  A.    It was nice.
10  Q.    Did it compare favorably with the software that
11  had been -- that you saw from Amhurst and Saint?
12  A.    No.
13  Q.    Why did it not compare favorably?
14  A.    It was not as function rich.
15  Q.    In what ways was it not as function rich?
16  A.    My opinion.
17  Q.    Sure.
18  A.    It was add-ons to HFMS product also.
19  Q.    Uh-huh.
20  A.    These were the large companies.
21  Q.    When you say these, you are talking about
22  Amhurst and Saint?
23  A.    The two ones I mentioned were large companies.
24  Q.    Uh-huh.
25  A.    That had products not built on the HFMS

Page 56

1  product.
2  Q.    Did you discuss with Mr. Goldman any of the
3  integration aspects between his financial applications
4  and his medical records applications?
5  A.    No.
6  Q.    And, again, at that time, you don't recall
7  stating that you were interested, when I say you, I
8  mean American Medical Centers, was interested in better
9  integrating medical records with HFMS?
10  A.    No.
11  Q.    At the time, at this meeting, did Mr. Goldman
12  also provide you with any source code relating to an
13  application called pharmacy?
14  A.    Yes.
15  Q.    And that was provided on an eight inch diskette
16  also?
17  A.    It was loaded on to the 34.
18  Q.    What did you do with these programs after you
19  received them?
20  A.    Could you ask a specific question? That's kind
21  of general for me. I could go on for days.
22  Q.    Did you or AMC look at the software at issue,
23  Mr. Goldman's medical records software, did you look at
24  it again after the meeting concluded?
25  A.    Joel returned on another visit to AMC.

Page 57

15 (Pages 54 to 57)

1  Q.   When was that?
2  A.   After the first visit.
3  Q.   About how long after the first visit?
4  A.   I don't recall.
5  Q.   Within a year?
6  A.   Yes.
7  Q.   Within a month?
8  A.   I don't recall.
9  Q.   What was the purpose of the second meeting?
10  A.   I don't recall.
11  Q.   Was it here in Nashville?
12  A.   Yes.
13  Q.   Who was at that second meeting?
14  A.   I would say Joel and I.
15  Q.   Did it take place in your offices at AMC?
16  A.   Yes.
17  Q.   Who initiated that meeting?
18  A.   I don't recall.
19  Q.   How long did it last?
20  A.   I don't recall.
21  Q.   More than one day?
22  A.   I believe so.
23  Q.   Were there any understandings or agreements
24  reached in that second meeting?
25  A.   There were discussions about how to further the

Page 58

1  medical records product, the Joel Goldman medical
2  records product.
3  Q.   You said discussions how to further the medical
4  records product?
5  A.   Yes.
6  Q.   Were there any understandings or agreements
7  reached in the first meeting?
8  A.   No.
9  Q.   To the best of your recollection what was
10  discussed in terms of furthering the medical records
11  product?
12  A.   I'll say in general we discussed maybe taking
13  some of the things that I had and some of the things
14  that Joel had, or Mr. Goldman, and looking to see if we
15  could take them to market.
16  Q.   Would this be marketed beyond AMC hospitals,
17  then?
18  A.   Yes.
19  Q.   Would this be a business enterprise that the
20  two of you would have some sort of joint interest in,
21  then?
22  A.   I assumed that was the relationship, yes.
23  Q.   And would it be Tom Givens or would it be AMC
24  that had the interest?
25  A.   It would probably be Tom Givens.

Page 59

1  Q.   Were there discussions as to what -- you
2  testified earlier there were no agreements or
3  understandings reached.  Were there terms --
4  A.   No.
5  Q.   -- that you proposed to Joel?
6  A.   No.
7  Q.   Were there terms that Mr. Goldman proposed to
8  you?
9  A.   No.
10  Q.   Can you be any more specific in terms of what
11  was discussed over this meeting that may have lasted
12  more than a day, other than a general discussion of
13  perhaps working together to market and improve these
14  products?
15  A.   I don't recall.  After those meetings, as I
16  began to work on the DRG --
17  Q.   Uh-huh?
18  A.   -- there were phone calls back and forth
19  between Mr. Goldman and I as to, you know, I'm doing
20  this, how would we handle this, you know, a particular
21  instance in the programs.
22  Q.   About how many phone calls were exchanged?
23  A.   More than two.
24  Q.   So after that second in-person meeting there
25  was at least a joint desire to pursue the prospect of

Page 60

1  working together further?
2  A.   I assume.
3  Q.   Did you have that desire personally?
4  A.   I would say yes.
5  Q.   Based on what you heard and observed from
6  Mr. Goldman, do you believe Mr. Goldman had that
7  desire?
8  A.   Yes.
9  Q.   You said there were more than two follow-up
10  phone calls.  Were there fewer than five?
11  A.   I don't recall.
12  Q.   Fewer than 10?
13  A.   Yes.
14  Q.   Do you recall who placed these phone calls, who
15  initiated them?
16  A.   I know I did initiate some.
17  Q.   And, likewise, do you know that Joel may have
18  initiated some?
19  A.   I don't recall.
20  Q.   Now, the phone calls, you said they were along
21  the lines of I'm doing this, are you doing that.  Were
22  the phone calls -- was the intent of the phone calls to
23  develop an integrated software package that
24  incorporated the best of Joel's software and the best
25  of AMC's software?

Page 61

1  A.  I would say yes.
2  Q.  **You hesitated a little bit there. If the**
3  **answer is not a yes or no, I want you to be able to**
4  **explain.**
5  A.  Okay. The emphasis, at that time, was on DRGs.
6  I mean, that was the primary emphasis.
7  Q.  **Uh-huh?**
8  A.  You know, so when you say, you know, in those
9  conversations, the emphasis was on that, functionality.
10 Q.  **Did Mr. Goldman present a DRG grouper at the**
11 **demonstration at the first meeting?**
12 A.  No.
13 Q.  **Did Mr. Goldman's software have DRG**
14 **capability --**
15 A.  No.
16 Q.  **-- when he met with you?**
17 A.  No.
18 Q.  **Is there something in your mind that you recall**
19 **specifically that makes you certain of your answer?**
20 A.  Yes.
21 Q.  **What is that?**
22 A.  Our emphasis was DRGs.
23 Q.  **And so what you're saying, if he had a DRG**
24 **product, you would have remembered it?**
25 A.  Yes.

Page 62

1  Q.  **Okay. Did you ever print out the source code**
2  **on paper that Mr. Goldman provided at that first**
3  **meeting?**
4  A.  Did I ever print out?
5  Q.  **(Nods head).**
6  A.  Yes.
7  Q.  **Regardless of whether you printed any portion**
8  **of it out, did you observe the copyright notice on the**
9  **source code that Mr. Goldman wrote?**
10 A.  No.
11 Q.  **Did you see his name on the program?**
12 A.  Yes.
13 Q.  **Did you see a date that it was written?**
14 A.  No.
15 Q.  **When did you leave AMC?**
16 A.  1984.
17 Q.  **Why?**
18 A.  Forum was wanting to transfer the IT function
19 to Indianapolis.
20 Q.  **Indianapolis?**
21 A.  Yes, their home headquarters.
22 Q.  **You wanted to stay here in Tennessee?**
23 A.  Yes.
24 Q.  **What did you do next?**
25 A.  I began to pursue contract programming.

Page 63

1  Q.  **Did you have any clients?**
2  A.  Yes.
3  Q.  **Do you remember their names?**
4  A.  Glass Unlimited.
5  Q.  **Any hospital contracts?**
6  A.  No.
7  Q.  **Any medical-related contracts?**
8  A.  No.
9  Q.  **After doing contract programming, what did you**
10 **do next?**
11 A.  That's what I -- I'm not sure I understand the
12 question.
13 Q.  **Okay.**
14 A.  And I guess the definition of -- I did
15 programming, you know, for Glass Unlimited, for a
16 construction company, for a manufacturing company. So
17 that's what I did next.
18 Q.  **Okay. And then I'm saying there came a time**
19 **when you started Advanced Information Concepts?**
20 A.  And that started when I left. My contract
21 programming company was Advanced Information Concepts.
22 Q.  **Okay. And AIC had various clients, including**
23 **Glass Unlimited, a manufacturing company, a**
24 **construction company?**
25 A.  Right, yes.

Page 64

1  Q.  **At some point AIC had a hospital client or a**
2  **medical-related client; correct?**
3  A.  In approximately '85 Forum Group sold the
4  hospitals to HCA.
5  Q.  **And then when Forum Group sold to HCA, going**
6  **back to your interrogatory answer, did AIC sign a**
7  **contract with HCA relating to programming?**
8  A.  To supporting those hospitals.
9  Q.  **Relating to supporting those hospitals?**
10 A.  Right. Programming-wise, because AMC was out
11 of the picture. HCA bought them, AMC was supporting
12 the hospitals and they wanted someone to take phone
13 calls, to keep the programs up to date, et cetera.
14 Q.  **How many hospitals did Forum Group buy?**
15 A.  They bought all 17. They bought everything
16 that AMC had.
17 Q.  **Okay.**
18 A.  Or Forum had. AMC/Forum, at this point, okay.
19 Q.  **Okay.**
20      MR. DENNEN: I think the question was, how
21 many hospitals did Forum Group buy, not how many
22 hospitals did HCA buy from Forum Group.
23      THE WITNESS: Okay. Back then, Forum
24 bought AMC, bought all 17 hospitals.
25      MR. DENNEN: Right.

Page 65

17 (Pages 62 to 65)

1          THE WITNESS: And Forum sold all those
2    hospitals to HCA.
3    BY MR. SMITH:
4    Q.     So the same AMC hospitals followed it all the
5    way to HCA?
6    A.     Right.
7    Q.     So AIC was contracted to provide IT support, or
8    information technology support for all 17 of those
9    hospitals?
10   A.     That's correct.
11   Q.     Did the terms of that contract involve more
12   than simply providing support? In other words, did the
13   contract also envision any new programming, new
14   software installations?
15   A.     Support included anything that needed to be
16   done, that they requested us to do.
17   Q.     Did AIC install any of the software at issue,
18   the medical records software at issue at any of the HCA
19   hospitals?
20   A.     Okay, I'm going to give a broader answer. When
21   they asked us to take those over, that's when we asked
22   Forum slash AMC for the software. That's when we
23   copied the software and brought it into AIC because we
24   needed to it support those HCA hospitals.
25   Q.     Okay.

Page 66

1    hospitals that HCA had acquired.
2    Q.     At the time that AIC received this source code
3    and object code, were copies of the medical records
4    software at issue then running in any of Forum Group's
5    hospitals?
6    A.     Yes.
7    Q.     How many?
8    A.     Approximately the five that I mentioned in my
9    interrogatories.
10   Q.     Did you have any personal involvement in
11   installing the software at issue in those four or five
12   hospitals?
13   A.     Yes.
14   Q.     Your involvement was during the time you were
15   at AMC?
16   A.     Yes.
17   Q.     Did you initiate those installations?
18   A.     What do you mean by initiate?
19   Q.     Was it your idea to put the software at issue
20   in those four or five hospitals?
21   A.     It was our company's decision. I was the
22   implementor.
23   Q.     So AMC made the corporation decision to put the
24   source code at issue into these four or five hospitals?
25   A.     Yes.

Page 68

1    A.     And it included the stuff that was developed at
2    AIC while I was there, plus additional applications
3    that they developed after I left. So we had that, as
4    well as the source code to support those hospitals.
5    Q.     When you left AMC did you retain personally a
6    copy of the source code for the medical records at
7    issue in this lawsuit?
8    A.     No.
9    Q.     When AIC received the contract to provide
10   support for these 17 hospitals you testified that, at
11   that time, AIC obtained the source code for some of the
12   applications, including financial management, HFMS
13   enhancements; correct?
14   A.     That's correct.
15   Q.     At the same time it received those software
16   applications, did AIC also receive copies of the source
17   code for the software at issue in this lawsuit?
18   A.     Yes.
19   Q.     Is this something that you specifically wanted
20   as part of the contract?
21   A.     I had to have it to support the hospitals.
22   Q.     When you say you had to have it, did you also
23   have to have the source code at issue?
24   A.     · I had to have all the object and all the source
25   code to support the applications that were in those

Page 67

1    Q.     Did AMC seek permission from Mr. Goldman before
2    doing that?
3    A.     It was AMC's understanding that we were
4    developing DRGs and enhancing the medical records
5    package together.
6    Q.     Together with Mr. Goldman?
7    A.     Yes. We were making it better by adding DRGs.
8    Q.     When you were meeting with Mr. Goldman and
9    having telephone conversations with him did you inform
10   him that his software was being installed at these
11   hospitals?
12   A.     At the time we installed I don't know that -- I
13   don't recall a specific conversation. Where we were
14   doing this, with the dialogue that we were having, in
15   my opinion it would be clear that we're moving forward
16   with doing this.
17   Q.     On what did you base that opinion, that it
18   would be clear that we were -- when you say we, I'm
19   assuming you mean AMC?
20   A.     (Witness nods head).
21   Q.     On what do you base your opinion that it would
22   be clear that AMC is going to be moving forward with
23   installing the software at issue in these hospitals?
24   A.     Because of the discussions we were having over
25   the phone, I'm doing this, I'm putting this together.

Page 69

1  Q.    Uh-huh.
2  A.    You know, using, you know, the base --
3  Q.    Uh-huh.
4  A.    -- code we had, at that time.
5  Q.    Did --
6  A.    -- that --
7  Q.    Excuse me. Did Mr. Goldman, to your knowledge,
8  ever personally visit any of these hospitals to assist
9  in the installation?
10 A.    No.
11 Q.    Did you ever call on Mr. Goldman with questions
12 relating to implementation issues?
13 A.    Yes.
14 Q.    Can you recall specifically what the issue may
15 have been in those phone calls?
16 A.    No.
17 Q.    When you made those -- was that you personally
18 who called him?
19 A.    Yes.
20 Q.    When you made those phone calls, did
21 Mr. Goldman assist you in resolving an implementation
22 issue?
23 A.    Yes.
24 Q.    Approximately how many implementation issues do
25 you think you may have discussed?

Page 70

1  Forum Group or HCA, in whichever manifestation it
2  happened to be, how long did that contract last?
3  A.    Approximately two years.
4  Q.    And did the scope of the contract expand to
5  include any other hospitals other than those 17?
6  A.    No.
7  Q.    Why did that contract terminate?
8  A.    HCA eventually moved the applications to their
9  internal systems.
10 Q.    And HCA had its own system that it was able to
11 install that presumably it had all over the country?
12 A.    Right.
13 Q.    You have to --
14 A.    I'm sorry. Yes.
15 Q.    About how many hospitals did HCA own at this
16 time; do you know?
17 A.    I don't know.
18 Q.    More than 17?
19 A.    Oh, yes.
20 Q.    At some point Paul Agee came to work with you
21 again; correct?
22 A.    Yes.
23 Q.    He's currently your chief financial officer?
24 A.    Yes.
25 Q.    When did he return to work with you?

Page 72

1  A.    Four.
2  Q.    Did AMC ever provide any compensation to
3  Mr. Goldman for the software?
4  A.    I don't recall.
5  Q.    Other than the $14,000 figure that you
6  discussed earlier, were there any preliminary
7  discussions on what a price might be for installing the
8  software at different hospitals?
9  A.    No.
10 Q.    Did you have an understanding that Mr. Goldman
11 would expect to be paid if this software was installed?
12 A.    If we had acquired his software, I would expect
13 he would expect payment.
14 Q.    Well, AMC did acquire the software; correct?
15 A.    No.
16 Q.    Okay. In what way did AMC not acquire the
17 software?
18 A.    We didn't purchase the applications.
19        MR. SMITH: Can we take a quick break?
20        MR. DENNEN: Sure.
21        (Recess taken.)
22 BY MR. SMITH:
23 Q.    Okay. Let's go back on the record.
24        We were talking about activities at AIC. For
25 approximately how long did AIC have a contract with the

Page 71

1        MR. DENNEN: And by you, you mean HMS?
2        MR. SMITH: Yes, sir.
3        THE WITNESS: I don't recall the specific
4  date, but it was two years ago.
5  BY MR. SMITH:
6  Q.    Approximately 2004?
7  A.    Yes.
8  Q.    Do you know where Mike Hayes is now?
9  A.    No.
10 Q.    Do you know where Mary Lee Bunch is now?
11 A.    No. Let me rephrase that. I know they're in
12 Nashville.
13 Q.    Okay. But you don't maintain contact with
14 them?
15 A.    No. I feel they're in Nashville.
16 Q.    I'm sorry?
17 A.    I say -- I said I know they're in Nashville. I
18 don't know that, I have a feeling they're still in
19 Nashville.
20 Q.    Because who would want to leave?
21 A.    That's right, yes.
22 Q.    How many people were at AIC when you began?
23 A.    When I began?
24 Q.    Was it just you?
25 A.    Just me.

Page 73

19 (Pages 70 to 73)

| | |
|---|---|
| 1 **Q.** **Who was your first hire?** | 1 them giving you that software? |
| 2 A. Katie something. | 2 A. Yes. |
| 3 **Q.** **Okay.** | 3 **Q.** **Do you still have that agreement?** |
| 4 A. Katie whatever. | 4 A. I cannot put my hands on that agreement. I |
| 5 **Q.** **And was she a programmer?** | 5 feel confident -- well, I can't put my hands on it, |
| 6 A. Yes. And receptionist. | 6 but, yes, it was. |
| 7 **Q.** **And this would have been around 1985?** | 7 **Q.** **How many pages was the agreement?** |
| 8 A. '84. | 8 A. One. |
| 9 **Q.** **'84. And AIC's initial business purpose was a** | 9 **Q.** **Who signed it?** |
| 10 **corporate entity -- was it incorporated?** | 10 A. Paul Agee. |
| 11 A. Yes. | 11 **Q.** **And yourself?** |
| 12 **Q.** **Its initial purpose was an incorporated entity** | 12 A. Yes. |
| 13 **to do business from your consulting activities; is that** | 13 **Q.** **And what were the essential terms of that** |
| 14 **right?** | 14 **agreement?** |
| 15 A. Yes. | 15 A. We just requested rights to all the software. |
| 16 **Q.** **Later on did AIC start developing software** | 16 By definition it was maybe a three liner that we |
| 17 **applications that it would go out and market to** | 17 requested rights or we requested the rights to all the |
| 18 **hospitals for installation and sale?** | 18 software that moved from AMC. |
| 19 A. Yes. | 19 **Q.** **And did Paul Agee have authority to sign on** |
| 20 **Q.** **When did that happen?** | 20 **behalf of the Forum Group, at that time?** |
| 21 A. 1986. | 21 A. Yes. |
| 22 **Q.** **What was its first product?** | 22 **Q.** **What was his title at the Forum Group, at that** |
| 23 A. The AMC products. I'm going to refer to | 23 **time?** |
| 24 anything, if by definition AMC meaning the stuff, or | 24 A. I don't know. |
| 25 meaning software that came over from AMC to support the | 25 **Q.** **Was he chief financial officer, do you think?** |
| Page 74 | Page 76 |

| | |
|---|---|
| 1 HCA. | 1 A. Maybe for that division. |
| 2 **Q.** **All the source code and --** | 2 **Q.** **Okay.** |
| 3 A. Yes, right. | 3 A. But I, you know, I had left by then. So, you |
| 4 **Q.** **So it included the HFMS enhancements?** | 4 know... |
| 5 A. Yes. | 5 **Q.** **Did you, both individually and as the** |
| 6 **Q.** **It would include your DRG grouper?** | 6 **corporation AIC, believe that this agreement gave you** |
| 7 A. And others, and fixed assets that I developed | 7 **unrestricted rights to use all of that software?** |
| 8 and other products, yes. | 8 A. Yes. |
| 9 **Q.** **Fixed asset software applications that you** | 9 **Q.** **On what did you base that belief, other than** |
| 10 **developed, it would include the source code at issue in** | 10 **the agreement itself?** |
| 11 **this lawsuit?** | 11 A. What do you mean what did I base that belief |
| 12 A. Yes. | 12 on? |
| 13 **Q.** **And it would include source code that -- well,** | 13 **Q.** **Did you believe that Mr. Agee had the authority** |
| 14 **did it include any other source code?** | 14 **to give you an unrestricted perpetual license to all of** |
| 15 A. I had source code for everything that was | 15 **these programs?** |
| 16 there. I don't know how to define it. All the | 16 A. Yes. |
| 17 products that were used to support HCA. | 17 **Q.** **And you're familiar -- let me ask, were you** |
| 18 **Q.** **Uh-huh?** | 18 **familiar with the concepts of software licensing in the** |
| 19 A. Which was the financial, GL, AP, fixed asset, | 19 **timeframe of 1984?** |
| 20 medical records, DRG. There was source code for all of | 20 A. (Witness nods head). |
| 21 that. | 21 **Q.** **You have to answer.** |
| 22 **Q.** **Did you, when I say you, did you or AIC pay the** | 22 A. Say that again. |
| 23 **Forum Group or HCA for acquiring that software?** | 23 **Q.** **Were you familiar with the concept of software** |
| 24 A. No. | 24 **licensing agreements around 1984?** |
| 25 **Q.** **Was there any written agreement associated with** | 25 A. I assume I was. |
| Page 75 | Page 77 |

20 (Pages 74 to 77)

1    A.    Approximately?
2    Q.    Approximately.
3    A.    Okay. Fifteen.
4    Q.    When you installed the AMC software, I'll call
5    it, did it always include the medical records software
6    that's at issue in this lawsuit?
7    A.    No.
8    Q.    Did any of the 15 include it?
9    A.    Yes.
10    Q.    About how many?
11    A.    Approximately?
12    Q.    Approximately.
13    A.    ·Five.
14    Q.    Now, would these five be separate from the five
15    HCA hospitals we discussed earlier?
16    A.    No.
17    Q.    Those would be the same hospitals we have
18    already discussed?
19    A.    Not -- can I give a little history?
20    Q.    Sure.
21    A.    HCA sold off some of those hospitals. So there
22    was maybe three to four of those hospitals that they
23    sold them to another acquirer who wanted to keep the
24    software that already had that software.
25    Q.    Okay.

Page 82

1    A.    But we did charge, you know, set up a licensing
2    fee, you know, for that.
3    Q.    Okay. And in addition, the way the math works
4    out, you had at least one or two new independent
5    installations to new hospitals that incorporated the
6    software at issue in this lawsuit; correct?
7    A.    I don't recall.
8    Q.    Okay. Shorthand for the software at issue in
9    this lawsuit, I've been calling it medical records
10    software?
11    A.    Yeah.
12    Q.    But let's call it the Goldman medical records
13    software, okay?
14    A.    Okay.
15        MR. DENNEN: Counsel, I think I'm going to
16    object to that term. If we want to go off the record,
17    maybe we can agree on a term.
18        MR. SMITH: It's not --
19        MR. DENNEN: I understand what you're...
20        MR. SMITH: I'm content to keep calling it
21    the medical records software at issue.
22        MR. DENNEN: That's fine.
23    BY MR. SMITH:
24    Q.    The medical records software at issue had the
25    capability to produce management reports based on

Page 83

1    admissions as well as discharges; is that correct?
2    A.    Yes.
3    Q.    Did Mr. Goldman, to your knowledge, was there
4    any other vendor that offered that capability?
5    A.    Yes.
6    Q.    Do you recall who?
7    A.    Yes.
8    Q.    Who?
9    A.    McDonnell Douglas, Saint, Amhurst, HPOC. 40
10    vendors, at that time.
11    Q.    We're talking in the mid 1980s?
12    A.    Yes.
13    Q.    Okay. Did any of those vendors have anything
14    similar to a one-page executive summary page?
15    A.    Yes.
16    Q.    Can you name anyone in particular?
17    A.    McDonnell Douglas.
18    Q.    What was the name of their program; do you
19    remember?
20    A.    MR2, or MRII.
21    Q.    Okay. Do you know when that was introduced,
22    approximately?
23    A.    Approximately, I'd say, '79 or '80.
24    Q.    Going back a bit, when AIC was selling and
25    installing some of the software that AIC acquired from

Page 84

1    AMC?
2    A.    Uh-huh.
3    Q.    You testified that AIC may have sold the
4    software at issue to perhaps five different hospitals.
5    Do you recall that testimony?
6    A.    AIC?
7    Q.    (Nods head).
8    A.    No. Say that again.
9    Q.    You testified earlier that AIC sold the
10    software at issue to approximately five hospitals --
11    A.    Yes.
12    Q.    -- while it was still AIC. And yet AIC sold
13    other portions of the AMC software to 15 hospitals?
14    A.    Uh-huh.
15    Q.    Why didn't those other hospitals receive the
16    software at issue?
17    A.    They could get a lot of the information out of
18    the financial product, and they didn't want to spend
19    the money.
20    Q.    Do you remember how much you charged for that
21    module?
22    A.    I don't -- I can -- do I remember exactly, no.
23    Can I tell you approximately?
24    Q.    Okay.
25    A.    Maybe $6,000.

Page 85

22 (Pages 82 to 85)

1  Q.    When you employed an application such as HFMS
2  you spoke with an IBM representative, is that correct,
3  to acquire it?
4  A.    No.
5  Q.    When you used HFMS how did you acquire that
6  source code?
7  A.    Through AMC.
8  Q.    How did AMC acquire it?
9  A.    Through acquisition from IBM.
10 Q.    Were you involved in any of those acquisitions?
11 A.    No.
12 Q.    Did you confer with IBM representatives?
13 A.    No.
14 Q.    Was it your understanding that IBM provided
15 HFMS for free?
16 A.    No.
17 Q.    Was it your understanding that HFMS was
18 provided at a cost?
19 A.    My understanding, at that point in time, is
20 that the software had been substantially modified, that
21 there was no copyright issue, and that basically if you
22 look in the industry as it is today, the high majority
23 of people running on the IBM mini platform that did
24 healthcare, the basis of the software was HFMS. It was
25 kind of a common practice, and IBM really moved out of

Page 78

1  that business around '86 or so.
2  Q.    Uh-huh.
3  A.    With HFMS.
4  Q.    Okay.
5  A.    And they had really acquired that from a
6  company called Dakota.
7  Q.    Uh-huh.
8  A.    So, but they weren't -- IBM was not selling
9  that software, at that time. They probably still had
10 the rights but right or wrong, it was industry
11 practice.
12 Q.    When AIC began to develop and market the
13 software products, did AIC sell them or did it give
14 them away as part of, say, a consulting contract?
15 A.    Perpetual license.
16 Q.    Did it sell them or did it give them away?
17 A.    Perpetual license.
18 Q.    Okay. My question is, did you receive anything
19 in exchange for that perpetual license?
20 A.    Yes.
21 Q.    Did you receive money?
22 A.    Yes.
23 Q.    Okay. As part of that transaction did AIC give
24 a written license agreement?
25 A.    Yes.

Page 79

1  Q.    Did AIC install object code on customers'
2  computers?
3  A.    Yes.
4  Q.    And the object code that was installed on
5  customers' computers was, again, based on the AMC
6  products that you had received from the Forum Group; is
7  that correct?
8  A.    The first two years, yes.
9  Q.    And that would be through what timeframe?
10 A.    '88, '89.
11 Q.    In what ways was it not based on the AMC
12 products after 1988, '89?
13 A.    We rewrote the product to run on the IBM, what
14 was a product called the AS400.
15 Q.    So you modified the -- we'll call it the AMC
16 code?
17 A.    Right.
18 Q.    To run on the AS400?
19 A.    Correct.
20 Q.    For a time did you run the AMC products on what
21 is called emulation mode?
22 A.    Yes.
23 Q.    Who were the first customers for the software
24 applications that AIC acquired from AMC?
25 A.    Hickman County Medical Center.

Page 80

1  Q.    Where are they located?
2  A.    Centerville, Tennessee.
3  Q.    And do you recall what the terms of that
4  agreement were?
5  A.    No.
6  Q.    Do you recall how much money you received for
7  the software?
8  A.    No. Probably in that box, though.
9  Q.    The witness is referring to an imposing stack
10 of boxes sitting here in the room.
11      Just so I can ask my questions better, when did
12 AIC change its name to HMS? Let me rephrase.
13 A.    I don't recall.
14 Q.    Did AIC at some point change its name to Health
15 Management Systems?
16 A.    Yes.
17      MR. DENNEN: Healthcare Management
18 Systems.
19      MR. SMITH: Beg your pardon, Healthcare
20 Management Systems.
21 BY MR. SMITH:
22 Q.    While it was still named AIC, approximately how
23 many installations of the AMC software did it do, while
24 your company was still AIC, in how many hospitals did
25 you install the AMC software?

Page 81

21 (Pages 78 to 81)

**Page 86**

1  Q.    $6,000 for a perpetual --
2  A.    License.
3  Q.    -- license?
4  A.    That included the DRGs.
5  Q.    Were there maintenance fees affiliated with
6  that?
7  A.    Yes.
8  Q.    Approximately how much were those?
9  A.    Typically it was 10 percent of the license
10 fees.
11 Q.    Ten percent per year?
12 A.    Yes.
13 Q.    And what about installation fees, was that
14 charged hourly?
15 A.    Yes.
16 Q.    Approximately how much would you charge for an
17 installation of the software at issue?
18 A.    $600. Twenty hours at $45.
19 Q.    That would be 900, wouldn't it?
20 A.    Okay. Excuse me.
21 Q.    At the time that AIC was selling the AMC
22 software were the applications integrated?
23 A.    Again, I'd have to ask you for a definition.
24 And this is an age old thing we still have with the
25 clients.

**Page 87**

1  Q.    Uh-huh.
2  A.    They ran on the same system.
3  Q.    Uh-huh.
4  A.    The definition of integration is like user
5  friendly.
6  Q.    It's a spectrum?
7  A.    So they all ran on the same platform. I would
8  say that they were interfaced more than integrated.
9  Q.    Okay. Did the software at issue use as its --
10 one of its important data file a file called abstract?
11 A.    As one of its important ones?
12 Q.    Yes.
13 A.    No. Wait.
14 Q.    Did it use a file called abstract?
15 A.    Yes.
16 Q.    Was abstract also used in the AMC software to
17 update patient accounting?
18 A.    No.
19 Q.    Do you understand the question?
20 A.    I understand the question, but I don't think
21 you really mean it. I'm sorry.
22 Q.    Let me make sure we're communicating. You are
23 familiar with a data file called abstract use in the
24 software at issue?
25 A.    Yes.

**Page 88**

1  Q.    In fact, HMS has a file called abstract use in
2  its programs; correct?
3  A.    Yes.
4  Q.    At the time AIC was marketing the software at
5  issue, the software at issue had a file called
6  abstract; correct?
7  A.    Yes.
8  Q.    Was that abstract file used in the financial
9  applications that AIC marketed, the patient accounting
10 records, for example?
11 A.    No.
12 Q.    Okay. The software that AIC marketed, did you
13 have a DRG grouper in that software?
14 A.    Yes.
15 Q.    Whose product was the DRG grouper?
16 A.    I developed the DRG grouper.
17 Q.    Is that the one you developed based on the code
18 that you received from, was it HIS -- HSI?
19 A.    Yes.
20 Q.    That in turn was derived from the Yale --
21 A.    Yes.
22 Q.    Again, the abstract file that was part of the
23 software at issue was created by Mr. Goldman; is that
24 correct?
25 A.    Yes.

**Page 89**

1  Q.    To the best of your knowledge, Mr. Goldman is
2  the author?
3        MR. DENNEN: Objection.
4  BY MR. SMITH:
5  Q.    Who, to the best of your knowledge, is the
6  original author of the software at issue?
7        MR. DENNEN: Objection to the extent it
8  calls for a legal conclusion. If you wish to define
9  author, it might help him answer your question.
10 BY MR. SMITH:
11 Q.    You can answer.
12 A.    I wouldn't have knowledge of who developed the
13 abstract product.
14 Q.    If it was somebody at AMC, you would know it
15 though; right?
16 A.    Yes.
17 Q.    If it was somebody at AIC, you would know;
18 right?
19 A.    Yes.
20 Q.    When you were at AIC were your primary
21 responsibilities -- what were your primary
22 responsibilities?
23 A.    Information technology.
24 Q.    But in terms of what you woke up in the morning
25 and did, it was programming and running the day-to-day

1  aspects of the business; sales, consulting?
2  A.    It was everything.
3  Q.    Everything?
4  A.    I'm sorry.  Ask me that question again.  I'm
5  back about five years from now.
6  Q.    Back after you left AMC they had been acquired
7  by the Forum Group?
8  A.    Uh-huh.
9  Q.    You were the only guy and you were out there
10  consulting, doing everything yourself.
11  A.    Uh-huh.
12  Q.    You hired Katie, she was a programmer and a
13  receptionist?
14  A.    Yes.
15  Q.    Over the next couple of years how much were you
16  involved in the active programming?
17  A.    Probably 75 percent.
18  Q.    Okay.  And what were some of the things that
19  you were working on?
20  A.    Support for customers, developing financial,
21  meaning general ledger, managing reporting systems.
22  Primarily financial applications.
23  Q.    Was there any other individual that was tasked
24  with programming primarily medical records applications
25  as that term was used in the 1980s?

Page 90

1  A.    Yes.
2  Q.    Who was that person?
3  A.    Annita Milkwick.
4  Q.    Did you ever look to see whether any of the
5  source code for the software at issue had a copyright
6  notice, and my question is, did you ever undertake to
7  look for a copyright notice?
8  A.    Yes.
9  Q.    When was that?
10  A.    I guess at AMC.
11  Q.    When he first gave it to you?
12  A.    I don't know.  I don't recall the specific time
13  or date.
14  Q.    Would it be unusual to receive source code that
15  didn't have any identification of whose it was and who
16  wrote it?
17  A.    Would it be, no.
18  Q.    And, again, you earlier testified that you
19  don't recall if his name appeared on any of this source
20  code?
21  A.    I said his name did appear on the source code.
22  Q.    You did say?
23  A.    Yes, I did say.
24  Q.    I beg your pardon.  What about the year of
25  authorship, did that appear?

Page 91

1  A.    No.
2  Q.    Did you look at all of the programs that he
3  provided or just some of them for a copyright notice?
4  A.    Some.
5  Q.    When AIC began marketing and selling the
6  software at issue did AIC remove the name of Joel
7  Goldman from the product that it marketed?
8  A.    I would not know that.
9  Q.    Who would know that?
10  A.    During my time, I wouldn't know.
11  Q.    Okay.  During your time the answer is no?
12  A.    At AMC, right.
13  Q.    Are you certain that you never removed Joel
14  Goldman's name from the source code while you were at
15  AIC?
16  A.    You, meaning Tom Givens?
17  Q.    Meaning Tom Givens personally?
18  A.    Yes.
19  Q.    Do you know if Annita Milkwick ever removed
20  Joel Goldman's name?
21  A.    No, I don't know that.
22  Q.    As an RPG programmer, is it part of the
23  functionality of a system 34, system 36 that there is a
24  time code on the code when it's created or modified
25  that indicates when the modification occurred?

Page 92

1  A.    Yes.
2  Q.    In the source code that you received from --
3  that AMC received from Mr. Goldman, the software at
4  issue, do you recall whether that had time stamps
5  embedded in the code?
6  A.    No.
7  Q.    Do you recall that it did not have time stamps
8  embedded in the code?
9  A.    No.
10  Q.    So you just don't know?
11  A.    Right.
12  Q.    That's a yes?
13  A.    Yes, I don't know.
14  Q.    Why did you incorporate HMS, Healthcare
15  Management Systems?
16  A.    Okay.  We decided after getting -- having
17  hospitals, that that was going to be the direction of
18  the company and that AIC didn't really reflect anything
19  that would give you an indication we were in the
20  healthcare business.
21  Q.    Okay.  So it was purely a name change?
22  A.    Yes.
23  Q.    At the time of the name change did you have
24  approximately these 15 hospitals as customers, or had
25  it expanded at that point?

Page 93

1  A.   Probably expanded.

2  Q.   **Approximately how many did you have -- how many**

3  **hospital customers did you have at the time of the**

4  **switch?**

5  A.   Twenty-five.

6  Q.   **Okay. That happened in 1986?**

7  A.   It was late --

8  Q.   **The name change?**

9  A.   It could have been '86.

10  Q.   **It's not anything -- it's not important.**

11       MR. DENNEN:  Why don't we state for the

12  record AIC changed its name in 1986 to Health

13  Management Systems.  I believe Tom's memory,

14  unfortunately --

15       MR. SMITH:  It's a public record.

16       MS. JACOBS:  Right.

17       MR. DENNEN:  Yeah.

18  BY MR. SMITH:

19  Q.   **In the early years of HMS, from '86, '87, who**

20  **was the person in charge of programming; was that still**

21  **you?**

22  A.   When you say in charge.

23  Q.   **Yeah.**

24  A.   I guess --

25  Q.   **You were the president; is that correct?**

Page 94

1  A.   Right.

2  Q.   **So ultimately you are in charge of everything?**

3  A.   Yes, right.

4  Q.   **Who was the person who had primary day-to-day**

5  **responsibilities for the technical programming aspect**

6  **of the business; was it still you?**

7  A.   From a responsibility point of view, yes,

8  myself and John Doss.

9  Q.   **When did John Doss join the company?**

10  A.   I'm going to say technically when we started

11  together.

12  Q.   **In '84?**

13  A.   84.  We started out sharing the office, you

14  know, really working together.

15  Q.   **Uh-huh?**

16  A.   And so, you know, we kind of combined together,

17  but we have always been together.

18  Q.   **Okay. So did you know him before starting AIC?**

19  A.   Yes.

20  Q.   **He's an accountant; is that correct?**

21  A.   What do you mean by he's an accountant?

22       (Discussion off the record.)

23  BY MR. SMITH:

24  Q.   **Let me rephrase.**

25       **He's more of a financial guy than he is a**

Page 95

1  **computer programming guy?**

2  A.   No.

3  Q.   **That's incorrect?**

4  A.   Yes.

5  Q.   **Okay.**

6  A.   He would -- I mean, he has an MBA but he was

7  more on the technical side and was in the consulting,

8  technology consulting background.

9  Q.   **Did he actively program for AIC?**

10  A.   Yes.

11  Q.   **Did he have any specific aspects of the**

12  **applications that he focused on?**

13  A.   Yeah, I mean, we didn't really have, I mean, at

14  that time, you just did whatever.

15  Q.   **Okay.**

16  A.   Right.

17  Q.   **And let me tell you I spoke with Annita**

18  **Milkwick a couple days ago.**

19  A.   Uh-huh.

20  Q.   **And she put things in three categories.**

21  **Patient accounting?**

22  A.   Uh-huh.

23  Q.   **Which I understand is about the same as**

24  **accounts receivable?**

25  A.   Uh-huh.

Page 96

1  Q.   **General ledger?**

2  A.   Uh-huh.

3  Q.   **Which is all the other financial aspects?**

4  A.   Uh-huh.

5  Q.   **And medical records?**

6  A.   Uh-huh.

7  Q.   **So she said during her time at AIC that's kind**

8  **of how she thought of the world?**

9  A.   Okay.

10  Q.   **How would you divide up the different**

11  **applications in terms of categories?**

12  A.   Well, we have patient access, clinicals,

13  patient accounting and financials.

14  Q.   **Okay. And financials, would that be the**

15  **general ledger, accounts payable, accounts receivable?**

16  A.   Fixed assets, materials management.

17  Q.   **Okay. What would patient accounting be?**

18  A.   Billing, collections, revenue reporting, some

19  parts of reimbursement.

20  Q.   **What would clinicals include?**

21  A.   Order communications.

22  Q.   **Beg your pardon?**

23  A.   Order communications.

24  Q.   **Order communications?**

25  A.   Right.

Page 97

25 (Pages 94 to 97)

Page 98

```
1   Q.      Orders with whom?
2   A.      Orders for the patient, you order a CBC, a
3   combined blood count, you order testing.
4   Q.      Okay.
5   A.      Lab, laboratory, pharmacy, radiology.
6   Q.      Okay. What would patient access include?
7   A.      Scheduling, admissions, referral tracking.
8   Q.      Where would the software at issue fall in each
9   one of these categories?
10  A.      It's probably in patient access, I would think,
11  or revenue reporting.
12  Q.      So a combination of patient access and patient
13  accounting?
14  A.      Yes.
15  Q.      Getting back to John Doss, wherever programming
16  was needed, somebody would jump in and do it --
17  A.      Yes.
18  Q.      -- is my understanding of your testimony?
19  A.      Yes.
20  Q.      Did his programming responsibilities stay the
21  same while he was at AIC, in other words, did they
22  increase in scope or decrease in scope?
23  A.      No.
24  Q.      As you brought on more people were these people
25  hired to do programming versus, say, marketing or
```

Page 99

```
1   sales?
2   A.      It grew, but I would say that during those
3   times implementation and phone support and programming
4   were all rolled into one.
5   Q.      Okay.
6   A.      As you grew, you know, but when you didn't have
7   anything or no business, there was no programming, but
8   as you got business, you had to support it, you had to
9   implement it, but everybody wore all those hats, there
10  were programmers, implementors and supporters.
11  Q.      Okay. At this time, you earlier testified that
12  Annita Milkwick was the main programmer for the medical
13  records aspect --
14  A.      Yes.
15  Q.      -- of the software?
16  A.      Yes.
17  Q.      Let's look at some exhibits now. Counsel has
18  copies of these exhibits already. I'm showing you
19  Exhibit 2.
20          (Marked Exhibit No. 2.)
21  BY MR. SMITH:
22  Q.      Do you recognize this document?
23  A.      Yes.
24  Q.      What is it?
25  A.      It's a medical record that comes out of the
```

Page 100

```
1   medical records product as defined.
2   Q.      It comes out of HMS's medical records software;
3   is that correct?
4   A.      AIC.
5   Q.      Okay.
6   A.      The AMC latter years.
7   Q.      Okay. And specifically what does this report
8   do?
9   A.      It gives you statistical information.
10  Q.      This is the Executive Summary Report?
11  A.      Yeah.
12  Q.      Is this report one of the more common reports
13  that hospital management might consult when running a
14  hospital?
15  A.      Today?
16  Q.      Yes.
17  A.      No.
18  Q.      Has its importance to hospital management
19  changed over time?
20  A.      Yes.
21  Q.      It formerly was more important than it is
22  today?
23  A.      Well, I mean, that information which comes from
24  several sources is, you know, it's good information,
25  but it's not what drives the decisions.
```

Page 101

```
1   Q.      I don't think you quite answered whether it
2   used to be more important than it is today?
3   A.      I would say it's more -- I would say it used to
4   be more important.
5   Q.      You mentioned in the previous answer this is
6   part of the HMS medical records reporting family. Is
7   it okay if we refer to all these exhibits as HMS
8   medical records reports, because your name --
9   A.      All these exhibits, what are all these
10  exhibits?
11  Q.      We have a bunch of exhibits that are very
12  similar to this.
13  A.      Uh-huh.
14  Q.      The reason I ask is because in some of the
15  contracts the name has changed to Health Information
16  Management and things like that?
17  A.      Yes, right.
18  Q.      But for simplicity, because the name has
19  changed over time?
20  A.      Just call it Health Information Management,
21  let's just do that.
22  Q.      Okay. So all of these are from the Health
23  Information Management users manual?
24          MR. DENNEN: When you say all of these,
25  what -- I'm sorry, Counsel, you have to define what you
```

1  Q.    The answer is yes. It goes really to the word
2  original. To the best of your knowledge, the person
3  who conceived and initially programmed this program,
4  I'll just ask you, was it Annita Milkwick or was it
5  somebody else?
6  A.    I would say it was someone else.
7  Q.    And this is the source code that produces the
8  Executive Summary Report that we've seen as Exhibit 2,
9  and to the best of your knowledge the first version of
10 this program that you saw would have been from AMC; is
11 that right?
12       MR. DENNEN: I'm going to object to that.
13 I don't -- I think you've got a compound question there
14 that assumes a number of -- is making a number of
15 assumptions. If you wish to break it down, feel free
16 to do so. I'm objecting to the form of that question.
17 BY MR. SMITH:
18 Q.    Do you understand the question, Mr. Givens?
19 A.    I thought I did. So repeat the question.
20 Q.    Could the reporter read back the question,
21 please.
22       (The requested proceedings were read back
23 by the court reporter.)
24       THE WITNESS: Question number one, is this
25 source code for the executive summary, yes. Did the

Page 106

1  first version of this code come from AMC, yes.
2  BY MR. SMITH:
3  Q.    And the first version of this code that came
4  from AMC was provided to AMC by Mr. Goldman; correct?
5  A.    Yes.
6  Q.    Did HMS ever contact Mr. Goldman to obtain his
7  permission to use any version of the source code before
8  you as Exhibit 4?
9  A.    HMS?
10 Q.    Yes.
11 A.    No.
12 Q.    And other than the telephone conversations and
13 the two meetings we have discussed did AMC ever obtain
14 Mr. Goldman's consent to use the source code?
15 A.    Yes.
16 Q.    When was that?
17 A.    During '83.
18 Q.    During the initial meetings?
19 A.    '83, '84, when we were working on the DRGs.
20 Q.    And earlier you weren't able to recall exactly
21 when your phone calls may have transpired between
22 yourself and Mr. Goldman. Do you think some of those
23 phone calls occurred after you had left AMC?
24 A.    No.
25 Q.    Okay. Well, we have a series of exhibits here,

Page 107

1  and I, just to save time, I don't want to, you know, go
2  through the same routine each time. What I'd like to
3  do is -- I guess I better.
4        (Marked Exhibit No. 5.)
5  BY MR. SMITH:
6  Q.    I'm going to show you Exhibit 5. And do you
7  recognize this document?
8  A.    Yes.
9  Q.    What is it?
10 A.    It says patient days by doctor by month.
11 Q.    This is an excerpt from the Health Information
12 Management documentation that HMS publishes; correct?
13 A.    Yes.
14       (Marked Exhibit No. 6.)
15 Q.    And showing you now Exhibit 6. I'll represent
16 this is a printout of around 1989, 1990, source code
17 from Mr. Goldman.
18 A.    That's not source code.
19 Q.    I'm sorry. I beg your pardon. It's a printout
20 of a report. Does Exhibit 6 appear to be substantially
21 similar to Number 5?
22       MR. DENNEN: Object to the use of the term
23 substantially similar. That is clearly not
24 substantially similar as evidenced by the face of the
25 document.

Page 108

1  BY MR. SMITH:
2  Q.    Exhibit 6 and 5, are you looking at the same
3  thing?
4        MR. DENNEN: Yes, I am.
5        THE WITNESS: I mean, there is different
6  information on them.
7        MR. DENNEN: They're clearly not
8  substantially similar.
9        THE WITNESS: What do you mean, the first
10 one says Medicare, this one says Medicaid. This is
11 Medi-Cal.
12 BY MR. SMITH:
13 Q.    Is the layout substantially similar?
14 A.    Yes.
15       MR. DENNEN: When you say layout, are you
16 referring to the fact that you have two columns and
17 columns down below?
18 BY MR. SMITH:
19 Q.    Other than the specific content of the report,
20 Mr. Givens, can you identify for me any aspect of the
21 layout that you think is substantially different?
22 A.    Well --
23       MR. DENNEN: I'm going to object once
24 again and just say the document speaks for itself.
25       MR. SMITH: With respect, Counsel, it does

Page 109

28 (Pages 106 to 109)

1  mean by all of these.
2       MR. SMITH: I'll be going through a series
3  of exhibits.
4       MR. DENNEN: I suggest that perhaps we can
5  go through them right now and he can identify those
6  that are a part of the HIM. I don't think it's fair
7  for him to say they are until he actually reviews them.
8  BY MR. SMITH:
9  Q.    I just want to make sure our terminology
10 doesn't create a stumbling block?
11 A.    HIM is more appropriate because it's more
12 statistics versus medical records which is a lot
13 broader.
14 Q.    Under today's terminology?
15 A.    Yes.
16 Q.    Okay.
17 A.    So this is all statistics.
18 Q.    So Health Information Management. Is the HMS,
19 Health Information Management software, is that derived
20 from the AMC software that you acquired from Mr. Agee
21 while you were at AIC?
22       MR. DENNEN: I'm going to -- one moment,
23 Tom. I'm going to object, because I think the word
24 derive. You made some jumps. I think it's not
25 accurate.

Page 102

1  BY MR. SMITH:
2  Q.    You can answer, if you can.
3  A.    What is the question again?
4  Q.    Are the HIM software applications that HMS
5  currently markets, is that derived from the software
6  that AIC initially acquired from Paul Agee?
7  A.    When you say derived, because I guess
8  everything derived from somewhere.
9  Q.    Uh-huh?
10 A.    Okay, so I guess you could say yes.
11 Q.    Okay.
12 A.    I'm not sure what you mean by derived.
13       MR. DENNEN: Let him define what he means
14 by derived.
15 BY MR. SMITH:
16 Q.    Well, let's walk through these and maybe that
17 will serve as a concrete definition versus words that I
18 might come up with.
19 A.    Fine.
20 Q.    So let me show you now, if you would -- you are
21 already at the third page of Exhibit 2.
22       (Marked Exhibit No. 3.)
23 BY MR. SMITH:
24 Q.    Showing you now Exhibit 3.
25 A.    Uh-huh.

Page 103

1  Q.    And I'll represent that Exhibit 3 is a printout
2  of a report that is produced by Mr. Goldman's software
3  as it existed, I think, around 1990?
4       MR. GOLDMAN: Uh-huh.
5  BY MR. SMITH:
6  Q.    I'll give you an opportunity to just compare
7  these. Let me know --
8  A.    What is the question?
9  Q.    Are these two reports substantially similar?
10      MR. DENNEN: Counsel, I object to that
11 question. I think the documents speak for themselves.
12      THE WITNESS: Similar, meaning do they
13 look alike?
14 BY MR. SMITH:
15 Q.    Yes.
16 A.    Not everything. They look pretty close to
17 similar.
18      (Marked Exhibit No. 4.)
19 BY MR. SMITH:
20 Q.    I'm showing you now Goldman Exhibit 4, and ask
21 you if you recognize that document?
22      MR. DENNEN: Let the record reflect that
23 the handwritten note in the top right corner is
24 something I've added.
25      THE WITNESS: So what are you asking?

Page 104

1  BY MR. SMITH:
2  Q.    Do you recognize -- this is source code, is it
3  not?
4  A.    Yes.
5  Q.    Do you recognize this as source code that was
6  provided by HMS to the plaintiff in this litigation,
7  this is HMS source code, I guess is what I'm looking
8  for?
9  A.    Yes.
10 Q.    Okay. This is HMS source code, I'll represent
11 to you, that was provided to us by HMS?
12 A.    Uh-huh.
13 Q.    And is for the program MR0E80. It identifies
14 the programmer as Annita Milkwick?
15 A.    Uh-huh.
16 Q.    And the company name, Advanced Information
17 Concepts. Do you see that?
18 A.    Uh-huh.
19 Q.    To the best of your recollection did Annita --
20 was Annita Milkwick the original author of this code?
21      MR. DENNEN: Object to the use of the term
22 author and also to the reference to the code. When you
23 say code, are you referring to the documentation that
24 is put forth on Exhibit 4?
25 BY MR. SMITH:

Page 105

27 (Pages 102 to 105)

1 not. We need the witness to identify anything that he
2 finds substantially different.
3           MR. DENNEN: Counsel, look at the
4 document. I mean, you know, the question -- if your
5 question is does it have lines and does it have
6 columns, and if that's your definition of substantial,
7 I'll allow him to answer that question.
8 BY MR. SMITH:
9 Q.    You can go ahead and answer.
10 A.    I guess yes.
11 Q.    Okay. What is substantially different between
12 the two documents in terms of the layout?
13 A.    In terms of substantial -- there is no
14 substantial difference. I misunderstood the question.
15           (Marked Exhibit No. 7.)
16 BY MR. SMITH:
17 Q.    Okay. I'm showing you now Exhibit 7. And this
18 is source -- a printout of source code for the report
19 which we just looked at. And my question here is near
20 the top. It says it's converted by Annita Milkwick?
21 A.    Uh-huh.
22 Q.    What does that mean?
23 A.    It means she moved it over to the 400.
24 Q.    Was the AS400 being marketed in 1986?
25 A.    Yes, that's when it came out. I mean, '89 is

Page 110

1 when it came out. That's what I assume.
2 Q.    Well, I ask you to assume that this was
3 converted on February 17, 1986?
4 A.    Uh-huh.
5 Q.    Was the AS400 in existence yet?
6 A.    In '89.
7 Q.    Okay. So if this was converted when it says it
8 was converted?
9 A.    Uh-huh.
10 Q.    What do you think it means that the document
11 identifies that Annita Milkwick converted it, what does
12 that mean?
13 A.    I have no idea.
14 Q.    Did Annita Milkwick, was she the original
15 composer, the original author of the original version
16 of this source code?
17 A.    No.
18 Q.    That would have been Mr. Goldman; correct?
19 A.    I don't know about that. But it was the
20 software that was delivered to AMC by Mr. Goldman.
21 Q.    Okay.
22 A.    Whether he was the original author, I don't
23 know.
24 Q.    Okay. Fair enough.
25           (Marked Exhibit No. 8.)

Page 111

1           (Marked Exhibit No. 9.)
2 BY MR. SMITH:
3 Q.    Showing you Exhibits 8 and 9 now. Exhibit 8 is
4 a report generated by HMS and it's year to date
5 admissions by financial class. Exhibit 9 is a slightly
6 different report. It's a month --
7           MR. DENNEN: It is a different report.
8           MR. SMITH: Sorry.
9 BY MR. SMITH:
10 Q.    Year to date apparently by financial class.
11 Can you identify for me substantial differences in the
12 layout between those two documents?
13 A.    No.
14           (Marked Exhibit No. 10.)
15 BY MR. SMITH:
16 Q.    Showing you Exhibit 10, just to get it in the
17 record, this is the source code that produced
18 Exhibit 8. Who is Steve S? He's listed as the person
19 who apparently modified the source code in 1987. Do
20 you remember who he is?
21 A.    No. Steve S. Somebody that worked for us, it
22 may be an employee.
23 Q.    That would have been somebody after HMS
24 started; correct?
25 A.    Yes.

Page 112

1 Q.    Okay. I'm not keeping up with... off the
2 record, please.
3           (Recess taken.)
4 BY MR. SMITH:
5 Q.    Mr. Givens, so we're back from lunch. I would
6 like to show you now Exhibit 39.
7           (Marked Exhibit No. 39.)
8 BY MR. SMITH:
9 Q.    What is this exhibit?
10 A.    39.
11 Q.    Yeah, can you identify it for us? Do you
12 recognize it?
13 A.    Yes.
14 Q.    Could you describe for us what it is?
15 A.    It says abstract, medical records abstract,
16 Madison file, physical file.
17 Q.    Are you familiar with this file?
18 A.    Yes.
19 Q.    And how it's laid out?
20 A.    Yes.
21 Q.    Was this part of the software application
22 programming that you received from AMC and Paul Agee?
23 A.    I guess.
24 Q.    And was the original author -- well, let me
25 show you Exhibit 38.

Page 113

29 (Pages 110 to 113)

1          (Marked Exhibit No. 38.)
2   BY MR. SMITH:
3   Q.      That has been provided to HMS in a document
4   exchange. This is Mr. Goldman's file, also called
5   abstract?
6   A.      Uh-huh.
7   Q.      I won't ask you to compare the two, but to the
8   best of your knowledge is Exhibit 39, was it originally
9   authored by Joel Goldman?
10  A.      I would have no idea.
11  Q.      Was it part of the source code that Joel
12  Goldman provided to you during the meetings at AMC in
13  1983?
14  A.      Yes.
15  Q.      I'm going to show you Exhibit 40.
16          (Marked Exhibit No. 40.)
17          MR. SMITH: Which, Counsel, I don't think
18  you have.
19  BY MR. SMITH:
20  Q.      Exhibit 40, Mr. Givens, is an email with an
21  attachment from Patty Eckler. Do you know, is she an
22  employee at HMS?
23  A.      Yes.
24  Q.      And have you ever seen this document before?
25  A.      No.

1   Q.      Is the order that they're written down, do they
2   track the order of the field names in Exhibit 39?
3   A.      I wouldn't know.
4   Q.      What does standard HMS conversion mean, does
5   that have any special meaning?
6   A.      Not to me. She's in the conversion department,
7   though. You might ask her.
8   Q.      Do you know who prepared this spreadsheet?
9   A.      This spreadsheet, no.
10  Q.      Would John Doss prepare something like this?
11  A.      No. It would be -- no.
12          (Marked Exhibit No. 41.)
13  BY MR. SMITH:
14  Q.      I'm showing you now Exhibit 41?
15          MR. SMITH: Counsel, I think you have
16  that.
17  BY MR. SMITH:
18  Q.      Exhibit 41 is taken from the initial pages of
19  the HIM manual?
20  A.      Uh-huh.
21  Q.      Do you recognize this document; are you
22  familiar with it?
23  A.      Not -- not. Where did it come from.
24  Q.      HMS produces a manual called Health Information
25  Management. It's the documentation for the HIM

1   Q.      This was -- I'll represent to you this is an
2   email that Mr. Goldman received from Patty Eckler with
3   an attached spreadsheet file, and I printed out the
4   attachment and the subsequent pages of Exhibit 40. And
5   if you could turn to in the lower right corner, it says
6   page four?
7   A.      The actual page four?
8   Q.      It's printed page four at the bottom of the
9   page.
10  A.      Okay, yeah.
11  Q.      And the listings there, the field names that
12  are there, are those, do those refer to the abstract
13  document that we looked at in Exhibit 39?
14  A.      You mean for...
15  Q.      Do those field names on Exhibit 40, with page
16  four at the bottom, do those refer back to Exhibit 39?
17  A.      No.
18  Q.      39. Now, 39 is --
19  A.      Yeah.
20  Q.      -- the HMS code?
21  A.      I don't know what you mean by refer. These are
22  field names that are standard industry processes. So
23  when you say --
24  Q.      Sorry.
25  A.      I don't know what refer means.

1   software. This is taken from the initial stages. It's
2   page Roman numeral little one.
3   A.      Okay.
4   Q.      And my question is, again, are you familiar
5   with this document?
6   A.      No.
7   Q.      Okay. If you turn to page two, I'll just ask
8   you, even though you're not familiar with it, it's
9   produced by HMS?
10  A.      Uh-huh.
11  Q.      If you could just take a few minutes and read
12  the remainder of the document, take as much time as you
13  need, and then my question is going to relate to how
14  patient accounting and Health Information Management
15  interact.
16  A.      Okay.
17  Q.      Are you ready?
18  A.      Sure.
19  Q.      Can you please explain for me how abstract
20  interacts with patient accounting which is a software
21  application module, or, beg your pardon, software
22  applcation group of programs?
23  A.      Uh-huh.
24  Q.      And Health Information Management, which is
25  another group of programs, explain in your own words

1  how abstract interacts between those two sets of
2  programs.
3  A.    It's a summary of the information our patients
4  file.
5  Q.    Does this exhibit, to the best of your
6  knowledge, accurately reflect how an abstract is used
7  in both patient accounting and Health Information
8  Management?
9  A.    I don't understand the question.
10 Q.    To the best of your knowledge, does Exhibit 41
11 accurately describe how the file abstract interacts
12 with both patient accounting and Health Information
13 Management?
14 A.    Interact?
15 Q.    Is that the difficulty, that word, interact?
16 A.    Yes. I'm not sure I understand the exact
17 question.
18 Q.    I can rephrase, if you would like.
19 A.    Okay.
20 Q.    Does Exhibit 41 accurately describe the
21 interface between patient accounting and Health
22 Information Management?
23 A.    No.
24 Q.    In what ways is it inaccurate?
25 A.    I guess it's not an interface. They're data
Page 118

1  A.    The patient's file is updated really with
2  diagnosis code.
3  Q.    Is the update limited to the diagnosis code or
4  is the patient's file updated with more than just the
5  diagnosis code?
6  A.    I don't know.
7  Q.    It would appear from this exhibit, Exhibit 41,
8  page i-3, that the patient's file was updated with a
9  variety of information at the conclusion of step
10 five -- actually, sorry -- step six.
11         Earlier you said this was not an accurate
12 reflection of the interface, and I'm going to ask you,
13 again, to explain why it's not an accurate reflection
14 of the interface with as much detail as you can give
15 me?
16 A.    Well, the interface is the program that is
17 taken from one file and another file. This is not a
18 program.
19 Q.    You are talking about Exhibit 41 is not a
20 program?
21 A.    No.
22 Q.    Well, I'm just using the words that -- I'm
23 trying to employ the same terminology the exhibit
24 employs. The exhibit talks about patient accounting
25 Health Information Management interface. You are
Page 120

1  elements.
2  Q.    When you say they're data elements, what is
3  data elements?
4  A.    Data elements is information stored in a
5  record.
6  Q.    Uh-huh. And the information that is stored in
7  an abstract is used in the Health Information
8  Management suite of programs; correct?
9  A.    Yes.
10 Q.    And patient accounting communicates with the
11 file abstract; correct?
12 A.    Yes.
13 Q.    The patient accounting suite of programs
14 produces data that is used to update abstract; correct?
15 A.    The patient accounting suite, no.
16 Q.    Well, if you turn to page i-3, at the top of
17 the page, step five is final census from patient
18 accounting, and then there are three little arrows, and
19 explain what happens in this step.
20 A.    The final census program runs, and populates in
21 the patient's file, the discharge date, the discharge
22 time, discharge status, financial, primary insurance
23 company, age, cost of service and the abstract file.
24 Q.    And then the final step is the patient's file
25 is updated from abstract; correct?
Page 119

1  saying that interface occurs in the context of a
2  computer program?
3  A.    Yes.
4  Q.    And that computer program acts as the interface
5  to carry the correct data back and forth and extract it
6  from the proper place and put it in the proper place;
7  correct?
8  A.    Yes.
9  Q.    Do you know the name of that program?
10 A.    No.
11 Q.    To the best of your knowledge, is it a single
12 program that is in one place with one set of its own
13 source code?
14 A.    I don't know.
15 Q.    Regardless of whether it's a single program in
16 one place, is the result of the program or programs
17 that are used to accomplish this interface, is the
18 result accurately reflected in Exhibit 41?
19         MS. JACOBS: Object to the form.
20 BY MR. SMITH:
21 Q.    You can answer.
22         MS. JACOBS: You can answer, if you
23 understand the question.
24         THE WITNESS: Ask the question again.
25         MR. SMITH: Could the reporter read it
Page 121

31 (Pages 118 to 121)

1   back, please?
2          (The requested proceedings were read back
3   by the court reporter.)
4          THE WITNESS: I don't know.
5   BY MR. SMITH:
6   Q.    Who would know at HMS?
7   A.    A programmer.
8   Q.    Who is the chief information officer at this
9   point; do you know?
10  A.    We don't have a chief information officer.
11  Q.    Director of information technology? Would that
12  be Blake Benz, is he still with the firm?
13  A.    No. That's a client.
14  Q.    Oh, I beg your pardon.
15         MR. GOLDMAN: He's smiling.
16         THE WITNESS: Yeah, a happy client.
17         MR. SMITH: You may want to let your
18  website operator know that something...
19         THE WITNESS: That's marketing.
20         MR. GOLDMAN: Not my department.
21  BY MR. SMITH:
22  Q.    Who would be in charge of preparing the
23  operator's manual for HIM, that's Health Information
24  Management?
25  A.    Luwana Bacum.

Page 122

1          MS. JACOBS: You may want to spell that.
2          THE WITNESS: B-A-C-U-M, I think.
3   Q.    And Luwana is L-U-A-N-N-A?
4   A.    I believe it's L-U-W-A-N-A.
5   Q.    And what is her title?
6   A.    I don't know.
7   Q.    But she has some responsibilities for preparing
8   documentation?
9   A.    Yes.
10  Q.    Is there any way to tell by looking at Exhibit
11  41 who authored this document?
12         MS. JACOBS: Object to the form. The word
13  author.
14  BY MR. SMITH:
15  Q.    Who wrote it?
16  A.    No.
17  Q.    Do you know whether the interface between
18  patient accounting and Health Information Management
19  has changed since December 2002?
20  A.    No.
21  Q.    Do you have any reason to think that it has
22  changed?
23  A.    No.
24  Q.    Did Joel Goldman install a copy of a program
25  called pharmacy on AMC's computer back in 1983?

Page 123

1   A.    I'd say yes.
2   Q.    Showing you now Exhibit 42.
3          (Marked Exhibit No. 42.)
4   BY MR. SMITH:
5   Q.    And while I'm at it, I'm going to show you
6   Exhibit 43.
7          (Marked Exhibit No. 43.)
8   BY MR. SMITH:
9   Q.    Exhibit 43 is part of a much larger suite of
10  programs that Mr. Goldman states is part of his
11  pharmacy program.
12  A.    (Witness nods head).
13  Q.    Presumably -- I shouldn't say -- we believe
14  that the original version of Exhibit 43 was provided
15  along with the pharmacy package that we have been
16  discussing. Exhibit 42, here, was provided by HMS?
17  A.    Uh-huh.
18  Q.    In a document production with some code
19  relating to pharmacy.
20  A.    Okay.
21         MR. SMITH: One moment. Off the record,
22  please.
23         (Discussion off the record.)
24  BY MR. SMITH:
25  Q.    Back on the record.

Page 124

1          I need to correct myself. Exhibit 43 came from
2   HMS.
3   A.    Okay.
4   Q.    It was part of a set of source code that was
5   provided to us in response to a document request,
6   anything with Joel Goldman's name on it, effectively.
7   In the -- I'm not sure what the correct term; you
8   programmers can help me out. But in the metadata, in
9   the underlying data that was with that source code,
10  with the file, was the information that is on
11  Exhibit 42.
12  A.    Okay.
13  Q.    You know, description of what this is. Have
14  you ever seen Exhibit 42 before?
15  A.    No.
16  Q.    Do you know what PHMSLIB would stand for?
17  A.    No.
18  Q.    Do you have any reason to believe it does not
19  mean pharmacy library?
20         MR. DENNEN: Objection, he said he doesn't
21  know what it stands for.
22  BY MR. SMITH:
23  Q.    That's a different question. Do you have any
24  reason to believe it does not stand for that?
25  A.    I have no reason to believe it doesn't stand

Page 125

32 (Pages 122 to 125)

1  for that?
2  Q.    Yes.
3  A.    No.
4  Q.    It could?
5         MR. DENNEN: He's speculating. I object
6  to that. You are asking for him to speculate on
7  something he already said he doesn't know.
8  BY MR. SMITH:
9  Q.    Do you know what the initials PROD would stand
10 for?
11 A.    I do.
12 Q.    What would that stand for?
13 A.    Production.
14 Q.    Going down to text description, could you read
15 that for us, please; what does that say?
16 A.    Source code, off, 8, quote, diskette, four, TG
17 dot C dash BDM2DLT.
18 Q.    Do you know who put that there?
19 A.    No.
20 Q.    Do you know when that may have been put there?
21 A.    No.
22 Q.    Do you know what the initials TG stand for?
23 A.    Yes. No, but I have a good idea.
24 Q.    Okay. What's your good idea?
25 A.    Tom Givens.

Page 126

1  Q.    Do you know what the initials C hyphen BDM
2  stand for?
3  A.    No.
4  Q.    And 2DLT with two exclamation marks, do you
5  know what that stands for?
6  A.    No.
7         (Marked Exhibit No. 46.)
8  BY MR. SMITH:
9  Q.    I'm showing you now Exhibit 46. Do you
10 recognize this document?
11 A.    Yes.
12 Q.    Do you know when it was prepared?
13 A.    No.
14 Q.    Can you give me a timeframe plus or minus a
15 year?
16 A.    No.
17 Q.    It would have been -- would it have been within
18 the last three years?
19 A.    I don't know.
20 Q.    Before we go any further, what is your current
21 title at HMS?
22 A.    Chairman.
23 Q.    Do you hold any other titles?
24 A.    No.
25 Q.    Were you formerly the president?

Page 127

1  A.    Yes.
2  Q.    When did you resign that spot?
3  A.    June of 2005.
4  Q.    Was your resignation amicable with the company?
5  A.    Yes.
6  Q.    And your successor, is it Tom Stephenson?
7  A.    Yes.
8  Q.    Do you remain active in the day-to-day
9  activities of the company?
10 A.    No.
11 Q.    How often does your board meet?
12 A.    I don't know yet. We haven't had a meeting.
13 Q.    Your lawyer will tell you at least once a year?
14 A.    Right, once a year.
15 Q.    So I take it you have not had a board meeting
16 since your resignation?
17 A.    No, not a formal board meeting.
18 Q.    Not a formal board meeting?
19 A.    Right.
20 Q.    Something to ratify some resolutions or
21 something?
22 A.    Right, yes.
23 Q.    Are you still available to consult with the
24 company on an as-needed basis?
25 A.    Yes.

Page 128

1  Q.    And do you receive some compensation for that
2  or not?
3  A.    Yes.
4  Q.    Looking at -- there are no page numbers on this
5  exhibit. It's a page that looks like this?
6  A.    Uh-huh.
7  Q.    It has a capital S and a capital T?
8  A.    Right.
9         MS. JACOBS: The fourth page.
10 BY MR. SMITH:
11 Q.    Near the bottom it says that the HMS customer
12 base consisting of more than 450 hospitals and
13 specialty facilities. To the best of your knowledge,
14 was that accurate when this was published?
15 A.    Yes.
16 Q.    Does it remain accurate today?
17 A.    No.
18 Q.    How is it inaccurate today?
19 A.    There is probably more.
20 Q.    About how many customers in the HMS customer
21 base today?
22 A.    I don't know.
23 Q.    Probably more than 450?
24 A.    I assume, yes.
25        MR. DENNEN: When you say customers, I

Page 129

33 (Pages 126 to 129)

1  think that probably needs a definition.
2  BY MR. SMITH:
3  Q.   What does customer base mean in this document,
4  if you know?
5  A.   It means hospital libraries.
6  Q.   What is a hospital library; how is that
7  different from a hospital?
8  A.   Well, I could have a corporate office.
9  Q.   Uh-huh?
10  A.   That has multiple entities.
11  A.   Uh-huh.
12  A.   And so that would be one client with multiple
13  hospitals.
14  Q.   So, for example, a hospital entity might have
15  half a dozen different satellite units or locations?
16  A.   Yes.
17  Q.   That would be why there are six different
18  customer libraries?
19  A.   Right.
20  Q.   Okay. How many unique contracting entities,
21  how many unique entities does HMS contract with today?
22  A.   I don't know.
23  Q.   Fewer than 450?
24  A.   Yes.
25  Q.   What would be the best way to determine that

Page 130

1  answer?
2  A.   Ask accounting.
3  Q.   Would John Doss know that answer?
4  A.   I don't know.
5  Q.   He is the chief financial officer of the firm?
6  A.   No.
7  Q.   Sorry. What is his -- that is Paul Agee.
8  Would Paul Agee know the answer?
9  A.   I don't know.
10  Q.   Is John Doss, is he active with the company
11  still?
12  A.   No.
13  Q.   What was his title before he left the company?
14  A.   Executive vice president.
15  Q.   Did he leave the company on amicable terms?
16  A.   Yes.
17  Q.   When was that?
18  A.   I don't know.
19  Q.   Before you left in June 2005?
20  A.   Same time.
21  Q.   Around the same time; is that correct?
22  A.   I may have misstated something.
23  Q.   Okay.
24  A.   I didn't leave in June of 2005. Tom Stephenson
25  became president in June of 2005.

Page 131

1  Q.   When did you resign as president?
2  A.   June of 2005.
3  Q.   Okay.
4  A.   When I left is January.
5  Q.   Okay.
6  A.   2006.
7  Q.   I see. Thank you. You resigned your office --
8  A.   Right.
9  Q.   -- in June of 2005, stayed on to assist in the
10  transition through the year?
11  A.   (Witness nods head).
12  Q.   But you've kept the title of chairman
13  throughout that time; right?
14  A.   Yes.
15  Q.   And, similarly, did John Doss relinquish his
16  title in June 2005?
17  A.   Yes.
18  Q.   And he stayed around, too, for the transition?
19  A.   Yes.
20  Q.   How long did he remain drawing a paycheck for
21  the transition?
22  A.   Continues to do that.
23  Q.   Today?
24  A.   Yes.
25  Q.   He is no longer active in day-to-day affairs;

Page 132

1  correct?
2  A.   No.
3  Q.   Okay. It's important to this litigation,
4  Mr. Givens, to have a handle on the number of
5  installations where the software at issue is installed?
6  A.   (Witness nods head).
7  Q.   And where it may have been installed. Just to
8  give us a perspective, Exhibit 46 refers to a customer
9  base of 450 hospitals and specialty facilities. You've
10  explained that would refer to customer libraries. Do
11  all of the customer libraries have the HMS/HIM
12  application installed?
13  A.   I don't know.
14  Q.   Does HMS keep any records of what facilities
15  have which software applications?
16  A.   Yes.
17  Q.   And what would the name of that document or
18  that report be called?
19       MR. DENNEN:   Counsel, I believe it's in
20  the contracts right behind you.
21       THE WITNESS:   Yeah.
22  BY MR. SMITH:
23  Q.   Well, when I ask, does it have a record, does
24  it have a record other than the original contracts?
25  A.   Yes.

Page 133

1  Q.    What would the name of that report be?
2  A.    I don't know.
3  Q.    If you were asking for it, who would you ask?
4  A.    Pat Douglas.
5  Q.    Is that a male or female?
6  A.    Female.
7  Q.    How do you spell her last name?
8  A.    D-O-U-G-L-A-S.
9  Q.    T-O-U-G?
10  A.    D.
11          MR. GOLDMAN:  Douglas.
12  BY MR. SMITH:
13  Q.    Oh, Douglas.  Pat Douglas, what is her title?
14  A.    Controller.
15  Q.    How would you describe this report if you were
16  to ask Pat Douglas for it?
17  A.    Give me a list of all clients who have medical
18  records.
19  Q.    Okay.  Would that be something that she could
20  give you within a day?
21  A.    Yes.
22  Q.    Is it something that exists on some database on
23  a computer that she could just print out?
24  A.    Yes.
25  Q.    What's the name of this database?

Page 134

1  A.    I don't know.
2  Q.    Do you as the president ever use this database?
3          MR. DENNEN:  Objection.
4  BY MR. SMITH:
5  Q.    I'm sorry.  Strike that.  Did you as president
6  ever personally use this database to extract
7  information about the company?
8  A.    No.
9  Q.    What is the purpose of the database; is it an
10  accounting database?
11  A.    Yes.
12  Q.    And would this database have records of the
13  customers and information about what they purchased
14  from HMS?
15  A.    I don't know.
16  Q.    But it would at least be able to tell you what
17  customers had different components of the HMS software;
18  correct?
19  A.    Yes.
20  Q.    Do you know whether it has a time when they
21  purchased it?
22  A.    It has one.  I don't know if it's updated
23  correctly.
24  Q.    Okay.  Do you know whether it would have any
25  sort of a purchase price affiliated with each contract?

Page 135

1  A.    I don't know.
2  Q.    Is this a database that's updated regularly as
3  each new contract comes in and it's part of your
4  general ledger?
5  A.    No.
6  Q.    So it exists independently of the firm's
7  accounting software?
8  A.    Yes.  Take that again.  I don't know what you
9  mean by firm's accounting software.
10  Q.    Okay.  Fair enough.  When I say accounting
11  software, I mean the credits and the debits that go
12  into the general ledger postings, which is how the
13  corporation keeps track of its money.  This database
14  that Pat Douglas has access to, is that the same as the
15  accounting system that is interacting with the general
16  ledger, or is it different?
17  A.    It's the same.  Clarification, it's a part of
18  the accounts receivable module.
19  Q.    Okay.
20  A.    So it -- but there is no integration to the
21  general ledger.
22  Q.    Part of the accounts receivable module allows
23  management to print off reports?
24  A.    Part of the reports allow management to do
25  accounts receivable.

Page 136

1  Q.    Right.  Two sides of the same coin.  Good.
2          Do you know what percent of HMS sales revenue
3  is related to HIM?
4  A.    No.
5  Q.    Does HMS track software sales by product
6  category?
7  A.    No.
8  Q.    HMS does track sales by software versus
9  hardware; correct?
10  A.    Yes.
11  Q.    And HMS does have systems to track, say,
12  installation revenues from software sales revenues;
13  correct?
14  A.    Yes.
15  Q.    Does HMS have a sales manager?
16  A.    Yes.
17  Q.    And is the title VP sales, something like that?
18  A.    There is a VP of sales.  Then there are sales
19  managers.
20  Q.    How many sales managers do you have?
21  A.    Two.
22  Q.    Do their responsibilities overlap or do they
23  have different responsibilities?
24  A.    Different territories.
25  Q.    Geographic territories?

Page 137

35 (Pages 134 to 137)

1  A.    Yes.
2  Q.    Who is your VP of sales?
3  A.    Mike Freeman.
4  Q.    Do you know whether Mr. Freeman has internal
5  management records keeping track of sales of the
6  different software applications?
7  A.    No.
8        MR. DENNEN:  No, you do not know?
9        THE WITNESS:  I don't know.
10 BY MR. SMITH:
11 Q.    Have you ever seen, in your capacity as
12 president, breakdowns of sales by applications?
13 A.    No.  Can I...
14 Q.    Please.
15 A.    We keep that on individual contracts.
16 Q.    Uh-huh.
17 A.    But to put it in a computer database, no.  I'm
18 not aware of the computer database.  The contract
19 typically breaks those down.
20 Q.    To the best of your knowledge, do most of the
21 contracts include HIM as part of the software that is
22 sold?
23 A.    Yes.
24 Q.    You earlier testified that you can't say that
25 all have that capacity.  Can you give me a rough
                                        Page 138

1  percentage of what you believe the percentage is of
2  contracts that have the HIM component as a part of the
3  software sale?
4  A.     What I believe is 80 percent.
5  Q.    The remaining 20 percent, would they -- I
6  believe earlier you testified that some of the AMC
7  hospitals were psychiatric facilities?
8  A.    Yes.
9  Q.    And they did not use medical records back in
10 1983?
11 A.    Correct.
12 Q.    Would psychiatric facilities be more likely or
13 less likely to ask for HIM?
14 A.    More likely.
15 Q.    Okay.  Today?
16 A.    Yes.
17 Q.    So is it possible for you as you sit here today
18 to give me a generalization of, say, the roughly
19 20 percent that don't buy HIM, is there any sort of
20 category or characteristic that distinguishes them?
21 A.    Yes.
22 Q.    What is that?
23 A.    Clinics.
24 Q.    Okay.  So clinics are less likely to purchase
25 HIM?
                                        Page 139

1  A.    Yes.
2  Q.    Can you define what a clinic is, in your mind?
3  A.    In my mind?
4  Q.    Yes.
5  A.    Sure.
6  Q.    What is a clinic?
7  A.    It's a primary care office where physicians
8  treat patients.
9  Q.    So they would tend to have fewer than 50
10 employees?
11 A.    In our hospital, or in our clinics, yes.
12 Q.    Perhaps as few as five?
13 A.    As few as five.
14 Q.    Correct?
15 A.    Yes.
16 Q.    Continuing to look at Exhibit 46 I guess at the
17 bottom it says page three.  It's in the box.
18 A.    Okay, yeah.
19 Q.    This section of the exhibit is talking about an
20 aspect called clinical?
21 A.    Yes.
22 Q.    There are other aspects, financial.  Would HIM
23 be within the clinical --
24 A.    No.
25 Q.    -- portion of this exhibit?
                                        Page 140

1  A.    No.
2  Q.    Where would HIM fall?
3  A.    Looks like over on page six at the bottom.
4  Q.    Oh, okay.  Now, is there any part of the
5  software at issue -- we've talked about, for example,
6  the Executive Summary Report we looked at very early
7  on.  Would that be part of the Health Information
8  Management?
9  A.    Yes.
10 Q.    Is there any part of the software at issue that
11 does not fall in HIM, with the possible exception of
12 abstract that we talked about?
13 A.    Explain to me, is there any part of the
14 software...
15 Q.    This is why it's important to be precise here,
16 so there is no confusion.  We've talked about the
17 source code that Mr. Goldman installed on AMC's
18 computer.  It included, what was installed included a
19 lot of what used to be called medical records.  We've
20 referred to that as the software at issue.  You've also
21 testified you believed it included some pharmacy
22 programs that were installed that day at AMC.
23 A.    Okay, but pharmacy is not a software that's at
24 issue.
25 Q.    That was where I'm going.  Did HMS utilize any
                                        Page 141

1  Q.  Who would know what that formula is?
2  A.  I assume Mike Freeman.
3  Q.  Mike Freeman?
4  A.  Uh-huh.
5  Q.  F-R-E-E-M-A-N?
6  A.  Right.
7  Q.  What is his title?  Is he the sale --
8  A.  Vice president of sales.
9  Q.  VP of sales, right.  Do you happen to know how
10 many beds Gilmore Health Systems in Mississippi had?
11 A.  No.
12 Q.  Is it typical that patient accounting would be
13 the single most expensive module?
14 A.  I would say yes, currently.
15 Q.  Let me show you Exhibit 48.
16      (Marked Exhibit No. 48.)
17      MR. DENNEN:  Why don't we take a break.
18      MR. SMITH:  Okay.
19      (Recess taken.)
20 BY MR. SMITH:
21 Q.  We're back on the record after a short break.
22 I'm showing you Exhibit 48.  Can you identify this
23 document for me, Mr. Givens?
24 A.  Yes.
25 Q.  What is it?

Page 154

1  A.  An agreement.
2  Q.  An agreement between HMS and Oktibbeha.
3  A.  Oktibbeha County Hospital.
4  Q.  O-K-T-I --
5  A.  Mississippi.
6  Q.  O-K-T-I-B-B-E-H-A.  Turning to page 14 in the
7  agreement, we have Exhibit A again.
8  A.  Fourteen, yeah.
9  Q.  In this contract the medical records are being
10 licensed for $30,000?
11 A.  Uh-huh.
12 Q.  And my question is, why do you think this
13 amount is different from the other amount?
14 A.  I assume it's a larger hospital with the
15 discount substantially higher, which typically is the
16 case.
17      MR. DENNEN:  You are referring to the
18 20 percent discount on the...
19      THE WITNESS:  Yeah.
20 BY MR. SMITH:
21 Q.  On page 15 of the exhibit, it says there is
22 less a 20 percent VHA discount.  What is VHA?
23 A.  Volunteer Hospital Association.
24 Q.  And is that an association to which this
25 hospital belonged?

Page 155

1  A.  Yes.
2  Q.  And that's a discount that HMS negotiated with
3  the association?
4  A.  Yes.
5  Q.  I don't want to assume anything.  So if this
6  sounds like a dumb question, it's because I can't
7  assume.  When HMS starts negotiating with a potential
8  customer, does it offer price concessions as part of
9  those negotiations?
10 A.  Initially?
11 Q.  Start out with initially.
12 A.  No.
13 Q.  Has HMS ever given a discount as a part of its
14 negotiations to sell a system to a hospital?
15 A.  Yes.
16 Q.  Sure.  Okay.  So the 17 percent discount that
17 we saw in Exhibit 46 would have been a negotiated
18 discount; is that correct?
19 A.  Yes.
20 Q.  But the other numbers that are above it are
21 prices that are driven by some set formula; is that
22 correct?
23 A.  Yes.
24 Q.  So the negotiations always occurs right near
25 the bottom line and not over the individual components;

Page 156

1  is that correct?
2  A.  Yes.  There is another factor, is the number of
3  modules you buy.
4  Q.  Is that included in the formula that you talked
5  about that Mike Freeman might have?
6  A.  No, but it's included in the discount.
7  Q.  Okay.  So if someone were to buy everything you
8  sold, you'd be more generous in your discount?
9  A.  Yes.
10 Q.  Okay.  And if in the rare occasion somebody
11 just wanted one or two things, chances are they would
12 get little, if any, discount?
13 A.  Yeah, I mean, in theory.
14 Q.  That's a theoretical question, because you
15 can't sit here today and think of anybody that bought
16 one or two isolated --
17 A.  That wouldn't happen.
18 Q.  Why wouldn't it happen?
19 A.  Because we wouldn't sell it.
20 Q.  Why not?
21 A.  It's not our business philosophy.
22 Q.  What's your business philosophy?
23 A.  Total product offering.
24 Q.  A total product offering?
25 A.  Yes.  We may implement that in stages.

Page 157

40 (Pages 154 to 157)

1  Q.    Was the license fee independently negotiated
2  for each module or more often did HMS give literally
3  the bottom line, total HMS software pricing?
4  A.    It's more of a --
5  Q.    More of a bottom line?
6  A.    I mean, what's the deal.
7  Q.    Right. So the customer would say, well, I
8  think I need the following modules?
9  A.    (Witness nods head).
10 Q.    And presumably the salesman would try to
11 increase the sale, et cetera?
12 A.    Right.
13 Q.    How did HMS determine what value to assign to
14 each of these modules?
15 A.    I would say market competitive analysis.
16 Q.    Do these modules independently compete with
17 other modules from other systems, from other vendors?
18 A.    When I say independently, I'm not sure I
19 understand.
20 Q.    Well, is it common for someone to get their
21 financial software from one vendor and, say, their
22 reporting software and Health Information Management
23 software from a different vendor?
24 A.    Is that common --
25 Q.    Yes.
                                              Page 150

1  A.    -- in the industry?
2  Q.    Yes?
3  A.    Yes.
4  Q.    Is it common for HMS to provide only part of a
5  customer's software needs?
6  A.    No.
7  Q.    Is it typical that when HMS makes a software
8  sale it sells an integrated solution?
9  A.    Yes.
10 Q.    Would you say that virtually all of HMS's
11 customers buy an integrated software package?
12 A.    What do you mean by integrated?
13 Q.    Mainly I mean financial plus general ledger,
14 patient accounting, accounts receivable, management
15 reports, Health Information Management. So my question
16 is, is it true that virtually all of HMS's customers
17 buy that integrated package?
18 A.    Yes.
19 Q.    Do you know of any customer that is still
20 running your code on a system 34, system 36?
21 A.    No.
22 Q.    Still looking at page 13, Bates 01261 on
23 Exhibit 47, you said that --
24        MR. DENNEN: Referring to that number
25 right there.
                                              Page 151

1         THE WITNESS: Oh, okay.
2  BY MR. SMITH:
3  Q.    When you say that there is market conditions,
4  or competitive pressures, I forget the term you used,
5  that influenced to some extent the pricing that HMS
6  used, what other factors influence the pricing that's
7  put in the license fee?
8  A.    I think market penetration in competitive.
9  Q.    Competitive pressures?
10 A.    Pricing, competitive pricing pressures.
11 Q.    What do you mean by market penetration?
12 A.    Let's suppose you have a new product that is
13 not broadly distributed by us.
14 Q.    Uh-huh?
15 A.    At this point.
16 Q.    Uh-huh?
17 A.    There are five installers, so they're trying to
18 gain market penetration, and you might offer a bigger
19 discount in order to gain market share until it becomes
20 a mature product from the industry acceptance point of
21 view.
22 Q.    I see. Does the license fee vary depending on
23 any other characteristics such as the size of the
24 customer?
25 A.    Size, yes.
                                              Page 152

1  Q.    Now, is that something that you are up front
2  with the customer about saying, well, for a customer of
3  your size, we're going to charge you a different rate,
4  or is it something that --
5  A.    I mean, they get a quote. Every customer gets
6  a quote. You know, as a part of the sales process.
7  Q.    I guess what I'm saying is, would it be typical
8  for a large customer to be charged more for that same
9  software?
10 A.    Yes.
11 Q.    And when I say charged more, I mean the license
12 fee as opposed to higher monthly support and
13 installation costs; do you understand?
14 A.    Yes.
15 Q.    Is there some sort of formula that you're aware
16 that's used internally at HMS for how that's gauged?
17 A.    Yes.
18 Q.    And what is the formula for medical records or
19 Health Information Management; do you know?
20 A.    I do not know, but there is one.
21 Q.    But there is one?
22 A.    Yeah.
23 Q.    Is it based on the number of beds or revenue,
24 what's it based on?
25 A.    Number of beds.
                                              Page 153

39 (Pages 150 to 153)

1  abstract, does clinical view supply information to or
2  extract information from abstract?
3  A.    No.
4  Q.    Same question for patient care documentation?
5  A.    No.
6  Q.    Same question for electronic medication
7  administration record?
8  A.    No.
9  Q.    Same question for provider orders?
10  A.    No.
11  Q.    Same question for order communications?
12  A.    No.
13  Q.    Same question for HMS PACS, Picture Archives
14  And Communication System?
15  A.    No.
16  Q.    Same question for radiology?
17  A.    No.
18  Q.    Same question for transcription and on line
19  electronic medical record?
20  A.    No.
21  Q.    Same question for pharmacy?
22  A.    No.
23  Q.    Same question for narcotics tracking?
24  A.    No.
25  Q.  ·  Same question for laboratory?

Page 146

1  A.    No.
2  Q.    Same question for reference laboratory?
3  A.    No.
4  Q.    Same question for microbiology?
5  A.    No.
6  Q.    Same question for blood administration?
7  A.    No.
8  Q.    Same question for surgery management?
9  A.    No.
10  Q.    Same question for rehabilitation?
11  A.    No.
12  Q.    Same question for quality improvement risk
13  management; gives decision makers the tools necessary
14  to improve on the facility's healthcare delivery
15  capabilities?
16  A.    No.
17  Q.    Same question for -- I'm sorry. My copy is cut
18  off. Does your copy --
19  A.    Mammogram reporting.
20  Q.    Mammography reporting system, yes or no?
21  A.    No.
22  Q.    I think this is the last bundle of -- this
23  has -- on page seven it has the caption additional.
24  Same question for home health?
25  A.    No.

Page 147

1  Q.    Same question for long-term care?
2  A.    No.
3  Q.    Same question for rehabilitation?
4  A.    Can I --
5  Q.    Go back to long-term care?
6  A.    No. Really, these are -- these include some of
7  the same that we discussed back early with maybe a
8  different emphasis on reimbursement. So, I mean, I
9  don't want to take you down a path. These are almost
10  the same thing. These are types of specialty
11  facilities within the hospital industry. So they're
12  not really modules, per say.
13  Q.    I see. Okay. So these are not describing so
14  much products that HMS offers as much as it is
15  different solutions that you might be able to address?
16  A.    Yes.
17  Q.    Okay. Do the earlier lists that we went
18  through, do they address modules, the HMS modules?
19  A.    Yes.
20  Q.    Okay. Fair enough. Are there any other
21  software modules that HMS actively markets under other
22  names that we haven't covered?
23  A.    Not to my knowledge.
24  Q.    I'm going to show you Exhibit 47.
25        (Marked Exhibit No. 47.)

Page 148

1  BY MR. SMITH:
2  Q.    This is a contract between HMS and Gilmore
3  Health Systems. And I will direct your attention to
4  about the middle of the document that is Exhibit A1.
5        MR. DENNEN: Page 13?
6        MR. SMITH: Yes, page 13. It's Bates
7  01261.
8        THE WITNESS: Okay.
9  BY MR. SMITH:
10  Q.    And you're familiar with the form of HMS's
11  contract, I take it?
12  A.    Yes.
13  Q.    Did you ever personally negotiate these?
14  A.    Back in the old days.
15  Q.    Back in the old days. Have you personally
16  negotiated these since 2002?
17  A.    No.
18  Q.    The one, two, three, four, fifth module box?
19  A.    Yes.
20  Q.    Is identified as medical records. That's the
21  name of what HMS now markets as HIM?
22  A.    Yes.
23  Q.    And the license fee was $25,000. Was that a
24  perpetual license fee?
25  A.    Yes.

Page 149

38 (Pages 146 to 149)

1  part of the pharmacy source code?
2  A.    No.
3  Q.    Of the source code that was provided to AMC by
4  Mr. Goldman in 1983, is there any part of the source
5  code that was provided that HMS uses in a place other
6  than Health Information Management?
7  A.    No.
8  Q.    And I'm going to rephrase the question just to
9  make sure I understand your answer, just to make sure
10 we're on the same page.
11     But in layman's terms, the only place the
12 software at issue is within the HMS suite of products
13 would be within the Health Information Management
14 portion of the applications HMS markets; is that
15 correct?
16 A.    Yes.
17 Q.    With that answer, I want to make sure, on page
18 five it talks about executive view.
19 A.    Yes.
20 Q.    And it appears that some of the things in
21 executive view sound a lot like the executive summary
22 we looked at earlier.
23 A.    Yes.
24 Q.    And my question to you, is there anything in
25 executive view that employs any part of the software at

Page 142

1  issue?
2  A.    No.
3  Q.    Executive -- who developed --
4  A.    When you say employ -- well...
5  Q.    Is there any data that is generated, I mean,
6  does executive view interact with Health Information
7  Management?
8  A.    Information out of Health Information
9  Management, some information is summarized into a data
10 repository that drives the executive information
11 system, primarily DRGs.
12 Q.    Okay. Would executive view also use
13 information from the abstract file?
14 A.    Yes, because DRGs are stored in the abstract.
15 Q.    Okay. On page six there is a, it says DRG
16 slash case mix management?
17 A.    Yes.
18 Q.    What does that module do?
19 A.    It is all -- it provides all of the DRG
20 reporting and case mix reporting.
21     THE WITNESS: Shall I explain?
22     MR. DENNEN: Let him ask you.
23 BY MR. SMITH:
24 Q.    Does that explanation that you just gave, does
25 this module also use the DRG information that is

Page 143

1  produced by abstract -- sorry -- stored in abstract?
2  A.    Yes.
3  Q.    Going back a page, does the accounts payable
4  module use or provide information to abstract?
5  A.    No.
6  Q.    Does general ledger use or provide information
7  to abstract?
8  A.    No.
9  Q.    Does the fixed program use or provide
10 information to abstract?
11 A.    No.
12 Q.    Same question for payroll human services?
13 A.    No.
14 Q.    Same question for time and attendance?
15 A.    No.
16 Q.    Same question for materials management?
17 A.    No.
18 Q.    Same question for patient scheduling?
19 A.    No.
20 Q.    Does admissions slash registration use any of
21 the information from abstract or provide information to
22 abstract?
23 A.    Admissions and registration.
24 Q.    The Exhibit 46 says that it integrates?
25 A.    I am going to say yes.

Page 144

1  Q.    Same question for medical necessity?
2  A.    No.
3  Q.    Same question for eligibility?
4  A.    No.
5  Q.    Same question for intake and referral tracking?
6  A.    No.
7  Q.    And I'll just read the description for that
8  because it sounds as though it has admit data. Intake
9  and referral tracking automates the intake process,
10 identifies the facility's referral sources and tracks
11 those sources through the entire patient's stay.
12     And to the best of your knowledge, it neither
13 uses information from abstract nor supplies information
14 from abstract; is that correct?
15 A.    That's correct. It does to admissions, though.
16 Q.    Admissions is not a separate -- here it is.
17 Sorry. Same question for contract management?
18 A.    No.
19 Q.    You said yes to DRG slash case mix management:
20 the last one, electronic remittance and billing?
21 A.    No. What page are we on?
22 Q.    I was on page six. I'm going to take you back
23 to page three now.
24 A.    Okay.
25 Q.    And the same question, with relation with

Page 145

1  Q.    Uh-huh?
2  A.    But not just selling an individual module.
3  Q.    When you say you'll implement it in stages, you
4  might, as part of the implementation process, you might
5  bring on one module at a time?
6  A.    One suite at a time.
7  Q.    One suite at a time?
8  A.    Yes.
9  Q.    Okay. Would that usually be in the contract,
10 this sort of phased introduction?
11 A.    If you look down in the implementation plans in
12 the contracts, it's kind of outlined a lot of times,
13 and it can vary.
14 Q.    Okay. Who are -- going back to your answer
15 that the 450 customer base refers to customer
16 libraries?
17 A.    (Witness nods head).
18 Q.    With that in mind, what entities are HMS's
19 biggest customers by total sales?
20 A.    I don't know if I want to get into --
21        MR. DENNEN: That clearly is confidential.
22 We would have that covered by a protective order, and
23 we would request that it be so designated.
24        MR. SMITH: Could you please designate
25 this part of the transcript as confidential attorney's

Page 158

1  eyes only?
2        MR. DENNEN: This is attorney's eyes only.
3  I ask Mr. Goldman remove himself from the room.
4        MR. SMITH: Off the record a second,
5  please.
6        (Discussion off the record.)
7        (Mr. Goldman leaves the deposition.)
8        (The following is designated confidential;
9  attorneys' eyes only.)
10       MR. SMITH: We have just had a discussion
11 relating to this line of questioning and we jointly
12 agreed that Mr. Goldman will leave the room during this
13 time. This portion of the transcript will be marked
14 confidential and I will make a representation to
15 plaintiff's counsel that I will not share the identity
16 of any of the customers with my client without
17 conferring first with defense counsel.
18       MR. DENNEN: We appreciate that.
19       MR. SMITH: However, I cannot say --
20       MR. DENNEN: We understand.
21       MR. SMITH: -- that the litigation may
22 proceed in a way that's it's necessary to confer with
23 my client on this.
24       MR. DENNEN: We understand that. We
25 certainly do appreciate it.

Page 159

1        MR. SMITH: And I appreciate Mr. Givens'
2  and counsels' cooperation during this portion of the
3  deposition.
4  BY MR. SMITH:
5  Q.    Mr. Givens, who is HMS's current largest
6  customer by revenue?
7  A.    Community Health Systems.
8  Q.    How many hospitals do they have?
9  A.    Seventy-one, or about.
10 Q.    And they're based here in Tennessee?
11 A.    Yes.
12 Q.    And who would the second largest be?
13 A.    Select Medical Corporation.
14 Q.    Where are they based?
15 A.    Mechanicsburg, Pennsylvania.
16 Q.    How many hospitals do they have?
17 A.    How many libraries?
18 Q.    Libraries?
19 A.    Probably a hundred.
20 Q.    And in total dollars they're still second?
21 A.    This is what's called -- this is a specialty
22 entity called long-term acute care, LTAC. They are
23 really 30 bed entities inside a hospital.
24 Q.    Select Medical Corp operates 30-bed health
25 facilities within --

Page 160

1  A.    Within a hospital model under the LTAC loss.
2  Q.    And LTAC is an acronym for what?
3  A.    Long-term acute care.
4  Q.    So is it accurate that Select Medical Corp may
5  have more libraries, but fewer beds?
6  A.    It's very accurate.
7  Q.    And since these are so significant, let's go
8  until we reach the lower stage. Who is the third
9  biggest customer?
10 A.    I don't know. At this point it's --
11 Q.    It falls off quickly?
12 A.    Yes.
13 Q.    Okay. How many contracts has HMS signed with
14 CHS?
15 A.    I don't know.
16 Q.    More than one?
17 A.    Yes.
18 Q.    Fewer than two?
19 A.    I would say no. More than 10.
20 Q.    Is it an annual term?
21 A.    No.
22 Q.    Do each of those contracts cover all of CHS's
23 hospitals?
24 A.    Ask that again.
25 Q.    Does each contract which CHS has with HMS cover

Page 161

41 (Pages 158 to 161)

1 all of the hospitals owned by CHS?
2 A.    Sometimes.
3 Q.    Do you know when the most recent contract with
4 CHS was negotiated and executed?
5 A.    No.
6 Q.    How about Select Medical Corp, approximately
7 how many contracts has HMS signed with Select Medical
8 Corp?
9 A.    I don't know, but it's less than five.
10 Q.    And CHS, you said, was greater than 10?
11 A.    Yes.
12 Q.    Is it greater than 20?
13 A.    I'd say yes.
14 Q.    And what are the reasons why HMS has so many
15 contracts with CHS?
16 A.    The way modules were introduced to the
17 marketplace, the way they acquired hospitals, were the
18 primary reasons.
19 Q.    And are these standalone contracts or are they
20 amendments to earlier contracts?
21 A.    More -- some are standalone contracts, some are
22 amendments.
23        MR. SMITH:  Okay.  This concludes the
24 confidential portion of the transcript.
25        MR. DENNEN:  Okay.

Page 162

1 A.    Yes.
2 Q.    Is their commission based -- I should say is
3 their commission weighted in any way on the percent of
4 the revenue that is derived from software sales versus
5 hardware sales?
6 A.    No, but we pay on gross profit on hardware, not
7 total hardware sales, the marginal hardware, the term
8 commissionable sale.
9 Q.    What is included in the term commissionable
10 sale?
11 A.    Software license fees, implementation and gross
12 margin on any purchased software.
13 Q.    Hardware, you mean?
14 A.    Well, anything.
15 Q.    Okay.  I'm confused.  You said license fees for
16 the software?
17 A.    Right.
18 Q.    Installation fees for the software?
19 A.    Yes.
20 Q.    Gross profit on the hardware?
21 A.    Right.
22 Q.    Anything else?
23 A.    Well, there are maybe other products like the
24 mammogram reporting system that we resale.  So it's the
25 gross profit on that particular module.  The PACS we

Page 164

1        (Thereupon, the designated confidential;
2 attorneys' eyes only portion is concluded.)
3        (Discussion off the record.)
4        (Mr. Goldman returns to the deposition.)
5 BY MR. SMITH:
6 Q.    A few questions on how the sales process works,
7 Mr. Givens.  How does HMS identify what hospitals or
8 clinics it wants to approach to sell its products?
9 A.    Through referrals, through telemarketing,
10 through advertising, through cold calls.
11 Q.    How large is your sales force?
12 A.    Should be eight sales execs.
13 Q.    Do they have geographic territories?
14 A.    Yes.
15 Q.    Do you have any national accounts?
16 A.    Yes.
17 Q.    How did you go about identifying customer
18 needs?
19 A.    We do a -- we meet with the customer and
20 assess.  We do a demonstration for the customer.
21 Sometimes it's an RFP.
22 Q.    You pay commissions to your sales
23 representatives?
24 A.    Yes.
25 Q.    Sales executives, I should say?

Page 163

1 resale.
2 Q.    When you have an existing customer and you
3 update or upgrade your software, do you receive a fee
4 for the upgraded software from the customer?
5 A.    No.
6 Q.    Is that included as part of the software
7 maintenance fee?
8 A.    Yes.
9 Q.    And does the maintenance fee cover ongoing
10 software support, telephone calls?
11 A.    Yes.
12 Q.    I can't get general ledger to work right?
13 A.    Yes.
14 Q.    Are there any other fees that HMS receives
15 after the sale other than maintenance fees from a
16 customer?
17 A.    Fees?
18 Q.    Just fees, and not including hardware that a
19 customer might decide they need, just software related
20 fees?
21 A.    There are service offerings.
22 Q.    What are service offerings?
23 A.    Education seminars.  We do statement rendering
24 for customers, we do accounts.
25 Q.    What is statement rendering?

Page 165

42 (Pages 162 to 165)

1  A.    We actually mail their statements.  We pick up
2  their statements, mail them out for them.
3  Q.    To patients?
4  A.    Yes.  We do accounts receivable collections.
5  We do consulting, operational consulting.
6  Q.    On your financial statement are these sorts of
7  activities broken out?
8  A.    Yes.
9  Q.    On your consolidated financial statement are
10 they?
11 A.    Yes.  Well, not on the audited financial
12 statements, but the internal financial statements.
13       (Marked Exhibit No. 51.)
14 BY MR. SMITH:
15 Q.    I'm going to show you Exhibit 51.  51 is HMS's
16 November 2004 statements.  And I'm looking at page five
17 which is your -- sorry.  That's cash flow.  The income
18 statement is on page three, and it doesn't appear that
19 this is broken out here?
20 A.    It's on the internal statements.
21 Q.    And do these categories of service fees, things
22 like statement rendering, services for accounts
23 receivable -- well, sorry for the transcript here.
24       Do service fees encompass statement rendering,
25 account receivable collections activity and consulting?

Page 166

1  A.    Yes.
2  Q.    So on your internal financial reports is there
3  a line that says service fees?
4  A.    It actually says each one of those categories.
5  Q.    Okay.  And would this be part of regular
6  revenue?
7  A.    Everything is regular revenue.  I mean, I don't
8  know what you mean by regular revenue here.
9  Q.    As I was going through some of these documents.
10 A.    Uh-huh.
11 Q.    Yesterday was the first time that I had seen
12 any of these internal financial statements?
13 A.    Right.
14 Q.    I recall seeing that term, I believe, as
15 opposed to extraordinary revenue, I suppose.
16       Okay.  I want to follow up with something you
17 said about gross profits and sales to commissions.  The
18 commissionable income that your sales executives'
19 compensation is based on, or is partly based on, would
20 include license fees, installation fees, gross profits
21 on hardware and gross profits on any markup for
22 third-party software licenses?
23 A.    (Witness nods head).
24 Q.    You have to say yes.
25 A.    Yes.

Page 167

1  Q.    Is there anything else in commissionable
2  revenue on which your salespeople receive commissions?
3  A.    No, that I'm aware of.
4  Q.    You mentioned that -- do you still have your
5  marketing brochure in front of you?  It's 46.  If you
6  turn to the bottom of page four on Exhibit 46, it says
7  mammography reporting system, third party?
8  A.    Uh-huh.
9  Q.    Who is that third party?
10 A.    I think it's mammography reporting system, MRS,
11 I believe.
12 Q.    And you have a license -- a reseller's
13 agreement with them?
14 A.    Yes.
15 Q.    Do you know what the terms of that agreement
16 are?
17 A.    No.
18 Q.    Do you know how much royalty you pay them for
19 every installation?
20 A.    No.
21 Q.    Do you know what is the number of beds, flat
22 amount?
23 A.    No.
24 Q.    Do you know how much you mark it up?
25 A.    No.

Page 168

1  Q.    When you sell it to a customer?
2  A.    No.
3  Q.    I thought you also mentioned PACS as a third
4  party?
5  A.    Uh-huh.
6  Q.    Is that P-A-C-S?
7  A.    Yes.
8  Q.    And I don't see PACS on Exhibit 46.
9        MR. DENNEN:  Page four at the top.
10       MR. SMITH:  There it is.  Thank you,
11 Counsel.
12 BY MR. SMITH:
13 Q.    Who is the vendor that supplies HMS with the
14 PACS system?
15 A.    Access Healthcare.
16 Q.    Do you know what the terms are of the agreement
17 between HMS and Access Healthcare regarding license
18 fees?
19 A.    Generally, yes.
20 Q.    What are those terms, generally?
21 A.    About a 25 percent margin.
22 Q.    Do you know what royalty access charges you for
23 a license?
24 A.    There is no royalty.
25 Q.    What license fee they charge you per license?

Page 169

43 (Pages 166 to 169)

1  A.    Seventy-five percent of the sales price.
2  Q.    So it's almost a -- well, it is a straight
3  percent of whatever you cancel it for, they receive?
4  A.    You know, if we have to discount, sometimes
5  we'll negotiate that.  This is a new product.  In one
6  hospital we actually gave the software away.  So our
7  cost, we lost money on it.
8  Q.    But you still had to pay something to Access
9  Healthcare?
10  A.    Right, yes.  Charge zero and pay 75,000.
11  Q.    Well, you said 75 percent, so is it typically a
12  $100,000 fee?
13  A.    It varies, again, the size of the hospital, the
14  number of radiology stations they have, the number of
15  pieces of equipment you're integrating.
16  Q.    Is it a formula that is reflected in the
17  licensing agreement, though?
18  A.    Not that I'm aware of.
19  Q.    But at least in this one instance where you
20  gave it away?
21  A.    (Witness nods head).
22  Q.    Presumably for some sort of competitive
23  purposes of penetration, the fee to Access Healthcare
24  was based on an inputted sales price of $100,000; is
25  that right?

Page 170

1  A.    No.  It was based on a negotiated sales price
2  of $75,000, a negotiated cost of 75,000.
3  Q.    And then Access Healthcare received 25 percent
4  of 75,000?
5  A.    No.
6  Q.    Okay.  I'm confused.
7  A.    Access received $75,000.
8  Q.    Right.  And that equals 25 percent?
9  A.    No.
10  Q.    No?
11  A.    HMS charged zero.  So zero minus 75 equals a
12  $75,000 loss.
13  Q.    Okay.  When I said there was an inputted
14  $100,000 sales price, that's what you would actually
15  charge somebody for that system, and then Access would
16  receive 75 percent and you would receive 75 --
17  25 percent; is that right?
18  A.    What the sales price, the contract basically
19  reads there would be a 25 percent margin to HMS.  The
20  sales price could vary.  And also given it's a new
21  product, issues where we sit down and negotiate the
22  situation in order to get market share.
23  Q.    Was this situation one of those situations
24  where you independently sat down and said, well, we
25  want to give this away.  Access said, well, we're not

Page 171

1  in the business of giving away our software and then
2  you decided together that they would receive 75,000 for
3  this installation?
4  A.    Yes.
5  Q.    Okay.  So this was outside of the parameters of
6  the 25 percent margin --
7  A.    Yes.
8  Q.    -- agreement?
9  A.    Yes.
10  Q.    I understand now.
11        I believe you've already answered this
12  question, but do you know how many HMS customers have
13  purchased medical records or HIM?
14  A.    No.
15  Q.    Do you know how many customers that used to
16  have HMS software, specifically the HIM or medical
17  records software, you've lost these customers and they
18  have changed vendors?
19  A.    No.
20  Q.    Can you give me an approximate number of how
21  many customers you think HMS has lost?
22  A.    Yes.
23  Q.    What is that number?
24  A.    Ten.
25  Q.    Is HMS continuing to add new customers every

Page 172

1  year?
2  A.    Yes.
3  Q.    Looking again at Exhibit 46.  You testified
4  earlier that HMS is not in the business of selling
5  individual modules.  On page nine of Exhibit 46 it
6  discusses integration.  Could you tell me how you made
7  the decision or why you made the decision to market an
8  integrated suite of software programs versus marketing
9  them singularly?
10  A.    We look at the total of the business problem to
11  be solved.  We sell to small community hospitals that
12  typically don't have an IT staff to support integration
13  issues.  And it's our belief that integration is the
14  simplest most cost effective solution for implementing
15  IT in our marketplace.
16  Q.    Your target customer would be a library, you
17  know, hospital library, what's the term, a site with
18  fewer than X number of beds, or how would you say what
19  your target customer is?
20  A.    Our target customers are hospitals that want a
21  full suite of product on an integrated platform in
22  typically a community marketplace.
23  Q.    And the number of beds is the secondary
24  consideration?
25  A.    Secondary consideration.

Page 173

1  Q.    A very large metropolitan hospital, though,
2  would not be at the top of your target list?
3  A.    Because they're not in a community market.
4  They are in a suburban market.
5  Q.    A community market we're talking more rural,
6  small city?
7  A.    Yes.
8  Q.    Do you believe this emphasis on integration is
9  unique to HMS?
10 A.    Do I believe that?
11 Q.    Yes.
12 A.    No.
13 Q.    There are other vendors out there that are also
14 selling integrated systems?
15 A.    Yes.
16 Q.    Is the integration factor important to your
17 customers?
18 A.    Yes.
19 Q.    Is it an advantage, you believe, for HMS over
20 other vendors who don't have integration systems?
21 A.    Yes.
22 Q.    Is it one of your more important advantages
23 versus the type of software you sell and how the
24 software works?
25 A.    No.

Page 174

1  Q.    So it's just all part of the mix?
2  A.    Yes.
3  Q.    I'm afraid I only have one copy of this, so I'm
4  going to mark it.  This will be Exhibit 55.
5        (Marked Exhibit No. 55.)
6        MR. SMITH:  We'll make copies afterwards.
7  BY MR. SMITH:
8  Q.    But I'm showing you Exhibit 55 which is a
9  printout from the HMS website, and it has various
10 categories there.  Under solutions, revenue cycle
11 overview?
12 A.    Uh-huh.
13 Q.    Could you tell me where the HIM system fits, if
14 it does, in those categories?
15 A.    We have our reimbursement module as a part of
16 the Health Information Management.  So from that point
17 of view that would integrate in with the expected
18 payment of what we would get paid on a bill.
19 Q.    So it's not only -- this says health
20 information that --
21 A.    Look from a revenue cycle point of view, okay.
22 Q.    You are saying -- let me interrupt.
23 A.    Yes.
24 Q.    That the DRG aspect of HIM, Health Information
25 Management, ties into the revenue cycle in terms of

Page 175

1  relating to patient accounting?
2  A.    In terms of what you are going to get paid, the
3  DRGs compute what you're going to get paid.
4  Q.    So it's a forward looking report?
5  A.    So do APCs, and CMGs.
6  Q.    What do those stand for?
7  A.    APC is ambulatory patient classification
8  system, CMGs are comorbidity groupings for rehab, HHRGs
9  are health -- it's a payment system for home health.
10 Q.    Okay.  So all of these different things that
11 you're talking about are forward looking of what the
12 hospital is going to receive in the future; is that
13 right?
14 A.    No, it's what they're going to get paid for
15 what they did.
16 Q.    But they may or may not have yet been paid?
17 A.    Right.
18 Q.    Okay.
19        THE WITNESS:  I'm going to take a break,
20 if you don't mind.
21        MR. SMITH:  I don't mind.  Let me finish
22 up this line of questioning.
23 BY MR. SMITH:
24 Q.    Earlier you testified that patient accounting
25 did interact to some degree with the file abstract.

Page 176

1  Health Information Management, of course, you said,
2  contract management did not?
3  A.    Right.
4  Q.    Is that still accurate testimony?
5  A.    That's correct.
6  Q.    And you testified that electronic remittance
7  and billing did not; is that still accurate?
8  A.    That's correct.
9  Q.    And you said medical necessity did not; is that
10 still correct?
11 A.    It's still correct.
12        MR. SMITH:  Okay.  We can take a break.
13        (Recess taken.)
14        (Marked Exhibit No. 49.)
15 BY MR. SMITH:
16 Q.    We're on the record and I'm showing the witness
17 Exhibit 49.
18        MS. JACOBS:  Nope.  Just about everything
19 else.
20        MR. GOLDMAN:  49 got lost.
21        MR. SMITH:  I only have one copy, which
22 means I probably provided it to mark.
23        MS. JACOBS:  Okay.  Go ahead.  We're all
24 right.  We'll share.
25 BY MR. SMITH:

Page 177

45 (Pages 174 to 177)

1  Q.    Exhibit 49 is something HMS produced to us,
2  Mr. Givens, and earlier we had talked about being able
3  to print out HMS customers who had medical or HIM
4  software, is this the sort of printout you would
5  expect --
6  A.    Yes.
7  Q.    -- the report to produce?
8  A.    Yes.
9  Q.    Looking on this list, does this appear to you
10  to be approximately the number of customers you would
11  expect?
12  A.    How many are there?
13        MS. JACOBS:  Six pages.
14  BY MR. SMITH:
15  Q.    Forty-six on the first page.  So 46 times six
16  is 264, something like that?
17  A.    I would say that's reasonable.
18  Q.    Do you know whether this list reflects all
19  customers, including customers that HMS may have lost
20  along the way?
21  A.    Yes.
22  Q.    And does it, in fact, include all customers,
23  including any customers that HMS may have lost along
24  the way?
25  A.    It appears to.

Page 178

1  Q.    Now, earlier, I believe you testified that
2  nearly all of your customers -- I beg your pardon.  I'm
3  mischaracterizing your testimony.  I believe you
4  testified that approximately 80 percent of your
5  customers would have purchased medical records?
6  A.    Yes.
7  Q.    So HMS, you believe, has more customers than
8  are listed in Exhibit 49?
9  A.    Not many more.
10  Q.    Okay.  By the way, when you sell a customer
11  software, do you install that software for the customer
12  on a computer?
13  A.    Do I?
14  Q.    Sorry, does HMS?
15  A.    Yes.
16  Q.    And is the software that's installed, is that
17  source code or object code?
18  A.    Object code.
19  Q.    As a practice, do you provide your customer
20  with source code?
21  A.    No.
22  Q.    Why not?
23  A.    It's subject to having the application modified
24  and creates support problems.  You don't have control
25  over the product.

Page 179

1  Q.    Of these facilities listed on 49, I've asked
2  this once before, but can you identify any of them that
3  might still be running system 34 and system 36 code?
4  A.    There is no system 36 or 34 code in our client
5  base.
6  Q.    Okay.  And how do you know that?
7  A.    Because we don't have any code that we support.
8  It's all I-series.
9  Q.    Well, let's -- does HMS have any older code
10  that it retains in-house?
11  A.    We maintain basically two version levels.
12  Q.    Of each software module?
13  A.    Yes.  It may be the installed version.  If you
14  will look at -- I don't know.  Basically if you read
15  all of our contracts it gives the client -- after the
16  new release comes out they have 60 days to install that
17  new release, okay.  And every client has to do that by
18  contract.  So there is the same version of code on
19  every client in our hospital base within 60 to 90 days.
20  Q.    Uh-huh?
21  A.    Okay.  Otherwise, we couldn't maintain it, with
22  the updates and everything.
23  Q.    Uh-huh?
24  A.    By contract it's -- okay.
25  Q.    The witness is looking at Exhibit 47 -- 48?

Page 180

1  A.    They should say the same.  It used to say that.
2  I think this is --
3  Q.    I believe it's paragraph 9.3.1?
4  A.    Right, HMS software that HMS sells shall
5  provide under this agreement shall be limited to the
6  delivery of one copy of such HMS software and
7  documentation to hospital.  Hospital agrees to install
8  all HMS software improvements and modification releases
9  no later than 60 days after hospital's receipt thereof,
10  or a mutually agreed upon time thereafter.
11  Q.    Okay.
12  A.    So...
13  Q.    So does HMS, then, overwrite or destroy older
14  versions of its source code after that transition
15  period?
16  A.    Well, what -- what happens is it just gets
17  modified.  You know, we've got this release, we have
18  the new release during this period.  So we're really --
19  it's not really getting destroyed, it's just getting
20  modified all the time.  But I couldn't go back and tell
21  you what the code looked like in 1994 or even the year
22  2005.
23  Q.    This lawsuit was filed in January 2005.  And if
24  you look at, for example, Exhibit 4, can you find
25  Exhibit 4?  It's a thick one.  There it is.

Page 181

46 (Pages 178 to 181)

1  A.    Uh-huh.
2  Q.    In the comments section, the revision log, beg
3  your pardon, the last comment in the revision log it
4  says MR55642, March 9, '05, the initials MLM, remove
5  commented code, period. Compile only?
6  A.    Uh-huh.
7  Q.    Period. HMS is identified and MLM is Mark
8  McCaghren?
9  A.    Yes.
10 Q.    Do you know Mr. McCaghren?
11 A.    Yes.
12 Q.    What does it mean to remove commented code?
13 A.    All these versions and releases over time.
14 Just example, they're talking about version 2006.
15 Let's suppose we add new code to it, delete code, et
16 cetera. Then for that period, like I keep two
17 versions, I will have that one -- I'll have a new code
18 out there, and it may have comments commented out what
19 was the changes that have been made from the previous
20 release. Then we move forward, we get rid of all those
21 comments, because the code, you get so many changes to
22 it, you can't tell. You know, all it does is have
23 lines in it with star, star, star and you lose what's
24 going on. So as we're moving forward in the code, we,
25 you know, keep one release back, then we remove the

Page 182

1  comment or the stuff that's unusable or added, you
2  know, in the next release.
3  Q.    Is this something that HMS does every year as a
4  matter of course?
5  A.    Yes, every release. It's kind of mass done.
6  It's a program that goes through and does it.
7  Q.    Is there anywhere in the revision log on
8  Exhibit 4 that you can find where there is another
9  reference to removing commented code?
10 A.    To what?
11 Q.    To removing commented code?
12 A.    No.
13 Q.    If it's, and you said this is a standard
14 ordinary part of the process of issuing new revisions;
15 is that correct?
16 A.    Yes.
17 Q.    Why, if you know, did Mr. McCaghren add the
18 comment, this time, of the removing commented code?
19 A.    We were -- we had moved, and he can answer this
20 better than I, but certain programs were internally
21 described, and we moved externally described, a number
22 of files. And so we removed -- we externally described
23 all those files and he just decided to put a comment in
24 there. I don't know that, you know, typically that
25 happens, that we put a comment in that did it, because

Page 183

1  probably the whole application would be externally
2  described, might be the reason he did that.
3  Q.    Do you know who Mr. McCaghren's supervisor was
4  at the time?
5  A.    Yes.
6  Q.    Who was that?
7  A.    Jim Dorsett.
8  Q.    What is Jim Dorsett's title?
9  A.    I'm not sure.
10 Q.    Is he a programmer?
11 A.    Yes.
12 Q.    Did the removal of the commented code have
13 anything to do with this lawsuit?
14 A.    The execution of this? Not really, but some of
15 it was to clean it up, to get something, you know,
16 instead of having a bunch of, you know, just junk out
17 there.
18 Q.    When you say some of it was to get rid of some
19 of the junk, can you explain what you mean, how that
20 might relate to the lawsuit?
21 A.    Just commented lines, you couldn't read the
22 code because it, you know, from where we changed
23 things. It may have star, star, star, it would have a
24 line of code and then star, star, star.
25 Q.    Did any of the commented code reference

Page 184

1  Mr. Goldman?
2  A.    No.
3  Q.    How can you be certain of that?
4  A.    I can't be certain of anything.
5  Q.    You seemed to answer quite definitely on that.
6  I'm wondering if you were the person involved in the
7  removal of any of the commented code?
8  A.    The reason I'm saying that, is there was no
9  reference to Mr. Goldman in any prior code or anything
10 that we got from AMC. So if there was a reference to
11 Mr. Goldman we would have to write it and put
12 Mr. Goldman's name on it ourselves. There was not
13 anything we received from AMC that was Mr. Goldman.
14 Q.    Well, let me refer you back to Exhibit 43,
15 which HMS provided. And this is a portion of the
16 pharmacy program that HMS had in its possession, and
17 this was code that you earlier testified Mr. Goldman
18 provided to you during the meeting in Nashville?
19 A.    Yes.
20 Q.    And it has Mr. Goldman's name on it?
21 A.    Yes. I'm referencing things I got from HMS
22 from AMC was things that Mr. Goldman provided us.
23 Mr. Goldman provided this code -- this is not a part of
24 our application.
25 Q.    Uh-huh?

Page 185

47 (Pages 182 to 185)

1  A.    This has nothing -- I mean, it's not a part of
2  my understanding of what we're talking about. It's not
3  a part of HMS application. When everything was sent
4  over to me from AMC, this was information that was sent
5  over that I happened to find when we were trying to
6  research, because I had these old diskettes. So this
7  is not a part of HMS application. It never was a part
8  of HMS application and --
9  Q.    Do you still have those old diskettes?
10  A.    Yes.
11  Q. .    How many do you have?
12  A.    I think there is one or two. This was the only
13  one I could find. And it was in with, you know,
14  everything in the world.
15  Q.    And what was on those diskettes?
16  A.    It was code related to this pharmacy product.
17  Q.    Did you personally review the diskettes?
18  A.    When you say personally reviewed the diskette,
19  I had someone to go out and buy an eight inch diskette
20  reader that took about three months. Because I had all
21  of these diskettes, there was two boxes, about 20, to
22  see if we could find out what was on them. And this is
23  all we found that really had anything to do with
24  Mr. Goldman that was on an eight inch diskette.
25  Q.    What was on the other eight inch diskettes?

Page 186

1  A.    CAFRS, the manufacturing program products that
2  we had written, I think some of the old Glass
3  Unlimited.
4  Q.    Were there any medical records program on any
5  of these --
6  A.    Not on the eight inch diskettes.
7  Q.    It's your testimony that the software at issue
8  that you received from AMC and Mr. Agee, none of it had
9  Mr. Goldman's name on it?
10  A.    No.
11  Q.    But that is your testimony; is that correct?
12  A.    That's correct. Can I modify that?
13  Q.    Uh-huh.
14  A.    This is 23 years ago.
15  Q.    Uh-huh?
16  A.    To the best of my recollection, I don't recall
17  In 1985 --
18  Q.    Uh-huh?
19  A.    ` -- any code that had Mr. Goldman's name on it
20  that was related, you know. I had this code.
21  Q.    And the witness is pointing at 43?
22  A.    Yeah.
23  Q.    Do you have any recollection of you or anyone
24  else at AMC removing Mr. Goldman's name, while you
25  worked at AMC, from the software at issue?

Page 187

1  A.    I'm sure that Mr. Goldman's name, if it wasn't
2  there, and Mr. Goldman gave it to me, and Mr. Goldman
3  had put his name, you know, as the programmer.
4  Q.    Uh-huh?
5  A.    Then I am sure someone removed it.
6  Q.    Uh-huh. Do you know who that would have been?
7  A.    It would have been myself, probably, and Mike
8  Hayes.
9  Q.    Do you have any recollection of removing
10  Mr. Goldman's name from any of the software at issue
11  while you were at AMC?
12  A.    Do I have a recollection?
13  Q.    Yes.
14  A.    No.
15      MR. SMITH: Could you read the witness'
16  answer back?
17      (The requested proceedings were read back
18  by the court reporter.)
19  BY MR. SMITH:
20  Q.    When you say it would have been myself,
21  probably, and Mike Hayes, why do you think it would
22  have been yourself, probably, and Mike Hayes?
23  A.    Because I was integrating the software.
24  Q.    Do you recall removing any notice of copyright?
25  A.    There was no notice of copyright.

Page 188

1  Q.    And is that because you would have -- you
2  believe you would remember that if there had been?
3  A.    I would remember if there had been.
4  Q.    Did you know about Mr. McCaghren's plans to
5  remove the commented code before he did it?
6  A.    Yes.
7  Q.    How did you learn that he was going to do this?
8  A.    Because I told him to.
9  Q.    Did he come to you and say, I want to do this,
10  or did you go to him and tell him remove the commented
11  code?
12  A.    I went to Jim Dorsett and said we needed to get
13  the medical records cleaned up so we could send it out.
14  Q.    Back pedal a little bit. Showing you Exhibit
15  50.
16      (Marked Exhibit No. 50.)
17  BY MR. SMITH:
18  Q.    This is a letter from your counsel to me, and
19  part of what was enclosed was Exhibit 49, which is the
20  medical records clients?
21  A.    Uh-huh.
22  Q.    And I just want to clarify any misunderstanding
23  or inconsistency. In her cover letter Ms. Jacobs
24  indicated it was a list of all HMS installations of
25  medical records clients since 1997. And my question

Page 189

1  is, is Exhibit 49, does that reflect installations
2  since 1997 or since 1986?
3  A.    It must be out of my Hickman -- I don't know.
4  Q.    Is there anything that would help you answer
5  that question? Do you need to confer with counsel or
6  anything like that?
7  A.    No. I didn't run this report, so I'm just
8  saying I don't know.
9  Q.    I just see a lot of listings here that predate
10  1997.
11        MR. DENNEN: 1999, St. Vincent General --
12        THE WITNESS: It must be everything. I
13  just don't know.
14  BY MR. SMITH:
15  Q.    I think there is one here. Here it is. Client
16  Number 60097. These are in client number order 60097.
17  It's Bates Number 1725. That's one of the earlier
18  ones, I think?
19  A.    Right, yeah. I looked at it.
20  Q.    To the best of your recollection, on that date
21  did HMS install medical records software?
22  A.    I would not know.
23  Q.    Okay. I'm showing now two related exhibits,
24  Exhibits 52 and 53.
25        (Marked Exhibit No. 52.)

Page 190

1        (Marked Exhibit No. 53.)
2  BY MR. SMITH:
3  Q.    These are applications -- well, at this point I
4  think they're certificates of registration to register
5  copyright. Exhibit 52 is the registration for a
6  computer program called Monitor Medical Records. And
7  my question is, your current -- HMS's current marketing
8  materials don't seem to incorporate the term monitor,
9  but is it the same software?
10  A.    Yes.
11  Q.    Is it just that marketing has deemphasized the
12  use of that trade name?
13  A.    Yes.
14  Q.    Trademark, I guess?
15  A.    Trademark.
16  Q.    Did you have anything to do with the decision
17  to apply for copyright for the computer programs?
18  A.    Yes.
19  Q.    Was that primarily your decision?
20  A.    No, not primarily.
21  Q.    Whose decision was it?
22  A.    It was, I guess, John, my decision...
23  Q.    And was there anything that prompted you to
24  seek registration in January 1994 instead of seeking it
25  earlier?

Page 191

1  A.    Yes.
2  Q.    What?
3  A.    We were getting brand recognition in the
4  marketplace, and felt like that we were becoming a
5  legitimate company and had a product with some
6  legitimate long-term viability.
7  Q.    And prior to that point, listen carefully to
8  the question, prior to that point, was it a conscious
9  decision not to seek registration?
10  A.    Conscious, no.
11  Q.    Okay. So in layman's terms you really didn't
12  think it was terribly important to do this until 1994?
13  A.    That's correct.
14  Q.    Okay. The next exhibit, Exhibit 53, is another
15  Certificate of Registration, and this one was -- if you
16  look at box six, it's on the second page of Exhibit 53.
17  Box six is that grayed out number to the right?
18  A.    Uh-huh.
19  Q.    It says this is a derivative work and then the
20  attachment identifies preexisting works, including
21  Monitor Medical Records. And my question is, do you
22  know why HMS filed this new application?
23  A.    No.
24  Q.    Do you know whether HMS has filed copyright
25  registrations since 1995 for the HIM component?

Page 192

1  A.    Rephrase that.
2  Q.    Do you know whether HMS has filed for copyright
3  registration for the HIM or medical records suite since
4  1995?
5  A.    No.
6  Q.    You don't know, or the answer is no?
7  A.    No, they haven't.
8  Q.    Why is that?
9  A.    It's not worth the problem, the trouble, in our
10  opinion.
11  Q.    It's just as easy to maintain it as a trade
12  secret?
13  A.    As a trade secret, we don't issue source code.
14  Q.    How many employees do you have today, HMS, that
15  is?
16  A.    I don't know.
17  Q.    110?
18  A.    No.
19  Q.    More?
20  A.    Over 300.
21  Q.    Are they all based in Nashville?
22  A.    No.
23  Q.    Do you have any other office in which they're
24  based?
25  A.    No.

Page 193

49 (Pages 190 to 193)

1  Q.    You have sales execs that are based out of
2  other locations?
3  A.    Yes.
4  Q.    Other than sales executives, are they based in
5  Nashville?
6  A.    Yes.
7  Q.    How many?
8  A.    Five or six.
9  Q.    Tom Stephenson, who is the current president,
10 how long has he been associated with AIC or HMS?
11 A.    He was the third employee. Probably since '85.
12 Q.    So he joined you and John Doss?
13 A.    Yes.
14 Q.    What is his background?
15 A.    Programmer.
16 Q.    Did he have any RPG programming experience
17 before coming to AIC?
18 A.    Yes.
19 Q.    Was that his first language, as it were?
20 A.    I don't know.
21 Q.    You've already said that all of you would pitch
22 in where needed?
23 A.    (Witness nods head).
24 Q.    So can you say that you versus John Doss,
25 versus Tom Stephenson were more responsible for medical

Page 194

1  records than others?
2  A.    No.
3  Q.    So as far as you know, you're all equally
4  knowledgeable about medical records in those very early
5  years; correct?
6  A.    No.
7  Q.    Who would be most knowledgeable?
8  A.    Me.
9  Q.    I don't think I asked you earlier, the reasons
10 for your retirement. What are the reasons why you
11 relinquished your presidency?
12 A.    Company continuity. This had been planned, it
13 was a succession plan that probably, I mean, we started
14 in 2000, and it was just getting the right management
15 team together and getting the right folks together and
16 give that management team a chance to do things on
17 their own and it was more of a company continuity.
18 Q.    Did your resignation have anything to do with
19 this lawsuit?
20 A.    No.
21 Q.    Did Mr. Doss' resignation have anything to do
22 with this lawsuit?
23 A.    No.
24 Q.    Earlier, I think you testified twice now that
25 your approximation in terms of how many of your

Page 195

1  customers purchased HIM as part of the software suite
2  was maybe 80 percent. Do you know how much revenue,
3  approximately, what percentage of your revenue, HMS's
4  revenue, comes from HIM?
5  A.    No.
6  Q.    And HMS does not keep track of revenue by any
7  of these categories that we discussed earlier?
8  A.    No.
9  Q.    Correct?
10 A.    Correct.
11 Q.    That would be a yes for correct?
12 A.    Correct, yes, I'm sorry.
13 Q.    Does HMS keep track of the inventory of copies
14 of the different software modules for purposes of
15 accounting?
16 A.    I'm not sure I understand that question. We
17 know who our clients are.
18 Q.    Inventory in terms of the number of -- I wish I
19 had the exhibits which I flagged to be copied
20 yesterday, but among those exhibits appeared to be at
21 the end of every fiscal year some sort of fixed asset
22 inventory?
23 A.    Okay.
24 Q.    And included in that inventory was software,
25 even though it's not a fixed asset?

Page 196

1  A.    Uh-huh.
2  Q.    And it would have a value of something for the
3  different modules?
4  A.    Okay.
5  Q.    For example, medical records, and so I'm asking
6  you a question that I knew the answer to. Would you
7  agree that HMS keeps track of inventory of the
8  different software modules?
9  A.    No.
10 Q.    Okay.
11 A.    It capitalizes software development costs.
12 Q.    I wish I had the exhibit to show you. But I'll
13 have it tomorrow. Would Mr. Doss be in a position to
14 explain the capitalization of software?
15 A.    It should be in the financial statement. Do
16 you have a copy of the balance sheet here?
17       MR. DENNEN: Right here.
18       THE WITNESS: It's covered in the
19 footnotes.
20       MR. SMITH: Exhibit 51.
21       (Marked Exhibit No. 51.)
22 BY MR. SMITH:
23 Q.    Page 14?
24 A.    Software development costs, on page eight, the
25 footnote.

Page 197

50 (Pages 194 to 197)

1    Q.    But as far as you know, you don't record an
2    inventory of software apart from accounting for a
3    software development cost?
4    A.    Right.  I mean, there is software, it's an
5    intangible.
6    Q.    Uh-huh.
7    A.    You know, according to the, you know, SAS, I
8    think this is '76, maybe '96.  It talks about the
9    conditions when you develop software, if you're
10   developing a new module or new product you can
11   capitalize that.  If you are doing enhancements to your
12   current software, it's expensed.  So, for example, an
13   electronic clinical information system was a new
14   product we developed over the years.  Well, we
15   capitalized the value of that until we got to the point
16   that it went to market.
17   Q.    Okay.
18   A.    Then we would start writing that off sometimes
19   over estimated numbers of sales and sometimes over a
20   straight line method, but it was, hey, there is one of
21   these.  It was the cost of development.
22   Q.    Thank you for explaining that.  That makes
23   sense.  What are the software modules that are most
24   frequently demanded or requested by your customers?
25   A.    The clinical suite.

Page 198

1    Q.    And that would include the lab reports, the
2    things --
3    A.    Clinical view, nursing, pharmacy, electronic
4    medication, administration records.
5    Q.    Are the financial capability of your software,
6    is that something that you market or is that something
7    that is kind of like wheels on a car, well, of course,
8    I need those?
9    A.    I'm not just making commentary.
10   Q.    Sure.
11   A.    If you look at the market now.
12   Q.    Uh-huh.
13   A.    We're selling a replacement market.  Everybody
14   has a computer system, everybody has financials.
15   Q.    Right.
16   A.    What is driving these new sales and what is the
17   reason for people to change.
18   Q.    Right.
19   A.    Is nursing care, okay, what we call clinical
20   view, the ability to have one spot that remotely over
21   the internet doctors can go in and look at the lab
22   results and lab, et cetera.  Those are key components
23   to drive sales.  The lab is important, but they have
24   probably not got a lab, but being able to integrate all
25   of that is the key why people would spend money to

Page 199

1    change.
2    Yes, it's nice that you have a good financial
3    system.  If that's all you have, you are not going to
4    even get in the door --
5    Q.    Okay.
6    A.    -- anymore.  So...
7    Q.    What is E-Health?
8    A.    E-Health is an application service provider
9    subsidiary.
10   Q.    When did HMS form that?
11   A.    I can't tell you the exact date.
12   Q.    It's wholly owned by HMS?
13   A.    Yes.
14   Q.    Why did HMS form it?
15   A.    We felt that it put more exposure on HMS where
16   we were actually hosting and running the applications
17   and we didn't know what all that meant with HIPPA and
18   everything coming on.  Plus we thought we might grow
19   it, you know, in a different direction.  But...
20   Q.    So if I -- just to speed the deposition along,
21   can you just correct me if I'm wrong?
22   A.    Okay.
23   Q.    HMS formed E-Health to host and run service
24   applications for hospitals?
25   A.    Uh-huh.

Page 200

1    Q.    In a way that hopefully would insulate HMS from
2    some liability if something happened through HIPPA or
3    something else; is that correct?
4    A.    I would say that was one reason, yes.
5    Q.    I mean, I don't --
6    A.    Yes.
7    Q.    As I'm trying to move the deposition along, I
8    don't want to be inaccurate in any way?
9    A.    Right.
10   Q.    Is that -- is E-Health a substantial part of
11   the revenue earnings of HMS?
12   A.    No, but it's growing.
13   Q.    Do most of your customers run their software on
14   in-house systems?
15   A.    Yes.
16   Q.    Do you think there may be a movement to have
17   more hospitals run their systems remotely?
18   A.    There may be, but it's a me, too.  The
19   competition had to, so, me, too.  It was to address the
20   competitive environment.
21   Q.    And their revenues are reflected in your
22   consolidated statements?
23   A.    Yes.
24   Q.    And other than the fact that it's a remotely --
25   a remote application service provider, in terms of the

Page 201

1  sales pitch to the end user, to the customer, are you
2  still having to convince that customer about the merits
3  of clinical view or any general ledger and HIM?
4  A.    Right.
5  Q.    And so it's the same product, just a different
6  delivery system; is that accurate?
7  A.    That's correct.
8  Q.    Okay. Other than PACS and mammography
9  services, I forget their name, does HMS license
10 software, application software that it resells to
11 other -- to end users?
12 A.    I must have been dazing.
13 Q.    That's all right. It's getting late and my
14 question was not the best.
15     You testified earlier that HMS is a reseller
16 for some software programs?
17 A.    Yes.
18 Q.    PACS, PACS?
19 A.    Right.
20 Q.    And this mammography services provider.
21 A.    Right.
22 Q.    Other than those two vendors, is HMS a reseller
23 of other software modules?
24 A.    I guess you could say yes.
25 Q.    Would that be IBM?

Page 202

1  A.    Yes.
2  Q.    Anybody else?
3  A.    IRP.
4  Q.    What does IRP do?
5  A.    They provide the DRG grouper.
6  Q.    Okay.
7  A.    We kind of abandoned maintaining it ourselves.
8  Q.    Uh-huh?
9  A.    But it's really that we buy it kind of
10 globally. We don't sell it, you know, it's just like
11 we license it once a year, in limited distribution.
12 Q.    So it's not exactly the resell?
13 A.    Yeah, I don't know how, yeah, to describe it.
14 That was the reason I kind of...
15 Q.    Right. Well, and if you get into that league
16 your business, of course, uses a lot of different
17 software?
18 A.    It's the same as buying an operating system
19 from IBM.
20     MR. SMITH: Counsel, subject to the
21 confidentiality order, I would like to see the
22 agreements with the mammography services folks and
23 PACS.
24     MR. DENNEN: Okay.
25     (Marked Exhibit No. 56.)

Page 203

1  BY MR. SMITH:
2  Q.    Can you look at Exhibit 56, please, Mr. Givens?
3  A.    Uh-huh.
4  Q.    A couple of questions on this. First, at the
5  very top, there is an indication that this contract may
6  be subject to scanning. As a general practice, does
7  HMS scan its contracts?
8  A.    Yes.
9  Q.    And these are stored on your system in what,
10 some sort of PDF format?
11 A.    (Witness shakes head.)
12 Q.    You don't know?
13 A.    Whatever it's stored in an algorithm, it's an
14 IBM product that was used to do the compression
15 algorithms, so...
16 Q.    The reason I'm asking is we have all these
17 boxes behind me, and if it's possible to just provide
18 me with a CD of these contracts, it would save me
19 taking up a lot of your time and document review if you
20 could provide me with a scanned document in some format
21 that I could read.
22     MR. SMITH: Counsel, could we put that on
23 our list, if it's possible to get scanned contract
24 documents in some recognizable format. It would save
25 us a trip down here.

Page 204

1      MR. DENNEN: Sure.
2      MS. JACOBS: What if they don't go back as
3  far as those boxes, though?
4  BY MR. SMITH:
5  Q.    Do you know whether or not all the contracts
6  have been scanned?
7  A.    (Witness shakes head.)
8      MR. SMITH: You got that, Mr. Reporter?
9      THE WITNESS: No, I don't know.
10     MS. JACOBS: The more recent but he
11 wanted...
12 BY MR. SMITH:
13 Q.    My next question on Exhibit 56 is that this is
14 a contract between a hospital, Ringgold County Hospital
15 and ICE Technologies of Pella, Iowa. Who is ICE
16 Technologies and why do you have a copy of their
17 agreement?
18 A.    They were a company that wanted to be a service
19 provider and relicense our program in their
20 geographical area. So I had read this. So that's what
21 this is.
22 Q.    How many contracts did ICE make using hospitals
23 with your software?
24 A.    Two.
25 Q.    And does ICE still provide those services to

Page 205

52 (Pages 202 to 205)

1 these hospitals?
2 A.    No.
3 Q.    Why not?
4 A.    We took over the support. They really didn't
5 have the expertise in the hospital business to be...
6 Q.    Did the two hospitals, did they move to
7 E-Health?
8 A.    I don't know how that -- something is
9 different. I don't know exactly.
10 Q.    But HMS today does not have a relationship with
11 ICE technology?
12 A.    I don't think so.
13 Q.    HMS had a contract with ICE Technology;
14 correct?
15 A.    Yes.
16 Q.    Is that a yes?
17 A.    I assume, yes.
18 Q.    Did that contract with ICE Technologies have
19 prices for ICE reselling the service -- the software
20 modules?
21 A.    I would have to read this contract. It looks
22 like there is something on Exhibit A.
23 Q.    This is the price between ICE and the hospital.
24 My question was between ICE and HMS?
25 A.    I think the contract is between HMS, isn't it?

Page 206

1        MR. GOLDMAN: And ICE.
2 BY MR. SMITH:
3 Q.    I don't believe HMS is a party to this
4 contract, no.
5 A.    Okay.
6 Q.    You know --
7 A.    Yeah, we would have to pull that other
8 contract. I don't know.
9 Q.    Realizing it's three and a half years ago?
10 A.    Yeah.
11 Q.    But this looks very similar to the HMS
12 contract. It's got the same, many of the same terms,
13 the same layout?
14 A.    Uh-huh.
15 Q.    And my question is, how did HMS get paid,
16 because presumably ICE paid you something from this
17 contract?
18 A.    Let's look at their contract. I don't know.
19 Q.    Okay. Does HMS have any management reports
20 showing sales by product line, that is, by category; I
21 think you said no already?
22 A.    No.
23 Q.    Does HMS prepare yearly budgets by -- let's
24 start with the first question: Does HMS prepare a
25 yearly budget?

Page 207

1 A.    Yes.
2 Q.    Do you break down target revenue by product
3 category?
4 A.    I can't answer that question. I don't know.
5 Q.    Did they while you were president?
6 A.    Yes.
7 Q.    And did HMS retain that budgeted information?
8 A.    Yes.
9 Q.    And, again, would that break out by software
10 module, or would it be larger categories?
11 A.    Yes.
12 Q.    Both?
13 A.    I don't understand the question. Would it
14 break out by module or larger categories, yes.
15 Q.    Okay. You're following your attorney's
16 instructions to the T there.
17 A.    Right.
18 Q.    Did it break it out by larger categories than
19 individual modules? Let me rephrase.
20        The budget that you prepared, did you prepare a
21 budget, for example, medical records, that is, HIM,
22 every year for target sales?
23 A.    Yes.
24 Q.    And in order to assess performance against the
25 budget, did you track sales of medical records or HIM?

Page 208

1 A.    No.
2 Q.    Explain to me why you would set a budget for
3 something you didn't track.
4 A.    To come up with total sales. We had a model so
5 we could take the standard price list and key in two
6 units, five units, seven units, and then we had a model
7 that would say, okay, typically we're going to give a
8 40 percent discount. So it was just a way to key into
9 that model and come up with a total software sales.
10 And it wasn't worth the detail from an administrative
11 point of view to try to track that and compare. It
12 wasn't important to us as a business. We wanted to
13 know what our total software sales were.
14 Q.    Who was the person who keyed in the anticipated
15 sales, for example, for HIM?
16 A.    I don't know.
17 Q.    Would you agree that that person had to have
18 some basis, at least, to make a guess on how many units
19 they would sell that year?
20 A.    To key it in?
21 Q.    Yes.
22 A.    No.
23 Q.    They just did it without a basis?
24 A.    The person keying it just keyed it.
25 Q.    I'm sorry.

Page 209

1  A.   Someone gave them a list and they keyed it.
2  Q.   I need to be more literal, then.  The person
3  that came up with the number for the estimate of the
4  number of any given modules sales?
5  A.   Uh-huh.
6  Q.   Did that person have a firsthand basis for
7  making that estimate?
8  A.   I would think so.
9  Q.   And who was that person with respect to the
10 person who estimated medical records sales?
11 A.   The executive vice president or the vice
12 president of sales.
13 Q.   And has that been Mr. Freeman -- for how
14 long -- Mr. Freeman holds that position now?
15 A.   Yes.
16 Q.   How long has he held that position?
17 A.   I believe two years.
18 Q.   Since 2004, approximately?
19 A.   I would think so.
20 Q.   Who was it before Mike Freeman?
21 A.   Andrew Rittler.
22 Q.   Is Andrew Rittler still with the company?
23 A.   No.
24 Q.   R-I-T-T-L-E-R?
25 A.   I believe so.

Page 210

1  Q.   How long was Andrew Rittler with your sales --
2  A.   I believe two years.
3  Q.   Do you know where Mr. Rittler is today?
4  A.   No.
5  Q.   Do you know where Mr. Rittler lives?
6  A.   No.
7  Q.   Do you know where he works?
8  A.   No.
9  Q.   Mr. Givens, if we were trying to come up with
10 the number of installations of the medical records or
11 HIM software and the revenue that was associated with
12 those installations, would the most efficient way be to
13 review each individual contract one by one and tally
14 them up?
15 A.   I don't know.
16 Q.   Are you aware of any reports or data that
17 separately keeps track of sales of medical records
18 software?
19 A.   I'm aware of estimates.
20 Q.   Those are the yearly budget estimates?
21 A.   We discussed the database earlier that you said
22 did I have a database that identifies who has medical
23 records?
24 Q.   Uh-huh, and you could estimate --
25 A.   But you don't know what it was sold for.

Page 211

1  Q.   Okay.
2  A.   And that can vary anything from 6,000 to
3  discount, I mean.
4  Q.   Much more?
5  A.   Yeah.
6  Q.   Okay.  What are the costs of marketing,
7  producing and selling the medical records -- HIM,
8  excuse me -- HIM software suite?
9  A.   I have no idea.
10 Q.   Have you, to your knowledge, or someone on your
11 behalf, undertaken any sort of analysis of the costs
12 related to the medical records software --
13 A.   No.
14 Q.   -- development costs?
15 A.   (Witness shakes head).
16 Q.   Would we be able to back into that number by
17 looking at the software development costs in your -- in
18 the HMS accounting system?  Does that somehow separate
19 out development costs for different modules?
20 A.   No.
21 Q.   Has medical records seen more than average or
22 less than average development attention in the last 10
23 years versus the other modules that HMS sells?
24 A.   Less than average.
25 Q.   Is the cost of maintaining medical records --

Page 212

1  sorry -- HIM, for the customer, that is, more than
2  average or less than average than your other suites?
3  A.   I don't really know.  I mean, in proportion to
4  what?
5  Q.   I'm talking about if you say that for any given
6  sale to Grant Hospital, we're receiving so much revenue
7  but we incur these costs, development costs, general
8  overhead, right on down the expense sheet on the
9  accounting statement.  But that relates to all of the
10 costs, and, you know, if you allocate that over the
11 entire sale, there is going to be an average per
12 software module, and I'm saying does the amount of
13 expense and time and effort that the company puts in
14 the HIM module, do you think it's higher than that
15 average or lower than that average?
16 A.   Lower.
17 Q.   Has it always been that way; has it always been
18 lower than average maintenance costs?
19 A.   No.
20 Q.   At the beginning was it higher?
21 A.   Yes.
22 Q.   And as the product has matured, it's lower?
23 A.   Yes.
24 Q.   And that would have happened when?  When did it
25 drop, fall below average?

Page 213

1  A.    I don't know.
2  Q.    Sometime in the 1990s?
3  A.    I don't know.
4  Q.    I'm almost ready to let you loose here.
5      In I think it was 2000 the company, according
6  to the financial statements, made a deal with you and
7  Mr. Doss to buy out your stock; is that correct?
8  A.    Say that again?
9  Q.    In the year 2000 did you and the company, HMS,
10  agree that you would sell your stock in the company to
11  HMS, to the -- sorry -- to the HMS employee stock
12  ownership plan?
13  A.    Yes.
14  Q.    And in return for that stock you and Mr. Doss
15  collectively received $30,000, is that -- $30 million;
16  is that correct?
17  A.    No.
18  Q.    Okay. How much did you -- what was the
19  purchase price of this stock from you?
20  A.    30 million.
21  Q.    What was the purchase price for Mr. Doss?
22  A.    Oh, sorry, for me, 15 million, for Mr. Doss,
23  15 million.
24  Q.    Okay. So collectively it was 30 million;
25  correct?

Page 214

1  A.    That's correct.
2  Q.    That's what I meant to say. In relation to
3  that stock sale was there any independent valuation of
4  the company?
5  A.    Yes.
6  Q.    And was the price of your stock based on that
7  independent valuation of the company?
8  A.    Yes.
9  Q.    Did you sell your stock at a premium or a
10  discount to the independent valuation, or neither?
11  A.    I think neither.
12  Q.    So the independent valuation was what you sold
13  the stock for?
14  A.    Yes.
15  Q.    Did you and Mr. Doss both own 50 percent of the
16  company?
17  A.    Yes.
18  Q.    Who performed that pricing?
19  A.    Moss Adams.
20  Q.    Is that an individual or a company?
21  A.    A company.
22  Q.    Where is that company located?
23  A.    Washington State.
24  Q.    Do you think the company has increased in value
25  or decreased in value since the appraisal?

Page 215

1  A.    Increased.
2  Q.    Revenues are continuing to remain healthy?
3  A.    Yes.
4  Q.    In your opinion, does the company have
5  manageable debt?
6  A.    It was a leveraged ESOP. So I believe the debt
7  is manageable.
8  Q.    Has the company made timely payments on the
9  notes it gave you and Mr. Doss?
10  A.    No.
11  Q.    Have you indulged any agreements; have you
12  extended due dates?
13  A.    We forgave.
14  Q.    You forgave some of the installments. Of
15  interest or principal?
16  A.    Principal -- interest, excuse me, interest.
17  Q.    Did you forgive interest payments because the
18  company was under financial stress?
19  A.    At that time, yes.
20  Q.    What year was -- what year did you forgive
21  interest payments?
22  A.    2004.
23  Q.    Have there been any other times when you and
24  Mr. Doss forgave interest payments?
25  A.    No. Let me say -- forgave may be -- we took a

Page 216

1  lesser interest rate than the contracted rate.
2  Q.    That's --
3  A.    Okay.
4  Q.    I saw that.
5  A.    Okay. So to me, I forgave.
6  Q.    In Exhibit 51, note 7A says that you and
7  Mr. Doss agreed to a reduced rate from 6.5 percent to
8  4.92 percent for the period -- the 11-month period
9  January 1, 2004, and November 30th, 2004.
10      Other than that interest rate concession, has
11  there been any other forgiveness or concession of any
12  part of the debt?
13  A.    No.
14  Q.    Just so the record is clear, there are two
15  notes with slightly different repayment terms to you
16  and Mr. Doss. The first $10 million note was what I
17  was just talking about. There is a second $5 million
18  note and that interest was changed from 6.5 percent to
19  3.77 percent for the same period. Does that square
20  with your recollection? There are two separate --
21  A.    It was changed, the two notes were changed.
22  Q.    And the interest is now reverted back to the
23  stated interest on the note?
24  A.    Yes.
25  Q.    And tell me why you sold your stock.

Page 217

55 (Pages 214 to 217)

1  A.    Succession plan. Most of the people had been
2  with the company, we wanted them to be -- we wanted a
3  continuation of management, a continuation of the
4  company. We were getting older, we had to have a plan
5  to get out and get the money that we put into it,
6  sweat, so the ESOP seemed like a good mechanism to
7  accomplish that goal.
8  Q.    Rather than taking the company public?
9  A.    Taking the company public or selling it to
10  someone else.
11  Q.    Did you and Mr. Doss receive any other
12  consideration, compensation, that is, other than the
13  $30 million in notes?
14  A.    No.
15  Q.    Mr. Givens, we're near the end of the
16  deposition, but at this point just I would like to ask
17  you. We made some serious claims here for copyright
18  infringement, you know, you testified today that the
19  source code that HMS is using relates back to the
20  source code that Mr. Goldman provided in 1983, and my
21  question is, what facts are there that you're going to
22  rely on to contest liability?
23  A.    I'm not a lawyer.
24      MR. DENNEN: I was about to say, Counsel,
25  I mean, we can be here all day long if we're going to

Page 218

1  go into that.
2  BY MR. SMITH:
3  Q.    Well, I don't want to get into any
4  attorney-client privilege, and I don't want to be --
5  strike that.
6      My question is, there may be legal reasons to
7  say that we're not entitled to any money, but are there
8  any factual reasons that you can share with me now,
9  factual reasons why you don't think that HMS or you are
10  liable?
11  A.    This is your -- they should be addressing these
12  questions. You're asking me something that is outside
13  my scope.
14      MR. DENNEN: If you want to ask specific
15  questions, he'll give specific answers. When you ask
16  for a generalized question of what facts, you know, we
17  listed some of them in the response to the complaint,
18  he's discussed some of them today, and there are many
19  legal questions.
20      MR. SMITH: We can probably talk about it
21  outside of the deposition.
22      MR. DENNEN: Sure.
23  BY MR. SMITH:
24  Q.    I have one last star and then I'll let you go.
25  I do not have a copy, an extra copy. Maybe counsel

Page 219

1  brought one with them, but I won't mark it because we
2  all know what it is. I'm showing you a copy of
3  plaintiff's complaint in this lawsuit, and in paragraph
4  32 Mr. Goldman alleged that Goldman's HIS software,
5  that's Health Information -- what does that stand for?
6      MR. GOLDMAN: Health Information Systems.
7  BY MR. SMITH:
8  Q.    Health Information Systems software, this is
9  what we're calling the software at issue, is original
10  to Goldman and is copyrightable subject matter under
11  the laws of the United States.
12      And HMS and you, through your attorneys, denied
13  that allegation. Do you know why HMS and you deny that
14  allegation?
15      MR. DENNEN: Again, object to the extent
16  it requires him to disclose attorney-client privilege.
17  BY MR. SMITH:
18  Q.    I don't want to hear anything that you and your
19  lawyer talked about, but, and it's possible you don't
20  know. If your lawyers have a reason and you don't know
21  it, that's fine. Is that the case?
22  A.    I'm sure they have a reason for what they do.
23  Q.    But you don't know any factual reason yourself
24  why they deny that allegation?
25      MR. DENNEN: I think the issue is that is

Page 220

1  a question of law which, or a mixed question of law and
2  fact and, therefore, the answer is truly a legal
3  question, not a factual question.
4      MR. SMITH: Okay.
5  BY MR. SMITH:
6  Q.    And the same question with 37. I'll read
7  upside down the allegation. At the present time, HMS
8  is providing information technology systems and support
9  to approximately 450 hospitals throughout the United
10  States and provides to those hospitals software
11  applications which contain substantial material copied
12  from Goldman's HIS system -- sorry -- Goldman's HIS
13  software.
14      You and HMS denied that allegation. You may
15  have already testified to this, but is there a factual
16  reason, factual basis for denying that allegation?
17  A.    I don't know how to respond.
18      MR. DENNEN: The response is, as you know,
19  the only obligation is to admit or deny the specific
20  allegation made in the complaint. And I think
21  certainly he's already testified that I don't believe
22  they have 450 hospitals in the United States, and I
23  think he certainly has testified there is not
24  substantial material copied from Goldman's HIS
25  software. So either one of those would be a basis for

Page 221

1  a denial.
2        MR. SMITH:  Okay.  I'll take that response
3  from counsel.  Allow me for a couple minutes to confer
4  with Mr. Goldman.
5        MR. DENNEN:  Sure.
6        (Recess taken.)
7        MR. SMITH:  Counsel, subject to our
8  earlier agreement at the top of the deposition on our
9  right to recall Mr. Givens, I have no further
10 questions.
11        MR. DENNEN:  Okay.  And we have no
12 questions at this time.
13        MR. SMITH:  The deposition is adjourned.
14 The reporter has asked me to advise you you have a
15 right to review this deposition.  Under the Federal
16 Rules of Civil Procedure it is the practice of the
17 court reporter not to provide a copy unless requested.
18        MR. DENNEN:  It's requested.
19        MR. SMITH:  The deposition is concluded.
20        FURTHER DEPONENT SAITH NOT.
21 (END TIME: 5:00 P.M.)
22
23
24
25
                                        Page 222

                     C E R T I F I C A T E
1
2        I, Edward F. Kidd, Registered Professional
3  Reporter and Notary Public, State of Tennessee at
4  Large, do hereby certify that I recorded to the best of
5  my skill and ability by machine shorthand the
6  deposition contained herein, that same was reduced to
7  computer transcription by myself, and that the
8  foregoing is a true, accurate, and complete transcript
9  of the deposition testimony heard in this cause.
10        I further certify that the witness was
11 first duly sworn by me and that I am not an attorney or
12 counsel of any of the parties, nor a relative or
13 employee of any attorney or counsel connected with the
14 action, nor financially interested in the action.
15        Dated this 29TH day of April, 2006.
16
17 _____
18 Edward F. Kidd
   My Commission Expires:
19 1/26/10
20
21
22
23
24
25
                                        Page 223

1                    E R R A T A
2
3      I, THOMAS E. GIVENS, having read the foregoing
   deposition, Pages 1 through 223, taken April 20, 2006,
4  do hereby certify said testimony is a true and accurate
   transcript, with the following changes, if any:
5
6  PAGE  LINE        SHOULD HAVE BEEN
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20        THOMAS E. GIVENS
21
22        _____
        Notary Public
23 My commission expires: _____
24
25
                                        Page 224