FILED - GR

06 AUG -1 PM 4:22

U.S. DISTRICT COURT CLERK
WESTERN DISTRICT MICH
BY___mrs_ /___
4/16/18

Case No. 1:05-CV-0035
Joel Goldman
v.
Healthcare Management Systems, Inc.
and Thomas E. Givens

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT C

7/

Goldman v. Healthcare Management Systems    **ORIGINAL**    June 14, 2006
Deposition of Joel Goldman

1

                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION

_____

JOEL GOLDMAN,
            Plaintiff,
        -vs-                    No.: 1:05-cv-35
                                Hon. Richard A. Enslen

HEALTHCARE MANAGEMENT
SYSTEMS, INC. and
THOMAS E. GIVENS,
            Defendants,
_____/


             D E P O S I T I O N   O F

WITNESS:          JOEL GOLDMAN

LOCATION:         2723 South State Street
                  Suite 400
                  Ann Arbor, Michigan

DATE:             June 14, 2006
                  9:15 a.m.

APPEARANCES:

FOR PLAINTIFF:    DYKEMA GOSSETT, P.L.L.C.
                  2723 South State Street
                  Ann Arbor, Michigan  48104
                  BY:  MR. BRADLEY L. SMITH
                       MS. KRISTA L. LENART

FOR DEFENDANTS:   BONE, McALLESTER, NORTON, P.L.L.C.
                  511 Union Street, Suite 1600
                  Nashville, Tennessee  37219
                  BY:  MR. KEITH C. DENNEN

                  VARNUM, RIDDERING, SCHMIDT, HOWLETT
                  Bridgewater Place
                  Grand Rapids, Michigan  49501
                  BY:  MR. BRYAN R. WALTERS

Also Present:     Mr. Joel Goldman

   Reporter:      Karen Klerekoper, CSR-4250, RPR

Goldman v. Healthcare Management Systems          June 14, 2006
Deposition of Joel Goldman

2

                          I N D E X


WITNESS:   JOEL GOLDMAN                        PAGE NO.
─────────────────────────────────────────────────────────

        Examination by Mr. Dennen                    3

                     EXHIBIT INDEX
─────────────────────────────────────────────────────────

EXHIBIT NO.        DESCRIPTION              PAGE NO.

  200         Minute book (if it exists)        30

  201         Proposals with Rawlins & Douglas  89

  202         Central Medico Turabo proposal    95

  203         (Unidentified)

  204         Copyright registration           177

  205         Exhibit submitted to
              Copyright Office                 178

  206         Pharmacy program                 189

  207         '97 code copyright registration  194

  208         Source code printout             200

  209         Goldman & Goldman version
              of copyright                     205

  210         Program with different heading
              and source code                  205

 211          Copy of same code already discussed 206

212, 213          "              "                207

214, 215          "         "  but different program 208

Patricia Murray & Associates, Inc.       Court Reporting & Videoconferencing
1-800-875-8238                           Offices in Brighton & Ann Arbor, MI

4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

3

1    Ann Arbor, Michigan

2    June 14, 2006

3    At 9:15 a.m.

4

5                          JOEL GOLDMAN

6        HAVING BEEN CALLED BY THE DEFENDANTS AND SWORN:

7                          EXAMINATION

8    BY MR. DENNEN:

9    Q.    Good morning, Mr. Goldman.

10   A.    Good morning.

11   Q.    I'm Keith Dennen.  We have met previously and we met

12         again this morning.  As you know, I represent

13         Healthcare Management Systems and Tom Givens.  We are

14         here today for your deposition, and before we get

15         started I know you have sat through depositions in

16         this case.

17               Have you previously given your deposition?

18   A.    No.

19   Q.    Okay.  Have you ever testified in a court trial?

20   A.    No.

21   Q.    Okay.  We generally know that the court reporter has

22         sworn you in.  That means you are under an obligation

23         to tell the truth.  I'm going to ask you questions.

24         You have done a really good job of listening to me.

25         If you would, please be sure to respond out loud.

4

1      Don't shake your head.  Don't assume that the court

2      reporter is taking it down correctly unless you say

3      it.

4              The purpose of this will -- is not an

5      endurance contest.  If you need to take a break,

6      please let us know.  I will ask you, if there is a

7      question pending to go ahead and answer the question.

8      Obviously, you are here to answer questions.  Your

9      attorneys are not here to answer questions for you.  I

10     say that to say, if I ask you a question, I'm asking

11     for a response from you, not for you to ask and

12     discuss it with your attorney.

13             Your attorney may make objections.  That's

14     for the record.  You still are obligated to answer the

15     question pending.  We will discuss the objections at a

16     later date.

17             Do you understand those instructions?

18  A.  Yes.

19  Q.  Do you have any questions before we get started?

20  A.  No.

21  Q.  Okay.  First of all, Mr. Goldman, if you would, sir,

22     please tell me -- did you attend college?

23  A.  Yes.

24  Q.  What college did you attend?

25  A.  Temple University.

Goldman v. Healthcare Management Systems June 14, 2006
Deposition of Joel Goldman

5

1    Q.   Did you receive a degree from Temple?

2    A.   No.

3    Q.   When did you attend Temple University?

4    A.   1966, well, yeah, I started in '66, September of '66.

5    Q.   Did you attend Temple for only one year?

6    A.   Yes.

7    Q.   Okay.  What was your course of study at Temple when

8         you were attending?

9    A.   Liberal arts.

10   Q.   Were you in the military?

11   A.   Yes.

12   Q.   Which branch were you in?

13   A.   The Air Force.

14   Q.   When were you in the Air Force?

15   A.   From '67 until '7 -- I'm not sure of the exact

16        discharge date, three years and ten months.

17   Q.   Did you receive an honorable discharge?

18   A.   Yes.

19   Q.   What was your military classification?  What do they

20        call it?

21   A.   Rank.

22   Q.   No, the specialty.

23   A.   Computer programmer.

24   Q.   Okay.  Prior to joining the United States Air Force,

25        had you had any computer programming training?

Goldman v. Healthcare Management Systems                          June 14, 2006
Deposition of Joel Goldman

6

1    A.    No.

2    Q.    Obviously if you were a computer programmer, then you

3          received training in computer programming.  Tell me

4          briefly about your training in the Air Force.

5    A.    I went to a technical school in Texas for six weeks.

6    Q.    Did you receive any other computer programming

7          training in the United States Air Force?

8    A.    You mean additional schools or --

9    Q.    Yes, formal training.

10   A.    No.

11   Q.    Okay.  What, I guess, programming language,

12         programming computer, did you receive training in in

13         the Air Force?

14   A.    SPS.

15   Q.    Is that a computer language?

16   A.    Yes.

17   Q.    Now, you were discharged approximately 1970 to '71.

18         What did you do after your discharge?

19   A.    Traveled the country.

20   Q.    Okay.  How long did you travel the country?

21   A.    About a year.

22   Q.    During that time did you engage in any occupation or

23         was it solely traveling?

24   A.    I traveled, and then I went to school briefly in

25         Colorado.

Patricia Murray & Associates, Inc.          Court Reporting & Videoconferencing
1-800-875-8238                              Offices in Brighton & Ann Arbor, MI
                                           4c14eea1-4404-419d-b567-94a8db683538

7

| | | |
|---|---|---|
| 1 | Q. | What kind of school or what school did you attend in |
| 2 | | Colorado? |
| 3 | A. | El Paso Community College. |
| 4 | Q. | Did you receive a degree from El Paso? |
| 5 | A. | No. |
| 6 | Q. | What was your course of study at El Paso? |
| 7 | A. | Computer programming. |
| 8 | Q. | Do you recall your dates of attendance at El Paso? |
| 9 | A. | Not really. |
| 10 | Q. | From El Paso did you then renew your traveling or did |
| 11 | | you enter into the job market? |
| 12 | A. | I went to San Diego. |
| 13 | Q. | Did you attend an educational institution or did you |
| 14 | | go to work -- |
| 15 | A. | I went to work. |
| 16 | Q. | Where did you go to work? |
| 17 | A. | I went to work for an accounting firm. |
| 18 | Q. | Do you recall when that would have been? |
| 19 | A. | The dates are going to escape me.  It's going to be |
| 20 | | like '71.  You know -- that's a guess. |
| 21 | Q. | How long were you with this accounting firm? |
| 22 | A. | It's -- it was less than a year. |
| 23 | Q. | What was your job title at the firm? |
| 24 | A. | Computer programmer. |
| 25 | Q. | Do you recall the name of the firm? |

8

1   A.   No.

2   Q.   When you left the accounting firm, what was your next

3        job or what did you do?

4   A.   I went to Philadelphia.

5   Q.   Were you employed in Philadelphia?

6   A.   Yes.

7   Q.   Who was your employer?

8   A.   Richardson Mints.

9   Q.   Can you spell that last name?

10  A.   I don't spell very well.  Richardson, like Richard,

11       S-O-N, Mints, M-I-N-T-S.

12  Q.   What did you do at Richardson Mints?

13  A.   Data processing manager.

14  Q.   What were your dates of employment at Richardson

15       Mints?

16  A.   You know, I worked there about two years.

17  Q.   Okay.  As a data processing manager, what were your

18       primary duties?

19  A.   I managed the data processing office.

20  Q.   Okay.  Did you have programmer's --

21  A.   I also programmed.  It was a small office.

22  Q.   Were you the primary programmer?

23  A.   Yes.

24  Q.   Did you have employees under you?

25  A.   Two.

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

9

1   Q.   What business was Richardson Mints in?

2   A.   Manufacturing mints.

3   Q.   Literally, candies?

4   A.   Literally, candies.

5   Q.   Okay.  Again, what language or what system would you

6        have been programming in --

7   A.   System 3, Model 10.

8   Q.   Okay.  If my timeline is correct, you would have left

9        Richardson Mints about 1975.  Does that sound correct?

10  A.   Close.

11  Q.   Okay.

12  A.   Maybe '74.

13  Q.   '74 to '75?

14  A.   Yeah.

15  Q.   Where did you go from Richardson Mints?

16  A.   Kansas.

17  Q.   Okay.  Were you employed in Kansas?

18  A.   Yes.

19  Q.   Who would your employer have been?

20  A.   Western Fidelity Life Insurance Company.

21  Q.   Where in Kansas were they located?

22  A.   Wichita.

23  Q.   What was your job title at Western Fidelity?

24  A.   Data processing manager.

25  Q.   How long were you with Western Fidelity?

10

1     A.    Several years.

2     Q.    When you say several, define that.  Is that more than

3           two, less than --

4     A.    I'm thinking two years.

5     Q.    Okay.

6     A.    Approximately.  Again, it's been a long time.

7     Q.    That's fair.  After a while your memory fades, doesn't

8           it?

9     A.    (Witness indicating.)

10    Q.    Do you recall how many employees you would have

11          managed?

12    A.    I had two employees there.

13    Q.    Did you perform programming also?

14    A.    Yes.

15    Q.    Again, what system would you have been programming in?

16    A.    System 3, Model 10.

17    Q.    Okay.

18    A.    And we converted to a System 3, Model 8.

19    Q.    Okay.  Do you recall when you left Western Fidelity?

20    A.    I don't recall the exact year.  It's just --

21    Q.    Okay.  Did you have any significant -- between the

22          time you got out of the Air Force, because you said

23          you traveled, between the time you got -- you were in

24          San Diego.  You left your job, and you left Western

25          Fidelity.  Were there any times of significant

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

11

1       nonworking activity?

2   A.  Define significant.

3   Q.  More than 30 days.

4   A.  That's -- I don't know.  I don't think so but I don't

5       know.

6   Q.  Did you attend any training, formal training, programs

7       or formal training schools, during any of this time we

8       have been talking about from the time you joined the

9       accounting firm until you went to -- left Western

10      Fidelity?

11  A.  Again, define the word formal.

12  Q.  Well, presented by a third party or a school where you

13      would have received a certificate?

14  A.  No certificates.

15  Q.  Okay.

16  A.  I received training from IBM.

17  Q.  So you did attend some IBM --

18  A.  It was informal.  That's why I wanted the word

19      defined.

20  Q.  Describe to me when you say informal what would have

21      been the setting --

22  A.  At the IBM Building in San Diego.

23  Q.  Okay.  Do you recall how long this training would have

24      lasted?

25  A.  A couple of months.

12

1    Q.    Okay.  Was this a formal school that you attended or

2          was it every other Tuesday type of thing?  How was

3          that structured?

4    A.    It was every day.

5    Q.    Okay.  Was it during the day or was it after --

6    A.    During the day.  It was part of the work/job, learning

7          a new computer system.

8    Q.    Okay.  So your employer at the time, the accounting

9          firm, paid you essentially to go to the IBM

10         building --

11   A.    Yes.

12   Q.    -- and be trained; is that correct?

13   A.    Yes.

14   Q.    And let's continue down this road.  You left Western

15         Fidelity Life Insurance.  What did you do after you

16         left Western Fidelity?

17   A.    I went to a work for a company in Colorado.

18   Q.    Where in Colorado would that have been?

19   A.    Canyon City.

20   Q.    What was the name of that company?

21   A.    You know, I don't really recall.  It was a new startup

22         company.  And I don't know -- I don't know the name.

23   Q.    Okay.  How long were you with this company?

24   A.    Not even a year.

25   Q.    What business was this company in?

13

1    A.    Service bureau.

2    Q.    When you say service bureau, what do you mean?

3    A.    We performed services for other companies, primarily

4          data processing.

5    Q.    Just so that I understand then, and the record

6          reflects, when you say data processing for other

7          companies, today we would call that outsourcing.

8    A.    Yes.

9    Q.    And what type of data processing services would you

10         have provided?

11   A.    An example would be the scheduling system for the

12         Colorado school system.

13   Q.    You said that you left after a year --

14   A.    Less than a year.

15   Q.    Approximately a year, less than a year.  What was your

16         job title?

17   A.    Systems designer/programmer.

18   Q.    I know it's been a long time.  Do you recall when you

19         would have left this company, the startup company?

20   A.    Not really.

21   Q.    Okay.  My mental math says 1976 or '77, is that --

22   A.    It's probably close.  It's fair.

23   Q.    Now, do you recall why you left that company?

24   A.    They didn't pay me my bonus.

25   Q.    Okay.  To your knowledge, did this company continue in

14

1           existence?

2    A.     I don't know.

3    Q.     Okay.  Obviously, if you weren't paid your bonus, you

4           must have decided to seek another employer.  Where did

5           you go from there?

6    A.     Iowa.

7    Q.     Where in Iowa?

8    A.     Waterloo.

9    Q.     Who was your employer?

10   A.     It was a hospital and, again, I don't remember the

11          name for some reason.

12   Q.     Is there more than one hospital in Waterloo?

13   A.     There is.

14   Q.     Is there any way of identifying which hospital this

15          would be?

16   A.     You know, probably would be.  At the time it had about

17          300 beds --

18   Q.     Would it been --

19   A.     -- so it was a fairly large hospital.

20   Q.     Would it be the largest one in Waterloo, Iowa?

21   A.     Today, I wouldn't know.

22   Q.     At the time?

23   A.     Yeah, pretty close.

24   Q.     What was your job title at the hospital?

25   A.     Programmer.

Patricia Murray & Associates, Inc.            Court Reporting & Videoconferencing
1-800-875-8238                                Offices in Brighton & Ann Arbor, MI

4c14eea1-4404-419d-b567-94a8db683538

15

1   Q.   How long were you at this hospital in Waterloo, Iowa?

2   A.   About a year.

3   Q.   As a programmer, did you manage any other persons or

4       were you --

5   A.   No.

6   Q.   Merely a programmer?

7   A.   Merely a programmer.

8   Q.   What computer programming system were you programming

9       in at that time?

10   A.   System 3, Model 12.

11   Q.   Again, I have asked you this before.  Did you receive

12       any formal training, attend any classes, while you

13       were at Canyon City or while you were in Waterloo,

14       Iowa?

15   A.   In Waterloo.

16   Q.   And what type of classes would you have received?

17   A.   IBM.

18   Q.   Was this the type of classroom training --

19   A.   Yes, it was.

20   Q.   -- we talked about before?

21   A.   There was an actual classroom training.

22   Q.   Okay.  Do you recall what type of class it was?

23   A.   Interactive programming.

24   Q.   Did you receive a certificate?

25   A.   Yes, but I don't have a copy of it.

16

1    Q.    After this long I would be surprised --

2    A.    I just wanted to clarify it.

3    Q.    I guess nowadays it's popular to have people say that

4          they are certified in this or certified in that.  Did

5          you have any kind of designation like that from IBM?

6    A.    No.

7    Q.    Where did you go from Waterloo, Iowa?

8    A.    Miami.

9    Q.    I assume that's Florida and not Ohio?

10   A.    Yes.

11   Q.    Do you recall when you went to Miami?

12   A.    It would have been about '78, '77, '78.

13   Q.    And who was your employer in Miami?

14   A.    Dynamic Control.

15   Q.    What would that business have been, that Dynamic

16         Control was in?

17   A.    Software design, programming, software sales.

18   Q.    What was your title with Dynamic Control?

19   A.    Analyst/programmer/project leader.

20   Q.    Now, when would you have left Dynamic Control?

21   A.    In, I guess, late '78.

22   Q.    So you were there for approximately a year to 18

23         months; is that correct?

24   A.    Maybe -- I can't even tell.

25   Q.    Okay.

17

1    A.    That would have been hard.  They worked us to death.

2          It felt like ten years.

3    Q.    Okay.  Obviously, I know what a programmer is.  I have

4          heard of the term analyst.  When you say analyst, tell

5          me what you mean that to mean.

6    A.    I would go to a client site, analyze their needs and

7          design software to meet those needs.

8    Q.    So you would, for example, if it were a law office,

9          you would come in and determine what their issues

10         were, and then go back and design a program to meet

11         those?

12   A.    Exactly.

13   Q.    And you said project leader.  Did that involve the

14         supervision of other employees?

15   A.    Yes.

16   Q.    Do you recall how many employees?

17   A.    It would vary based on the project.

18   Q.    I was going to ask you, what type of projects would

19         you have been the project leader on?

20   A.    A dialysis system, a healthcare system of some sort, a

21         trucking system, the retirement system for the

22         southern district of Teamsters.

23   Q.    Again, I don't -- just to understand, I assume that a

24         client such as the Teamsters would contact your

25         organization and then a team of people would go and

18

1  analyze the needs and design the software, is that --

2  A.  Yes.

3  Q.  -- accurate?

4  And would you have been the overall leader

5  of that team?

6  A.  Yes.

7  Q.  All right.  Now, I think you said you left Dynamic

8  Control in late 1978?

9  A.  Yes.

10  Q.  Where did you go from there?

11  A.  Florida Keys Memorial Hospital.

12  Q.  Where is that hospital, or was it?

13  A.  Key West, Florida.

14  Q.  How long were you at Florida Keys?

15  A.  I -- that's -- I really wasn't an employee.  I was

16  like a -- they hired me as a contract employee, so I

17  worked there for -- with them for several years.

18  Q.  First, when did you cease working for them?

19  A.  You know, it's -- I really don't recall.

20  Q.  Okay.

21  A.  That's kind of hard.

22  Q.  When you say contract employee, explain to me what you

23  mean by contract employee.

24  A.  What I did was create programs for them to make them

25  more efficient.

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

                                                                      19

1    Q.   Were you a W2 employee?  Did you receive a --

2    A.   I received -- initially, I received a W2 because they

3         had set my hours.  Later on I was paid per hour as I

4         made them more efficient.

5    Q.   And obviously creating your own obsolescence is one of

6         the issues with technology?

7    A.   Exactly.

8    Q.   I guess I want to explore this just a little bit.

9         Would you have had an office at the hospital?

10   A.   My own office?

11   Q.   Yes.

12   A.   No.

13   Q.   Well, would your work station have been at the

14        hospital, perhaps is a better way of saying it?

15   A.   I had a desk.

16   Q.   And did they expect you to be there -- you said they

17        set your hours initially -- during a normal work time?

18   A.   Actually not.  They just...

19   Q.   What would your job title have been at the Florida

20        hospital?

21   A.   Data processing manager.

22   Q.   And how many employees would you have supervised?

23   A.   Initially, or --

24   Q.   Let's start with initially.

25   A.   I believe there were 17 initially.

Patricia Murray & Associates, Inc.        Court Reporting & Videoconferencing
1-800-875-8238                             Offices in Brighton & Ann Arbor, MI
                                           4c14eea1-4404-419d-b567-94a8db683538

20

1   Q.   Obviously by your earlier comments that was reduced at

2        some point.  What would have been the reduction?

3   A.   To three.

4   Q.   Do you recall over the course how long it took to

5        reduce from 17 to 3?

6   A.   It was -- it was over -- I don't know the exact time

7        period, you know.  It was -- probably more than a

8        year.

9   Q.   When it was reduced to three, were you one of the

10       people that was reduced out of the job?

11  A.   I was already working limited hours at that time.

12  Q.   When you say limited, how many --

13  A.   It was as needed.

14  Q.   Okay.  Would that have been more than 40 hours a

15       month?

16  A.   Like I said, I can't tell you.

17  Q.   Okay.  Were they -- had they converted to paying you

18       on a 1099 at that point in time or were they still

19       paying you as W2?

20  A.   I believe it was a 1099.  You know, again, I don't

21       remember.

22  Q.   Okay.  Were you working for anyone else at the same

23       time?

24  A.   Yes.

25  Q.   Who were you working for?

21

| | | |
|---|---|---|
| 1 | A. | DePoo Hospital. |
| 2 | Q. | Can you spell that, please, sir? |
| 3 | A. | D-E-P-O-O, I hope. |
| 4 | Q. | Where is that located? |
| 5 | A. | Key West. |
| 6 | Q. | When did you start working for DePoo Hospital? |
| 7 | A. | In '79. |
| 8 | Q. | What were you doing for them? |
| 9 | A. | Designed their hospital system. |
| 10 | Q. | Okay. When you say system, you are referring to the |
| 11 | | computer system? |
| 12 | A. | Yes. |
| 13 | Q. | How long were you employed by them? |
| 14 | A. | Until 1999. |
| 15 | Q. | You were an employee? |
| 16 | A. | I was never an employee. I will clarify that, sorry. |
| 17 | Q. | And were you, I guess, an independent contractor? |
| 18 | A. | Yes. |
| 19 | Q. | Did you have a formal agreement, a written agreement |
| 20 | | with DePoo Hospital? |
| 21 | A. | To the best of my recollection, yes. I would not have |
| 22 | | a copy of it. |
| 23 | Q. | Going back to the other hospital in Key West, did you |
| 24 | | have an employment agreement with them? |
| 25 | A. | Yes. Again, I don't have a copy of it. |

22

```
 1   Q.   We have got the two hospitals in Key West.  Were you

 2        employed by anyone else during this same period of

 3        time?

 4   A.   Yes.

 5   Q.   Who were you employed by?

 6   A.   Key West Fragrance.

 7   Q.   What kind of business would Key West Fragrance be?

 8   A.   Fragrance and cosmetics.

 9   Q.   Would it be a wholesaler, a retailer or a

10        manufacturer?

11   A.   All of the above.

12   Q.   I believe you referenced fragrances and cosmetics?

13   A.   Yes.

14   Q.   When did you become employed by Key West Fragrance?

15   A.   At -- I'm guessing here, it would have been either '79

16        or '80.

17   Q.   Okay.  What would your position have been at Key West

18        Fragrance?

19   A.   Systems design/programmer.

20   Q.   Were you an employee of Key West Fragrance?

21   A.   No.

22   Q.   You were an independent contractor?

23   A.   Yes.

24   Q.   So I assume you wouldn't have supervised any employees

25        then at Key West Fragrance; is that correct, sir?
```

Patricia Murray & Associates, Inc.      Court Reporting & Videoconferencing
1-800-875-8238              Offices in Brighton & Ann Arbor, MI
4c14eea1-4404-419d-b567-94a8db683538

23

```
1    A.   No.

2    Q.   Did you have a written agreement with Key West

3         Fragrance?

4    A.   You know, I don't recall.

5    Q.   I want to back up for just a minute.  I guess we have

6         been talking about the period of time around 1979 to

7         1980?

8    A.   Yeah.

9    Q.   And I believe you said that you were -- you went from

10        Dynamic Control to Florida Keys Memorial Hospital in

11        late 1978, somewhere in there.  You would have been an

12        employee for some period of time of Florida Keys

13        Memorial Hospital?

14   A.   Yeah.

15   Q.   And what I want to ask you is while you were an

16        employee of Florida Keys, were you also an independent

17        contractor for these other entities?

18   A.   Yes.

19   Q.   I just want to keep that straight in my mind.

20   A.   Okay.

21   Q.   While you were an employee of Florida Keys, would you

22        have been an independent contractor for anyone else?

23   A.   For the hospital in Puerto Rico.

24   Q.   What hospital was that?

25   A.   Hospital San Rafael.
```

24

1    Q.   And when would you have began doing work for that

2         hospital?

3    A.   Oh, from about '79.

4    Q.   What would you have been doing for Hospital San

5         Rafael?

6    A.   I installed a computer system.

7    Q.   Now, did you have a written agreement with Hospital

8         San Rafael?

9    A.   I believe so, yes.

10   Q.   Again, do you have a copy of that?

11   A.   No, sir.

12   Q.   Okay.  Were there any other entities while you were an

13        employee of Florida Keys that you would have been an

14        independent contractor for?

15   A.   I -- I was but I don't remember the dates, so I don't

16        know when -- when I was doing work for Florida Keys,

17        clarify that.

18   Q.   I want to focus in on, you were an employee of Florida

19        Keys for some period of time.  You don't really recall

20        how long?

21   A.   Again, the word employee, I don't see -- by employee,

22        do you mean was I told when to come or was I -- I'm

23        trying to clarify the word employee.

24   Q.   Well, for my purposes I typically do it based upon, I

25        received a W2 --

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

                                                                    25

1    A.    Okay.

2    Q.    -- for that year.

3    A.    I worked for Singleton Fleets in Key West.  I don't

4          remember when.  It was just another --you know, it

5          could have been '79, '80, '81.

6    Q.    What was Singleton Fleets?

7    A.    They handled shrimp boats.

8    Q.    When you say handled, do you mean they operated shrimp

9          boats or --

10   A.    They operated shrimp boats, they repaired them, they

11         bought fish.

12   Q.    And what were your duties --

13   A.    I designed their computer system.

14   Q.    Now, again, did you have a written agreement with

15         them?

16   A.    You know, I don't recall.

17   Q.    Going back, backing up just a bit, I don't believe I

18         asked you this question, at Dynamic Control, what

19         computer system would you have been programming with,

20         or in?

21   A.    A System 3, Model 15.  Then a System 3, Model 34.  And

22         then a System 3, Model 38.  The 38 was a preliminary

23         machine.  It wasn't really released to the public.

24   Q.    When you refer to all of these, you are referring to

25         IBM; is that correct?

26

1   A.   Yes, sorry.

2   Q.   And at Florida Keys Memorial Hospital, what system

3        would it have been?

4   A.   It was a System 3, Model 34.

5   Q.   DePoo Hospital, what you said, you worked with them

6        from '79 until '99 --

7   A.   So, it was a lot of machines.

8   Q.   I was about to say originally --

9   A.   It was a 34.

10  Q.   Then Key West Fragrance, do you recall?

11  A.   System 34.

12  Q.   Okay.  And Singleton Fleets?

13  A.   System 34.

14  Q.   Okay.  Now, we are on my timeline, about 1981?

15  A.   Could be, yeah.

16  Q.   Between, I guess, your attendance at the IBM training

17       program at Waterloo, Iowa, and 1981, would you have

18       attended any more classes?

19  A.   No, I don't think so.  I really don't think so.  I

20       didn't have time.

21  Q.   Now, we mentioned Florida Keys as being an employer.

22       You said they paid you initially as a W2 employee.

23       Thereafter, you have reduced the staff to three and

24       they called you on an as-needed basis.

25                 Have you been an employee of any entity

27

1    | since your employment with Florida Keys Hospital?
2  A.| You mean received a W2? Let me think. I don't think
3    | I have. I don't recall but I don't think I have
4    | received -- well, I will take that back. I received
5    | W2s from my own corporation. Would that count?
6  Q.| Well, yeah, we are going to delve into that, I guess.
7    | Maybe I should say as any third-party entity, one that
8    | is not an affiliate of yours?
9  A.| Yeah, I believe so. I don't remember any.
10 Q.| You do not remember any other than your own affiliated
11   | entities?
12 A.| Exactly.
13 Q.| Let's talk about your affiliated entities. What would
14   | those have been?
15 A.| I don't understand the word affiliated.
16 Q.| What corporations would you have been --
17 A.| I --
18 Q.| -- involved with?
19 A.| The only corporation I had here would have been
20   | Goldman & Goldman, Inc., which was...
21 Q.| When was that entity incorporated?
22 A.| You know, I think -- I have the corporate papers on
23   | that, I can give you an exact date, and they are not
24   | here but I believe it was 1990.
25 Q.| What state was that --

28

| | | |
|---|---|---|
| 1 | A. | Michigan. |
| 2 | Q. | What would have been the business of Goldman & |
| 3 | | Goldman, Inc.? |
| 4 | A. | You know, variety, I guess.  I left -- it would have |
| 5 | | been software, I don't remember exactly what it said |
| 6 | | but we had a -- |
| 7 | Q. | Well, probably in your charter you had some language |
| 8 | | to say, here is the business we think we are going to |
| 9 | | do. |
| 10 | A. | You know, I really don't recall how it was worded. |
| 11 | | You know, we can ask, or we can look at the papers if |
| 12 | | we need to. |
| 13 | Q. | Sure.  I guess what I'm asking you is, what business |
| 14 | | did Goldman & Goldman, Inc. actually do? |
| 15 | A. | Software design. |
| 16 | Q. | And who were the shareholders of Goldman & Goldman, |
| 17 | | Inc.? |
| 18 | A. | Joel Goldman. |
| 19 | Q. | Other than you, Mr. Goldman, have there ever been any |
| 20 | | other shareholders of Goldman & Goldman, Inc.? |
| 21 | A. | No. |
| 22 | Q. | Who were the directors, the members of the board of |
| 23 | | directors of Goldman & Goldman? |
| 24 | A. | Jaime Larsen. |
| 25 | Q. | Jaime, is that I-M-E? |

Patricia Murray & Associates, Inc.          Court Reporting & Videoconferencing
1-800-875-8238                              Offices in Brighton & Ann Arbor, MI

4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems          June 14, 2006
Deposition of Joel Goldman

|   |    | 29 |
|---|----|-----|
| 1 | A. | Yes.  L-A-R-S-E-N. |
| 2 | Q. | L-A-R-S-E-N? |
| 3 | A. | And William Barry. |
| 4 | Q. | Who is Jaime Larsen? |
| 5 | A. | She was my wife. |
| 6 | Q. | Who is Mr. Barry? |
| 7 | A. | He was a long-time associate. |
| 8 | Q. | Okay.  Let's talk about the board of directors at |
| 9 |    | Goldman & Goldman.  When -- I guess, let me rephrase |
| 10 |   | that. |
| 11 |   | Are you still a member of the board of |
| 12 |   | directors of Goldman & Goldman? |
| 13 | A. | Yes. |
| 14 | Q. | Is that still an active corporation? |
| 15 | A. | Yes. |
| 16 | Q. | Have you been a member since its organization or its |
| 17 |   | incorporation? |
| 18 | A. | Yes. |
| 19 | Q. | And Ms. Larsen, I understand it, is your wife who has |
| 20 |   | passed away? |
| 21 | A. | Yes. |
| 22 | Q. | Was she a director at the time of incorporation or -- |
| 23 | A. | Yes. |
| 24 | Q. | Did she continuously serve until she died? |
| 25 | A. | Yes. |

30

1    Q.   Just for my notes, when did she pass away?

2    A.   In 1999.

3    Q.   Mr. Barry, would he have been a member of the board of

4         directors at the incorporation?

5    A.   Yes.

6    Q.   Is he still a member of the board of directors?

7    A.   Yes.

8    Q.   Are there any other members of the board of directors

9         of Goldman & Goldman?

10   A.   I don't know if we officially added anybody back after

11        my wife deceased.

12   Q.   Does your corporation maintain a minute book?

13   A.   If it did, my attorney would handle that.

14             MR. DENNEN:   I would ask, Brad, if we could

15        get a copy of the minute book of Goldman & Goldman,

16        Inc.?

17             MR. SMITH:   That's fine.

18             MR. DENNEN:   That would be Exhibit Number

19        200.

20             MR. SMITH:   If it exists.

21             MR. DENNEN:   With the qualification, if it

22        exists.

23             THE WITNESS:   Right.

24             MR. DENNEN:   And perhaps if it doesn't

25        exist, a copy of the charter bylaws and corporate

Goldman v. Healthcare Management Systems
Deposition of Joel Goldman

June 14, 2006

31

1     minutes, to the extent Mr. Goldman has those.

2   BY MR. DENNEN:

3   Q.   Now, you mentioned -- well, let's back up.

4               Who serves as president of Goldman &

5        Goldman, Inc.?

6   A.   That would be me.

7   Q.   Okay.  Is there a secretary for the corporation?

8   A.   Currently?

9   Q.   Yes.

10  A.   I don't know if we put it in the records or not.

11  Q.   Okay.  Who is the secretary then, even if it's de

12       facto?

13  A.   It would be Susan Barnes.

14  Q.   Who is Susan Barnes?

15  A.   My girlfriend.

16  Q.   When would Ms. Barnes have become secretary?

17  A.   I wouldn't remember.  For a couple of years.  I don't

18       know.

19  Q.   2002, 2003?

20  A.   Yes.

21  Q.   Somewhere in there?

22  A.   Somewhere like that.  Again, it would be informal, if

23       anything.

24  Q.   Does Mr. Barry have a position as an officer with the

25       corporation?

```
       32

 1   A.   Yeah, I believe he was treasurer.  I'm not really sure

 2        if that's what we gave him.

 3   Q.   Okay.  Whatever position he has held, has he held that

 4        position --

 5   A.   Yes.

 6   Q.   -- since the organization of the company?

 7   A.   Yes.

 8   Q.   You have done a real good job.  Let me finish my

 9        question so it's accurately reflected.

10              Anyone else who serves as an officer of

11        Goldman & Goldman, Inc.?

12   A.   You know, not to my recollection.

13   Q.   Does Goldman & Goldman, Inc. have any employees?

14   A.   Yes.

15   Q.   How many employees?

16   A.   Two.

17   Q.   Who are those?

18   A.   Marian Larsen,

19   Q.   L-A-R-S-E-N also?

20   A.   Yes.

21   Q.   And who else?

22   A.   And myself.

23   Q.   What are Ms. Larsen's, Ms. Marian Larsen's, duties?

24   A.   Keeps the books.

25   Q.   Okay.  Other than -- well, rephrase that.
```

33

1                  What is the maximum number of employees

2       Goldman & Goldman would have had since its

3       organization in 1990?

4   A.    W2 employees?

5   Q.    Yes, sir.

6   A.    Two or three, I don't know if we ever even had three.

7       Jamie was an employee before her mother, and I don't

8       recall if we had any more.

9   Q.    Let me -- I appreciate what you are saying.  Marian

10      Larsen is then your stepdaughter, is that correct, or

11      your daughter?

12   A.    Marian Larsen is my mother-in-law.

13   Q.    Mother-in-law, I'm sorry.  And you are saying that

14      your wife, your deceased wife, may have been an

15      employee?

16   A.    She was.

17   Q.    She was an employee?

18   A.    Yes.

19   Q.    But other than your mother-in-law, your wife and you,

20      to your knowledge, has the company had any other

21      employees?

22   A.    I don't believe we ever issued any other W2s.

23   Q.    Okay.  Other than Goldman & Goldman, Inc., have you

24      had any other business entities?  When I say entity,

25      corporation, partnerships, now we have something

Patricia Murray & Associates, Inc.       Court Reporting & Videoconferencing
1-800-875-8238                      Offices in Brighton & Ann Arbor, MI
4c14eea1-4404-419d-b567-94a8db683538

34

1      called a limited liability company, any other

2      entities?

3   A.  I guess I need that clarified.  If I was given stock

4      in a company, would that be considered --

5   Q.  That would be considered to be an entity.

6   A.  Okay.  In 1989, I was given 50 percent stock in a

7      company called Green Tree.

8   Q.  Okay.  Do you know the full name of Green Tree?

9   A.  I think it was Green Tree, Inc.

10  Q.  Okay.  Do you know where that corporation was

11     incorporated?

12  A.  It was Michigan.

13  Q.  Okay.  Is it still in existence?

14  A.  I don't believe so.

15  Q.  You used the past tense of "was Michigan."

16  A.  Yes.

17  Q.  Either -- the natural is it either ceased to exist or

18     else it changed to a different state.

19  A.  It just was never used.

20  Q.  Did it ever engage in any business?

21  A.  No.

22  Q.  Who would have been the other shareholders of Green

23     Tree?

24  A.  Alan Ladd.

25  Q.  Was he the only shareholder?

Goldman v. Healthcare Management Systems                June 14, 2006
Deposition of Joel Goldman

|     |     |                                                          |
|-----|-----|----------------------------------------------------------|
| 1   | A.  | Yes.                                                     |
| 2   | Q.  | When you say was given to you, do you know why           |
| 3   |     | Mr. Ladd gave you this stock?                            |
| 4   | A.  | We were going to engage as partners in a venture.        |
| 5   | Q.  | What would have been the nature of that venture?         |
| 6   | A.  | Computerized billing systems for healthcare.             |
| 7   | Q.  | Okay.  Other than Green Tree, which you said never       |
| 8   |     | engaged in any business, would there have been any       |
| 9   |     | other business corporation that you would have been a    |
| 10  |     | shareholder of?                                          |
| 11  | A.  | No, I don't believe so.  I don't think so.               |
| 12  | Q.  | Okay.  Even let me take it a step further, Goldman &     |
| 13  |     | Goldman was incorporated in, I believe you said, 1990    |
| 14  |     | in the State of Michigan?                                |
| 15  | A.  | Yes.                                                     |
| 16  | Q.  | And you said it continues in existence today?            |
| 17  | A.  | Yes.                                                     |
| 18  | Q.  | Prior to 1990, would you have engaged in business as     |
| 19  |     | Goldman & Goldman?                                       |
| 20  | A.  | No.                                                      |
| 21  | Q.  | Would you have used in your business any other names     |
| 22  |     | to distinguish yourselves?                               |
| 23  | A.  | I used the initials JSM.                                 |
| 24  | Q.  | Okay.  Was it just JSM?                                  |
| 25  | A.  | Yes.                                                     |

35

36

1    Q.   What did JSM stand for, if anything?

2    A.   Joel, Star and Michelle.

3    Q.   Star, S-T-A-R?

4    A.   Yes.

5    Q.   Who are Joel, Star and Michelle?

6    A.   Michelle is my daughter and Star was sort of a term of

7         endearment for my first wife.

8    Q.   I assume you are Joel?

9    A.   You assume correctly.

10   Q.   Would you have said computing systems, use any other

11        adjectives with this name?

12   A.   Possibly.

13   Q.   Do you recall using any?

14   A.   I could have.  I mean, I recall I used something.  I

15        could have said JSM Computer Systems, JSM Key West.

16   Q.   Okay.  This entity, did you ever incorporate it,

17        formally organize it?

18   A.   No.

19   Q.   When did you begin using the name JSM or some

20        derivative of that?

21   A.   It would have been in '79.

22   Q.   And when did you cease using JSM, or derivative?

23   A.   You know, I really don't recall.  Probably after my

24        divorce.

25   Q.   When was your divorce?

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

37

1    A.   You know, I actually don't have the exact date.

2              MR. GIVENS:   I'm going to take a break.

3              MR. DENNEN:   Why don't we do that right

4         now, Tom.

5                   (A recess was taken)

6              MR. DENNEN:   We are back from our break.

7    BY MR. DENNEN:

8    Q.   Mr. Goldman, before we took a break we were talking

9         about your various -- I guess the corporation Goldman

10        & Goldman and we were talking about JSM.  I just want

11        to refresh my own recollection, I believe you said

12        JSM, you ceased using JSM when you got divorced; is

13        that correct?

14   A.   That would be -- that would make sense to me.

15   Q.   Again, I think I asked this question but I want to ask

16        it again, do you recall when that divorce would have

17        occurred?

18   A.   You know, it would be a matter of record in Key West.

19        I got divorced there.

20   Q.   Not to belabor the point, would it have been the

21        middle '80s, late '80s, early '90s?

22   A.   It was sometime in the '80s.  Again, not the exact

23        date.

24   Q.   From that time, whatever date that is, and we can

25        figure out what that is, until you incorporated

38

1        Goldman & Goldman, Inc., did you use any other trade

2        names or business names, or anything like that?

3   A.   Not that I recall.

4   Q.   Now, JSM, when you used the name JSM, what business

5        was JSM in?

6   A.   Software.

7   Q.   When you say software, what do you mean, sir?

8   A.   Design, implemented, contracted, whatever.

9   Q.   When I say contracted, I guess I am thinking of

10       essentially contract as an independent contractor who

11       has a contract with a third party.  Is that the use

12       you are making of that?

13  A.   Yeah.

14  Q.   Did JSM ever sell a product?

15  A.   Not under that name.

16  Q.   Okay.  What name would JSM have sold a product under?

17  A.   The only product -- are you referring to that time

18       period?

19  Q.   I'm referring to the period of time when you used the

20       name JSM, which have been 1979 to sometime in the

21       '80s.

22  A.   I would have sold the product under my name.

23  Q.   Now, again, I don't -- I'm trying to get this in my

24       mind and sometimes my mind can be a little logical and

25       sometimes it isn't.

39

1          For example, Florida Keys Hospital, would

2      you have contracted with them as JSM?

3    A.  No.

4    Q.  DePoo Hospital, would that have been JSM?

5    A.  No.

6    Q.  Key West Fragrance, would that have been JSM?

7    A.  No.

8    Q.  And Hospital San Rafael in Puerto Rico, would that

9      have been JSM?

10   A.  No.

11   Q.  And Singleton Fleets, would that have been JSM?

12   A.  No.

13   Q.  And you said that pretty emphatically.  So what would

14     have been the distinction between these entities and

15     the other ones that JSM contracted with?

16   A.  I would clarify, JSM did not contract with anybody.  I

17     thought I said that.

18   Q.  Oh, okay.  I misunderstood you then.  I'm sorry.

19   A.  I think you need to look --

20   Q.  Let's go back to JSM's business.

21   A.  Okay.

22   Q.  What was JSM's business, tell me again, if you would,

23     sir.

24   A.  JSM was just a name.  I guess I really don't

25     understand the question there.

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

40

1    Q.   Well, that's fair, I'm glad you made that statement

2         because you and I may be saying the same thing on

3         different levels.

4              When you say JSM was just a name, I was

5         assuming that, for example, if Joel Goldman did

6         contract programming work for the Dykema law firm,

7         that Dykema would receive an invoice that said at the

8         top JSM, or something to that nature.  I'm trying to

9         understand what exactly you used JSM for.

10   A.   Maybe -- at the time I thought about incorporating it

11        as a name, but never did.  Maybe that's the best

12        scenario.

13   Q.   Would you have business cards that had JSM on them

14        that you would give to people?

15   A.   No.

16   Q.   So as far as your customers were concerned, JSM did

17        not exist?

18   A.   Exactly.

19   Q.   Okay.

20   A.   It was a reference point for myself.

21   Q.   Okay.  That's fair enough.  It was not a name that you

22        gave to third parties?

23   A.   Exactly.

24   Q.   Okay.  Now we understand each other.

25              Again, I don't mean to belabor the point,

Goldman v. Healthcare Management Systems
Deposition of Joel Goldman

June 14, 2006

41

1      but JSM, there wouldn't be anybody out there who would

2      have received a paycheck from JSM or there wasn't a

3      JSM checkbook --

4   A.  No.

5   Q.  Or anything of that nature?

6   A.  No.

7   Q.  Now, okay, in that case, I think we can go on and

8       forget about JSM.

9              So Joel Goldman, individually, entered into

10      these contracts with the various entities we have

11      talked about, Hospital San Rafael?

12  A.  Yes.

13  Q.  Hospital DePoo, the shrimp fleet, that name is

14      Singleton Fleets, that would have been with you

15      individually, is that correct, sir?

16  A.  Yes.

17  Q.  Now, when would you have begun doing this contract

18      work individually?

19  A.  What time frame are you talking about?

20  Q.  Well --

21  A.  Are we strictly talking in the Key West time frame?

22  Q.  I guess before you moved to Key West, did you do any

23      independent contracting program on the side?

24  A.  Yes.

25  Q.  Has that always been something that you have done?

42

1    A.   Yes.

2    Q.   After you moved to Key West, though, that became your

3         primary business, correct, was independent contract

4         programming?

5    A.   Yes.

6    Q.   That's what I'm talking about.

7    A.   Okay.

8    Q.   So let's start then.

9    A.   From that time period.

10   Q.   From that time period, that's a good reference point.

11        You moved to Key West, it looks like, sometime in

12        1978?

13   A.   Right.

14   Q.   Give or take a little bit.

15   A.   Right.

16   Q.   Again, just for my own reference, do you have any

17        specific -- was it '78 or '77, do you specifically

18        recall?

19   A.   I don't have that exact date.  It was in that time

20        frame.

21   Q.   But you don't have any reference that it was March of

22        1978?

23   A.   No, I couldn't give you that date, that exact --

24   Q.   When did you leave Key West?

25   A.   You know, that's kind of a -- can't really answer.  I

```
                                                                   43
 1          went back and forth to Key West for -- until 1999.  So
 2          I never really left.
 3    Q.    When you say back and forth to Key West, what do you
 4          mean?  Did you have another home somewhere else?
 5    A.    That I owned?
 6    Q.    Well, I don't think home ownership is a requisite to
 7          have another home.  Obviously, you came to Michigan at
 8          some point in time.  When you say back and forth, are
 9          you referring to Michigan and Key West?
10    A.    I lived other places also.
11    Q.    Where else did you live?
12    A.    Georgia, Puerto Rico.
13    Q.    Where else?
14    A.    I think that's -- I don't recall any other -- well,
15          Miami, sorry about that.
16    Q.    You didn't name Michigan.  Was Michigan in that list?
17    A.    Yeah, sorry.  I thought that was assumed.
18    Q.    And it was but I wanted to make sure.  Unfortunately,
19          when she is taking down the record --
20    A.    Okay.
21    Q.    I think you and I are on the same wavelength, so
22          that's good.
23    A.    All the other places I worked I lived there,
24          obviously.
25    Q.    Again, I went to get some reference points.  You said
```

44

1    you left Key West in 1999, went there in approximately

2    1978, '79, in that neighborhood.  Did you own a home

3    in Key West during this period of time?

4  A.  No.

5  Q.  Did you receive your mail in Key West during this

6      period of time?

7  A.  Yes.

8  Q.  When you were in Georgia -- when were you in Georgia?

9  A.  You mean physically living there?

10 Q.  Yes.

11 A.  Again, define the word living.  You know, I didn't

12     live there on a full-time basis.  It was just like

13     a --

14 Q.  You tell me.

15 A.  I don't -- I don't -- living there is -- I was there

16     for some times.  I could have been there a week out of

17     three months and the next time I could have been there

18     a month.  I really didn't stay there.

19 Q.  Do you recall what time period you would have been

20     spending time in Georgia?

21 A.  I'm thinking it was between '82 and about '86 and '87.

22 Q.  Where in Georgia would that have been?

23 A.  St. Simons Island.

24 Q.  And with respect to Puerto Rico when you were, I

25     guess, spending time in Puerto Rico, what time frame

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

45

1          would that have been?

2     A.   From '79 up until about '86 and, again, that's a

3          guess.

4     Q.   Sure.  It's been a long time.

5     A.   Yeah.

6     Q.   We would all agree with that.  And Miami, Florida?

7     A.   It was just in the time I worked at Dynamic, and I

8          actually owned a home there at that time.

9     Q.   But that was before you moved to Key West, so that

10         would have been 1978, '77, correct?

11    A.   Yeah.

12    Q.   Because you maintained a residence after that?

13    A.   Yes.

14    Q.   When did you cease having that residence?

15    A.   I rented it out for a time period and I don't remember

16         when I sold it.  Again, it would have been a matter of

17         record.

18    Q.   Would it have been the mid-'80s?

19    A.   You know, I don't remember.  I sold it to the people I

20         rented it to.

21    Q.   Sure.  And Key West, you know, being a southerner I

22         refer to my home place as being that place where I

23         keep going back to even though I may be living

24         somewhere else.  Would you have considered Key West to

25         be the home place in my vernacular?

46

1   A.   Off and on.

2   Q.   That's fine.  Then Michigan, where in Michigan did you

3        reside?

4   A.   Initially, in Trufant.

5   Q.   Can spell that for me, please, sir?

6   A.   T-R-U-F-A-N-T.

7   Q.   When did you reside in Trufant?

8   A.   '86 or '87.

9   Q.   Were there any other communities where you would have

10       resided in Michigan?

11  A.   Grand Rapids.

12  Q.   When would that have occurred?

13  A.   That would have been about, again, I don't know the

14       exact time frame, from '87 to about '90, maybe '88.

15       Again, I don't have that exact date.

16  Q.   Okay.  Anywhere else in Michigan?

17  A.   My current home.

18  Q.   Where is that?

19  A.   It's in Canadian Lakes.

20  Q.   When did you move there?

21  A.   I purchased that in -- it's either '90 or '91.

22  Q.   You resided in Canadian Lakes, Michigan since 1991 and

23       continuously?  I guess you continued going back to Key

24       West but you said that was until 1999?

25  A.   Yeah.

Goldman v. Healthcare Management Systems                 June 14, 2006
Deposition of Joel Goldman

47

1    Q.   When you would go back to Key West during this time

2         period, was that for a week, a month, longer periods

3         of time or was it just, it depended?

4    A.   Usually the winter.

5    Q.   That's fair enough.  Since 1999 you have resided

6         solely in Canadian Lakes, Michigan; is that correct?

7    A.   Yes.

8    Q.   All right.  Goldman & Goldman, does it have a business

9         office?

10   A.   Third floor of my house.

11   Q.   Has that been the business office since 1990 or '91?

12   A.   Yes.

13   Q.   Has it ever had any other offices other than at your

14        home, wherever that might be?

15   A.   No.

16   Q.   During the time that you were -- let's say, from 1979

17        until 1990 when Goldman & Goldman was incorporated,

18        would you have had any offices when you were, I guess,

19        without a corporation, other than at a home office?

20   A.   I don't -- I guess I don't understand the question.

21        Did I work out of someplace or --

22   Q.   We are in a rented office, obviously, at your

23        attorney's office.  Did you rent any other --

24   A.   I did not rent any spaces or anything like that or --

25   Q.   Would you have received mail at that location other

48

1          than at your home for your business entity?

2     A.   Not that -- I don't really think so.

3     Q.   Okay.  Would you -- other than going to the customer's

4          location, would you have had an office anywhere that

5          you would have utilized?

6     A.   Well, I had a place in Puerto Rico but, again, the

7          word office, I didn't really work out of anyplace.

8     Q.   When you say a place in Puerto Rico, explain that to

9          me a little bit, what you mean.

10    A.   I had a clothing store, so I don't know if I -- I

11         didn't know if that was relevant.

12    Q.   Well, I mean, when did you have the clothing store?

13    A.   From about '84 to about '86 or '87, I think.  The

14         dates are really kind of vague.

15    Q.   Sure.  Did that clothing store have a name?

16    A.   Ültimo.

17    Q.   You have to spell that one for me, for sure.

18    A.   U-L-T-I-M-O.

19    Q.   Where that was located?

20    A.   In the Catano, in Puerto Rico.

21    Q.   Okay.  What kind of clothing did your store sell?

22    A.   Men's.

23    Q.   Was that your full-time occupation?

24    A.   No, no.  It was a venture.  Can I put it that way?  It

25         was a venture.

Patricia Murray & Associates, Inc.          Court Reporting & Videoconferencing
1-800-875-8238                              Offices in Brighton & Ann Arbor, MI

4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems
Deposition of Joel Goldman

June 14, 2006

49

| | | |
|---|---|---|
| 1 | Q. | Were you an investor only or did you -- |
| 2 | A. | No, I was an investor. |
| 3 | Q. | I guess, to ask that question again, did you work in |
| 4 | | the store in any capacity or work with that business |
| 5 | | in any capacity? |
| 6 | A. | I -- as an employee or -- |
| 7 | Q. | Did you devote any amount of time -- |
| 8 | A. | I did put a little time in it, yes. |
| 9 | Q. | Okay. I believe, kind of, you referenced that you |
| 10 | | would have worked in that store in your other |
| 11 | | business? |
| 12 | A. | Occasionally, I would have worked through a computer |
| 13 | | terminal so I could dial in to clients. |
| 14 | Q. | Sure. Was this store, was it an incorporated entity? |
| 15 | A. | No. |
| 16 | Q. | Who were the other investors? |
| 17 | A. | No one. |
| 18 | Q. | Were you the sole owner? |
| 19 | A. | (Witness indicating.) |
| 20 | Q. | Did you have any employees in the store? |
| 21 | A. | I had some contract employees. |
| 22 | Q. | I guess to borrow a phrase, who was minding the store |
| 23 | | for you? Did you have someone who was the manager or |
| 24 | | maybe that was the problem? |
| 25 | A. | I'm sorry. Yeah, there was -- yeah, there was |

50

1       somebody managing the store.

2   Q.  Ultimately, I guess you made the decision to shut down

3       the store?

4   A.  Yeah.

5   Q.  Any other business ventures that you have been

6       involved in since 1979 up through the present?

7   A.  No, I don't think so.

8   Q.  Let's talk about from 1979 until, I guess, 1990 when

9       Goldman & Goldman was incorporated.

10  A.  Okay.

11  Q.  During that time what would you have said your primary

12      business was?

13  A.  Designing software.

14  Q.  Who were your customers?

15  A.  Primarily hospitals.

16  Q.  During this period of time, how many hospitals would

17      you have had as customers?

18  A.  Quite a few.  Do you need a list of names or --

19  Q.  Probably, ultimately, I will want a list of names but

20      at this point in time, would it have been more than

21      20?

22  A.  Between the time frame of when?

23  Q.  '79 and '90.

24  A.  I'm going to say probably 10.

25  Q.  Okay.

Goldman v. Healthcare Management Systems
Deposition of Joel Goldman

June 14, 2006

51

| | | |
|---|---|---|
| 1 | A. | I don't know if that's an exact figure. |
| 2 | Q. | We have already identified two hospitals in Key West |
| 3 | | and one in Puerto Rico. Do you recall any of your |
| 4 | | other hospital customers? |
| 5 | A. | Georgia. That would be -- do you want -- |
| 6 | Q. | If you have that name that -- |
| 7 | A. | Henry General. |
| 8 | Q. | Where is that located? |
| 9 | A. | Stockbridge. |
| 10 | Q. | Okay. Any others come to mind? |
| 11 | A. | I don't know the name but I can give you the location. |
| 12 | Q. | Sure. |
| 13 | A. | It would be Hinesville. |
| 14 | Q. | Hinesville, Georgia? |
| 15 | A. | Yep. |
| 16 | Q. | Okay. |
| 17 | A. | Claxton, Georgia. You can put a fruitcake next to |
| 18 | | that. |
| 19 | Q. | What else? |
| 20 | A. | Canton, Georgia. |
| 21 | Q. | Okay. |
| 22 | A. | Cummings, Georgia. I don't remember if this was |
| 23 | | Evanston or Evans, home of Stucky's. |
| 24 | Q. | Okay. Any others that come to mind? |
| 25 | A. | Texas. Angleton, Texas. |

52

1    Q.   Is that E-N?

2    A.   A-N.  Livingston, Texas.  Taft, Texas.

3    Q.   Any others?

4    A.   Michigan.  Did I get through ten yet?  Must have been

5         more.  Mecosta in Big Rapids.  Now, okay, let's stop,

6         yeah.  Kelsey in Lakeview.

7    Q.   You are saying Kelsey Hospital in Lakeview, Michigan?

8    A.   Right.  South Haven Hospital.  The hospital in

9         Marshall, I don't remember the name.

10   Q.   Let me stop you there, South Haven Hospital, where is

11        that located?

12   A.   South Haven.  I'm giving you locations again, and the

13        hospital name could change, which they do.

14   Q.   I assume most of these communities, there is only one

15        hospital?

16   A.   Yeah, they are small.

17   Q.   When you say small, what is the bed range?

18   A.   Generally, under 100 beds.

19   Q.   Any others that come to mind?

20   A.   Well, the Puerto Rico Hospital.

21   Q.   We have already got Hospital San Rafael.

22   A.   I figured you wanted the whole list.

23   Q.   Let's do that.  Puerto Rico.

24   A.   You have DePoo and Florida Keys.

25   Q.   We have got roughly -- that's actually 16 hospitals.

53

1              Now, they would have been customers of Joel
2       Goldman sometime between '79 and 1990, is that --
3    A.  Clarification, they were not -- I usually handled
4       it -- the hospitals I dealt with I usually handled
5       through a third party.
6    Q.  Tell me about that relationship.  First, who is that
7       third party?
8    A.  Well, it would depend on the location.
9    Q.  Why don't you tell me about the relationship, and we
10      can get into that?
11   A.  I would not market -- I didn't market directly.  That
12      was not my job.
13   Q.  Help me understand.  Give me an example of one of
14      these hospitals where there would have been a third
15      party involved?
16   A.  I would design software but I would not go out and try
17      to sell software to a party.  Somebody would come to
18      me and say I have a hospital system for you, and they
19      would, essentially, have the contract with the
20      hospital and then they would pay me.
21   Q.  Do you recall who those third parties were?
22   A.  One would have been Tom McDougal.
23   Q.  Anyone else?
24   A.  Boy, I think it's also Tom Kasnak.
25   Q.  Spell that last name, please, if you can.

Goldman v. Healthcare Management Systems          June 14, 2006
Deposition of Joel Goldman

54

1   A.   I couldn't even begin.

2   Q.   Who else?

3   A.   I guess they are the only ones that I...

4   Q.   Let's use Mr. McDougal, for example.

5   A.   Okay.

6   Q.   Mr. McDougal would have a contract with -- do you

7        recall which hospital Mr. McDougal would have had a

8        contract with?

9   A.   It would have been, like, Henry General.

10  Q.   Okay.  Henry General would enter into a contract with

11       Mr. McDougal?

12  A.   Right.

13  Q.   Would that be him personally?

14  A.   At that point I really didn't know.  I had a contract

15       with Mr. McDougal to receive monies for those systems.

16       I do not have a copy of that contract.

17  Q.   I guess, what would the hospital ask Mr. McDougal to

18       do?

19  A.   Provide a system for their hospital.

20  Q.   And Mr. McDougal would then contact you and would you

21       then write a system for that hospital?

22  A.   I already had a system designed.

23  Q.   Would you then sell that to Mr. McDougal who would

24       resell it to the hospital?

25  A.   We had an agreement where he would pay me a fee per

55

| | | |
|---|---|---|
| 1 | | installation. |
| 2 | Q. | Do you recall what that fee was? |
| 3 | A. | It would vary based on the percentage of the sale. |
| 4 | Q. | Do you recall what that percentage was? |
| 5 | A. | Initially? |
| 6 | Q. | Yes. |
| 7 | A. | 50 percent. |
| 8 | Q. | Obviously, it must have changed at some point? What |
| 9 | | did it become? |
| 10 | A. | What did it try to become or what did it become? |
| 11 | Q. | My question is, what did it become? |
| 12 | A. | It became nothing. We went our separate ways. |
| 13 | Q. | Okay. How many hospitals would Mr. McDougal have |
| 14 | | sourced, that's probably my word? |
| 15 | A. | The initial Georgia and Texas hospitals. |
| 16 | Q. | And when did you terminate your relationship with |
| 17 | | Mr. McDougal? |
| 18 | A. | You know, I -- it's going to be, like, '85 or'86, and |
| 19 | | I'm real sketchy on that date. |
| 20 | Q. | When did you begin your relationship with |
| 21 | | Mr. McDougal? |
| 22 | A. | I thinking it was '82. Again, I'm sketchy on that |
| 23 | | date. I can... |
| 24 | Q. | What reference would help you remember that better? |
| 25 | A. | The first installation would have been Henry General, |

56

1      so...

2   Q.   Now, I guess from the hospital's perspective, would

3        they have known that you were involved in this

4        process, this project?

5   A.   Yes.

6   Q.   How would they have known?

7   A.   Well, they paid me for any additional programming

8        directly.

9   Q.   Let me back up in the process.  Who would have

10       installed the software onto the hospital's system?

11  A.   I was involved in every installation.

12  Q.   What was your involvement?

13  A.   I either helped or totally installed every system.

14  Q.   Now, did you have a formal kind of maintenance

15       agreement with the hospital or -- how did they know to

16       call you?

17  A.   It was the nature of the way we set up the agreements

18       with the facilities.

19  Q.   Was there a maintenance agreement as part of that

20       agreement?

21  A.   There was.  I -- it wasn't directly with me but it

22       was...

23  Q.   When you say it wasn't directly with you, help me

24       understand what you are saying.

25  A.   It was a concept.  I would always be there to help

57

| | | |
|---|---|---|
| 1 | | them if they couldn't get relief from the other party. |
| 2 | Q. | Now, when you say get relief from the other party, are |
| 3 | | you referring to Mr. McDougal? |
| 4 | A. | Yes. If they had a question, they would call him |
| 5 | | first, and me second. |
| 6 | Q. | Just a scenario, I'm in the hospital data processing |
| 7 | | center and the system is not working. Would I pick up |
| 8 | | the phone and call Mr. McDougal first? |
| 9 | A. | Yes. |
| 10 | Q. | And then how would I know to call you? |
| 11 | A. | If your problem didn't get solved. |
| 12 | Q. | Did Mr. McDougal have the ability to solve whatever |
| 13 | | the problems were? |
| 14 | A. | He was supposed to. |
| 15 | Q. | When the customer came to you, how did you get paid |
| 16 | | for that advice or that service, or maybe you didn't? |
| 17 | A. | I got paid on a per hour basis. |
| 18 | Q. | Did you send an invoice to Mr. McDougal or to the |
| 19 | | customer? |
| 20 | A. | When they called me directly, I would deal directly |
| 21 | | with the customer. |
| 22 | Q. | When you said they call you directly, would |
| 23 | | Mr. McDougal call you with questions -- |
| 24 | A. | Yes. |
| 25 | Q. | -- about doing things? |

58

1          What about -- you have referenced

2      additional programming.  Did you create updates for,

3      like, Henry Hospital?

4   A.  Yes, and custom programming.

5   Q.  Now, the updates, specifically, were those released in

6      the computer software terms through Mr. McDougal?

7   A.  Some were.

8   Q.  Why were not all of them released through

9      Mr. McDougal?

10  A.  You know, I don't really recall.

11  Q.  Was that a part of his contract with the hospital, to

12      provide updates?

13  A.  You know what?  I really didn't see his contracts with

14      the hospital.

15  Q.  I guess that gets me back to my question.  You said

16      you did custom programming for the hospital as well,

17      Henry Hospital?

18  A.  Yeah.

19  Q.  Would that have been at Mr. McDougal's request?

20  A.  Usually it was at the hospital's request.

21  Q.  I asked this before, how would the hospital know to

22      call you?  Would that be basically Mr. McDougal would

23      say you need to call Mr. Goldman?

24  A.  No, they all knew to call me.

25  Q.  Do you know how they knew to call you?

59

1    A.   I told them.

2    Q.   Okay.  When you were on premises doing installation,

3         is that when you told them?

4    A.   Yes.

5    Q.   Did you have -- I guess, do you have contact with the

6         customer during the sales process?

7    A.   The only contact I would have had is usually to give

8         them a demo.  You know, when we demonstrated the

9         software, I would do the demonstration.

10   Q.   Do you know where Mr. McDougal is now?

11   A.   No.

12   Q.   When is the last recollection you have of his

13        whereabouts; do you recall?

14   A.   When we terminated our agreement.

15   Q.   Do you know where he was located then?

16   A.   Atlanta, I believe.

17   Q.   Now, did he have a corporation or a business name that

18        he used or was he just an individual?

19   A.   You know, I think he did, and I don't really have the

20        name of that.

21   Q.   If you wanted to get in touch with Mr. McDougal, do

22        you know of any means that you could utilize to get in

23        touch with Mr. McDougal?

24   A.   No.

25   Q.   After you terminated your relationship with

60

1        Mr. McDougal, did your relationship continue with the

2        hospitals that Mr. McDougal had brought to you?

3   A.   Some of them.

4   Q.   I believe you said you never saw the contract between

5        Mr. McDougal and these hospitals, is that correct,

6        sir?

7   A.   To the best of my recollection, I don't remember

8        seeing them.

9   Q.   Do you have a copy or would you have a copy of any of

10       those agreements?

11  A.   I know surely not.

12  Q.   Did you have a written agreement with Mr. McDougal?

13  A.   You know, I don't have a copy of it, so I believe I

14       did but I don't have a copy of it.

15  Q.   So you believe you had one at one time, you no longer

16       have that?

17  A.   Right.

18  Q.   Why do you no longer have that agreement?

19  A.   I think I moved too many times.

20  Q.   Did you prepare that agreement or did Mr. McDougal

21       prepare the agreement?

22  A.   Like I said, he would have had it prepared.

23  Q.   Would you have had that agreement reviewed by an

24       attorney?

25  A.   I would have at the time.  I know the second one

61

1      was...

2  Q.  When you reference the second one --

3  A.  That was the falling out.  There was a second

4      agreement he requested me to sign, and that's when we

5      no longer -- we parted ways.

6  Q.  And you have referenced he wanted a change in the

7      percentage.  Were there any other details he wanted

8      changed that you didn't agree with?

9  A.  I didn't bother reading it after the percentage

10     change.

11  Q.  Now, on the percentage, 50 percent, roughly, what

12     would have been the compensation you would have

13     received under the agreement with these hospitals?

14  A.  It was minimum of $10,000 per sale.

15  Q.  Was there a maximum?

16  A.  Plus installation costs and expenses.

17  Q.  Was there a maximum?

18  A.  No.

19  Q.  Roughly, what would have been the installation cost

20     and expenses on an ordinary basis?

21  A.  30, 40,000.  It just depended on the facility.  It's

22     kind of hard to tell.

23  Q.  Are you saying that you would have incurred 30 or

24     $40,000 in installation costs?

25  A.  Possible -- depending on what system they had prior,

Goldman v. Healthcare Management Systems                 June 14, 2006
Deposition of Joel Goldman

62

1          depending on what they wanted done, if they wanted

2          their information transferred.  There is a lot of

3          variables, so the price was variable.

4    Q.    Would that have been part of your contract with

5          Mr. McDougal or did you have a separate contract with

6          the hospital?

7    A.    It was on a time-and-materials basis.

8    Q.    I understand that, but was that contract with

9          Mr. McDougal or was it with the hospital entity?

10   A.    It was the hospital had their choice to -- they could

11         have contracted him, they could have contacted me.  It

12         was the hospital's choice.

13   Q.    So did you have separate agreements with these

14         hospitals, separate written agreements or oral

15         agreements?

16   A.    It was oral agreements.

17   Q.    Okay.

18   A.    Usually it was all done on a handshake.

19   Q.    Did you ever have a written agreement with any of

20         Mr. McDougal's hospitals?

21   A.    To the best of my recollection, no.

22   Q.    You would have billed on an hourly rate for -- what

23         was that hourly rate?

24   A.    In the early '80s, it would have been -- I think it

25         was like 40 bucks an hour.

Goldman v. Healthcare Management Systems
Deposition of Joel Goldman

June 14, 2006

63

1   Q.   Did that increase in this period of time we have been

2        talking about between --

3   A.   To 75.

4   Q.   So you are saying, and I just want to understand, and

5        I didn't bring a calculator with me, but at $40 an

6        hour, that's 1,000 hours it would have taken to

7        install this program?

8   A.   You know, the word installation, we need to clarify

9        that term maybe.

10  Q.   Tell me when you say installation, what you mean.

11  A.   You know, you have a program and it starts running.

12       But then over a time period, let's say six months, you

13       would improve it or make changes for the customer.   So

14       it's -- or it could be a year.

15  Q.   You are talking about making specific improvements

16       that the customer requested?

17  A.   Exactly.

18  Q.   Not the actual installation of the program onto the

19       machine?

20  A.   Right.   The installation would be very quick and then

21       as they used the software, they would know what

22       questions to ask.

23  Q.   I guess, you know, you said 30,000 to 40,000, again,

24       excuse me, I'm doing the math right now, so that would

25       be 400 hours of installation at $75 an hour so 10

64

```
 1        weeks, I guess, 10 workweeks.  Did you --
 2   A.   I don't know.  Programmers don't work in the
 3        same -- you know, like it could be 12 hours a day, 14
 4        hours.  You don't stop, you don't punch a time clock
 5        and start at 8:00 and get done at 5:00.
 6   Q.   Okay.
 7   A.   It's like an attorney.
 8             MR. GIVENS:  I have to take another break,
 9        I'm sorry.
10             MR. DENNEN:  We are going to go on.
11   BY MR. DENNEN:
12   Q.   Now, you said Tom Kasnak was someone else you dealt
13        with?
14   A.   Yes.
15   Q.   We will try to figure out some way to get the proper
16        spelling.  When were you involved with Mr. Kasnak?
17   A.   It would have been '85 or '86.  And we can get a
18        specific date based on Big Rapids Hospital, if you
19        like.
20   Q.   Did you have the same relationship with Mr. Kasnak --
21   A.   Yes.
22   Q.   -- that you had with Mr. McDougal?
23   A.   Yes.
24   Q.   Were you paid in the same manner on a percentage
25        basis?
```

65

```
 1    A.   Yes.

 2    Q.   And you referenced Big Rapids Hospital, would that

 3         have been a hospital Mr. Kasnak would have contracted

 4         with?

 5    A.   Yes.

 6    Q.   Were there any other hospitals that Mr. Kasnak

 7         contracted with that --

 8    A.   The list of the Michigan hospitals.

 9    Q.   Again, did you ever see the contracts between

10         Mr. Kasnak and --

11    A.   You know, I don't recall.

12    Q.   Would you have a copy of any of those contracts?

13    A.   I definitely don't -- I don't have a copy of those.

14    Q.   Sure.  What differences, if any, were there in your

15         agreement with Mr. Kasnak and your agreement with

16         Mr. McDougal?

17    A.   None.

18    Q.   Was the percentage the same?

19    A.   Yes.

20    Q.   And did you and Mr. Kasnak part company?

21    A.   Yes.

22    Q.   When did that occur?

23    A.   I think it was about '86 or early '87.

24    Q.   Why did you part company?

25    A.   He made unauthorized program changes.
```

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

66

| | | |
|---|---|---|
| 1 | Q. | Help me -- well, again, with Mr. Kasnak, did you |
| 2 | | perform the installation? |
| 3 | A. | I was always involved. |
| 4 | Q. | Did you perform the demonstrations? |
| 5 | A. | Yes. |
| 6 | Q. | Did Mr. Kasnak provide, I guess, updates and support |
| 7 | | to the installation? |
| 8 | A. | Yes. |
| 9 | Q. | You said that Mr. Kasnak made unauthorized program |
| 10 | | changes.  What specifically did Mr. Kasnak do? |
| 11 | A. | Had one of his programmers rewrite the payroll system. |
| 12 | Q. | The payroll system? |
| 13 | A. | Uh-huh. |
| 14 | Q. | And how did you discover this? |
| 15 | A. | It didn't work. |
| 16 | Q. | Okay.  When you say it did not work, how did you |
| 17 | | discover it did not work? |
| 18 | A. | Did you ever hear what happens when employees don't |
| 19 | | get paid. |
| 20 | Q. | Oh, yeah.  I guess this was installed at one of the |
| 21 | | hospitals and the employees did not get paid at that |
| 22 | | hospital? |
| 23 | A. | Exactly. |
| 24 | Q. | Which hospital was that? |
| 25 | A. | It was -- I believe it was South Haven, Marshall.  It |

Patricia Murray & Associates, Inc.        Court Reporting & Videoconferencing
1-800-875-8238                            Offices in Brighton & Ann Arbor, MI
                                          4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

67

1          was all the hospitals that accepted the update.

2    Q.    Obviously, Mr. Kasnak had programmers who worked for

3          him --

4    A.    Yes.

5    Q.    -- is that correct?

6    A.    Yes.

7    Q.    And you had provided the code to them?

8    A.    Yes.

9    Q.    Now, I get confused.  I'm not a computer person.

10         There is this concept called source code and there is

11         a concept called object code, and it's my

12         understanding, if I understand correctly, you would

13         have provided the source code to Mr. Kasnak?

14   A.    Yes.

15   Q.    And his programmers would have then rewritten that

16         code on a payroll system, correct?

17   A.    Yes.

18   Q.    Why did you provide the source code to Mr. Kasnak?

19         Was it for the purpose of --

20   A.    Yes.

21   Q.    -- making updates and changes?

22   A.    So that he would support local Michigan clients.

23   Q.    Would you have provided source code to Mr. McDougal?

24   A.    Yes.

25   Q.    Did Mr. McDougal have programmers on his staff?

68

1   A.   Yes.

2   Q.   These programmers would have written updates or

3        corrected problems, was that part of their job duties?

4   A.   Under my direction.

5   Q.   When you say under your direction, what do you mean?

6   A.   If they made a change, I was to be informed of those

7        changes.

8   Q.   Now, let's go back to the payroll situation here.

9        Obviously, when people didn't get their paychecks, it

10       creates a little bit of a stir.  How did you become

11       aware of this situation?

12  A.   A couple -- I got a phone call from some of the

13       hospitals, if I recall, that's -- or I think I was

14       told from the other facilities that didn't get the

15       update.  I don't recall specifically.

16  Q.   What did you do in response?

17  A.   Cried.

18  Q.   After you got over the sorrow at the incident, did you

19       do anything to fix this issue?

20  A.   I -- not for the hospitals that took the change.  I

21       don't think they wanted to talk to me again.  There

22       was a lynch mob at the hospitals.

23  Q.   When I say how did you become aware of the change,

24       obviously, you would have had a meeting, I assume, or

25       a telephone conversation with Mr. Kaczynski (sic) to

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

69

1    discuss this?

2  A.  Yes.

3  Q.  What was his response?

4  A.  He blamed me.

5  Q.  As a result, you all had a termination of the

6      relationship. And not to be facetious, were any legal

7      proceedings filed or any action other than was there a

8      written termination agreement prepared?

9  A.  No. We never went -- no.

10 Q.  Did you ever speak to Mr. Kaczynski again or

11     communicate with Mr. Kaczynski?

12 A.  You know, I tried. It's Kasnak, by the way.

13 Q.  Thank you for the correction.

14 A.  No problem.

15 Q.  I guess Kaczynski was the Unabomber.

16 A.  It's about the same thing.

17 Q.  Going back to, he blamed you. Obviously, you took

18     offense at this and the relationship terminated.

19              Now, as a result of the termination of the

20     relationship, did your relationship with the hospitals

21     in Michigan terminate?

22 A.  Every one except for two of them.

23 Q.  Which ones were those?

24 A.  Mecosta in Big Rapids, and Kelsey in Lakeview, the

25     ones that didn't get the update.

70

1    Q.   Do you know why they didn't get the update?

2    A.   They refused it.

3    Q.   Do you know why they refused it other than being the

4         luck of the draw?

5    A.   They didn't have a problem with their payroll so why

6         change something that works.

7    Q.   I guess, in computer vernacular, you receive an

8         update, and it's up to you to install it or not

9         install it, and --

10   A.   They chose not to install it.

11   Q.   Would there have been charges for the update?

12   A.   Yes.

13   Q.   In return for this price you pay for the update and

14        they made a decision they didn't want to pay for it?

15   A.   Right.

16   Q.   Now, during this period of time you have referenced

17        payroll, is there a method, a logical method of

18        breaking down, I guess, the functional components of

19        the software we have been discussing, payroll,

20        accounts receivable, is there a way of doing that that

21        you would have used?

22   A.   Yes.

23   Q.   What was that?

24   A.   I guess, maybe I'm confused with the word functional.

25        I don't know what -- you know, each one is considered

71

```
 1        a system of, you know, like a --
 2   Q.   What would have been the systems you would have
 3        been --
 4   A.   It -- you know, like, accounts receivable -- are we
 5        going through examples or do you want to be specific?
 6   Q.   I would like to be as specific as you can.  During
 7        this period of time, the '79 -- let's break it down.
 8        I don't know if there is a natural way of breaking it
 9        down.
10   A.   There is to a degree.  Now, I might get one wrong.  We
11        would have had payroll, of course.  You would have had
12        an accounts payable, which is standard business.  You
13        would have had general ledger.  You would have had
14        accounts receivable.  You would have had inventory
15        control.  You would have had an admissions-type
16        system, sometimes it would have been classified under
17        accounts receivable.
18             You would have had a billing system, again,
19        sometimes you would classify that as part of accounts
20        receivable.  You would have a medical records system
21        and then, when you get into healthcare, you have a
22        pharmacy, a laboratory.  You could -- you would have a
23        radiology system, and there is a lot of miscellaneous
24        components.  You know, it depends through the years
25        they have added nursing and other components, but
```

72

1       that's pretty simple.  Did I miss anything?

2  Q.  You said payroll, accounts payable, general ledger,

3       accounts receivable, inventory control, and then you

4       said for hospital systems you would add admissions,

5       billing --

6  A.  Well, accounts receivable would be in anybody's

7       system.

8  Q.  Right.  Admissions, billing, medical records,

9       pharmacy --

10  A.  Laboratory.

11  Q.  -- lab and radiology?

12  A.  Yeah.

13  Q.  Okay.  And as you just pointed out, the nonhealthcare

14       ones, basically, are a generic financial product, if

15       you will.  It's what you would expect in an accounting

16       software, is what I refer to.  Payroll and accounts

17       payable, general ledger, accounts receivable and

18       inventory control, basically, all businesses are going

19       to have that?

20  A.  Yeah, yeah, that's --

21  Q.  Your shrimp fleet, would you have given -- would they

22       have had this functionality, the payroll, accounts

23       receivable, accounts payable, general ledger --

24  A.  Uh-huh.

25  Q.  -- and inventory control?

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

73

1    A.    Yes.

2    Q.    Obviously, they wouldn't have admissions or medical

3          records?

4    A.    Right.

5    Q.    So Key West Fragrance similarly would have had those

6          kind of programs or systems, would they not?

7    A.    Yes.

8    Q.    From your vernacular, I'm going to use systems because

9          that's what you and I can agree on, if we can.

10   A.    Okay.

11   Q.    When I say system, I'm referring to the

12         functionalities that you have just identified, if

13         that's okay.  HMS refers to them as modules.

14   A.    Whatever is easier for you.

15   Q.    I want to have your language because --

16   A.    I call it system.

17   Q.    That's fine.  We will use your language.

18               We have identified Mr. McDougal, Mr. Kasnak

19         as being people with whom you contracted, third

20         parties with whom you contracted.

21               During this period of time, 1979 to 1990,

22         would you have contracted with any other third

23         parties?

24   A.    Formally or informally?

25   Q.    Either way.

74

| | | |
|---|---|---|
| 1 | A. | I'm trying to think of the word -- informally, would |
| 2 | | have been Roberto Sanchez. |
| 3 | Q. | Now, going back you said you had a written agreement |
| 4 | | with Mr. Kasnak and you had one with Mr. McDougal? |
| 5 | A. | Right. |
| 6 | Q. | However, you don't know where those are? |
| 7 | A. | Right. |
| 8 | Q. | Mr. Kasnak's agreement that you had, would you have |
| 9 | | had a lawyer look at that? |
| 10 | A. | You know, I don't even recall. |
| 11 | Q. | And I guess the reason you don't have a copy of this |
| 12 | | agreement with Mr. Kasnak is that you moved so many |
| 13 | | times and because of the passage of time? |
| 14 | A. | Yeah.  It's just I -- important papers in a box, the |
| 15 | | box sort of didn't make a move. |
| 16 | Q. | It's not in a garage somewhere, or a basement? |
| 17 | A. | No, I have actually looked. |
| 18 | Q. | And you don't have that anymore? |
| 19 | A. | No. |
| 20 | Q. | Would you have had a written agreement with |
| 21 | | Mr. Sanchez? |
| 22 | A. | No.  That's why I clarified the word formally, |
| 23 | | informally. |
| 24 | Q. | Okay.  What was your oral agreement with Mr. Sanchez? |
| 25 | A. | If he found a hospital for me, we would share revenue |

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

                                                                75
1          based on the sale.

2    Q.    Mr. Sanchez, when did you begin your relationship with

3          Mr. Sanchez?

4    A.    '79.

5    Q.    Has that relationship ended?

6    A.    Yeah, in '99.

7    Q.    Why did that relationship end?

8    A.    He -- he was one of the owners of DePoo Hospital, Key

9          West.

10   Q.    I guess why did the relationship end, did DePoo

11         Hospital cease to exist?

12   A.    They were sold.

13   Q.    Who bought DePoo, do you know?

14   A.    It was a company out of Naples, Florida.

15   Q.    How many, I guess, hospitals did you share revenues

16         with Mr. Sanchez?

17   A.    You know, he never took a dime.

18   Q.    Okay.

19   A.    That's, again, back to the informal --

20   Q.    Okay.  You had an agreement but he never asked you to

21         pay him anything.  Did you give him any consideration

22         for these referrals?  Did you give him trips or

23         clothes, or anything like that?

24   A.    Took him out to dinner.  It was -- he was also a

25         consultant to the facilities so...

76

1   Q.   Which facilities are you referring to?

2   A.   DePoo Hospital, the hospital in Caguas, Puerto Rico.

3   Q.   Spell that, if you would, please.

4   A.   C-A-G-U-A-S.  St. Mary's Hospital in Georgia.  Palm

5        Springs Hospital in Hialeah, Florida.

6   Q.   Any others?

7   A.   No.

8   Q.   Now, you said that Mr. Sanchez was a consultant also?

9   A.   To the hospitals.

10  Q.   To these hospitals?

11  A.   Yes.

12  Q.   What was the nature of his consultant agreement or

13       arrangement?

14  A.   I really don't know.

15  Q.   Do you know what services he was providing?

16  A.   It varied to each facility.

17  Q.   Can you give me an example?  Was I.T. one of the

18       services he was consulting --

19  A.   No, no.  Medicare Cost Report, for an example.

20  Q.   As part of his consulting agreement, would he -- like

21       Mr. McDougal, and the others, he wouldn't have been

22       under an obligation to provide the systems --

23  A.   No.

24  Q.   -- that we have talked about?

25  A.   Never.

77

1   Q.   Do you know where Mr. Sanchez is now?

2   A.   Key Biscayne, Florida, I believe.

3   Q.   Do you have an address, a phone number for

4        Mr. Sanchez?

5   A.   No.

6   Q.   When is the last time you communicated with him?

7   A.   I think I talked to him in 2002.

8   Q.   If you needed to get in touch with Mr. Sanchez, how

9        would you go about getting in touch with him?

10  A.   I don't know.

11  Q.   Is there some other person who would know where

12       Mr. Sanchez is residing?

13  A.   I guess somebody that worked at the hospital, DePoo.

14  Q.   How did you become -- how were you introduced to

15       Mr. Sanchez?

16  A.   He was part owner of DePoo Hospital.

17  Q.   Who contracted with you?  What individuals contacted

18       you to do services for DePoo?

19  A.   IBM.

20  Q.   So you basically met Mr. Sanchez through that

21       introduction and relationship?

22  A.   To IBM, yes.

23  Q.   Did Mr. Sanchez have a title at DePoo?

24  A.   I --

25  Q.   Was he the administrator, or anything of that nature?

Goldman v. Healthcare Management Systems
Deposition of Joel Goldman

June 14, 2006

78

1    A.    I -- everything.  He was above the administrator.

2    Q.    Okay.   He was the owner in every sense of the word?

3    A.    Yeah.   King would have been the word.

4    Q.    Given the nature of the relationship, would you

5          provide a source code to Mr. Sanchez?

6    A.    No.

7    Q.    I believe you said St. Mary's Hospital in Georgia,

8          where is St. Mary's located?

9    A.    St. Mary's.

10   Q.    It's in St. Mary's, Georgia?

11   A.    Yeah.

12   Q.    That was not one of the ones we talked about?

13   A.    Because you said -- you said prior to '90.

14   Q.    That was going to be my question.  Would that have

15         been a relationship that would have been post-1990?

16   A.    Yeah.

17   Q.    Let's go through, if we can, the relationship -- well,

18         I believe you said that your minimum with Mr. Kasnak

19         and Mr. McDougal was $10,000 per hospital?

20   A.    Yeah.

21   Q.    Did that include all of the systems that you

22         identified earlier?  Did that include payroll,

23         accounts payable, general ledger, accounts receivable,

24         inventory control, admissions?

25   A.    Didn't include inventory at the time.

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

79

1    Q.   Would it have included billing, medical records,

2         pharmacy, lab and radiology systems?

3    A.   Pharmacy usually not, because it was a separate -- a

4         lot of places had their own pharmacy systems.  No

5         laboratory.

6    Q.   No laboratory?

7    A.   No.

8    Q.   So the standard package, if you will, of systems for

9         the $10,000, tell me what that included.

10   A.   It would have been accounts payable, general ledger,

11        payroll, the accounts receivable, the billing -- let

12        me look at the list here, and the admissions, medical

13        records.

14   Q.   So you are saying laboratory, pharmacy and radiology

15        were separate --

16   A.   Those were usually billed on a time and materials,

17        usually as an interface.

18   Q.   When we reference medical records in 2006, medical

19        records is everything about the patient from

20        temperature, blood pressure, the whole patient record,

21        back in -- my understanding is, in 1985, it was a

22        totally different concept, it was more statistical in

23        nature; is that correct?

24             What is the difference between --

25   A.   It is still the road map.  So, you know, without the

80

1    medical records, you can't get to the clinical-based

2    applications so there is a -- you know, its purpose is

3    still basically the same.  You have a tracking of the

4    information for the patient.

5  Q.  Maybe -- I want to make clear, in 1985, the medical

6    records software would not have had the patient's

7    blood pressure or temperature, it would have been the

8    patient chart as we refer to it?

9  A.  Yes, in the initial database file.  It would have had,

10   or could have had a road map to the patient's blood

11   pressure, and so forth.

12 Q.  Right.  But when they refer to, in today's vernacular,

13   electronic medical records, that is something that is

14   different from medical records --

15 A.  I think you need to clarify that.

16 Q.  Clarify it.

17 A.  You can't do one without the other.  So you still need

18   that road map to get to the blood pressure, and so

19   forth.  So, you know, you might have an image of

20   something but you still have to go from point A to

21   point B.

22 Q.  Okay.  This is more -- I guess maybe the better way

23   for me to say it, as I understand it, this is more

24   statistics on admissions, and things of that nature,

25   or am I incorrect?

```
                                                            81
 1                    MR. SMITH:  Could you clarify "this" when
 2        you say "this."
 3     BY MR. DENNEN:
 4     Q.  The medical record system is -- well, tell me what it
 5         did.  Maybe that's a better way of saying it.
 6     A.  Again, it classified the patients into a master
 7         patient index so that you could track every visit.
 8         It, also, again, was the road map to the clinical
 9         information systems, the billing systems, the accounts
10         receivable systems.
11                    If you -- you couldn't really produce a
12         bill without having the medical records information.
13     Q.  Okay.  Under --
14     A.  You would have to have a diagnosis code, which would
15         be stored in the medical records.
16     Q.  Okay.
17     A.  Every piece of paper would have a visit number on it,
18         which, again, would be stored in the medical records.
19     Q.  I understand.
20     A.  If that --
21     Q.  We are going to come back to that.  I understand what
22         you are saying but I don't know that the record is
23         going to reflect it.
24                    I want to go to 1990.  In 1990, you
25         incorporated Goldman & Goldman?
```

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

82

1   A.   That is correct.

2   Q.   Did you engage in business -- the prior business that

3        you had engaged in, did you then, in essence, continue

4        that business under the name Goldman & Goldman, under

5        that corporate name?

6   A.   Yes.

7   Q.   Now, during the period of '79 to 1990, I think I have

8        asked you this, did you have any employees as Joel

9        Goldman individually?

10  A.   No.

11  Q.   Did you have any contract programmers?

12  A.   If I contracted somebody, they would be paid directly

13       from the facility.  If I needed a programmer, I would

14       say, hey, I need some help.

15  Q.   Is it fair to classify you as a one-man shop during

16       this time?

17  A.   Pretty much.

18  Q.   Now, 1990 you begin working as Goldman & Goldman

19       incorporated?

20  A.   (Witness indicating.)

21  Q.   Did you continue to be a one-man shop?

22  A.   I did.

23  Q.   I want to back up.  You said basically your

24       relationship with DePoo Hospital continued until 1999?

25  A.   Yes.  Actually, well, to clarify, the name changed to

Goldman v. Healthcare Management Systems                                June 14, 2006
Deposition of Joel Goldman

83

1      Lower Florida Keys Health System, somewhere in the

2      middle there.  I believe it was '89.

3  Q.  Lower Florida Keys --

4  A.  Maybe '90.

5  Q.  -- Health System.

6           You said you believe in about 1990?

7  A.  The small hospital acquired the larger hospital.

8  Q.  Was that larger hospital the other one that you

9      referenced --

10  A.  Florida Keys Memorial Hospital, yes.

11  Q.  Now, prior to that acquisition, had you maintained

12      your relationship with Florida Keys Hospital?

13  A.  Off and on, not -- I believe it terminated for a while

14      and I can't give you the exact date.  They were

15      managed by another facility so there were several

16      years where I really did not go to them.

17  Q.  Okay.  Hospital San Rafael, I believe you said your

18      relationship was in 1979.  Did that continue --

19  A.  Until about '86 or '87.

20  Q.  The Michigan hospitals, with the exception of Big

21      Rapids, and there was one other, it --

22  A.  Kelsey.

23  Q.  In Lakeview?

24  A.  Uh-huh.

25  Q.  Your relationship with those would have terminated, I

84

1        think, that was '86 or '87?

2   A.   No.  I think Mecosta would have been, I'm guessing, it

3        was either '97 or '98.

4   Q.   Mecosta, you --

5   A.   I continued to do work with them until -- through, I

6        think it was '97 or '98, and I'm not really sure about

7        that date.  It could have been part of '99.  I'm not

8        sure.

9   Q.   That's 1999.  Then you said that you kept your

10       relationship with Kelsey Hospital.  When would that

11       have terminated?

12  A.   You know, I -- I don't remember.  It was sometime in

13       the '90s.

14  Q.   Okay.

15  A.   They were taken over by Spectrum, and the dates were

16       kind of vague.

17  Q.   Okay.  Your relationship with the other Michigan

18       hospitals ended with Mr. Kasnak?

19  A.   Yes.

20  Q.   I think you said your relationship with the

21       Mr. McDougal's hospitals terminated when you

22       terminated the relationship with McDougal; is that

23       correct?

24  A.   Some -- I kept some of the hospitals.

25  Q.   Which ones would you have kept?

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

85

1    A.    I kept the hospital in -- Henry General, Angleton, in

2          Texas; Livingston.  I think that's all.  Those were

3          all the time.

4    Q.    You kept those from Mr. McDougal?

5    A.    Uh-huh.

6    Q.    I didn't ask you, but did your -- when you terminated

7          your relationship with Mr. McDougal, was there a

8          lawsuit filed or was there any legal correspondence

9          back and forth?

10   A.    There was some legal correspondence.

11   Q.    Do you have copies of any of that?

12   A.    No.

13   Q.    The Georgia hospitals, did you keep those after

14         Mr. McDougal -- you and Mr. McDougal left your

15         relationship, or were they separate, the ones in

16         Georgia?

17   A.    Didn't I just give you --

18   Q.    You gave me Henry General, that was the only one?

19   A.    Yeah.

20   Q.    Puerto Rico, we talked about San Rafael.  We talked

21         about all of those?

22   A.    Uh-huh.

23   Q.    So when did your relationship with Henry General

24         cease?

25   A.    I'm thinking '89.

86

1    Q.   Your relationship with Angleton?

2    A.   I'm not sure.  It would have been some time in the

3         '80s, late '80s, after '86, to that time period, and

4         the same thing with Livingston.

5    Q.   Then with respect to Mr. Sanchez, you referenced

6         another hospital in Puerto Rico, is that the San

7         Rafael?

8    A.   That's San Rafael.

9    Q.   I'm sorry.

10   A.   It's just the location.  Sometimes I use the location

11        versus the name.

12   Q.   Okay.  Then St. Mary's in Georgia was -- that was

13        after your relationship, correct, with Mr. McDougal

14        terminated?

15   A.   Yes.  That hospital was owned by Mr. Sanchez.

16   Q.   When did your relationship with that hospital cease?

17   A.   It was pretty quick.  He sold it.

18   Q.   Okay.  Palm Springs, Florida, the Palm Springs

19        Hospital in Hialeah, Florida?

20   A.   That went through about '99 to 2000.

21   Q.   Was that one also owned by Mr. Sanchez?

22   A.   No, he was a consultant.

23   Q.   Why did that terminate?

24   A.   They purchased another computer system.

25   Q.   Do you know what system they purchased?

Goldman v. Healthcare Management Systems                                June 14, 2006
Deposition of Joel Goldman

87

| | | |
|---|---|---|
| 1 | A. | The high-end HBOC. |
| 2 | Q. | Your relationship with Mecosta in Big Rapids, why did |
| 3 | | they terminate, do you know? |
| 4 | A. | They put in a new system. |
| 5 | Q. | Do you know what system they put in? |
| 6 | A. | Medatech. |
| 7 | Q. | The Kelsey hospital that terminated in the 1990s -- |
| 8 | A. | They were taken over by Spectrum. |
| 9 | Q. | Spectrum Hospital -- |
| 10 | A. | Healthcare. |
| 11 | Q. | I guess that is a larger healthcare system? |
| 12 | A. | Uh-huh. |
| 13 | Q. | Why did your relationship with Henry General |
| 14 | | terminate? |
| 15 | A. | They upgraded their system. |
| 16 | Q. | What system did they put in, do you know? |
| 17 | A. | SMS. |
| 18 | Q. | SMS? |
| 19 | A. | Yes. |
| 20 | Q. | Is that a company? |
| 21 | A. | It is.  I believe they were called -- I think were |
| 22 | | taken over, the last time I heard, by Siemens. |
| 23 | Q. | Siemens? |
| 24 | A. | I'm not sure. |
| 25 | Q. | Then Angleton and Livingston, you said you terminated |

88

1      your relationship --

2   A.  They changed systems to a different platform off of

3       the IBM.

4   Q.  What system did they --

5   A.  Those I really don't know.

6   Q.  Now, from 1990 until -- let's use 1999 or 2000, other

7       than the ones we have already discussed, did you have

8       any installations anywhere else --

9   A.  From where?

10  Q.  1990 until, I'm using 1999 --

11  A.  I had an installation in '97 at Rawlins, Wyoming.

12  Q.  R-A-W-L --

13  A.  L-I-N-S.

14  Q.  Are there any others?

15  A.  Douglas, Wyoming.

16  Q.  Is that also in '97?

17  A.  Yes.

18  Q.  Were they owned by the same company?

19  A.  No.

20  Q.  Any others?

21  A.  No.

22  Q.  During our prior conversations you referenced the

23      assistance that Mr. Sanchez gave to you, and then also

24      the agreements with the two other individuals,

25      Mr. McDougal and Mr. Kasnak.  Did the Rawlins and

89

1     Douglas Hospitals, did you have any similar assistance

2     from anyone?

3  A.  There was a salesman out of Washington, and I don't

4     remember his name.  He got a 33 percent commission of

5     the sales price, and I just don't recall his name.

6  Q.  When you say Washington, is that Washington state?

7  A.  Yes.

8  Q.  How did you come to be in contact with this salesman?

9  A.  He contacted me.  He worked for a physician billing

10    company in Washington.

11 Q.  What did he inform you?

12 A.  That they had -- he had two hospitals that were

13    looking to change computer systems.

14 Q.  When did -- well, let me back up.

15            Did you have a written agreement with him

16    or with his company?

17 A.  You know, I didn't.

18 Q.  And, I guess, would the check have been written by

19    Goldman & Goldman for his commission?

20 A.  Yes, it would have.

21 Q.  Do you still have those records?

22 A.  You know, I -- I would have to look.  I believe I

23    still have the -- I think I have the contract with the

24    hospital.  I'm not 100 percent certain.

25 Q.  Let's make as the next exhibit, that would be, I guess

90

1        201.   We actually have two hospitals identified,

2        Rawlins and Douglas --

3    A.   I know I have the proposals.  I don't know if I had

4        the signed contract.

5                    MR. DENNEN:   Could we go off the record for

6        just a minute?

7                    (Discussion off the record)

8    BY MR. DENNEN:

9    Q.   All right.  Mr. Goldman, we have had a discussion off

10       the record and you indicated that you may or may

11       not -- you don't believe you have a signed copy.  You

12       may have a working draft.  As the Exhibit Number 201,

13       I would say a signed copy or any working drafts of the

14       agreements or proposals with either the Rawlins or

15       Douglas Hospitals and, obviously, with the caveat you

16       are indicating you may or may not have those

17       documents.  If you don't, it's fine to say, look, we

18       don't have them.

19                    I tell you what, guys.  It is 10 after the

20       hour.  I think this would be a good time to take a

21       lunch break.

22                    MR. SMITH:   Okay.

23                    (A luncheon recess was taken)

24   BY MR. DENNEN:

25   Q.   We are back from our lunch break.  I want to go

Goldman v. Healthcare Management Systems      June 14, 2006
Deposition of Joel Goldman

91

1        through the -- before we took our break, we were

2        discussing the individuals who you had basically a

3        relationship with, and you identified one as Tom

4        Kasnak. Do you know where Mr. Kasnak was living

5        when -- or what's the last address or the last --

6   A.   Kalamazoo.

7   Q.   Do you know if Mr. Kasnak is still living there?

8   A.   Don't know.

9   Q.   I believe you said he had a company name or an entity

10       that he used?

11   A.   Yes.

12   Q.   Do you recall the name of that entity?

13   A.   I remember the acronym.

14   Q.   What was that?

15   A.   KISS.

16   Q.   KISS?

17   A.   The K was for Kasnak.

18   Q.   Certainly.

19   A.   And that's what I remember. I believe it was

20       incorporated, so you can always pull records.

21   Q.   We will definitely do that. You referenced a salesman

22       from Washington State and you didn't recall his name?

23   A.   No.

24   Q.   Has your memory come back on that issue?

25   A.   I still don't know.

Patricia Murray & Associates, Inc.      Court Reporting & Videoconferencing
1-800-875-8238      Offices in Brighton & Ann Arbor, MI
4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

92

1    Q.    Do you recall the company he worked for?

2    A.    No.

3    Q.    When you paid the commission to him, did you pay it to

4          him individually or to his company?

5    A.    I believe I paid it directly to him.

6    Q.    Do you remember where in Washington State he would

7          have been located, or his company would have been

8          located?

9    A.    No.

10   Q.    How much commission did you pay to him?

11   A.    I don't remember the exact figure.  It was -- I really

12         don't remember the exact figure.  I'm guessing around

13         25,000, but that would just be a guess.

14   Q.    Was that for both hospitals?

15   A.    Just one, per each.  Again, that would be a guess.

16   Q.    What was your agreement?  Were you paying him 33

17         percent commission?

18   A.    Of just the sales price of the software.  So he would

19         get no percentage of installation or training, or

20         anything like that.

21   Q.    How much were you paid total on the Douglas, Wyoming

22         Hospital?

23   A.    I would have to check my records.  There is time and

24         materials you get paid per -- you know, and expenses

25         and it was just -- it's over a time frame of maybe six

Patricia Murray & Associates, Inc.          Court Reporting & Videoconferencing
1-800-875-8238                              Offices in Brighton & Ann Arbor, MI
                                           4c14eea1-4404-419d-b567-94a8db683538

93

1          months.

2     Q.   Okay.

3     A.   And the same thing with the Rawlins Hospital, and they

4          also would purchase hardware, and there is just a lot

5          that goes with it.

6     Q.   Now, when did your relationship with those two

7          entities -- those two hospitals cease?

8     A.   Carvon wrote me my last check in September of 2004.

9     Q.   Now you said Carvon?

10    A.   Carvon, that's the Rawlins Hospital.  It's called,

11         Carvon, C-A-R-V-O-N.

12    Q.   September of 2004?

13    A.   Uh-huh.

14    Q.   What about the Douglas one?

15    A.   Boy, I think they -- it was 2001 or 2002.  I'm not

16         sure about that date.

17    Q.   I believe we have already asked these questions but

18         I'm going to refresh my recollection.  You don't

19         believe you have signed copies of the agreements with

20         either hospital; is that correct?

21    A.   Not to the best of my knowledge.

22    Q.   I think earlier I qualified my question to you with

23         from 1990 until 1999, and you have answered between

24         1999 and 2006, present day, did you have installations

25         at any other hospitals other than the Rawlins and

Goldman v. Healthcare Management Systems          June 14, 2006
Deposition of Joel Goldman

94

1     Douglas ones?

2    A.   I had an international one in the Dominican Republic.

3    Q.   What hospital was that?

4    A.   Central Medico Turobo (ph).

5    Q.   You still have that installation in place?

6    A.   No.

7    Q.   When did that one cease?

8    A.   2004.

9    Q.   Was that one that Mr. Sanchez had an interest in?

10   A.   No.

11   Q.   How did you come to have a hospital in the Dominican

12        Republic?

13   A.   It was through a friend of mine that said they

14        possibly needed some software, so I went down there.

15   Q.   When was that?

16   A.   I think I -- 2000, 2001.

17   Q.   Obviously, you installed some of your systems?

18   A.   Yeah.

19   Q.   How much were you paid on the Central Medico Turobo?

20   A.   It depended on the day of the week.  It was in pesos

21        so...

22   Q.   How much was that?

23   A.   All total, $5,000 in U.S. currency, probably about 25,

24        30,000.  They were -- they never finished paying me.

25   Q.   Did you have a contract or written agreement with

95

```
 1         them?
 2    A.   I have -- I had a proposal.  I don't know if I still
 3         have a signed agreement or not.
 4                   MR. DENNEN:  If we could, let's make the
 5         proposal or signed agreement Exhibit Number 202.
 6    BY MR. DENNEN:
 7    Q.   Other than Rawlins and Douglas and the Dominican
 8         Republic, did you have any other software
 9         installations between 1999 and 2006?
10    A.   Not that I recall.
11    Q.   Now, I guess I'm assuming that would be Goldman &
12         Goldman, Inc. when I say you.  Were you still
13         operating as Goldman & Goldman, Inc.?
14    A.   Yes.  Well, Dominican Republic is a little different
15         so it's kind of -- it's -- without going into too much
16         detail, the Dominican Republic is different.
17    Q.   Who is the party to the contract?
18    A.   It was me as an individual because they have what they
19         call flat rate tax.  What you get paid is what you
20         earn.  They take the taxes out ahead of time.  They
21         don't have no department of taxation, as such.  It's
22         too much. ..
23    Q.   So other than that one, which was your personal
24         contract?
25    A.   Right.
```

Goldman v. Healthcare Management Systems
Deposition of Joel Goldman

June 14, 2006

96

```
1    Q.   I assume would be reflected on your personal tax
2         return, the Rawlins and Douglas Hospitals, any income
3         from that would be on your Goldman & Goldman tax
4         return, correct?
5    A.   Yep.
6    Q.   Is Goldman & Goldman a sub-chapter S corporation?  Did
7         it make that election?
8    A.   No, it's a regular corporation.
9    Q.   What is referred to as a C corporation?
10   A.   I believe.  I don't know the technical term.
11   Q.   Other than Michigan, is Goldman & Goldman qualified to
12        do business in any other states?
13   A.   I don't know if that's -- I don't -- I don't know
14        about corporate law.  My attorney set up the
15        corporation so you would have to ask him.
16   Q.   Who is that?
17   A.   Michael Hults.
18   Q.   Can you spell --
19   A.   H-U-L-T-S.
20   Q.   Where is Mr. Hults located?
21   A.   Big Rapids.
22   Q.   Big Rapids, Michigan.  While we are on it, do you have
23        an accountant who works with you --
24   A.   I had an accountant.  I don't anymore.
25   Q.   Who was your accountant?
```

Patricia Murray & Associates, Inc.
1-800-875-8238

Court Reporting & Videoconferencing
Offices in Brighton & Ann Arbor, MI

4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems          June 14, 2006
Deposition of Joel Goldman

97

1   A.   I will have to get that to you.  I don't remember the

2        name off the top of my head.

3   Q.   Where was your accountant located?

4   A.   Grand Rapids.

5   Q.   When did you cease using the accountant?

6   A.   2001.

7   Q.   Did you pay taxes -- when I say you, Goldman &

8        Goldman, did it pay income taxes --

9   A.   Yes.

10  Q.   -- to any state other than --

11  A.   Sorry.

12  Q.   -- other than the State of Michigan?

13  A.   No.

14  Q.   To your knowledge, did it ever pay sales tax in any

15       state?

16  A.   No.

17  Q.   Now, other than Mr. Kasnak, Mr. McDougal, the salesman

18       from Washington State, your friend with the connection

19       to the Dominican Republic and Mr. Sanchez, did anybody

20       else ever assist you in the placements of software

21       with a hospital?

22  A.   Steve Nahm.

23  Q.   Would you spell his last name, please, sir?

24  A.   N-A-H-M.

25  Q.   N-A --

98

1    A.    H-M.

2    Q.    Who is Mr. Nahm?

3    A.    He was the CEO of the DePoo Hospital.

4    Q.    What was your arrangement with Mr. Nahm?

5    A.    We tried to set up a business in California.

6    Q.    What did you do in trying to set up a business in

7          California?

8    A.    We bought a computer and set up dentists as a billing

9          service.

10   Q.    So the business of this entity was as a dental billing

11         service?

12   A.    Yes.

13   Q.    Where was this computer located or housed?

14   A.    California.

15   Q.    Where in California?

16   A.    Commerce City, I believe.

17   Q.    Was that where Mr. Nahm was located?

18   A.    Yes.

19   Q.    Why did this business not go forward?

20   A.    It just didn't work, I don't know.

21   Q.    When did you attempt to do this with Mr. Nahm?

22   A.    It would have been, I'm thinking, like, '96.

23   Q.    Did the business have a name?

24   A.    No.

25   Q.    Other than buying a computer, did it have any other

99

```
 1        assets?
 2   A.   No.
 3   Q.   What caused it -- when you said it didn't work, what
 4        caused that reality to occur to you and Mr. Nahm?
 5   A.   We didn't make any money.
 6   Q.   So you did have customers?
 7   A.   Without -- I guess I couldn't explain it without going
 8        into a little detail.
 9   Q.   Please, go ahead.
10   A.   It was a private label credit card.  We had a bank
11        that would issue credit to customers for getting
12        dental work done.
13   Q.   So the dentist would -- the dentist would sign up for
14        a program and as part of the customers coming in, they
15        would get a credit card?
16   A.   The customer would come in and they could dial in and
17        essentially get a loan to do the dental work, and the
18        bank would pay the dentist a guaranteed fee and the
19        bank would then bill for the dentist.
20   Q.   Okay.
21   A.   And we got a percentage of all of that.
22   Q.   I guess going along that route, you said you didn't
23        make any money.  How long was this business in
24        operation?
25   A.   I think we tried it for six months.
```

100

1  Q.    What was your involvement during that six-month

2        period?

3  A.    I designed all of the software.

4  Q.    Are you -- let me back up.

5              When you determined that it wasn't working,

6        what did you all do to close down the business?

7  A.    There was never any -- we never made any money.  There

8        was a person that was -- that had the concept, that

9        designed the concept, and I basically put in my time

10       to write the software.  And we all just basically

11       donated time to get it up and running and, hopefully,

12       we saw a lot of money, or potential money.  It just

13       did not materialize.  We had 12,000 dentists and

14       couldn't make a dime, and we had no employees.

15       Everything was computerized.

16 Q.    I guess what I'm getting to, did the company file

17       bankruptcy?

18 A.    No.   There was -- there was never any income.   There

19       was never any expenses.   There was never any -- it was

20       just three people, some people getting together to try

21       to create a business opportunity and the bank provided

22       the loans, and so forth.  You can call the bank.   I

23       think it made a lot of money on the loans.

24 Q.    What bank was that?

25 A.    I don't recall.  I'll try to remember the name of it.

Goldman v. Healthcare Management Systems                June 14, 2006
Deposition of Joel Goldman

101

1          I can't remember the name of the bank.   This was in
2          the '90s, I just don't.
3     Q.   So mid-'90s?
4     A.   It was like '96.
5     Q.   Would it have been a bank in Commerce City?
6     A.   No, it was a bank in Orange County somewhere.
7     Q.   It's been long enough you don't remember?
8     A.   Right.
9     Q.   I want to -- was your relationship with Mr. Nahm
10         solely this business and the fact that he had -- how
11         long was he the CEO of DePoo?
12    A.   I think he was there from '79 up until '86, maybe.
13         I'm not sure when he left.
14    Q.   He would have been somebody you would have worked with
15         as part of your contracting, correct, or was he?
16    A.   He was just an employee for the hospital.
17    Q.   Do you know where Mr. Nahm is now?
18    A.   No.
19    Q.   When was the last time you communicated with Mr. Nahm?
20    A.   '99.
21    Q.   Where was he then?
22    A.   California.
23    Q.   Still in Commerce City?
24    A.   I believe -- I believe he was in Manhattan Beach.   He
25         wouldn't want to live in Commerce City.

102

1    Q.   After he left DePoo Hospital, where did he go from

2         there?

3    A.   I -- I think he went to Tampa.

4    Q.   He wouldn't have been involved in any of the

5         hospitals --

6    A.   No.

7    Q.   -- in which you had installations?

8    A.   Well, he helped me install and helped at Douglas, in

9         Wyoming.

10   Q.   Was that as just a contract employee?

11   A.   Yeah.  He tried to...

12   Q.   Any other businesses that we haven't discussed that

13        you were involved in since 1979?

14   A.   Until?

15   Q.   Until the present?

16   A.   I had -- I guess I didn't mention this earlier.  I had

17        another corporation that I set up in Michigan called

18        e-Health Technologies.

19   Q.   When was that corporation organized, chartered?

20   A.   It was -- I think it was 2005.  And it has been

21        disbanded and I filed the papers for it.

22   Q.   Did it have any shareholders other than you?

23   A.   Yes.  Mark Renfro.

24   Q.   Mark Renfro, R-E-N-F-R-O?

25   A.   Right.

                                                                103

1    Q.   Anyone else?

2    A.   No, besides myself.

3    Q.   Right.  Any officers or directors other than you and

4         Mr. Renfro?

5    A.   I don't think so.

6    Q.   What was the business of e-Health Technologies?

7    A.   It was going to set up electronic medical records

8         systems.

9    Q.   Where is Mr. Renfro now, do you know?

10   A.   Jacksonville, Florida.

11   Q.   Why did this venture disband?

12   A.   Difference of opinion.

13   Q.   A difference of opinion between you and Mr. Renfro?

14   A.   Yes.

15   Q.   So other than Goldman & Goldman, have you engaged in

16        business in this other entity which never got off the

17        ground, I guess two entities since 1990, is that the

18        sole --

19   A.   I believe so, yes.

20   Q.   Have you used any trade names other than Goldman &

21        Goldman during that same period?

22   A.   I filed for a trade name?

23   Q.   No, my question --

24   A.   Like a corporate trade name or --

25   Q.   Like Burger King is a trade name for a company.

104

1   A.   No, I don't recall if I did.

2   Q.   I don't believe I have asked you this question.

3        Obviously this is a lawsuit and you are the plaintiff

4        in this lawsuit, you individually are.  Have you ever

5        been a plaintiff in any other lawsuit?

6   A.   No.

7   Q.   Have you ever been a defendant in any other lawsuit?

8   A.   No.

9   Q.   Has Goldman & Goldman been a plaintiff or a defendant

10       in any lawsuit?

11  A.   No.

12  Q.   You said no earlier.  I assume when you got divorced

13       that was a legal proceeding so --

14  A.   Maybe I'm confused.  Is that a lawsuit?

15  Q.   In most states it is.  I don't know in Florida if that

16       would have been a lawsuit or not.  Maybe with that

17       caveat, are there any other lawsuits out there?

18  A.   No -- well, we had, like, a self-made divorce,

19       basically.  We went to a judge but we wrote up the

20       divorce agreement ourselves with an attorney.

21  Q.   That's fine.  I'm asking you about lawsuits in which

22       you or Goldman & Goldman or JSM, I guess, would have

23       been involved?

24  A.   No.

25  Q.   There are none?

                                                                    105

1    A.    (Witness indicating.)

2    Q.    Have any of the entities with which you have ever been

3          an owner/investor ever filed bankruptcy?

4    A.    Not to my knowledge.

5    Q.    Is there a reason for that caveat?

6    A.    Well, if I was -- I don't know if, like, Kasnak or

7          McDougal, or any of these other people, filed

8          bankruptcy so...

9    Q.    That's fair enough, and obviously you haven't filed

10         personal bankruptcy, correct?

11   A.    Right.

12   Q.    I assume you have never -- let me ask the question.

13         Have you ever been charged with a crime other than a

14         minor traffic offense?

15                   MR. SMITH:  Objection, because I think

16         under the Rules of Evidence it's whether or not he has

17         been convicted of a crime in the last ten years.

18                   MR. DENNEN:  I understand from the

19         admissibility but this is a discovery deposition.  I'm

20         allowed to ask the question and discover additional

21         evidence.

22   BY MR. DENNEN:

23   Q.    So with that caveat, I'm asking you that question.

24                   MR. SMITH:  Go ahead and answer.

25   A.    Within the last ten years?

Goldman v. Healthcare Management Systems          June 14, 2006
Deposition of Joel Goldman

106

1    BY MR. DENNEN:

2    Q.   No, ever.

3    A.   I had a DUI.

4    Q.   So you were charged with DUI?

5    A.   Yes.

6    Q.   Were you convicted or did you plead guilty to DUI?

7    A.   I don't -- it wasn't really any -- I don't know how

8         to --

9    Q.   What was the disposition of the criminal case?

10   A.   There was none.  I don't know.  I didn't get -- lose a

11        license or anything like that, is that what you are

12        trying to say?

13   Q.   Let's go through the facts.  When did that occur?

14   A.   In '89.

15   Q.   Where did that occur?

16   A.   Key West.

17   Q.   Did you go to court?

18   A.   Yes.

19   Q.   Were you asked to plead not guilty or guilty or no

20        contest?

21   A.   I think it was a no contest.  I'm not sure.

22   Q.   Were you placed on probation?

23   A.   I was asked to do community service and attend a

24        class.

25   Q.   Did you complete --

107

1   A.   Yes.

2   Q.   -- your community service and your --

3   A.   Yes.

4   Q.   -- attendance of the class?

5                   Other than this one DUI, is there any other

6        criminal charge that you have ever had in your entire

7        life?

8                   MR. SMITH:  Once again, just want to make

9        sure the record reflects that I object to the

10       admissibility of any of these answers.

11                  You can go ahead and answer the question.

12  A.   I had actually another DUI in '79.

13  BY MR. DENNEN:

14  Q.   Okay.  Where was that?

15  A.   Key West.

16  Q.   What was the disposition?

17  A.   It was --

18  Q.   Was it a similar disposition?

19  A.   Yeah, actually, I designed software for the sheriff's

20       department.

21  Q.   Anything else?

22  A.   I was arrested for possession of marijuana.

23  Q.   When was that?

24  A.   '72.

25  Q.   What was the disposition of that?

108

1   A.   It was thrown out.  I never went to court, or

2        anything.  It was -- there was no charges that were

3        filed.  I mean, it was closed.

4   Q.   Where was that?

5   A.   Philadelphia.

6   Q.   I assume that is Philadelphia, Pennsylvania?

7   A.   Yep.

8   Q.   Anything else?

9   A.   Well, let me see, well, Colorado in '70.

10  Q.   What was the charge there?

11  A.   Possession of marijuana.

12  Q.   What was the disposition?

13  A.   No evidence.

14  Q.   So you were saying it was dismissed?

15  A.   Both charges were dismissed, there was no evidence.

16  Q.   Both charges in Colorado?

17  A.   No, Colorado and Philadelphia.  There was --

18  Q.   Okay.

19  A.   -- wasn't any.

20  Q.   Anything else?

21  A.   Nope.  I don't think so.  That's going back 30 years.

22       Let me see, no.

23  Q.   I know 30 years is a long time, and memories fade, but

24       nothing since 1989 for sure?

25  A.   No.  I -- no traffic tickets, right?

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

                                                                      109

1    Q.   We are excluding traffic tickets.  We are talking

2         about just misdemeanors or felonies.

3    A.   Okay.

4    Q.   I believe I asked you earlier if you had ever given

5         testimony in a deposition.  Have you ever given

6         testimony other than today?

7    A.   I don't -- I don't think so.

8    Q.   I want to go back to, I guess, 1978, or so, when you

9         went to work at Florida Keys Memorial Hospital.

10   A.   Okay.

11   Q.   How did you get that job?

12   A.   I went down there with/for Dynamic Control initially.

13   Q.   So this was a client of Dynamic Control?

14   A.   Exactly.

15   Q.   What happened?  How were you made an offer of

16        employment?

17   A.   I worked for them and they were tired of paying

18        Dynamic the big bills, so they offered me a job.

19   Q.   Who would have made that offer?

20   A.   The administrator of the hospital.

21   Q.   Do you recall the administrator's name?

22   A.   It was a strange name.  I think it was something like

23        Raleigh Dudick (ph).  It was strange.  I'm thinking it

24        was something very --

25   Q.   Now, in your position with Florida Keys did you report

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

110

1      directly to the administrator?

2  A.   Yeah.

3  Q.   How big was the hospital?

4  A.   Boy, this was a long time.  It was probably 125 beds,

5       I'm guessing there.  I'm just not sure.

6  Q.   Was it solely one facility located in Key West?

7  A.   Yes.

8  Q.   Was it a primary care facility as opposed to a rehab

9       or a psych facility?

10 A.   Yes, I don't remember.  I don't remember.

11 Q.   Now, when you left Dynamic Control and went to Florida

12      Keys, did you download software onto a diskette and

13      take it with you to Florida Keys?

14 A.   No.

15 Q.   Did Florida Keys already have the software on its

16      system that you were going to enhance and program?

17 A.   Yes.

18 Q.   Did that software have a name?

19 A.   HFMS.

20 Q.   HFMS?

21 A.   Yes.

22 Q.   What is HFMS?

23 A.   It was the IBM program for hospitals.

24 Q.   HFMS would have been something -- would that have been

25      bought from Dynamic Control?

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

                                                                    111

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Would it have come with a machine? |
| 3 | A. | It came from IBM with a machine.  Dynamic Control had |
| 4 | | their own software. |
| 5 | Q. | I may be showing my age but I remember the days of the |
| 6 | | great big computer boxes as opposed to the personal |
| 7 | | computer boxes.  Would this have been on one of those |
| 8 | | larger size boxes? |
| 9 | A. | Define the word larger. |
| 10 | Q. | Would it fit in this room where we are sitting? |
| 11 | A. | Yes. |
| 12 | Q. | Would it have been -- I'm trying to get some reference |
| 13 | | point. |
| 14 | A. | It was probably eight foot by four foot, something |
| 15 | | like that.  It was originally a System 34, which would |
| 16 | | sink a 12-foot boat. |
| 17 | Q. | Okay.  You're saying it is pretty massive, |
| 18 | | relatively -- |
| 19 | A. | In today's terms, yes. |
| 20 | Q. | About as big as a side-by-side refrigerator? |
| 21 | A. | A little bigger. |
| 22 | Q. | That's probably a better analogy.  Did you access it |
| 23 | | by using card readers or had they progressed -- |
| 24 | A. | This was past the card readers.  You actually had real |
| 25 | | terminals, hence the word green screen. |

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

112

1    Q.    But these were dummy terminals in the sense of there

2          wasn't a CPC attached to it, correct?

3    A.    CPC is not a good word to use.

4    Q.    Okay.  I'm sorry.  I remember when I was a younger man

5          using a terminal that was basically just a screen with

6          a cable to the mainframe, is that the same type of

7          situation?

8    A.    Yes.

9    Q.    I actually remember card readers.

10             So when you were programming on the Florida

11         Keys system, did you have to be in the Florida Keys

12         offices?

13   A.    Yes.

14   Q.    Now, I believe you said at the same time, or soon

15         thereafter, was when you went to the other hospital,

16         DePoo Hospital --

17   A.    Correct.

18   Q.    -- as a contract programmer?

19             Again, how did -- did you bring the

20         software to the hospital or did the hospital already

21         have code on its computer?

22   A.    They contacted IBM.  IBM contacted me.  And we

23         installed the -- they bought the computer from IBM and

24         then installed the software onto their computer.

25   Q.    They bought an IBM computer?

Patricia Murray & Associates, Inc.          Court Reporting & Videoconferencing
1-800-875-8238                              Offices in Brighton & Ann Arbor, MI

4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems
Deposition of Joel Goldman

June 14, 2006

113

1   A.   Yes.

2   Q.   And an IBM software package?

3   A.   I -- I don't remember the whole arrangement but

4        everything was done with IBM.  I installed all of the

5        software.  I don't believe that IBM gave them any

6        software because I already had copies of the IBM

7        software.

8   Q.   I guess I want to be sure I understand who would have

9        contacted you from DePoo Hospital?

10  A.   At the time --

11  Q.   Or was it IBM who contacted you?

12  A.   IBM contacted -- when I was working in Key West --

13  Q.   Right.

14  A.   -- IBM would contact me.

15  Q.   I guess what my question is, I want to make sure I

16       understand what you're saying, is you were sitting at

17       Florida Keys Hospital and the phone range and IBM said

18       we have got a prospect over at DePoo, is that -- would

19       that have been how it would have occurred?

20  A.   That's correct.

21  Q.   And so you went over and introduced yourself to

22       somebody at DePoo?

23  A.   Yes.

24  Q.   Who would that have been?

25  A.   Roberto.

114

1    Q.  And you introduce yourself to Roberto.  What do you

2        say by way of introduction, IBM called and said to

3        expect me?

4    A.  Hello.  Basically that, yeah.

5    Q.  And Roberto/DePoo then says, we are going to buy the

6        IBM hardware, correct?

7    A.  Exactly.

8    Q.  And, I guess, you said you didn't think IBM gave them

9        any software.  Would they have bought software from

10       IBM?

11   A.  You know, they had the operating system and IBM at

12       that time sold you a system, you know, with their

13       operating system, and so forth.  So -- when I

14       installed the software I installed it with the IBM

15       service engineer and customer engineer.

16   Q.  So the only software you would have installed would

17       have been obtained from IBM?

18   A.  And my software for the hospital system.

19   Q.  Now, where did you get that software?  What computer

20       did you use to develop that software?

21   A.  I developed the software at Florida Keys Hospital.

22   Q.  On their box?

23   A.  On their box.

24   Q.  That was using the HFMS program that Florida Keys had

25       purchased from IBM, correct?

Goldman v. Healthcare Management Systems                        June 14, 2006
Deposition of Joel Goldman

115

1    A.   It was based on parts of that, yes.

2    Q.   I'm somewhat confused.  When would you have installed

3         the software at DePoo?  Was it -- because you went to

4         work for Florida Keys you said in '79.

5    A.   It was -- it wasn't that -- it was almost immediately.

6         You see...

7    Q.   They would have been contemporaneous?

8    A.   Yeah.  IBM was hungry.

9    Q.   Sure.  I want to be sure.  When you say IBM is hungry,

10        correct me if I'm wrong, and I might be putting words

11        in your mouth, they -- it wasn't uncommon for them to

12        basically use outsiders as a selling tool for their

13        sales of their hardware.  Their sales were in hardware

14        at that time, not the software, is that a fair

15        statement?

16   A.   That's -- that's pretty close.  That is a fair

17        statement.

18   Q.   Of course that was back when IBM was still the king of

19        the computer, the hardware?

20   A.   Exactly.

21   Q.   So that would have been how you would have gotten that

22        referral?

23   A.   (Witness indicating.)

24   Q.   Okay.  Now, did you receive any kind of written

25        document or permission from Florida Keys to allow you

Patricia Murray & Associates, Inc.         Court Reporting & Videoconferencing
1-800-875-8238                              Offices in Brighton & Ann Arbor, MI

116

1      to take this software off their system and put it into

2      the competitor?

3    A.   Didn't need it.

4    Q.   Why do you say you didn't need it?

5    A.   One of the provisions for my employment at Florida

6      Keys system was that I owned everything I produced.

7    Q.   Do you have a written agreement with Florida Keys

8      systems that says that?

9    A.   I would have -- I don't have it now.

10   Q.   Why don't you?

11   A.   Because that was in the '70s and I don't have all of

12     those documents.

13   Q.   Just a passage of time?

14   A.   Yeah.  It's just...

15   Q.   Is there anyone who can, to your knowledge, verify the

16     existence of that agreement?

17   A.   I don't know.  The administrator at the hospital.

18   Q.   Other than the administrator, is there anyone else?

19   A.   It would have been -- it might have been the IBM

20     people.

21   Q.   Do you know who the IBM people were?

22   A.   That's a -- I can't recall the name.

23   Q.   Okay.

24   A.   They work at the IBM office and they had Key West

25     territory.  You could look it up.

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

                                                              117

1    Q.   So, you put the hardware -- excuse me.  You put the

2         software that you took from Florida Keys onto the box

3         at DePoo?

4    A.   I don't like the word took.  My software.

5    Q.   Well, we can argue about --

6    A.   Okay.

7    Q.   But the software from Florida Keys was installed by

8         you onto the DePoo mainframe?

9    A.   That is correct.

10   Q.   What I want to get to is, I'm trying to understand

11        because, again, my memory of computers in those days

12        where you didn't have -- did you ever have one of

13        these System 36s or System 34s at your house?

14   A.   What time frame?  At one time I did, yes.

15   Q.   When would that have been?

16   A.   It was like '84, '85.  I had System 36 at that time

17        and I don't remember the exact year so don't -- but I

18        did have one.

19   Q.   But before '84/'85, give or take a little bit of time,

20        you would have been limited to working at Florida Keys

21        or --

22   A.   I would have been working at DePoo or Florida Keys,

23        you know?

24   Q.   Sure.  Again, I want to kind of go down this line.

25        Before you got your mainframe, if you were at Florida

118

1      Keys would you make changes and modifications to the

2      software?

3  A.  Yes.

4  Q.  Was that a part of your agreement with Florida Keys to

5      do that?

6  A.  Yes.

7  Q.  And would you then make a copy of that and put it on

8      the system at DePoo?

9  A.  Yes.

10 Q.  I think I asked you this question earlier, I know I

11     did, you don't have a copy of your agreement with

12     Florida Keys or DePoo?

13 A.  No.

14 Q.  Were there any other hospitals, any other places that

15     housed an IBM mainframe of --

16 A.  Puerto Rico

17 Q.  You would have used their mainframe to make changes --

18 A.  Yes.

19 Q.  -- correct, to the software?

20          And, again, you don't have a copy of your

21     agreement with Puerto Rico?

22 A.  No.

23 Q.  In all of these instances you were paid by these

24     individuals, these entities?

25 A.  Yes.

119

1    Q.    Did you have an agreement with IBM?

2    A.    A formal written agreement?

3    Q.    Yes.

4    A.    Not that I can recall.

5                   MR. DENNEN:  Let's take a break.

6                   (A recess was taken)

7    BY MR. DENNEN:

8    Q.    We have had a brief break now.  I believe when we took

9          our break we were talking about the way that

10         modifications were made by you to the software and one

11         of the -- you indicated you got a mainframe at your

12         house, IBM System 36?

13   A.    Uh-huh.

14   Q.    In 1984 or '85?

15   A.    I don't remember the exact year.

16   Q.    Sure.  Now, did you use that continually or did you

17         change and get a different type of computer, AS400,

18         for example?

19   A.    I didn't get an AS400.  I never got an AS400.  Well,

20         what time frame?

21   Q.    Why don't you tell us --

22                  MR. SMITH:  Is there a question pending?

23   BY MR. DENNEN:

24   Q.    Well, the question is, what other computers did you

25         utilize at your house to make modifications to the

Goldman v. Healthcare Management Systems                     June 14, 2006
Deposition of Joel Goldman

120

1           software?

2      A.   Again, what time?

3      Q.   We started --

4      A.   Today?

5      Q.   We started in '84, '85 you had a mainframe at your

6           house.

7      A.   Yeah.

8      Q.   And that was a system --

9      A.   36.

10     Q.   How long did you use the 36?

11     A.   A couple of years.

12     Q.   What did you replace the System 36 with?

13     A.   At my house, I really -- that's again, it's time

14          frame.  Currently I have two AS400s in my house.  Is

15          that --

16     Q.   Sure.  When did you obtain those AS400s?

17     A.   I believe it was, one last year, and one about two

18          years before.

19     Q.   So you would have acquired your first AS400 in about

20          2002?

21     A.   I -- I had one -- let me see, I had an AS400 -- you

22          are talking in my house, my home office?

23     Q.   Whatever office you use.

24     A.   I think I had one in '93, and I -- they got smaller by

25          then, by the way.

Patricia Murray & Associates, Inc.          Court Reporting & Videoconferencing
1-800-875-8238                              Offices in Brighton & Ann Arbor, MI
                                           4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems                              June 14, 2006
Deposition of Joel Goldman

                                                                         121

1    Q.   Right.  So --

2    A.   I don't know the exact dates but I have had them --

3    Q.   Well, you acquired a System 36 in '84, '85?

4    A.   Uh-huh.

5    Q.   Then in -- excuse me.  1993 you got an AS400; is that

6         correct?

7    A.   '93?  I'm trying to remember.  I don't remember the

8         exact date.  Maybe it was -- it could have been '93,

9         it could have been '96, I just don't know.  I -- I had

10        an AS400 in my office at some time.

11   Q.   Did you cease using that AS400 or did you dispose of

12        that AS400?

13   A.   I took one, was the one I used in California.

14   Q.   Okay.

15   A.   And then I took that same machine and sold it to the

16        hospital in Wyoming --

17   Q.   So that --

18   A.   -- in '97.  So that one.  And I had purchased

19        one, another one, at about the same time frame.  I'm

20        thinking that one was '96 and I had another one I

21        purchased in '97.  Again, don't quote me on these

22        dates.

23   Q.   Sure.  What would have happened to the one you

24        purchased in '97?

25   A.   I took that to the Dominican Republic.

122

1    Q.   What happened to the System 36?

2    A.   I really don't know, boat anchor.

3    Q.   You would have presumably disposed of it in some form

4         or fashion when you got the AS400?

5    A.   It was -- it was deposed of.  It was -- I don't

6         remember what happened to it.  It was just of no

7         value.

8    Q.   After you obtained a mainframe at your house, did you

9         continue to make modifications on the client's boxes

10        of the software?

11   A.   There is -- I have to clarify some things.  I'm going

12        to guess in '81 or '82 I obtained equipment so I could

13        dial in from anywhere in the world.

14   Q.   Okay.  When you say dial in, what do you mean?

15   A.   I used a modem.

16   Q.   That allowed you to call into the clients' machine?

17   A.   What you would do is you would put this big,

18        beautiful, blue box, because they were blue, and you

19        would dial in to that box, which would connect to the

20        user's machine.  It was a -- so you didn't have to be

21        on the user's site.

22   Q.   You could do that from anywhere in the world as long

23        as you had that blue box with you?

24   A.   Blue box, a computer.  It wasn't very portable.

25   Q.   Once you had this capability, did you continue also

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

123

1     making modifications on-site at the client's --

2   A.   When I was there.

3   Q.   When you were there.  Okay.

4              So the source code then, as I understand

5        it, would have been on the clients' computer; is that

6        correct?

7   A.   Yes.

8   Q.   Hospital San Rafael, you indicated that you began

9        working with them in 1979.  Would they have

10       been -- would they have received the computer software

11       that was on the Florida Keys Hospital system?

12  A.   They received the software that was on the DePoo

13       system.

14  Q.   Now, how did you make that transfer?

15  A.   I put them on eight-inch diskettes.

16  Q.   How many would that have been?

17  A.   I don't -- you know, it's hard to tell.  I couldn't

18       tell you how many.

19  Q.   Five?

20  A.   You would have had so many for each module, or system.

21  Q.   Right.

22  A.   What term do you like?

23  Q.   But you don't remember how much -- how many you would

24       have had?

25  A.   Not really.

124

1    Q.    Okay.

2    A.    At least one per system.

3    Q.    Okay.

4    A.    Usually more.

5    Q.    Let's see, would you have done the same thing with

6          Singleton Fleet's client?

7    A.    Singleton Fleet's client was software written

8          specifically for them.

9    Q.    The McDougal system software, would that have come

10         from the software based on the Florida Keys box?

11   A.    Would it -- based on it?

12   Q.    Sure.

13   A.    Yes.

14   Q.    Was that after you got -- did you deal with them after

15         you got your computer at the house?

16   A.    Before.

17   Q.    Before you got the computer at the house?

18   A.    Right.  I would -- I was dealing with Mr. McDougal

19         prior to having the computer at the house.

20   Q.    So let me see if I -- well, what about Mr. Kasnak, did

21         you have the computer at the house when you were

22         dealing with his clients?

23   A.    You know what?  I'm pretty sure I did.

24   Q.    You are pretty sure you did not?

25   A.    I did.

125

1  Q.  Okay. Now, with all of these installations, did they

2      have the source code on their systems, on their box?

3  A.  Now, I -- I'll clarify it, there was source code on

4      the box but they couldn't access it.

5  Q.  I believe you said with McDougal --

6  A.  Well, McDougal had the software, a copy of the

7      software but -- and he could add and make changes but

8      the users could not.

9  Q.  Why was that?

10 A.  Because if they made changes you could get in trouble.

11     I mean, if they made an unauthorized change, then the

12     program wouldn't work and, you know, how could I fix

13     it?

14 Q.  Well, I guess if somebody knew what they were doing

15     and made a change that worked, you wouldn't need to

16     fix it, would you?

17 A.  That's not a point. That's not -- it -- at some point

18     in time if I had to make a change later on, I would

19     have a problem because there would be a change that I

20     didn't recognize, so my change would affect that

21     change. That could be a problem. It's not

22     something --

23 Q.  But forgetting whether or not it's good business or

24     good practices to do it, the source code was on the

25     computer box at the user site, correct, sir?

Goldman v. Healthcare Management Systems                June 14, 2006
Deposition of Joel Goldman

126

1    A.    Yes.

2    Q.    I know we have gone through this before but you don't

3          have any of your written agreements with DePoo or any

4          of these installation sites, correct?

5    A.    No.

6    Q.    After you began working, I guess, at DePoo, did you

7          take any more classes, any more IBM classes or get any

8          more formal training on computers?

9    A.    At any time?

10   Q.    Yes.

11   A.    I went to a class on the AS400 and, I believe, that

12         was '89.

13   Q.    How long was that class?

14   A.    I don't recall.  It was either a week or two weeks.

15   Q.    Where was that located?

16   A.    It was in Detroit.

17   Q.    Does the AS400 use a different computer language from

18         the 36?

19   A.    It uses a similar language, an updated version.

20   Q.    Was that the purpose of the class, was to teach you

21         this new language?

22   A.    Yes.

23   Q.    This updated version?

24   A.    Called Native Mode.

25   Q.    Did you attend any other classes, any other training

Goldman v. Healthcare Management Systems                           June 14, 2006
Deposition of Joel Goldman

                                                                           127

1       classes?

2   A.  Not -- no, I don't think so.

3   Q.  With respect to -- well, when did you cease working

4       with Florida Keys?

5   A.  There were different -- this is kind of -- you have to

6       be more specific.  There was Florida Keys became

7       managed by HCA, which became -- it has gone through

8       several gyrations.

9   Q.  Let's talk about it.  You went to work at Florida Keys

10      in --

11  A.  '79, '78.

12  Q.  '78 or '79.  And it was -- when did it become managed

13      by HCA?

14  A.  I'm really not sure.  I'm going to guess it was, like,

15      '81.  It was a short time frame, '81, '82.  I'm -- you

16      know?

17  Q.  Did they utilize the software system that was in

18      place?

19  A.  No.  They put in their own.

20  Q.  Okay.  When HCA ceased managing them, do you recall

21      when that occurred?

22  A.  I believe it was when we took them over.  I will say

23      we, when the small hospital acquired them.

24  Q.  When DePoo acquired --

25  A.  Yes.

Goldman v. Healthcare Management Systems                      June 14, 2006
Deposition of Joel Goldman

128

| 1 | Q. | When was that? |
| 2 | A. | I believe it was in 1990. |
| 3 | Q. | So for seven or eight years Florida Keys was an HCA |
| 4 | | hospital? |
| 5 | A. | Yes.  I did not see them. |
| 6 | Q. | Did you have any agreement with HCA about the |
| 7 | | software? |
| 8 | A. | I removed all of the software. |
| 9 | Q. | Excuse me? |
| 10 | A. | I removed the software off the computer system. |
| 11 | Q. | You removed it.  How did you remove it? |
| 12 | A. | I went in and I deleted the source code. |
| 13 | Q. | Who requested that you do that? |
| 14 | A. | The people who were putting new software in. |
| 15 | Q. | HCA people? |
| 16 | A. | Yeah. |
| 17 | Q. | Was there any particular reason they asked you to do |
| 18 | | it? |
| 19 | A. | Because it was my software. |
| 20 | Q. | Okay. |
| 21 | A. | You have to remember that was my software.  It was not |
| 22 | | their software.  I had an agreement with them to write |
| 23 | | software, which I owned. |
| 24 | Q. | But you don't have a copy of that agreement, do you, |
| 25 | | sir? |

Goldman v. Healthcare Management Systems                   June 14, 2006
Deposition of Joel Goldman

                                                                      129

1    A.    No.

2    Q.    You don't have anyone other than yourself who can

3          testify as to the existence of that software -- let me

4          finish my question, the existence of that agreement,

5          do you?

6    A.    No.

7    Q.    So you removed the software by hitting the delete key,

8          correct?

9    A.    Well, that's not -- I was simplifying it for you.  I

10         mean, you go and remove -- you give it a command to

11         remove the source code.  And since it was an old

12         machine, I don't even remember the command.

13   Q.    Every time you have lost an installation have you done

14         that?

15   A.    I have tried to.

16   Q.    When you say you have tried to, explain that to me.

17   A.    You know, sometimes you might lose an installation

18         where they don't want to see you again and they just

19         give you in writing that they have removed it and that

20         is usually acceptable.

21   Q.    Tell me which ones have not allowed you to remove the

22         source code.

23   A.    Some of the hospitals that I would have had agreements

24         with, Kasnak and McDougal, who I no longer service.  I

25         never went back to any of those facilities.

130

1   Q.   Were those the only ones that you accepted a letter?

2   A.   It would either been a letter or I accept verbal

3       agreements.  If they tell me they are going to remove

4       it, I usually accept that as a...

5   Q.   Now, with Kasnak and McDougal, who gave you that

6       agreement?  Was that given to you by Kasnak or was it

7       given to you by each individual hospital?

8   A.   I -- again, I don't recall those.  It was --

9   Q.   Okay.

10   A.   I believe the hospitals went as far as even just

11       removing the whole computer, so I don't think

12       they -- it wasn't a fact of software.  I think they

13       went to a different computer system.

14   Q.   All of the hospitals in the Kasnak --

15   A.   I'm not sure.

16   Q.   Okay.

17   A.   I mean, the other names we can check, if you like.  I

18       believe -- oh, I don't know.

19   Q.   What about Mr. McDougal and Mr. Kasnak, they had

20       source code, did you remove it from their systems?

21   A.   No.

22   Q.   Why not?

23           MR. SMITH:  Excuse me, could the reporter

24       read the last question and answer.

25           (The requested portion of the record was

131

1            read by the reporter)

2            MR. SMITH:   Thank you.

3    BY MR. DENNEN:

4    Q.   Why did you not remove it from their systems?

5    A.   I didn't think they would sell it without my

6         knowledge.

7    Q.   Did they provide any written certification to that

8         effect?

9    A.   No.

10   Q.   Did you attempt to obtain certification?

11   A.   No.

12   Q.   I believe we referenced earlier that you may have

13        exchanged some letters from lawyers with at least one

14        of these individuals, McDougal or Kasnak, was that a

15        subject of correspondence by the lawyers?

16   A.   It could have been.   There was -- I didn't have any

17        legal correspondence with Kasnak.

18   Q.   What about Mr. McDougal?

19   A.   McDougal, I had contacted an attorney.   It was

20        primarily for money he owed me, not for anything to do

21        with the software systems.

22   Q.   Okay.   So were the letters that went back and forth

23        related solely to collection of money?

24   A.   Yes.

25   Q.   How much money was that?

132

1   A.   I believe it was $50,000.

2   Q.   That would have been in '86?

3   A.   Yeah, about -- roughly around that time.

4   Q.   So that was real money back in '86?

5   A.   (Witness indicating.)

6   Q.   But you weren't concerned about the software then in

7        1986, source code?

8   A.   No.  And you want me to clarify why?

9   Q.   Sure.

10  A.   It's because when I installed source code in another

11       site, I would do certain things to make it run for an

12       entire hospital system.  Like, it would be missing

13       certain files, and so forth, so if they didn't install

14       it correctly, it just wouldn't work correctly.  So I

15       was involved in every installation.

16  Q.   Was that why the payroll module didn't work with

17       Michigan hospitals?

18  A.   No.  The payroll module was -- system or module?  We

19       are going back and forth on the terms.

20  Q.   I'm probably guilty, payroll system.

21  A.   Okay.  No.  That was where actual programs in the

22       system were changed.

23  Q.   Okay.

24  A.   It really had to do with the integration of the

25       programs.

133

| | | |
|---|---|---|
| 1 | Q. | Again, getting back to, I guess, Mr. McDougal, were |
| 2 | | you successful in collecting your $50,000? |
| 3 | A. | No. |
| 4 | Q. | Did you collect any amount? |
| 5 | A. | No. |
| 6 | Q. | Do you know why you didn't collect money that you |
| 7 | | thought you were owed? |
| 8 | A. | Yeah, my attorney fees would have exceeded |
| 9 | | collections. |
| 10 | Q. | Why was that? It seems like a simple collection case. |
| 11 | A. | He was fighting it and my attorney fees -- it really |
| 12 | | wasn't worth my time. |
| 13 | Q. | What did the 50,000 relate to? |
| 14 | A. | Software sales. |
| 15 | Q. | Which hospitals? |
| 16 | A. | I don't recall right now. I just remember the amount. |
| 17 | Q. | What was the maximum amount of money you received for |
| 18 | | software sales? |
| 19 | A. | You mean for one site? |
| 20 | Q. | Yes. One site. |
| 21 | A. | It's hard to tell. I couldn't even tell you. |
| 22 | Q. | We know you said -- |
| 23 | A. | Minimum was ten. |
| 24 | Q. | Was ten? |
| 25 | A. | It usually averaged between -- you know, it was over a |

134

```
 1        time frame.  I don't even want to venture a guess.

 2        The money you received was over months and years

 3        actually.

 4   Q.   But just for the software itself, just for

 5        that -- because your commission or your percentage was

 6        based upon the -- it was 50 percent, was it not, with

 7        Mr. McDougal?

 8   A.   Yes.

 9   Q.   What would have been the maximum amount you would have

10        received from Mr. McDougal?

11   A.   I think 25,000, it could have been, on one of the

12        sales.  I'm not even sure.

13               Again, like I said, the way the money was

14        paid was they would give a down payment, and then I

15        would receive additional money for installation, and

16        so, it got really vague on how that sales price got

17        put in.

18   Q.   What would have been the maximum amount you would have

19        received from Mr. Kasnak?

20   A.   Again, about -- it would have been -- again, it's

21        about the same thing.  It would have been about

22        25,000.  There was a lot of additional, you know,

23        installation time.

24               With Mr. Kasnak, if I did a demonstration,

25        I would get paid for actually doing the demo so I
```

135

1    charged a fee to come in and -- fly in and do a demo,

2    and so forth, which was actually $4,000 just to do the

3    demo.

4    Q.   You were paid by Mr. Kasnak?

5    A.   Yes.

6    Q.   What about Mr. McDougal --

7    A.   No.

8    Q.   -- did he pay you?

9              Okay.  So you elected to forego the $50,000

10   from McDougal and just get on with life; is that a

11   fair statement?

12   A.   Yeah.

13   Q.   Did Mr. McDougal have an attorney?

14   A.   Yeah.

15   Q.   Do you have copies of any of that correspondence from

16   way back when?

17   A.   No.  But the two attorneys went to school together.

18   Q.   When you did demos back -- I assume today a demo would

19   be done on a laptop?

20   A.   Yes.

21   Q.   But way back when you couldn't really take an AS400 or

22   a System 32 --

23   A.   36.

24   Q.   -- whatever, with you, did the client already have to

25   have that computer to do a demo?

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

136

1   A.   Not necessarily.

2   Q.   Explain that to me.  Explain how you did that.

3   A.   Well, let's -- I'll use Michigan for an example, since

4        we are in Michigan.

5   Q.   Sure.

6   A.   The Grand Rapids office had a very nice IBM office and

7        they would provide the space for the demo.  They would

8        also provide tea, coffee, Cokes, doughnuts, give me a

9        very nice demo room with a projector, comfortable

10       seats.

11  Q.   Sure.

12  A.   Let me use their equipment.

13  Q.   Okay.

14  A.   So I would show up a day ahead of time, install an

15       operating system, and we would have the demo there.

16  Q.   Now, was that how you always did demos or did you go

17       to the customer's location, potential customer's

18       location?

19  A.   If they had the equipment, I would have went to the

20       customer site.  Sometimes a customer would go to an

21       existing site to see a demo.

22  Q.   What made that determination whether you went to a

23       customer site, you went to IBM or you went to their

24       place, was there any rhyme or reason?

25  A.   (Witness indicating.)

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

                                                              137

 1   Q.   You are shaking your head?

 2   A.   I'm just trying to -- it's just at the customer's

 3        convenience.  You did what the customer wanted.

 4   Q.   Again, to borrow a phrase, the customer is always

 5        right when I'm trying to sell to him, right?

 6   A.   (Witness indicating.)

 7   Q.   So at another customer site, I assume, you would

 8        contact the I.T. people and they would -- you would

 9        schedule a visit through them.  How often did that

10        occur?

11   A.   Well, almost always you did end up at a customer site

12        visit, even if it wasn't the initial demo.  I mean,

13        you don't usually make a sale unless you have a

14        reference point where there is somebody to say nice

15        things about you.

16   Q.   Okay.  But, ordinarily, that would be kind of a final

17        point as opposed to a beginning point.  So if you go

18        to a customer site, what do you have to do?

19   A.   Well, if you go to Key West in the wintertime you

20        usually make a sale.

21   Q.   Let's say, it's Grand Rapids in the wintertime and you

22        don't have IBM with a nice, plush office, what do you

23        do, or what did you do?

24   A.   You better do a good demo.

25   Q.   Would you fly in a day early?

138

1   A.   Yeah.  Again, it depended on each site, if we had to

2        install a system from scratch.  If there was no

3        machine there, I would have to get IBM to set up a

4        machine or set up some site where there was a

5        computer.

6   Q.   I guess what I'm getting to, how long did it take you

7        to load the software onto the system?

8   A.   I could do it in a day or less.

9   Q.   Eight hours?

10  A.   Yeah.

11  Q.   How long did your demonstrations take, typically?

12  A.   It depended how organized.  It could take one day or

13       two days.

14  Q.   Okay.

15  A.   Each group of people would come in, you know, from

16       each department.

17  Q.   So you would have the accounting people there, and

18       then --

19  A.   Medical records, and so forth.

20  Q.   Everybody got to see it, touch it --

21  A.   Question-and-answer periods.

22  Q.   Typical rule-by-committee structure, is that fairly

23       standard in a hospital?

24  A.   Well, I guess.

25  Q.   So you would be there for one to two days.  Then -- I

139

1      guess I'm thinking about, you got paid $4,000 for this

2      kind of three-day trip?

3   A.  For Kasnak, yes.

4   Q.  Yes?

5   A.  Yes.

6   Q.  But Mr. McDougal didn't pay you for those kind of

7      demonstrations?

8   A.  No.

9   Q.  Was that just a failure on your part to negotiate

10     that?

11  A.  Yeah.

12  Q.  Other than Mr. Kasnak, did anybody typically pay you

13     to come and do a demonstration?

14  A.  No.

15  Q.  Did you do a demonstration for DePoo Hospital in the

16     Keys, Key West?

17  A.  I think he just looked at the system at Florida Keys.

18     I don't really -- didn't really do a demo.  It was

19     just kind of different.  They needed a system

20     desperately.  He talked to IBM and they put it in

21     almost sight unseen.

22  Q.  Did you ever bring anyone to Florida Keys to see how

23     it worked, see the system in operation?

24  A.  Afterwards?

25  Q.  Yes, any of your customers or potential customers.

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

```
     140

1    A.   After they built a new facility.

2    Q.   When was that?

3    A.   I'm trying to remember.  It was '83 or '84.  I'm not

4         really sure on the date on that.

5    Q.   That would have been, HCA would have already taken

6         them over then?

7    A.   DePoo never got taken over.

8    Q.   I'm sorry, I was saying Florida Keys but --

9    A.   You said that DePoo.

10   Q.   No, I said Florida Keys.  Let's start with Florida

11        Keys.  The next question was going to be DePoo.

12                  So with Florida Keys did you ever take

13        anybody there for a demonstration?

14   A.   You know, I don't recall, and I don't think so.

15   Q.   Okay.  Did you ever take anyone to Puerto Rico for a

16        demonstration?

17   A.   I don't think so.

18   Q.   Now, I think we previously got a little mixed up.

19   A.   Yeah.

20   Q.   A little failure to communicate here.

21   A.   It's getting a little late now.  Aged people.

22   Q.   At DePoo, you said after they built their new patient

23        tower --

24   A.   Yes.

25   Q.   -- which would have been '83 or '84?
```

Patricia Murray & Associates, Inc.          Court Reporting & Videoconferencing
1-800-875-8238                              Offices in Brighton & Ann Arbor, MI

Goldman v. Healthcare Management Systems
Deposition of Joel Goldman

June 14, 2006

141

1    A.    Don't quote me on that date.

2    Q.    But certainly not prior to that?

3    A.    Right.

4    Q.    Who at Florida Keys would have known about your work

5          for DePoo, anyone?

6    A.    Who at Florida Keys?  Everybody would have.  Anyone

7          that was there.

8    Q.    How would they know?

9    A.    Because I told them.

10   Q.    So at the time you were working at DePoo, you were

11         also the manager for that area over at Florida Keys

12         and you still had your 17 employees, or am I missing

13         the timeline?

14   A.    You know what?  As we are going I remember another

15         hospital I had, too, at the same time.

16   Q.    Good.

17   A.    If you want another one, Fisherman Hospital.

18   Q.    Fisherman?

19   A.    At Marathon.  Somehow that slipped my mind.

20   Q.    We will come back to Fisherman.  I appreciate --

21   A.    I wanted to clarify because we are going --

22   Q.    So you were the manager at this time of the 17-person

23         department, if I understand you correctly?

24   A.    (Witness indicating.)

25   Q.    You said everybody would have known because you would

142

1        have told them.  Did you seek permission from the

2        administrator to go over to DePoo?

3   A.   I told -- we discussed it and he said no problem.

4   Q.   Okay.  Now, the Marathon Hospital -- Fisherman

5        Hospital, that was another '79 hospital that you had?

6   A.   I don't remember the exact date.  I'm going guess that

7        was pretty close to the same time frame.

8   Q.   Okay.

9   A.   It was '79, '80, '81.  Again, it was an IBM favor,

10       they called and said, help.

11  Q.   When did you cease having a relationship with that

12       hospital?

13  A.   They were purchased out by an another facility, and

14       maybe '83, '84.

15  Q.   So Mr. Sanchez wouldn't have had any involvement with

16       this hospital?

17  A.   The only -- he was their -- he did their Medicare cost

18       reports.

19  Q.   Was he an accountant?

20  A.   He was a -- he was everything.  He used to work for

21       Blue Cross and he knew Medicare.

22  Q.   Now, when they ceased using your source code, did you

23       remove the source code by pressing the button?

24  A.   No.

25  Q.   Why not?

Patricia Murray & Associates, Inc.              Court Reporting & Videoconferencing
1-800-875-8238                                  Offices in Brighton & Ann Arbor, MI

4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems
Deposition of Joel Goldman

June 14, 2006

143

| | | |
|---|---|---|
| 1 | A. | I don't recall. |
| 2 | Q. | Well, did you do a demonstration for the Fisherman's |
| 3 | | Hospital or was that just a -- we are in a hurry, we |
| 4 | | need something? |
| 5 | A. | If I recall, they were already operating a system and |
| 6 | | I just added software to their existing system to make |
| 7 | | it functional.  So I paid -- I actually charged them a |
| 8 | | fee and it was a nominal fee.  Then I charged them per |
| 9 | | hour, plus expenses, and I -- maybe I did two months |
| 10 | | worth of work there, three months. |
| 11 | Q. | This was while you were working at both DePoo and at |
| 12 | | Florida Keys? |
| 13 | A. | Uh-huh. |
| 14 | Q. | The software you added, would that have been taken |
| 15 | | from the Florida Keys system? |
| 16 | A. | Again, I don't like the word taken. |
| 17 | Q. | Obtained. |
| 18 | A. | It was obtained from me. |
| 19 | Q. | It was on -- |
| 20 | A. | It was similar to the software that was running on the |
| 21 | | machine in Florida Keys. |
| 22 | Q. | I mean, we can debate the language -- |
| 23 | A. | Sorry. |
| 24 | Q. | -- all day long.  It was housed on the Florida Keys -- |
| 25 | A. | Okay. |

144

1    Q.    -- box, correct?

2    A.    Yes.

3    Q.    And you copied it from the Florida Keys box and

4          installed it onto the Marathon box, correct?

5    A.    I guess that's a fair...

6    Q.    That included the HFMA proprietary software from IBM?

7    A.    Yeah, I believe at that time they already

8          had -- that's why I'm saying Fisherman's would have

9          purchased that from IBM possibly at that time.  That's

10         why I'm saying I fixed their programs.

11              MR. SMITH:   Just -- the word "proprietary,"

12         I don't know whether you and the witness have an

13         understanding of what you meant by that word.

14              MR. DENNEN:   I think we do, owned by IBM is

15         when I say proprietary.

16   BY MR. DENNEN:

17   Q.    Source code, again, how long does it take to

18         de-install that source code?

19   A.    Minutes.

20   Q.    Ten minutes?

21   A.    It could be ten minutes, half hour.  It's just...

22   Q.    And why would it be important to you to de-install the

23         source code?

24   A.    It's -- well, it's really not that important depending

25         on, you know, the honesty of the client.  How is that?

145

1    Q.    So what you are saying is, that you had no reason to

2          remove the source code?

3                    MR. SMITH:  Object to the characterization

4          of the witness's answer.

5    BY MR. DENNEN:

6    Q.    Going back to my question, was there a reason to

7          remove the source code?

8    A.    I didn't feel that the customers were going to try to

9          sell it so, you know, it's -- I didn't think it was

10         any profit to them.  They weren't in the software

11         business.  They were in the hospital business.

12   Q.    So what you are saying, the source code has no value?

13   A.    I believe you just put a word in my mouth.

14   Q.    I'm trying to understand --

15   A.    If you don't sell it, it has no value.  If you are

16         going to sell it to somebody else, it has a value, or

17         you are going to use it to make a profit, it has a

18         value.  If you are not in that business, it doesn't

19         really have a value.  The object code does because you

20         will use it in your facility.

21   Q.    Okay.  Again, I guess I'm trying to understand, it

22         takes roughly ten minutes to remove source code from a

23         computer, at this time, the System 36.  And you said

24         sometimes you did it, sometimes you didn't do it.  And

25         I'm trying to understand is --

146

1    A.    Usually.

2                   MR. SMITH:   Wait for --

3    BY MR. DENNEN:

4    Q.    What I'm trying to understand is, why did you do that

5          if it had no value?

6    A.    I would do it at the request of the user.  For

7          instance, Florida Keys Hospital asked me to remove the

8          source code and the object code and files related to

9          that information.

10   Q.    That's one installation.  Does the source

11         code -- access to the source code enable someone to do

12         anything with it?

13   A.    If they had the source code, they could modify it and

14         if they were in the business, make a profit from it.

15   Q.    Well, if I'm just a hospital and I have the source

16         code, and I have a programmer, intelligent programmer,

17         can that programmer take that source code and continue

18         making improvements and modifications to the software?

19   A.    If he was pretty sharp, probably.

20   Q.    In fact, that's what you did at Florida Keys, wasn't

21         it?

22   A.    Make changes to -- modify an existing system, yes.

23   Q.    That's what your job --

24   A.    Yes.

25   Q.    -- at Florida Keys --

4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

147

1    A.    Yes.

2    Q.    -- was, to take software and do that?

3    A.    Right.

4    Q.    That's why it's important to you to have the source

5          code removed from the box, right?

6    A.    You live and you learn.

7    Q.    When you put source code onto a box -- let's go back

8          to McDougal, because you left your source code on his

9          box, and he is in the business.  You said that you

10         didn't feel compelled to even have your attorney ask

11         him to certify that he removed it; is that correct?

12   A.    Yes.

13   Q.    What other steps -- what steps, if any, did you take

14         to protect that source code from third parties?

15   A.    I -- for the software that I specifically wrote, I

16         would put copyright notices in that software and I

17         would put my name in that software.  If it was

18         software I had modified that had belonged to a third

19         party, I would leave those notices in for that third

20         party.

21   Q.    So for the Florida Keys software, you would leave the

22         notices in that -- for the software they already

23         owned?

24   A.    Yes, for the IBM software, there would have been

25         copyright notices by IBM.  Although IBM allowed us to

Patricia Murray & Associates, Inc.          Court Reporting & Videoconferencing
1-800-875-8238                              Offices in Brighton & Ann Arbor, MI

148

```
1        use it, you would still be required to leave those
2        notices in.
3   Q.   You had -- I guess I misunderstood.  I thought you
4        didn't have an agreement with IBM, was that incorrect?
5   A.   I -- it was a -- IBM was not in the software business.
6        They wanted to sell boxes.
7   Q.   I understand that.
8   A.   I don't believe -- I don't even know how much they
9        charged for their software, if anything at all.  If
10       they were installing a system, they would give
11       software with that system to sell that system.
12  Q.   Right.
13  A.   If I installed the system I would ask IBM's permission
14       and they were aware of what programs were going in
15       those boxes.
16  Q.   Okay.  And did you obtain that in writing?
17  A.   I don't believe I did.
18  Q.   Did you ever ask IBM for something in writing that
19       would confirm your right to do that?
20  A.   I -- I don't -- I don't remember if I did.
21              MR. DENNEN:  Let's take a break.
22              (A recess was taken)
23  BY MR. DENNEN:
24  Q.   We are back from our break.  I think when we left on
25       our break we were discussing the steps that you took
```

149

1      with respect to the removal of software. Let's talk

2      about something new for a change.

3              I want to ask you one more question, can

4      you delete the software remotely, delete the source

5      code remotely?

6  A.   Yes, with a preface.

7  Q.   What is that?

8  A.   As long as you have access.

9  Q.   Now, in this lawsuit you have named as a defendant Tom

10      Givens, who is sitting next to me. Tell me about the

11      first time you met Mr. Givens. When did that occur?

12 A.   I believe the first time was in Miami.

13 Q.   Where in Miami?

14 A.   It was at some bar, and I remember discussing medical

15      records in prisons and how it would be another

16      business.

17 Q.   What was the significance of medical records in

18      prisons?

19 A.   The fact that since they didn't have a medical records

20      system, as such, if you put a prisoner in with a very

21      ill prisoner, let's say, somebody for a minor crime,

22      and he caught a disease, and died, you know, did he

23      have a lawsuit against the prison system for not

24      protecting him?

25 Q.   Now, how were you introduced to Mr. Givens?

150

1  A.   You know, I don't recall.

2  Q.   Was it a planned meeting?

3  A.   I believe so, and I don't recall.  I just recall that

4       meeting because of the uniqueness of the concept,

5       which is still a relevant concept.  I don't think they

6       have a good system now.

7  Q.   Was there anyone else present for that meeting?

8  A.   You know, I don't recall.

9  Q.   Do you recall what year this was?

10  A.   No.  It was '82, '83.

11  Q.   Now, you said it was a planned meeting, would you have

12       called Mr. Givens?

13  A.   You know, I don't recall.  Again, I will reiterate, I

14       remember the subject matter because something like

15       that sticks in your mind.

16  Q.   So you remember the subject matter --

17  A.   And you know the basics of the meeting, I don't

18       remember.

19  Q.   Okay.  Is that just because of the passage of time?

20  A.   Passage of time and, again, it was a unique subject

21       matter.  Things like that would stick in your memory.

22  Q.   I guess what I'm saying is, because of passage of

23       time, am I understanding correctly you can't really

24       remember many, if any, of the details --

25  A.   Exactly.  You know, I don't know if we said, hey,

151

```
 1        let's do this.  Nothing.
 2    Q.  Sure.  So that was the first meeting, and you are
 3        saying that would have been '82 or '83; is that
 4        correct?
 5    A.  Yeah.
 6    Q.  When was the next meeting?
 7    A.  It was in '83.
 8    Q.  Where was that?
 9    A.  That was in Nashville.
10    Q.  Do you recall what location it was?
11    A.  That was in the American Medical Center offices.
12    Q.  Again, how was that meeting set up?
13    A.  That was arranged by Tom.
14    Q.  When you say Tom, are referring to Mr. Givens?
15    A.  Mr. Givens.
16    Q.  Did he call you?
17    A.  I believe so.  Again, that's where it gets to be a
18        sketchy recollection on it.
19    Q.  What were you asked to do?
20    A.  To demonstrate my medical records system and to
21        discuss a unique business opportunity.
22    Q.  Who was the demonstration of the medical records
23        systems to be to?
24    A.  To Mr. Givens.
25    Q.  Anyone else?
```

Patricia Murray & Associates, Inc.          Court Reporting & Videoconferencing
1-800-875-8238                                Offices in Brighton & Ann Arbor, MI

4c14eea1-4404-419d-b567-94a8db683538

152

1   A.   I believe the only other person who was there was his

2        secretary.

3   Q.   What was the business opportunity?

4   A.   That he was -- he had several hospitals, I believe it

5        was seven at the time, is the number that sticks in my

6        mind, that all needed a medical records system because

7        of the fact that DRGs and UB82s, which is the new

8        billing format, was going to be a requirement at all

9        facilities.

10                  And that since he had a -- I had an

11       integration system that would take and integrate my

12       medical records into existing hospital HIS systems,

13       that this was a good fit.

14  Q.   When you say HIS systems, what does HIS mean?

15  A.   Hospital Information System.

16  Q.   UB82, what is a UB82?

17  A.   Uniform billing, and '82 would be the date that the

18       form was created.

19  Q.   Is that a federal government form?

20  A.   Yes.

21  Q.   Who promulgates that?  Who requires you to use that?

22  A.   It was required -- it was a uniform billing form for

23       all the insurance companies.  Prior to that, they

24       really didn't have -- each insurance company had their

25       own form.

153

1   Q.   Was that a Medicare form?

2   A.   It was a uniform billing form.  I'm trying to --

3   Q.   I understand, and not to confuse it, Medicare is a

4        payer?

5   A.   Medicare is a payer so it would be the same form for

6        Medicare, for Blue Cross, for Aetna, for whoever.

7   Q.   And Medicare was requiring the UB82?

8   A.   I believe, again, this is going to be stressing the

9        memory.

10  Q.   Sure.

11  A.   I thought it was supposed to be all insurance

12       companies were required to use this.  The only ones I

13       think had a bypass would have been Medicaid.

14  Q.   Okay.

15  A.   Again, that's to the best of my recollection.

16  Q.   Only Medicaid --

17  A.   Because Medicaid went state-by-state.

18  Q.   Sure.  You referenced the term DRG, what is that?

19  A.   Did I?

20  Q.   Yes, you did.  What is that?

21  A.   DRG is a term called Diagnosis Related Group.

22  Q.   What is your understanding of what a DRG or Diagnosis

23       Related Group is?

24  A.   It was a way of classifying patients into certain

25       disease states.  For example, heart failure or

154

1        congestive heart failure.

2    Q.   So let me -- again, using your example of congestive

3         heart failure, would some type of code be applied to

4         that?  Would it be a numerical code?

5    A.   It would be a value.

6    Q.   How is that value reflected?

7    A.   What do you mean?

8    Q.   Numbers or --

9    A.   It would be a number.

10   Q.   What would be an example of a number?  Would it be

11        AB123 or --

12   A.   One.

13   Q.   Okay.

14   A.   I believe the original number was 1 to 170, or 469 I

15        think was the bad one, but don't quote me.

16   Q.   1 to 170?

17   A.   1 to 469 -- 470, I'm sorry.

18   Q.   1 to 470?

19   A.   Yeah, that's just --

20   Q.   That code would be assigned but, basically, depending

21        upon what the person who was at the hospital for?

22   A.   Based on their diagnoses and procedures performed to

23        that patient.

24   Q.   So there would be a different code for an

25        appendectomy?

155

| | | |
|---|---|---|
| 1 | A. | In simplified terms, yes. |
| 2 | Q. | Was that promulgated by Medicare -- |
| 3 | A. | Yes. |
| 4 | Q. | -- the DRG? |
| 5 | A. | Yes. |
| 6 | Q. | Do you recall when that occurred? |
| 7 | A. | When they decided to use it or when it was started |
| 8 | | being created? |
| 9 | Q. | When Medicare said to the hospital you have to use it. |
| 10 | A. | I believe it was '83. |
| 11 | Q. | Now, is there something called a CPT code? |
| 12 | A. | Yes. |
| 13 | Q. | What is that? |
| 14 | A. | That was the physician terminology for procedures. |
| 15 | Q. | So a CPT is a similar to thing to a DRG? |
| 16 | A. | No. |
| 17 | Q. | I'm sorry. Is it involved at all in any of this? |
| 18 | | When I say any of this, the Medicare requiring DRGs. |
| 19 | A. | It's not in -- it's not used, no. |
| 20 | Q. | ICD9s? |
| 21 | A. | ICD9s are used to create a DRG. |
| 22 | Q. | Okay. What are DRGs used for in a hospital? Why did |
| 23 | | Medicare want this DRG on the billing? |
| 24 | A. | For reimbursement. |
| 25 | Q. | So they are used to get paid? |

156

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Prior to this period of time Medicare paid on a cost |
| 3 | | basis, did it not? |
| 4 | A. | That's what I believe, yes. |
| 5 | Q. | So really DRG is a part of what they refer to as a |
| 6 | | prospective pay system? |
| 7 | A. | That's not -- prospective pay is for outpatients. |
| 8 | Q. | Okay.  I'm sorry.  So Medicare was going from a |
| 9 | | cost-based system to a system that basically paid |
| 10 | | based upon a code, a DRG code, correct? |
| 11 | A. | In the simplest form, yes. |
| 12 | Q. | I'm trying to be simple. |
| 13 | A. | Okay. |
| 14 | Q. | I'm sure we can bring in coding experts who will |
| 15 | | explain it.  That's why this was important to AMC, |
| 16 | | correct? |
| 17 | A. | Yes. |
| 18 | Q. | So who created DRGs? |
| 19 | A. | Who created? |
| 20 | Q. | Yes. |
| 21 | A. | DRGs were originally -- that's a hard question. |
| 22 | Q. | Okay. |
| 23 | A. | They came from another source originally, without |
| 24 | | going into too much detail.  They were based on a |
| 25 | | system out of New Jersey that were not DRGs, and I |

157

1       don't remember that system's name.

2  Q.   I seem to remember reading somewhere that Yale

3       University --

4  A.   Yale University.

5                  MR. SMITH:  Wait for the question.

6  BY MR. DENNEN:

7  Q.   -- did something?

8  A.   I'm sorry, what was the question.

9  Q.   What is your understanding of Yale University's

10       involvement with the creation of DRGs?

11  A.   Helped create the routines to group the ICD9 codes

12       into DRGs.

13  Q.   So you said the DRG system was based on a system that

14       was being used in New Jersey?

15  A.   Yeah.

16  Q.   And Yale University somehow modified it into DRGs?

17  A.   That took that concept, which was a code for disease,

18       and created a new system that was to be more accurate.

19  Q.   That new system is a system called DRGs or Diagnosis

20       Related Group?

21  A.   Yes.

22  Q.   I believe you said in 1983 Medicare said to all

23       hospitals you are going to get paid now on DRGs; is

24       that correct?

25  A.   I can't tell you if that's absolutely correct.  I

158

1       don't know if there were -- I'm guessing there were

2       institutions that had bypasses.  I don't know how

3       Medicare works, and I didn't know if it --

4   Q.  If you knew the answer to that, I think --

5   A.  But it might have been some would have went on

6       immediately, some would have had a couple of years.

7   Q.  A transition period may have been in place but that

8       was 1983?

9   A.  We would start computing the DRG.

10  Q.  So you begin computing DRGs.  You met with Mr. Givens

11      about the DRG issue, and the new requirement these

12      seven hospitals had.  Did he make a proposal or did

13      you make a proposal or --

14  A.  To the best of my recollection, I discussed a figure

15      of $10,000 per system that he would do the

16      installation and after he installed them, he would pay

17      me.

18  Q.  Did you provide that in writing?

19  A.  I believe we shook our hands on it.

20  Q.  What was his response?

21  A.  It was a good deal for both of us.

22  Q.  So from your perspective, it was a done deal?

23  A.  From my perspective I was under the impression,

24      without going into too much detail, that he would

25      install it in one system to see how it went.  And if

159

1           it was good for him, he would do additional ones.

2    Q.    Now, when you say for him, you are referring to AMC,

3           correct?

4    A.    Right.

5    Q.    And did you ever receive anything in writing from

6           AMC --

7    A.    No.

8    Q.    -- confirming that agreement?

9    A.    No.

10   Q.    I guess to do this demonstration you had loaded the

11          medical record software onto the AMC computer system,

12          correct?

13   A.    Yes, I did.

14   Q.    So what happened at the conclusion of that meeting?

15   A.    I also gave him some diskettes with additional

16          soft -- with the software on them, and we had

17          discussed that he would go ahead and install them on a

18          test facility and he would get back with me.

19   Q.    So you gave him diskettes with the software on it,

20          correct?

21   A.    Yes.

22   Q.    And that included the source code, correct?

23   A.    Yes, I did.

24   Q.    Did you require him to sign a confidentiality

25          agreement or nondisclosure agreement of any kind?

160

1   A.   I did not.

2   Q.   Okay.  And so did you then return to Key West,

3        Florida?

4   A.   Yes.

5   Q.   What was your next communication with Mr. Givens?

6   A.   You know, I don't recall another communication with

7        him.

8   Q.   Did you have any communication with anyone else at

9        AMC?

10  A.   No, not to my recollection.

11  Q.   Did you ever contact anyone, Mr. Givens, or anyone at

12       AMC and say, hey, where is my $70,000?

13  A.   No.

14  Q.   Did you ever call and ask them to take the software

15       off the box and return the diskettes --

16  A.   No.

17  Q.   Let me finish my question.  Did you ever ask anyone at

18       AMC to return the diskettes that you said you gave to

19       them?

20  A.   No.

21  Q.   Did these diskettes have the -- for want of a better

22       term, the fault in them that you mentioned earlier

23       that wouldn't allow someone else to run them?

24  A.   Actually, not, because he was to install them so I had

25       to take -- remove that.

161

1  Q.  If I understand you correctly, you are saying you just

2      forgot about it, correct?

3  A.  You know, I was quite busy at the time, and I assumed

4      that if he used it, he would contact me.

5  Q.  So, again, I just want to make sure that the record is

6      clear, you had no further communication, telephone,

7      fax, written correspondence, with Mr. Givens over the

8      AMC after you returned back to Florida?

9  A.  Not that I recall.

10 Q.  What did you do to ensure that the source code was not

11     copied, or otherwise improved upon, that you provided

12     to AMC?

13 A.  Well, I had copyright notices in my software.  I

14     assumed that he wouldn't use it without my knowledge.

15 Q.  Now, you have a copy of that software that you gave to

16     Mr. Givens, the AMC diskette?

17 A.  You know, it's -- I don't.

18 Q.  You do not?

19 A.  I do not.

20 Q.  Okay.  How can someone verify that you included the

21     copyright notice on the diskette that you gave to Mr.

22     Givens?

23 A.  Some older code that I found, again, not all the code,

24     because I found some old code that had been written at

25     that time frame.

162

1   Q. Okay. But you don't have a copy of the specific item

2       you gave to Mr. Givens?

3   A. I do not have a specific copy of the items I gave Mr.

4       Givens.

5   Q. Okay. So, therefore, if Mr. Givens says there was no

6       copyright notice on that code, what is your response?

7   A. That he is lying.

8   Q. If Mr. Givens said he had numerous conversations with

9       you, is he also lying about that?

10   A. Again, if he had numerous conversations with me, it's

11       quite possible, because I had numerous conversations

12       with a lot of clients. I was handling quite a few

13       hospitals, so I had conversations over the years, so,

14       again, I said I didn't recall.

15   Q. What you are saying is that Mr. Givens would not be

16       lying about that, you just have no recollection?

17   A. Exactly.

18   Q. Now, just so the record is clear, you do not have a

19       copy of any of the information, the diskettes or any

20       of the -- a hard copy of that that you gave to Mr.

21       Givens, correct, sir?

22   A. I have copies of several programs.

23   Q. Right.

24   A. That are similar in nature and would be -- are they

25       the exact copies of the programs? I wouldn't know.

```
                                                       163
 1          Programs have changed.
 2    Q.    Sure.  When did you start using DRGs in your code?
 3    A.    I started working with Yale University in 1979.
 4    Q.    How did you obtain that relationship?
 5    A.    They were looking at facilities to help gather medical
 6          records information, and I don't recall exactly how
 7          the contact was made, but I was one of those
 8          individuals.  It could have been through IBM.
 9    Q.    Who was your contact at Yale?
10    A.    Again, in all honesty, I would call Yale and everybody
11          would pick up the phone, and it was -- it was a Ph.D.
12          of some sort.
13    Q.    You don't remember any specific person?
14    A.    We would send the files back and forth and I would run
15          tests and send changes back and forth, and we did this
16          for a period of time.
17    Q.    So Yale was providing information to you for you to
18          run tests on; is that correct?
19    A.    They provided what they call the bit masks.  The
20          original groupers were in bit masks, and without
21          getting technical, they were files that were basically
22          looked like computer language.
23    Q.    Okay.
24    A.    And we would run sample data through, and then we
25          would test that data to see how it came out.
```

164

1    Q.    When in 1979 did you begin working with Yale?

2    A.    At Yale, it's going to be -- to give you a specific

3          month, I wouldn't know, but it was over a series of

4          time.  Remember, this was over several years.  It

5          started here and until Medicare made DRGs, what was to

6          be used, we went through literally hundreds and

7          thousands of patients and data to get to those bit

8          masks.

9    Q.    Okay.  So you would have started when you were an

10         employee at Florida Keys on this project?

11   A.    I did, yes.

12   Q.    Again, just so I understand, was Mr. Givens interested

13         in your DRG grouper, was that what was significant for

14         his AMC hospitals?

15   A.    Actually, it would have been the whole medical records

16         system.  There was not just one portion of it.  It

17         would have been the way the diagnosis codes were

18         organized, the database functionality.

19   Q.    After you left Mr. Givens office at AMC, when is the

20         next time you heard of Mr. Givens?

21   A.    When I lost the sale at Rawlins Hospital -- or not

22         lost the sale, I actually lost my client.  Actually

23         didn't hear of him.  I got a database file in an

24         e-mail.

25   Q.    I'm sorry, just one second.  Rawlins Hospital, you

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

                                                                   165

1          lost that client.  Why did you lose that client?

2    A.    The CFO wanted a different computer system.

3    Q.    Why did the CFO want a different one?

4    A.    Conflict of interest.

5    Q.    What was the conflict of interest?

6    A.    We didn't like each other.

7    Q.    What was the nature of that conflict or that dislike?

8    A.    She was running the hospital into the ground.

9    Q.    Who is she?

10   A.    Flo Kostic.

11   Q.    Flo K-O-S-T-I-C-K?

12   A.    I don't know how to spell it, T-I-C, I think.

13   Q.    What did the computer I.T. person have to do with the

14         financial affairs of the hospital?

15   A.    She was the CFO, chief financial officer.

16   Q.    How did that relate to you providing computer

17         programming?

18   A.    She decides what computer system the hospital uses.

19   Q.    I guess what was -- why were you all interacting,

20         maybe that's the better question?  You said you didn't

21         like each other.  What I'm trying to figure out is,

22         why would that matter?

23   A.    Well, she was hired.  She was a new employee.  I had

24         been there for several years.  She didn't like my

25         computer system, so she works for the hospital, I

166

1        don't, they changed computer systems.

2    Q.   It wasn't a personal dislike, it was --

3    A.   In addition, it was a personal dislike.

4    Q.   How did that personal dislike manifest itself?  Did

5         you get into shouting matches?  Did you get into

6         boxing matches or did you respectfully agree you

7         needed to go your own way?

8    A.   It was more like respectively agreed we need to go our

9         own way.

10   Q.   So you lost that client because the CFO basically

11        didn't like you?

12   A.   Correct.

13   Q.   And you don't know why she didn't like you?

14   A.   I didn't have hair.  I don't know.

15   Q.   So before that, which would have been 2003, you had

16        never heard of Tom Givens or Healthcare Management

17        Systems?

18   A.   I had heard the name Healthcare Management Systems.

19   Q.   In what context had you heard --

20   A.   In '97.

21   Q.   Okay.  Tell me about that.

22   A.   They were competing against me the hospital in

23        Rawlins, Wyoming.

24   Q.   Other than this one instance, you had never heard of

25        Healthcare Management Systems?

167

1   A.   No, not to my recollection.

2   Q.   Who are your primary competitors?  I guess you are not

3        in that business anymore, so who would have been at

4        the time Goldman & Goldman's primary competitors?

5   A.   Well, if I recall there was Dairyland, J & S Data,

6        HBOC.

7   Q.   I'm sorry H --

8   A.   BOC.

9   Q.   V or B?

10  A.   B, HBOC.

11  Q.   Any others?

12  A.   Some bigger systems that wouldn't be competitors, like

13       what I call Medatech or Cerner, these other big

14       systems.

15  Q.   Is that based on bed size of the hospital?

16  A.   Sometimes but -- yeah.

17  Q.   What is, kind of, your bed size, what would have been

18       your bed size at the time?

19  A.   I would have gone up to 200 beds.

20  Q.   What was the largest hospital you had on your system?

21  A.   I had the Key West Hospital, with the two hospitals

22       combined, was probably about 200 beds all combined.

23  Q.   What would have been the smallest?

24  A.   Well, DePoo was 13 beds originally.

25  Q.   What about the others, the other hospitals, Michigan

168

1          hospitals?

2    A.    They ranged from 25 beds to 100 and I think Mecosta,

3          that is 125, 150.  I think they are a little bigger

4          now because they got Medatech.

5    Q.    Sounds like a lot of these would have been Hill Burton

6          Hospitals, are you familiar --

7    A.    That's just a payment.

8    Q.    Well, actually, a law they were formed under.

9    A.    The hospital in Puerto Rico was actually quite large.

10   Q.    How large was it?

11   A.    It was -- I think it was 149 beds but it was always

12         full, so it was more like a -- the hospital that

13         replaced it was 600 beds.

14   Q.    But you didn't have a system on the replacement

15         hospital, correct?

16   A.    No, that's -- it went to 600 beds.

17   Q.    Okay.  I guess -- what did you become aware of in 1997

18         when you were making the bid for Rawlins, Wyoming?

19   A.    That there was several companies competing.  I

20         believe, Dairyland was one, HMS was one, and myself.

21   Q.    Okay.  Did you have an opportunity to review what HMS

22         was doing?

23   A.    Not really.  I was told that this was some

24         similarities.

25   Q.    Who told you that?

169

1   A.   The chief financial officer.

2   Q.   Who was that?

3   A.   I'm getting a little tired now, so Jeff Gullaher.

4        Please don't ask me to spell it.

5   Q.   I'm going to spell it G-U-L-L-A-H-E-R.

6             Now, would he have been the CFO at the

7        time, I guess, there that was replaced by the lady,

8        Flo Costic?

9   A.   There was several replacements after he left.

10  Q.   Do you know where Mr. Gullaher is now?

11  A.   I believe he is in Montana.

12  Q.   Is he still working at a hospital?

13· A.   Yeah, I believe he is working for several hospitals.

14  Q.   Would that be in-house or as a consultant, do you --

15  A.   I believe he is chief financial officer, maybe, for

16       the group.  I'm not really sure of his exact title.

17  Q.   Do you know where in Montana?

18  A.   No.

19  Q.   That's a big state.

20  A.   (Witness indicating.)

21  Q.   Now, what did -- what exactly did Mr. Gullaher tell

22       you?

23  A.   He said that there were similarities in the system.

24  Q.   What did you say in response?

25  A.   Well, that's nice.

```
170
```

1.  Q.  Did he tell you what kind of similarities?

2.  A.  He said some of the reports looked similar.

3.  Q.  Now, when you say reports, you are referring to the

4.      statistical reports generated by the --

5.  A.  Medical records?

6.  Q.  Yes.

7.  A.  Yes.

8.  Q.  Did he show you those reports?

9.  A.  No.

10. Q.  Did you ask to see those reports?

11. A.  You know, I don't recall.

12. Q.  Was there any reason he would not have shown you those

13.     reports?

14. A.  Yeah, because I got the contract.

15. Q.  I mean, to your knowledge --

16. A.  I don't even know if he had a copy of them.

17. Q.  Okay.

18. A.  I mean, when you get a demo you see reports.  I don't

19.     even know if he really had a copy of them.  I just --

20. Q.  Did you check on the HMS --

21. A.  Actually, I did.  I tried to look them up on the

22.     Internet.

23. Q.  Okay.

24. A.  And --

25. Q.  What did you discover?

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

                                                                    171

1    A.    Nothing.

2    Q.    What else did you do?  Did you call anybody in the

3          industry?

4    A.    Actually, I called an attorney to do a research on

5          them.

6    Q.    Who was that?

7    A.    I don't recall his name.  It was from California.

8    Q.    Do you recall where in California?

9    A.    No.

10   Q.    Did you pay this attorney?

11   A.    I actually sent him a retainer of $5,000.

12   Q.    What was that for?

13   A.    To do some research and find out if there was any

14         validity.

15   Q.    Any validity to what?

16   A.    To the fact it -- maybe it was my software.

17   Q.    Did you perform that research?

18   A.    He -- I got, he didn't know back, and he actually

19         returned my retainer.

20   Q.    This was in 1997?

21   A.    Yes.

22   Q.    He returned your retainer?

23   A.    Yes.

24   Q.    How quick a turnaround was that?

25   A.    You know, I couldn't give you exact times.

172

1   Q.   Was it 30 days, was it 6 months?

2   A.   Again, I was busy installing a system.  At that time,

3        hey, I just got a contract.  I'm a happy individual.

4   Q.   You were installing the system in --

5   A.   In Rawlins, exactly, and I was installing the system

6        in Douglas.

7   Q.   So, you, to use your words were fat and happy with two

8        contracts --

9   A.   I had the contracts.  I'm assuming that maybe there

10       was no validity to any of it.

11  Q.   So you didn't contact any other attorneys?

12  A.   No.

13  Q.   Did you try to obtain any information about HMS from

14       Jeff Gullaher, like where they were located?

15  A.   Not that I recall.

16  Q.   Is it fair to say you retained an attorney and the

17       attorney said, I don't -- in your words, I don't know

18       and you just --

19  A.   I just assumed that there was no validity to it and I

20       moved on, exactly correct.

21  Q.   Now, there were two hospitals.  One was Douglas,

22       Wyoming?

23  A.   Yeah.

24  Q.   Did Mr. Gullaher have anything to do with that other

25       hospital?

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

173

1    A.    Nope.

2    Q.    Were they owned by separate entities?

3    A.    Yes.

4    Q.    Just to be -- well, let's take a break now.

5                    (A recess was taken)

6                    (Discussion off the record)

7                    MR. DENNEN:  Back on the record.  We have

8          just had a discussion with counsel for the plaintiff

9          in this case, Joel Goldman, in which he has requested

10         that I provide a limit on a second day of four hours

11         and I have respectfully declined that request.  I have

12         informed him that I don't think it would be more than

13         probably 9:00 to 3:00 with an hour break for lunch but

14         at this point in time cannot commit to that, and we

15         have agreed we will go for an additional hour on this

16         deposition and adjourn at that time to come back at a

17         later date, subject to going before the magistrate or

18         the judge if it's appropriate, if necessary.

19                    MR. SMITH:  And I would just add that I

20         have requested that counsel give some sort of time

21         limit on the length of the continued deposition and

22         counsel has declined to provide any cap on the

23         duration of any continued deposition indicating that

24         it could go three, four more days, which plaintiff

25         finds objectionable.

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

174

1           MR. DENNEN:  I think, just so the record is

2      clear, that the statement that it would be three to

3      four more days was dependent upon the answers of the

4      plaintiff to the questions asked.  And I also stated

5      that I couldn't imagine that it would last longer than

6      the five hours previously mentioned.  But then

7      depending upon the information that the plaintiff

8      provided, it could go longer.  It's 5:00, let's go to

9      6:00.

10   BY MR. DENNEN:

11   Q.   Who was your contact, Mr. Goldman, at the Douglas,

12        Wyoming hospital?

13   A.   You know, I don't recall the name.  It was the chief

14        financial officer.

15   Q.   It would be the CFO?

16   A.   Yes.

17   Q.   Is that person still the CFO, to your knowledge?

18   A.   No.

19   Q.   Now, I believe we have discussed at length a variety

20        of things.  I want to show you a document, I

21        believe -- I'm going to show this to you and ask you

22        to take a look at that document, please, sir.  Tell me

23        if you recognize that document.

24   A.   Yes, sir, I do.

25   Q.   Tell me what that document is, please.

175

1   A.    It is a program that I wrote and submitted to the

2         copyright office.

3   Q.    I might not have given you -- is that your signature

4         on this document?

5   A.    Yes, it is.

6   Q.    And that signature is dated September 2nd, 2004, is it

7         not, sir?

8   A.    Yes, it is.

9   Q.    And in this document you reference a creation date, I

10        believe, of September 30th, 1997 for the date of

11        publication, is that correct, sir?

12  A.    October 1st.

13  Q.    I may be looking at a different one. Okay. October

14        1st, 1979, do you see that, sir?

15  A.    Yes.

16  Q.    Again, this was -- there is a date stamp at the

17        bottom, is there a date stamp on your copy?

18  A.    Date stamp on what? What page are you talking about?

19  Q.    Well, I think what has happened, in the copying

20        process they have gotten out of order. I ask you to

21        take a look at that.

22              MR. WALTERS: Are you going to mark that?

23              MR. DENNEN: Not yet.

24  BY MR. DENNEN:

25  Q.    Now, looking at the bottom of that do you see a date

176

| | | |
|---|---|---|
| 1 | | stamp of December 16, 2004? |
| 2 | A. | This one has -- |
| 3 | Q. | Excuse me? |
| 4 | A. | This one doesn't have a date stamp. |
| 5 | Q. | I'm asking you to take a look at the one in your hand. |
| 6 | A. | Okay. |
| 7 | Q. | Now, I believe it has a second page to it dated |
| 8 | | September 2nd, 2004? |
| 9 | A. | Yes. |
| 10 | Q. | Do you see that, sir? |
| 11 | A. | Yes. |
| 12 | Q. | That is your signature? |
| 13 | A. | Yes. |
| 14 | Q. | And the document itself says that you first published |
| 15 | | this work on October 1st, 1979.  Do you see that, sir, |
| 16 | | at number 3? |
| 17 | A. | Yes. |
| 18 | Q. | And why did you wait some 25 years to file this |
| 19 | | certificate of registration? |
| 20 | A. | Actually, I didn't believe it was necessary because it |
| 21 | | was a program that would be continually changed. |
| 22 | Q. | Okay.  When you say this wasn't necessary? |
| 23 | A. | What I consider this is a work in progress. |
| 24 | Q. | Okay.  So what made you decide to go ahead and file |
| 25 | | with the copyright office? |

177

1    A.    I was told it was necessary.

2    Q.    Okay.  Now, I'm going to show you -- if we could,

3          let's mark that, that's two pages.  I believe it's

4          Exhibit Number 204.

5                     MARKED BY THE REPORTER:

6                     DEPOSITION EXHIBIT NUMBER 204

7    BY MR. DENNEN:

8    Q.    That's the copyright registration.  I need a stapler.

9                     MR. SMITH:  There is one behind you.

10   BY MR. DENNEN:

11   Q.    Okay.  Mr. Goldman, I'm going to leave that in front

12         of you.

13                    I'm going to show you a wealth of

14         information and ask you to take a moment and look at

15         this.  I'm going to ask you as you are looking at

16         that, do you recognize that?

17   A.    Yes.  Well, you want me to say every page?

18   Q.    Yes.  Take a moment.

19   A.    I will say that the majority of it as I look through

20         it --

21   Q.    You recognize the majority of it --

22   A.    Yes.

23   Q.    And what is that?

24   A.    These are programs, part of some of the programs that

25         I had written.

178

1    Q.    Why don't you give that back to me, sir?

2    A.    Okay.

3    Q.    Because we are going to get a little bit confused.

4          When I say a little bit confused, because

5          my secretary put this together and maybe didn't do too

6          good of a job.

7          I'm going to show you a document.  Do you

8          see a stamp there, sir?

9    A.    Yes, I do.

10   Q.    Library of Congress?

11   A.    Yes.

12   Q.    Can you tell me -- or maybe I should ask you, is this

13         a document you submitted to the copyright office as an

14         exhibit to the document we have identified previously

15         as 204?

16   A.    I believe so.

17   Q.    Let's mark that as Exhibit Number 205.

18                   MARKED BY THE REPORTER:

19                   DEPOSITION EXHIBIT NUMBER 205

20   BY MR. DENNEN:

21   Q.    Sir, I would like for you to leave Exhibit Number 205

22         in front of you.  And go, if you would, to the first

23         page which has the code in it, if you would, sir,

24         please turn to Exhibit Number 205.

25   A.    Okay.

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

179

1   Q.   And go to the first page with the code in it.

2   A.   Okay.

3   Q.   You see that it says:  Copyright, Joel Goldman, 1979?

4   A.   Yes.

5   Q.   Then on the side it has UGDRG.  Tell me what that

6        UGDRG is?

7   A.   It's a name of a program.

8   Q.   What is the program?

9   A.   It actually does a -- it's part of a group of other

10       programs and what it would have done -- let me just

11       review it.  It would have updated a screen.  It would

12       update information on a computer screen.

13  Q.   The DRG reference is to Diagnosis --

14  A.   Yes, it is.

15  Q.   Going down to the line 18 on that first page, do you

16       see line 18?

17  A.   Yes, I do.

18  Q.   Do you see line 20 on that same page?

19  A.   Yes, I do.

20  Q.   What is the reference in line 18 to?

21  A.   Line 18 is a file called DX tab, which is one of the

22       grouper files.

23  Q.   Is that part of the grouper files that have been part

24       of public domain files that United States Government

25       allows by virtue of the DRG requirement?

180

1   A.   Yes.

2   Q.   The same with number 20?

3   A.   Yes.

4   Q.   Those are the public domain files --

5   A.   I don't know if they are called the same name.

6   Q.   Okay.  You and I are on the same wavelength.

7              Going down to 31, do you see 31 right

8      there?

9   A.   Yes.

10   Q.   Is that what is referred to as an HFMA file?

11   A.   That is an interface file, correct.

12   Q.   But it's in the HFMA program?

13   A.   It is.

14   Q.   Just looking at what is in front of you, I'm going to

15      turn to a page 448, or line 448, I'm sorry.  Do you

16      see in line 0448, it says, AMA diagnosis?

17   A.   Yes.

18   Q.   What does that refer to?

19   A.   They left against medical advice.

20   Q.   So AMA for that purpose is against medical advice,

21      it's not the American Medical Association?

22   A.   Yes.

23   Q.   Okay.  I just wanted to clarify it.

24              Again, all of these -- if you would, sir,

25      if you go to the line that has 937 on it.  Do you see

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

181

1        that, sir?

2               If you go to the next page -- let me go up.

3        If you go to 932, see line 932, it says DRGDSC?

4  A.    Uh-huh.

5  Q.    What is that referring to?

6  A.    That's a field name called DRG description.

7  Q.    What that is doing is, that is putting in information

8        about DRGs, correct?

9  A.    Yes.

10  Q.    Then I go to the next page and I have, written by JSM

11       Computer Systems?

12  A.    Yes.

13  Q.    I guess I want to make sure JSM Computer Systems was a

14       company that, I guess I understood, you never used.

15  A.    It was, again, the company name that we discussed

16       earlier that I was going to create a company but it

17       was never incorporated.

18  Q.    Were you going to -- I guess I thought your prior

19       testimony was you engaged in that conversation after

20       1979, is that incorrect?

21  A.    Excuse me?

22  Q.    That you had that idea after 1979, am I incorrect on

23       that?

24  A.    Yes, you are.

25  Q.    When did you decide --

182

1    A.    Correct me if I'm wrong, I think I said that I stopped

2          using it after I was divorced, and I believe I used

3          that, JSM, even prior to '79 on other code, that we

4          did not discuss.  That was my wife's name, my

5          daughter's name and my name.

6    Q.    When did you get divorced?  I thought you said it was

7          in the mid-'80s?

8    A.    Again, I said I didn't have the exact date but I

9          thought it was '81 or '82.  Like I said, I -- we were

10         separated for a long time.

11   Q.    Again, I'm just trying to get this in point.  You were

12         using the name JSM Computer Systems, you're saying, in

13         1979?

14   A.    I was -- I believe I was using it even prior to that.

15   Q.    Okay.

16   A.    My daughter was born in '75, so I would have used it

17         anytime after she was born.

18   Q.    And I'm just going through here, and this doesn't

19         appear to be a compiled version of the code.  As I

20         understand a compiled version would put the date on

21         there when any changes are made; is that correct?

22   A.    A compiled version would just put the date that you

23         compiled it.

24   Q.    Now, on the AS -- this is code written for 36,

25         correct, System 36?

Patricia Murray & Associates, Inc.            Court Reporting & Videoconferencing
1-800-875-8238                                Offices in Brighton & Ann Arbor, MI

4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems
Deposition of Joel Goldman

June 14, 2006

183

1   A.   Correct.

2   Q.   On the AS400 there would be a field which would show

3        each time you make a change, correct?

4   A.   Correct.

5   Q.   Does the 36 have that capability?

6   A.   I don't recall.

7   Q.   Where did you obtain this code that you filed with the

8        copyright office?

9   A.   This code came from an old computer I found in -- my

10       garage and computer came from 1985.

11  Q.   Okay.

12  A.   So it was the oldest code I could find.

13  Q.   That would be a 1985 code?

14  A.   That's the date of the computer.  I don't know.

15       That's what I had for a computer.  So it was a lot of

16       code prior to '85, as long as I had the computer.

17  Q.   Where is that computer now?

18  A.   It's in my office.

19  Q.   Would it be available to access to determine whether

20       or not there had been any changes made to this code

21       and when those changes were made?

22  A.   It would be available -- well, yeah, can I preface

23       that?

24  Q.   Sure.

25  A.   It's a 386 and it's -- it powers up occasionally.

184

1  Q.  So what you are saying is it may or may not work?

2  A.  When you turn it on you cross your fingers and you

3      pray.  Do you have any machines that are that old?

4  Q.  IBM 386, though, you are saying that's 1985 --

5  A.  That's a 1985 computer.

6  Q.  -- computer?

7  A.  The computer itself is 20 years old.  It's a PC.

8  Q.  I was going to say, a 386 I thought didn't come out

9      until a little later?

10 A.  I think the first 386 was in 1985.  It was very

11     expensive at the time.

12 Q.  But going back to the public domain references on 18

13     and 20, you would agree with me, would you not, that

14     Medicare had an issue that is public domain or the

15     United States Government had an issue to put public

16     domain files in 1979?

17 A.  Well, you know what, those files were actually the

18     same files that we used at Yale and I believe you are

19     incorrect.

20 Q.  Okay.  Did you get a document, written document, from

21     Yale allowing you to use those files?

22 A.  No.

23 Q.  Okay.

24 A.  But they -- how else would I have gotten them in '79?

25 Q.  Sir, show me where on here, other than the insertion

Goldman v. Healthcare Management Systems
Deposition of Joel Goldman

June 14, 2006

185

1       copyright, Joel Goldman, 1979 -- let me back up and

2       ask you, is this the same code that you had at the

3       Florida Keys facility in 1979?

4   A.  Actually, this program would have been -- this was a

5       Puerto Rico program.

6   Q.  How can you tell this was a Puerto Rico --

7   A.  Because I didn't have my standard coding.  It says UG

8       on it.

9   Q.  What does UG stand for?

10  A.  It stands for Ugaurta (ph), which was a person who

11      worked at the hospital in Puerto Rico.

12  Q.  Why would you have Ugaurta's name on this?

13  A.  Because prior to -- again, detail?

14  Q.  Yes.  I want the details.

15  A.  Because the DRGs, in fact, were not used in the

16      States, I did use the DRG grouping as a way of

17      determining the type of patients.  So that we could

18      estimate how patients affected the reimbursement in

19      Puerto Rico.

20  Q.  Okay.  What does Ugaurta have to do --

21  A.  He was a physician that worked at the hospital in

22      Puerto Rico and we would use the software to

23      evaluate -- even though DRG was not a real term yet,

24      we could still use that DRG to determine if a

25      physician overused facilities or the facilities of the

186

1      hospital.

2    Q.   What was the DRG you were using?

3    A.   The Yale DRG, which was created in 1979.

4    Q.   Okay.  And you are saying that the references here on

5         18 and 20 to the public domain software, Yale gave you

6         that pre-1983?

7    A.   Absolutely positively.

8    Q.   But you don't have anything in writing that shows

9         that?

10   A.   No, sir.

11   Q.   Show me on this, other than your insertion of Joel

12        Goldman, 1979, where on here that anyone else looking

13        at this can see that this was actually created in

14        1979?

15   A.   There really wouldn't be.

16   Q.   Why would you have used written by JSM Computer

17        Systems on these other pages but not used it on this

18        one page?

19   A.   You know, I would write software and make changes to

20        software, and pass changes over, and sometimes I wrote

21        something in, and sometimes I didn't and it just

22        really depended.  This was a very old program.  This

23        was one example.

24   Q.   Well, apparently, they both say 1979 --

25   A.   They both --

187

1              MR. SMITH:  Wait for a question.

2    BY MR. DENNEN:

3    Q.    That's why I'm asking you, why the difference?

4    A.    There were quite a few programs in '79.

5    Q.    Okay.

6    A.    These --

7    Q.    I guess I'm still trying to figure out why you would

8          have said written by JSM Computer Systems in one

9          instance and not in all instances?  Was there any

10         magic to that?

11   A.    Not really.

12   Q.    Again, the computer that you found is a 386, that may

13         or may not work, you're saying that that one dates

14         back to 1985?

15   A.    That was the original date of the computer.

16   Q.    Right.

17   A.    The software on it dates back -- when I originally

18         looked at the software, it dated back to 1980 and some

19         of it had said '79.

20   Q.    So some of it said --

21   A.    Some of the software was dated '79 as far as date

22         stamps.  You know when --

23   Q.    Sure.

24   A.    -- you power the machine up and you look at the date

25         stamp on the file itself?  It had a date stamp of

188

1          1979.

2     Q.   Some of it did?

3     A.   Yes.

4     Q.   But not all of?

5     A.   Well, on a PC, as you know, when you make a change, it

6          changes the date stamp.  Even if you look at it and

7          then save it, it will save the date stamp.

8     Q.   So changes were made on the software from '79 to '85

9          and those changes were noted on the PC?

10    A.   You know, even if there wasn't changes made, it could

11         have been noted on the PC.  For instance, if you open

12         up a Word document and then put it back on your

13         machine, it would change the date.  So that's not --

14    Q.   There is no way to look at that machine and know that

15         your testimony, that the copyright symbol was on here

16         and this is the '79 code, is accurate, correct?  There

17         is no way to verify independently that statement?

18    A.   I guess that would be a fair...

19    Q.   Sir, I'm going to give you this and ask you if you

20         recognize that?

21    A.   It's a disk that was given to me from HMS.

22    Q.   Okay.  So that is HMS's code then, correct?

23    A.   No, this is my program -- this was given to me from

24         HMS as discovery, I believe, or it was sent to us.

25    Q.   Let's back up.  Do you recognize the information that

189

1        is contained --

2   A.   I do.

3   Q.   -- in the paper?

4   A.   I do.

5   Q.   Tell me what that information is.

6   A.   It is actually a copy of the pharmacy programs that I

7        had written.

8   Q.   These pharmacy programs would have been one of the

9        ones given to Mr. Givens at the meeting we discussed?

10  A.   You know, until they actually gave it to me, I didn't

11       recall that I had given it to him but, apparently, I

12       did.

13  Q.   Okay.  Now, let's make that Exhibit Number 206.

14                  MARKED BY THE REPORTER:

15                  DEPOSITION EXHIBIT NUMBER 206

16  BY MR. DENNEN:

17  Q.   So have you had an opportunity to review --

18  A.   I did look at some of it, yes.

19  Q.   And on that pharmacy program, where can you show me

20       that it has a copyright date and --

21  A.   You know, the pharmacy system I didn't -- I don't

22       believe I ever even put a copyright on any of the

23       pharmacy.

24  Q.   I thought your prior testimony was that was your

25       method of insuring that since you apparently gave out

190

1       the source code indiscriminately, it was the copyright

2       symbol?

3                    MR. SMITH:  Object to the characterization

4       of the witness's testimony.

5   BY MR. DENNEN:

6   Q.  You can answer.

7   A.  The pharmacy program wasn't really one that I was that

8       proud of.  It wasn't -- you know, it would have been

9       more like a give-away program.  It's not as useful.

10  Q.  Now, when we went through the list of modules of

11      programs that you had, the pharmacy was one of the

12      ones that you listed.  So are you saying that you

13      didn't find that pharmacy program to be valuable?

14  A.  Exactly.

15  Q.  So, therefore, are you saying that you altered your

16      habit of putting the copyright symbol on there?

17  A.  You know, I didn't even think about it.

18  Q.  Okay.

19  A.  It was -- it would have been similar to, let's say,

20      the IBM program that I did not write.  The pharmacy

21      was only running with one installation.

22  Q.  Which one was that?

23  A.  Florida Keys Memorial Hospital.

24  Q.  That was created on Florida Keys system?

25  A.  Yes, it was.

191

1     Q.    That was running on their system?

2     A.    Yes, it was.

3     Q.    And was that created again -- well, let me back up.

4              Hand me if you would, the exhibit 206,

5         please, sir.

6              Now, I will note for the record that at the

7         top it has a SEU source listing and a date of June 8,

8         '06.  That's merely the date it was printed, correct?

9     A.    Yes.

10     Q.    I'm going to show you this one page.  I'm sorry, I

11         don't have another copy of that.

12              Do you see where it says, written by JSM,

13         up there at the top?

14     A.    Uh-huh.

15     Q.    Again, that is the JSM we have previously referenced

16         in the -- excuse me, the deposit with the Copyright

17         Office, correct?

18     A.    Yes.

19     Q.    And that JSM name, I guess, if this came from Mr.

20         Givens, you were still using it in '83, correct?

21     A.    Yeah.  Well, I take that back because I don't know

22         if -- you know, I wrote this program for one facility

23         and I didn't make any program changes to it so it

24         would have -- you know, this could have been the same

25         code from '81 or -- I don't even know exactly when I

4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

192

1         wrote this.  It would have been possibly '80, '81.  I

2         really don't know the exact date but I didn't make a

3         lot of changes to it.

4    Q.   Okay.  I'm going to show you another page.  You can

5         hold on to both of those pages.  And you see similarly

6         the reference to JSM, do you not, sir?

7    A.   Uh-huh.

8    Q.   And, again, there is no copyright notice, is there?

9    A.   That's correct.

10   Q.   When you gave this diskette to Mr. Givens when he was

11        with AMC, what did you expect him to do with that?

12   A.   You know, again, I didn't even recall giving that

13        diskette to him.

14   Q.   Why do you think you gave it to him?

15   A.   Maybe to show him a sample of the pharmacy.

16   Q.   A sample of the pharmacy program?

17   A.   Exactly.

18   Q.   That would be the purpose of inducing him to consider

19        buying it?

20   A.   You know, I just don't recall.  I was surprised he had

21        a copy of it.

22   Q.   That's more of it.  I need a bigger clip.

23                   Who would be Kasnak Software Specialists,

24        that the individual we referred to earlier?

25   A.   Yes.

Patricia Murray & Associates, Inc.          Court Reporting & Videoconferencing
1-800-875-8238                              Offices in Brighton & Ann Arbor, MI
                                           4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems                June 14, 2006
Deposition of Joel Goldman

                                                                   193

1    Q.   To your knowledge, is there -- well, let's back up.

2                    You have in your possession software

3         licensed by HMS to Carbon County Hospital; is that

4         correct?

5    A.   Do I have it in my possession?

6    Q.   Yes.

7    A.   That you guys gave me?

8    Q.   No, sir.  This would be that you obtained in your

9         responses to requests for admission -- excuse me, in

10        your Rule 26 disclosures, you state that you have

11        copies of computer software sold or licensed by HMS to

12        Carbon County Hospital?

13                    MR. SMITH:  May I see that, please?

14                    MR. DENNEN:  Sure.

15   BY MR. DENNEN:

16   Q.   How did you obtain that?

17   A.   That was e-mailed to me.

18   Q.   Who e-mailed it to you?

19   A.   Patty Echler (ph), I believe.  I would have to look at

20        my records.  It's an employee of HMS.

21   Q.   An employee of HMS?

22   A.   Yes.

23   Q.   And why did she e-mail that to you?

24   A.   They were installing the HMS software at Carbon and it

25        was one of their conversion file formats.

194

1    Q.    Carbon, that's one of the ones in Wyoming, correct?

2    A.    That's -- yes.

3    Q.    You have that in your possession and control, correct,

4          sir?

5    A.    Yes.  It was a database, not software.

6    Q.    I wanted to ask you, and I'm going to show this form

7          to you, ask you to take a look at it.

8                    (Discussion off the record)

9    BY MR. DENNEN:

10   Q.    Apparently, we -- no.

11   A.    There is a couple of different ones together.

12   Q.    Tell you what, if you would, sir, you separate them

13         out.  Okay.

14                Now, taking back, and I'm marking as

15         Exhibit Number 207, the one that you separated out.

16         Take a look at that, sir, if you would.

17                    MARKED BY THE REPORTER:

18                    DEPOSITION EXHIBIT NUMBER 207

19   BY MR. DENNEN:

20   Q.    You have taken a look at that document?

21   A.    Yes.

22   Q.    Tell me what that is, the whole document.

23   A.    I believe it's for the copyright registration for the

24         '97 code.  I'm not sure.

25   Q.    Okay.  So that is a document you filed with the United

195

1     States Copyright Office with respect to the 1997

2     version of the code; is that correct?

3  A.   Yes.

4  Q.   If you would, there are several entries in there where

5     I believe it -- these are dates referenced other than

6     1997, am I correct about that?

7  A.   You are correct.

8  Q.   Why is that?

9  A.   Because I was -- when we registered it, I had code

10     that was -- I tried to find old -- as old a code as

11     possible for the '97.  The large of the percentage of

12     this was written in '97.

13  Q.   But some of it is written afterward, is it not?

14  A.   There were some program changes that were made after

15     that time period.

16  Q.   So, in fact, that doesn't reflect the 1997 version of

17     the codes, does it?

18  A.   It -- besides minor changes, it is '97 code.  I

19     mean --

20  Q.   But there are changes that were made after the year

21     1997, are there not, in that -- as evidenced by the

22     face of the document?

23  A.   I believe the face of the document.

24  Q.   The pages that are attached?

25  A.   The first page here was just a sample of the screen

196

1         that was created.

2    Q.   Okay.

3    A.   That just comes from the computer.  It's not part of

4         the program --

5    Q.   I understand that.

6    A.   When we went through it, and if I there was some date

7         stamps that were dated, I believe, '98.  And it's a

8         small routine.

9    Q.   Right.

10   A.   So there was some code that was added.

11   Q.   Right.  So it is, in fact, not the 1997 version of the

12        code, correct, sir?

13   A.   Again, I will preface that, it's 99 percent '97 code.

14   Q.   Do you see, sir, at line 8, certification, box 8?

15   A.   Yes.

16   Q.   That certifies all the statements you make in there

17        are true?

18   A.   Yes.

19   Q.   In fact, on the first page you make a certification,

20        do you not, the date of the publication of this

21        particular work that's in line 3.  Do you see that?

22   A.   Yes.

23   Q.   And that does not say 1998, does it?

24   A.   Yes.

25   Q.   What is the date it says in there?

Goldman v. Healthcare Management Systems            June 14, 2006
Deposition of Joel Goldman

197

1   A.   '97.

2   Q.   So, therefore, your statement to the United States

3        Copyright Office is inaccurate, isn't it?

4   A.   The copy of the software itself was running and

5        written in 1997.  The version that we filed had some

6        minor changes in it.  I'm going to preface that with

7        the simple thing that I made a mistake, since we filed

8        it in 2004, that it had some minor changes that did

9        not affect the major portions of the program.

10                 Again, 99 percent of this program was

11       written in 1997, and a larger percentage of that came

12       from original code in 1983.  It was a derivative

13       product of the '83 code, or '79 code actually so...

14  Q.   What was the '83 code --

15  A.   The '83 code would have been the code I gave Mr.

16       Givens.

17  Q.   Okay.

18  A.   So the --

19  Q.   Well, let me ask you this:  I asked you a yes-or-no

20       question and I said the certification you made to the

21       United States Copyright Office that this attachment

22       was created on in 1997 was inaccurate, is it not?

23       It's a yes-or-no question, sir.

24  A.   Yes.

25  Q.   The statement is inaccurate?

Goldman v. Healthcare Management Systems                June 14, 2006
Deposition of Joel Goldman

198

1   A.   Since there was some work that was -- some items added

2        after '97.

3   Q.   Right.  Now, that's because of the passage of time,

4        correct?

5   A.   Yes.

6                MR. SMITH:  Could you clarify what you

7        mean, what is because of the passage of time?

8                MR. DENNEN:  The inaccuracies in the code.

9        He didn't have a copy of his 1997 code.  He was having

10       to recreate it.

11               THE WITNESS:  I need some water.

12               MR. SMITH:  Could you start over and

13       rephrase the question?

14               THE WITNESS:  Yeah.

15  BY MR. DENNEN:

16  Q.   The reason you submitted what was not the 1997 version

17       of the code was because you didn't have the 1997

18       version of the code to submit, correct?

19  A.   I think the question is a little vague.  I -- the real

20       problem -- well, I'm not going to go into an

21       explanation.

22  Q.   Tell me what the explanation is.

23  A.   The code was written in 1997.  This program was

24       written -- was converted to Y2K in 1997.  I

25       will -- again, 99 percent of the code was in 1997.

199

```
 1              When we submitted it to the Copyright
 2      Office, we tried to submit a code when it was
 3      originally written, which was 1997.  I submitted a
 4      code that I thought was all intact.  I did not look at
 5      every line when I submitted it.  It's still -- I will
 6      go by the statement, I believe, except for a couple
 7      minor changes that it is a 1997 copy, to the best of
 8      my ability.
 9  Q.  Okay.
10  A.  And that is, again, to the best of my ability, slash,
11      knowledge.
12  Q.  Okay.  I'm going to show you three separate documents.
13      Let's move this because I don't want to get everyone
14      confused.  I want to show you three separate
15      documents.  First that document, do you recognize that
16      document?
17  A.  Yes.
18  Q.  Tell me what that document is?
19  A.  That is a program and a printout.
20  Q.  Is that what is referred to as a compiled version of
21      the printout, the program rather?
22  A.  No, it's just a printout of the source code.  It is
23      not a compiled version.
24  Q.  Now, I want to show you, sir, where you have copyright
25      date.  Do you see that on that line?
```

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

```
     200
 1   A.    Yes, yes.
 2   Q.    And what is it that you have inserted there?
 3   A.    That I did from 1979 to 2004.
 4   Q.    Okay.  I believe you have your name, do you not?
 5   A.    Yes, I do.
 6   Q.    Then what is the date when you made that insertion?
 7   A.    I made that insertion on 8-25-04.
 8   Q.    Do you know why you made that change on 8-25-04?
 9   A.    Yes, I do.
10   Q.    Why was that?
11   A.    Because I was confused by some -- I thought that it
12         was like Microsoft, where -- when Microsoft puts a
13         copyright notice in, that they put a from and to date
14         and I thought I needed to show when the original was,
15         and this was a derivative product of that.
16   Q.    What did it say before you made the change?
17   A.    I don't recall.
18                 MR. DENNEN:   I'm going to mark that as
19         Exhibit Number 208.
20                 MARKED BY THE REPORTER:
21                 DEPOSITION EXHIBIT NUMBER 208
22   BY MR. DENNEN:
23   Q.    Now, I'm going to show you another piece of paper.
24         And I will represent to you that the markings up at
25         the top in ink are our markings.
```

Goldman v. Healthcare Management Systems
Deposition of Joel Goldman

June 14, 2006

201

1   A.   Okay.

2   Q.   That's the same program, is it not, sir?

3   A.   Yes.  Well, hold on one second.

4   Q.   Take your time.

5   A.   It appears to be the same.

6   Q.   Okay.  On the line with the copyright date, what is

7        the notation there?

8   A.   The 1989?

9   Q.   I guess.  Right here, line 4, it says 1989 to 2004?

10  A.   Yes.

11  Q.   Does it not?

12  A.   Yes.

13  Q.   It also says Goldman & Goldman, Inc., correct?

14  A.   Yes.

15  Q.   So when did Goldman & Goldman, Inc. -- do you have a

16       written document between Goldman & Goldman and you

17       transferring the copyright back?

18  A.   No.  I didn't -- I never transferred that to Goldman &

19       Goldman, Inc.

20  Q.   Okay.  That's inaccurate then; is that correct?

21  A.   Yes.

22            MR. SMITH:  What is inaccurate?

23            MR. DENNEN:  Well, the statement that the

24       copyright is owned by Goldman & Goldman, Inc.

25  A.   It is not owned by Goldman & Goldman, Inc.

202

BY MR. DENNEN:

2  Q.   I'm trying to -- I'm trying to understand why you have

3       two different names on the same program apparently

4       done at the same time.

5                  MR. SMITH:  Is there a question pending?

6                  MR. DENNEN:  Yes.

7  BY MR. DENNEN:

8  Q.   I'm asking that question, why are there two separate

9       dates and two separate legal entities --

10 A.   I don't think these were done at the same time.

11 Q.   Well, obviously, within --

12 A.   I think you are going to need to talk to Ingrid, who

13      filed the copyrights, because --

14                 MR. SMITH:  Careful, I don't want you to

15      reveal any communications with Ingrid.

16                 THE WITNESS:  I'm sorry.

17 BY MR. DENNEN:

18 Q.   Are you giving me permission to speak with Ingrid?

19 A.   No.

20 Q.   Were you the person who put in Goldman & Goldman,

21      Inc., 1989 to 2004?

22 A.   Yes.

23 Q.   Were you instructed to do that by someone?

24 A.   I was going to file new copyrights for the new -- for

25      all of the software when I have additional software

Patricia Murray & Associates, Inc.          Court Reporting & Videoconferencing
1-800-875-8238                               Offices in Brighton & Ann Arbor, MI

4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

203

```
 1          besides medical records, and so forth.  So we were

 2          going to get software ready to file for a new

 3          copyright for code, all for the AS400, not just the

 4          medical records but all other programs.  So I was

 5          unsure whether to file it under Goldman & Goldman or

 6          the Joel Goldman.  We didn't know at the time so

 7          I -- to the best of my recollection.

 8  Q.      I guess my question is, did you intend to transfer the

 9          copyright to Goldman & Goldman?

10  A.      Again, I --

11                  MR. SMITH:  Just to clarify, is the

12          question, when this was inserted was there an

13          intention to have that accomplished --

14                  MR. DENNEN:  I think that's up to him to

15          answer.

16                  MR. SMITH:  -- or to reflect a transfer or

17          was there an intent to transfer at any time?

18                  MR. DENNEN:  I think my question was, did,

19          he, Mr. Goldman intend to transfer the copyright to

20          Goldman & Goldman?

21                  MR. SMITH:  By virtue of this insertion?

22                  MR. DENNEN:  No, period.

23  A.      If I was going to sell my corporation in the future, I

24          was going to transfer the software to the corporation

25          and file a new copyright with that to give value to
```

Patricia Murray & Associates, Inc.          Court Reporting & Videoconferencing
1-800-875-8238                               Offices in Brighton & Ann Arbor, MI

4c14eea1-4404-419d-b567-94a8db683538

204

1    the new corporation if I got out of the computer

2    software business.

3  BY MR. DENNEN:

4  Q.  Okay.  Did you, in fact, ever transfer the copyright

5    to Goldman & Goldman?

6  A.  No.

7  Q.  Have you ever indicated to anyone that you had

8    transferred the copyright to Goldman & Goldman?

9  A.  What is the word indicated?

10  Q.  Stated, informed.

11  A.  To a third party?

12  Q.  To a third party, any third party.

13  A.  Not that I recall.

14  Q.  Okay.  When you did business with the group in

15    Wyoming, was that as Goldman & Goldman, Douglas and

16    Rawlins Hospitals?

17  A.  I -- yes, I believe so.

18  Q.  Were there agreements, although you -- well, you said

19    you may have had them, may not.  Were they with Joel

20    Goldman or were they with Goldman & Goldman?

21  A.  We'll have to -- why don't we pull those agreements

22    and I will --

23  Q.  To your recollection, were they with Joel Goldman or

24    were they with Goldman & Goldman?

25  A.  I think they were with Goldman & Goldman.

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

                                                                    205

1   Q.    Okay.  So did Goldman & Goldman ever have any formal

2         documents that gave it the right to license that

3         software?

4   A.    No.

5   Q.    Now, by the way, just for the record, this document is

6         number 209.  This is the version that says Goldman &

7         Goldman.

8                    MARKED BY THE REPORTER:

9                    DEPOSITION EXHIBIT NUMBERS 209, 210

10  BY MR. DENNEN:

11  Q.    I'm showing you a document I am marking as 210 and ask

12        you to take a look at it.

13                   Again, except for the handwritten notation

14        at the hospital, which I will represent to you we

15        added for identification purposes, this appears to be

16        the same program that we discussed in the prior two

17        exhibits, is it not?

18  A.    Actually, it's a different program.  This one

19        says -- has a different heading on the top, and this

20        one says service code.

21                   MR. GIVENS:  When you cross reference, this

22        was prior to him...

23  BY MR. DENNEN:

24  Q.    Let's assume for the discussion purposes -- we can go

25        line by line and compare the code at some point,

Patricia Murray & Associates, Inc.        Court Reporting & Videoconferencing
1-800-875-8238                             Offices in Brighton & Ann Arbor, MI
                                           4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems                    June 14, 2006
Deposition of Joel Goldman

206

```
1          but -- let the record reflect the witness is
2          reviewing.
3      A.  It's a similar program.
4      Q.  Is this a program you created?
5      A.  Yes.
6      Q.  I notice that at the top it doesn't comply with your
7          naming convention, and that it doesn't have a
8          reference to either Joel Goldman, JSM Computer Systems
9          or Goldman & Goldman.  Do you know why that would be
10         the case?
11     A.  Sometimes I would forget to put it in.
12     Q.  Now, if you would, let's put that aside, clean up our
13         table here, because we don't want to get confused.
14                  I'm going to give you three documents.  Ask
15         you to take a look at them.
16     A.  Can we take a minute?  Can I take a break?
17     Q.  I'm going to ask you, these documents, do they appear
18         to be the copy of the same code with the same
19         differences that we discussed with the prior exhibits?
20     A.  Yes.
21                  MR. DENNEN:  We will make that collective
22         Exhibit Number 211.
23                  MARKED BY THE REPORTER:
24                  DEPOSITION EXHIBIT NUMBER 211
25                  MR. SMITH:  Do you want to take a break
```

Patricia Murray & Associates, Inc.         Court Reporting & Videoconferencing
1-800-875-8238                             Offices in Brighton & Ann Arbor, MI

4c14eea1-4404-419d-b567-94a8db683538

Goldman v. Healthcare Management Systems                                June 14, 2006
Deposition of Joel Goldman

                                                                              207

1          now?   Off the record.

2                          (A recess was taken)

3     BY MR. DENNEN:

4     Q.    Mr. Goldman, we previously had a discussion off the

5           record.   I'm going to show you basically three

6           documents, which, again, have handwritten markings at

7           the top but which reflect the same differences in the

8           program as far as the ownership, the date, or the lack

9           thereof.

10                         Do you see that, sir?

11    A.    Yes.

12    Q.    Would your testimony be the same with respect to these

13          documents, as it was with respect to Exhibit Number

14          211, and I guess 208, the prior testimony?

15    A.    Yes.

16    Q.    That would be Exhibit Number 212.

17                         MARKED BY THE REPORTER:

18                         DEPOSITION EXHIBIT NUMBER 212

19    BY MR. DENNEN:

20    Q.    For the interest of expediency, we will mark that as

21          collective Exhibit Number 212.

22                         Again, Mr. Goldman, I'm marking as

23          collective Exhibit Number 213, a similar group of

24          documents.

25                         MARKED BY THE REPORTER:

208

```
 1                    DEPOSITION EXHIBIT NUMBER 213
 2   BY MR. DENNEN:
 3   Q.   Let's put those together, or at least keep them
 4        separate.  I don't want to get that confused.
 5             I have given you Number 213.  If you would
 6        sir, take a moment.  And my question to you is:  Would
 7        your testimony be the same with respect to the dates
 8        and the names and, I guess, copyright attribution with
 9        respect to that one as well, that exhibit?
10   A.   Yes.
11   Q.   Same question with respect to collective Exhibit
12        Number 214.
13                    MARKED BY THE REPORTER:
14                    DEPOSITION EXHIBIT NUMBERS 214, 215
15   BY MR. DENNEN:
16   Q.   Same question with respect to Exhibit Number 215, same
17        question, is your answer the same?
18             I'm going to show you what appears to be
19        the same with this collective exhibit.  I'm out of
20        stickers now.
21             The only difference between this one and
22        the prior one is that it appears that the 1989 to 2004
23        still refers to Goldman & Goldman, Inc. on the two
24        documents that have a copyright notice on them.
25   A.   These are not the same.
```

209

1   Q.   These are different programs?

2   A.   Yes, these are not the same.

3   Q.   If you would, sir, point out to me how you know that

4       they are not the same?

5   A.   This is year to date, and they are different programs.

6   Q.   They are different.  So the answer to the question is

7       they are different programs?

8   A.   (Witness indicating.)

9   Q.   At the risk of extending this past our self-committed

10      deadline, why don't we stop right here.  We will come

11      back -- off the record.

12             (Discussion off the record)

13             MR. DENNEN:  We have been on the record, or

14      off the record rather.  We have agreed we will do one

15      more day of this deposition, if necessary.  But I will

16      state that I have informed counsel that I don't

17      believe it will take more than four hours.

18             MR. SMITH:  We are agreed.  The deposition

19      is adjourned.

20             (The deposition was adjourned at 6:15 p.m.

21          Signature of the witness was not requested by

22          counsel for the respective parties hereto)

23

24

25

210

1                          CERTIFICATE OF NOTARY

2        STATE OF MICHIGAN   )

3                            ) SS

4          COUNTY OF OAKLAND)

5

6

7

8              I, Karen Klerekoper, a Certified
    Shorthand reporter, a Notary Public, hereby certified
9   that I recorded in shorthand the examination of
    Joel Goldman, the deponent in the foregoing
10  deposition; and that prior to the taking of said
    deposition the deponent was first duly sworn, and that
11  the foregoing is a true, correct and complete
    transcript of the testimony of said deponent.
12             I further certify that no request was made for
    submission of the transcript to the deponent for
13  reading and signature and that no such submission was
    made.
14             I also certify that I am not a relative or
    employee of a party or an attorney for a party; or
15  financially interested in the action.

16

17

18

19  *Karen Klerekoper*
    Karen Klerekoper, CSR-4250, RPR
20
    Notary Public, Oakland County, Michigan
21  My Commission expires:  10/7/12
    Dated:  This day of June 20, 2006
22

23

24

25

Patricia Murray & Associates, Inc.          Court Reporting & Videoconferencing
1-800-875-8238                              Offices in Brighton & Ann Arbor, MI

4c14eea1-4404-419d-b567-94a8db683538