

A

```
 1            IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3

 4    JOEL GOLDMAN,                          )
                                             )
 5                    Plaintiff,             )
      vs.                                    )  CASE NO.
 6                                           )  1:05 CV 0035
      HEALTHCARE MANAGEMENT SYSTEMS, INC.)
 7    and THOMAS E. GIVENS,                  )
                                             )
 8                    Defendants.            )
                                             )
 9    _____)

10         THE DEPOSITION OF

11         THOMAS E. GIVENS

12         Taken on Behalf of the Plaintiff

13         April 20, 2006

14

15               C O N F I D E N T I A L
                 =======================
16

17

18

19

20    _____

21

22    ATKINSON-BAKER, INC.
      COURT REPORTERS
23    (800) 288-3376
      www.depo.com
24    REPORTED BY: EDWARD F. KIDD, REGISTERED PROFRESSIONAL
                   REPORTER AND NOTARY PUBLIC
25    FILE NO.: A002A65
```

Page 1

1  of the statistics and produces reports on these
2  statistics, but all of those answers, all of your
3  answers do not relate to the software that Mr. Goldman
4  claims is infringed; is that correct?
5  A.    That's correct.
6  Q.    So the software that was installed at these 17
7  AMC hospitals, did that -- did any of that medical
8  records code include any of the code that plaintiff
9  claims is infringed in this lawsuit?
10 A.    In '83 after the group was finished is when we
11 began to install software that is in dispute.
12 Q.    Okay. So it was installed at -- was it
13 installed at all 17 hospitals?
14 A.    No.
15 Q.    Was it installed at approximately five
16 hospitals, then?
17 A.    To the best of my recollection.
18 Q.    That's a yes?
19 A.    No, that's to the best of my recollection.
20 Q.    But the answer is affirmative, is a yes, to the
21 best of your recollection it was installed at
22 approximately five hospitals?
23 A.    That's correct.
24 Q.    And those five hospitals were sold to a company
25 called HCA?

```
1    A.      In a subsequent event, yes.
2    Q.      Who owned them before they were sold to HCA?
3    A.      Forum Group.
4    Q.      And who owned them before Forum Group?
5    A.      American Medical Centers.
6    Q.      And at what stage was the software, the medical
7    record software in dispute installed?  Was it while the
8    hospitals were owned by AMC, while the hospitals were
9    owned by the Forum Group, or while the hospitals were
10   owned by HCA?
11   A.      By the Forum Group.
12   Q.      How long did the Forum Group own these
13   hospitals?
14   A.      I can't give you a definite time.
15   Q.      When did the Forum Group acquire the hospitals?
16   A.      I can't give you an exact date.
17   Q.      Was it while you were at AMC?
18   A.      Yes.
19   Q.      So it was sometime between '81 and '84?
20   A.      Yes.
21   Q.      And you have an approximate year when HCA
22   acquired the hospitals?
23   A.      Yes.
24   Q.      Approximately what year?
25   A.      '85.
```

```
1    Q.      Going back to -- we should get a new term for
2    this.
3    A.      When were we going to take that break?
4    Q.      It's a famous lawyer's statement, I have one
5    last question, but we will.
6            The medical records that you worked on while at
7    AMC that were not part of the software at issue in this
8    lawsuit, maybe we call that AMC's -- we call that AMC's
9    self-developed medical records.
10   A.      Okay.
11   Q.      Is that an apt description?
12   A.      However you define it.
13   Q.      So AMC's self-developed medical records
14   programs, was that basically an enhancement of the
15   capabilities of patient accounting and HFMS?
16   A.      Yes.
17   Q.      Just a second.
18           (Recess taken.)
19   BY MR. SMITH:
20   Q.      Mr. Givens, we're back from our break and we
21   would like to move to a slightly different topic, your
22   interactions with Joel Goldman before today.
23   A.      Okay.
24   Q.      Have you met Mr. Goldman before this morning?
25   A.      Yes.
```

1  A.    And it included the stuff that was developed at
2  AIC while I was there, plus additional applications
3  that they developed after I left. So we had that, as
4  well as the source code to support those hospitals.
5  Q.    When you left AMC did you retain personally a
6  copy of the source code for the medical records at
7  issue in this lawsuit?
8  A.    No.
9  Q.    When AIC received the contract to provide
10 support for these 17 hospitals you testified that, at
11 that time, AIC obtained the source code for some of the
12 applications, including financial management, HFMS
13 enhancements; correct?
14 A.    That's correct.
15 Q.    At the same time it received those software
16 applications, did AIC also receive copies of the source
17 code for the software at issue in this lawsuit?
18 A.    Yes.
19 Q.    Is this something that you specifically wanted
20 as part of the contract?
21 A.    I had to have it to support the hospitals.
22 Q.    When you say you had to have it, did you also
23 have to have the source code at issue?
24 A.    I had to have all the object and all the source
25 code to support the applications that were in those

67

```
 1   hospitals that HCA had acquired.
 2   Q.    At the time that AIC received this source code
 3   and object code, were copies of the medical records
 4   software at issue then running in any of Forum Group's
 5   hospitals?
 6   A.    Yes.
 7   Q.    How many?
 8   A.    Approximately the five that I mentioned in my
 9   interrogatories.
10   Q.    Did you have any personal involvement in
11   installing the software at issue in those four or five
12   hospitals?
13   A.    Yes.
14   Q.    Your involvement was during the time you were
15   at AMC?
16   A.    Yes.
17   Q.    Did you initiate those installations?
18   A.    What do you mean by initiate?
19   Q.    Was it your idea to put the software at issue
20   in those four or five hospitals?
21   A.    It was our company's decision.  I was the
22   implementor.
23   Q.    So AMC made the corporation decision to put the
24   source code at issue into these four or five hospitals?
25   A.    Yes.
```

```
 1   Q.      Who was your first hire?
 2   A.      Katie something.
 3   Q.      Okay.
 4   A.      Katie whatever.
 5   Q.      And was she a programmer?
 6   A.      Yes.  And receptionist.
 7   Q.      And this would have been around 1985?
 8   A.      '84.
 9   Q.      '84.  And AIC's initial business purpose was a
10   corporate entity -- was it incorporated?
11   A.      Yes.
12   Q.      Its initial purpose was an incorporated entity
13   to do business from your consulting activities; is that
14   right?
15   A.      Yes.
16   Q.      Later on did AIC start developing software
17   applications that it would go out and market to
18   hospitals for installation and sale?
19   A.      Yes.
20   Q.      When did that happen?
21   A.      1986.
22   Q.      What was its first product?
23   A.      The AMC products.  I'm going to refer to
24   anything, if by definition AMC meaning the stuff, or
25   meaning software that came over from AMC to support the
```

```
 1   HCA.
 2   Q.      All the source code and --
 3   A.      Yes, right.
 4   Q.      So it included the HFMS enhancements?
 5   A.      Yes.
 6   Q.      It would include your DRG grouper?
 7   A.      And others, and fixed assets that I developed
 8   and other products, yes.
 9   Q.      Fixed asset software applications that you
10   developed, it would include the source code at issue in
11   this lawsuit?
12   A.      Yes.
13   Q.      And it would include source code that -- well,
14   did it include any other source code?
15   A.      I had source code for everything that was
16   there.  I don't know how to define it.  All the
17   products that were used to support HCA.
18   Q.      Uh-huh?
19   A.      Which was the financial, GL, AP, fixed asset,
20   medical records, DRG.  There was source code for all of
21   that.
22   Q.      Did you, when I say you, did you or AIC pay the
23   Forum Group or HCA for acquiring that software?
24   A.      No.
25   Q.      Was there any written agreement associated with
```

```
 1   Q.      When you employed an application such as HFMS
 2   you spoke with an IBM representative, is that correct,
 3   to acquire it?
 4   A.      No.
 5   Q.      When you used HFMS how did you acquire that
 6   source code?
 7   A.      Through AMC.
 8   Q.      How did AMC acquire it?
 9   A.      Through acquisition from IBM.
10   Q.      Were you involved in any of those acquisitions?
11   A.      No.
12   Q.      Did you confer with IBM representatives?
13   A.      No.
14   Q.      Was it your understanding that IBM provided
15   HFMS for free?
16   A.      No.
17   Q.      Was it your understanding that HFMS was
18   provided at a cost?
19   A.      My understanding, at that point in time, is
20   that the software had been substantially modified, that
21   there was no copyright issue, and that basically if you
22   look in the industry as it is today, the high majority
23   of people running on the IBM mini platform that did
24   healthcare, the basis of the software was HFMS.  It was
25   kind of a common practice, and IBM really moved out of
```

1  A.     Approximately?

2  Q.     Approximately.

3  A.     Okay.  Fifteen.

4  Q.     When you installed the AMC software, I'll call
5  it, did it always include the medical records software
6  that's at issue in this lawsuit?

7  A.     No.

8  Q.     Did any of the 15 include it?

9  A.     Yes.

10 Q.     About how many?

11 A.     Approximately?

12 Q.     Approximately.

13 A.     Five.

14 Q.     Now, would these five be separate from the five
15 HCA hospitals we discussed earlier?

16 A.     No.

17 Q.     Those would be the same hospitals we have
18 already discussed?

19 A.     Not -- can I give a little history?

20 Q.     Sure.

21 A.     HCA sold off some of those hospitals.  So there
22 was maybe three to four of those hospitals that they
23 sold them to another acquirer who wanted to keep the
24 software that already had that software.

25 Q.     Okay.

1  Q.      In fact, HMS has a file called abstract use in
2  its programs; correct?
3  A.      Yes.
4  Q.      At the time AIC was marketing the software at
5  issue, the software at issue had a file called
6  abstract; correct?
7  A.      Yes.
8  Q.      Was that abstract file used in the financial
9  applications that AIC marketed, the patient accounting
10 records, for example?
11 A.      No.
12 Q.      Okay.  The software that AIC marketed, did you
13 have a DRG grouper in that software?
14 A.      Yes.
15 Q.      Whose product was the DRG grouper?
16 A.      I developed the DRG grouper.
17 Q.      Is that the one you developed based on the code
18 that you received from, was it HIS -- HSI?
19 A.      Yes.
20 Q.      That in turn was derived from the Yale --
21 A.      Yes.
22 Q.      Again, the abstract file that was part of the
23 software at issue was created by Mr. Goldman; is that
24 correct?
25 A.      Yes.

```
 1   BY MR. SMITH:
 2   Q.      Do you recognize -- this is source code, is it
 3   not?
 4   A.      Yes.
 5   Q.      Do you recognize this as source code that was
 6   provided by HMS to the plaintiff in this litigation,
 7   this is HMS source code, I guess is what I'm looking
 8   for?
 9   A.      Yes.
10   Q.      Okay.  This is HMS source code, I'll represent
11   to you, that was provided to us by HMS?
12   A.      Uh-huh.
13   Q.      And is for the program MR0E80.  It identifies
14   the programmer as Annita Milkwick?
15   A.      Uh-huh.
16   Q.      And the company name, Advanced Information
17   Concepts.  Do you see that?
18   A.      Uh-huh.
19   Q.      To the best of your recollection did Annita --
20   was Annita Milkwick the original author of this code?
21           MR. DENNEN:  Object to the use of the term
22   author and also to the reference to the code.  When you
23   say code, are you referring to the documentation that
24   is put forth on Exhibit 4?
25   BY MR. SMITH:
```

1  Q.     The answer is yes. It goes really to the word
2  original. To the best of your knowledge, the person
3  who conceived and initially programmed this program,
4  I'll just ask you, was it Annita Milkwick or was it
5  somebody else?
6  A.     I would say it was someone else.
7  Q.     And this is the source code that produces the
8  Executive Summary Report that we've seen as Exhibit 2,
9  and to the best of your knowledge the first version of
10 this program that you saw would have been from AMC; is
11 that right?
12         MR. DENNEN:  I'm going to object to that.
13 I don't -- I think you've got a compound question there
14 that assumes a number of -- is making a number of
15 assumptions. If you wish to break it down, feel free
16 to do so. I'm objecting to the form of that question.
17 BY MR. SMITH:
18 Q.     Do you understand the question, Mr. Givens?
19 A.     I thought I did. So repeat the question.
20 Q.     Could the reporter read back the question,
21 please.
22         (The requested proceedings were read back
23 by the court reporter.)
24         THE WITNESS:  Question number one, is this
25 source code for the executive summary, yes. Did the

```
1    first version of this code come from AMC, yes.
2    BY MR. SMITH:
3    Q.    And the first version of this code that came
4    from AMC was provided to AMC by Mr. Goldman; correct?
5    A.    Yes.
6    Q.    Did HMS ever contact Mr. Goldman to obtain his
7    permission to use any version of the source code before
8    you as Exhibit 4?
9    A.    HMS?
10   Q.    Yes.
11   A.    No.
12   Q.    And other than the telephone conversations and
13   the two meetings we have discussed did AMC ever obtain
14   Mr. Goldman's consent to use the source code?
15   A.    Yes.
16   Q.    When was that?
17   A.    During '83.
18   Q.    During the initial meetings?
19   A.    '83, '84, when we were working on the DRGs.
20   Q.    And earlier you weren't able to recall exactly
21   when your phone calls may have transpired between
22   yourself and Mr. Goldman.  Do you think some of those
23   phone calls occurred after you had left AMC?
24   A.    No.
25   Q.    Okay.  Well, we have a series of exhibits here,
```

1  Q.    Okay. I'm not keeping up with... off the
2  record, please.
3        (Recess taken.)
4  BY MR. SMITH:
5  Q.    Mr. Givens, so we're back from lunch. I would
6  like to show you now Exhibit 39.
7        (Marked Exhibit No. 39.)
8  BY MR. SMITH:
9  Q.    What is this exhibit?
10 A.    39.
11 Q.    Yeah, can you identify it for us? Do you
12 recognize it?
13 A.    Yes.
14 Q.    Could you describe for us what it is?
15 A.    It says abstract, medical records abstract,
16 Madison file, physical file.
17 Q.    Are you familiar with this file?
18 A.    Yes.
19 Q.    And how it's laid out?
20 A.    Yes.
21 Q.    Was this part of the software application
22 programming that you received from AMC and Paul Agee?
23 A.    I guess.
24 Q.    And was the original author -- well, let me
25 show you Exhibit 38.

113

```
1                    (Marked Exhibit No. 38.)
2    BY MR. SMITH:
3    Q.     That has been provided to HMS in a document
4    exchange.  This is Mr. Goldman's file, also called
5    abstract?
6    A.     Uh-huh.
7    Q.     I won't ask you to compare the two, but to the
8    best of your knowledge is Exhibit 39, was it originally
9    authored by Joel Goldman?
10   A.     I would have no idea.
11   Q.     Was it part of the source code that Joel
12   Goldman provided to you during the meetings at AMC in
13   1983?
14   A.     Yes.
15   Q.     I'm going to show you Exhibit 40.
16                   (Marked Exhibit No. 40.)
17              MR. SMITH:  Which, Counsel, I don't think
18   you have.
19   BY MR. SMITH:
20   Q.     Exhibit 40, Mr. Givens, is an email with an
21   attachment from Patty Eckler.  Do you know, is she an
22   employee at HMS?
23   A.     Yes.
24   Q.     And have you ever seen this document before?
25   A.     No.
```

1  Q.     Now, earlier, I believe you testified that
2  nearly all of your customers -- I beg your pardon.  I'm
3  mischaracterizing your testimony.  I believe you
4  testified that approximately 80 percent of your
5  customers would have purchased medical records?
6  A.     Yes.
7  Q.     So HMS, you believe, has more customers than
8  are listed in Exhibit 49?
9  A.     Not many more.
10 Q.     Okay.  By the way, when you sell a customer
11 software, do you install that software for the customer
12 on a computer?
13 A.     Do I?
14 Q.     Sorry, does HMS?
15 A.     Yes.
16 Q.     And is the software that's installed, is that
17 source code or object code?
18 A.     Object code.
19 Q.     As a practice, do you provide your customer
20 with source code?
21 A.     No.
22 Q.     Why not?
23 A.     It's subject to having the application modified
24 and creates support problems.  You don't have control
25 over the product.