**F**

Joel Goldman

v.

Healthcare Management Systems, Inc.
and Thomas E. Givens

United States District Court

Western District of Michigan

Civil No: 1:05CV0035

Report of

Vincent A. Thomas

July 31, 2006

United States District Court
Western District of Michigan
Civil Action: 1:05CV0035
Joel Goldman v. Healthcare Management Systems, Inc. and Thomas E. Givens

## Experience and Credentials

I am a Senior Managing Director in the Forensic and Litigation Advisory Practice and a member of the National Intellectual Property team for FTI Consulting, Inc. ("FTI"). Prior to joining FTI, I was a partner with KPMG LLP, an international accounting and consulting firm.

Throughout my career, I have worked on numerous commercial and intellectual property disputes, have conducted complex studies of damages and have also testified in matters related to such studies including matters involving patent, copyright, trade secret and trademark infringement. In addition to preparing damage studies in commercial litigation, I also have significant experience in corporate financial and accounting management positions, including Director and Analyst as well as Chief Financial Officer for a high tech enterprise where I was responsible for managing its intellectual property portfolio. In that capacity as well as during my consulting career, I have been involved in performing royalty analysis, analyzing the application of license agreements, valuing intellectual property and reviewing and analyzing hundreds of license agreements.

I graduated Cum Laude from DePauw University with a Bachelor of Arts degree in Economics and subsequently received a Masters of Business Administration degree from Indiana University. I am also a Certified Public Accountant, Certified Valuation Analyst and a member of the American Institute of Certified Public Accountants, Indiana CPA Society, National Association of Certified Valuation Analysts, National Association of Certified Fraud Examiners and Licensing Executives Society.

**Exhibit 1** contains a summary of my education and experiences as well as prior testimony and publications/seminars I have authored.

## Background Information

### Joel Goldman

Joel Goldman ("Goldman") is an individual currently residing in Stanwood, Michigan.[1] Goldman is in the business of "writing, revising, and licensing computer software."[2] As is further

---

[1] First Amended Complaint and Restated Jury Demand ("Amended Complaint"), filed May 25, 2006, paragraph 4, page 2.
[2] Amended Complaint, paragraph 5, page 2.

United States District Court
Western District of Michigan
Civil Action: 1:05CV0035
Joel Goldman v. Healthcare Management Systems, Inc. and Thomas E. Givens

described below, Goldman wrote the computer software that is at issue in this dispute.

Healthcare Management Systems

Healthcare Management Systems, Inc., ("HMS") is a Tennessee corporation with its principal place of business in Nashville, TN.[3]  HMS was founded by Thomas E. Givens ("Givens"[4]) and John Doss ("Doss") in 1984 (as Advanced Information Concepts ["AIC" - see below]) and provides "an information technology system that integrates clinical and financial applications on a single IBM platform to over 450 community hospitals nationwide."[5]

Thomas E. Givens

Givens is an individual who served as an "officer, director, employee and/or principal of HMS."[6] Currently the chairman of HMS, Givens served as its president through June 2005[7] and was a shareholder in the company through 2000 when he sold his stock to the HMS Employee Stock Ownership Plan ("HMS ESOP") for $15 million.[8]

Givens and Doss started AIC (which subsequently changed its name to HMS) in 1984 to provide contract computer programming services and shortly thereafter began selling and installing software to hospitals.[9]  The company's clients eventually included a group of hospitals previously owned by Given's former employer, American Medical Centers ("AMC").[10]

Goldman's Health Information Services Software

During the 1970's (and completed by 1979), Goldman developed software "for hospital medical records, which included statistical analysis by physician, financial class, and service code" (known as Goldman's Health Information Services software [the "HIS Software"]).[11]  The HIS Software initially operated on IBM System 34 and 36 hardware.[12]  The 1979 version of the HIS Software is registered with the United States Copyright Office (Registration Number TX 6-023-

---

[3] Amended Complaint, paragraph 6, page 2.
[4] HMS and Givens are collectively referred to as "Defendants."
[5] From www.hmstn.com as of July 21, 2006.
[6] Amended Complaint, paragraph 10, page 3.
[7] Transcript of the April 20, 2006 deposition of Givens, pages 127-128.
[8] Transcript of the April 20, 2006 deposition of Givens, page 214.
[9] Transcript of the April 20, 2006 deposition of Givens, pages 63-64 and 81-82.  Transcript of the April 21, 2006 deposition of Doss, page 15.
[10] Transcript of the April 20, 2006 deposition of Givens, pages 65-66.
[11] Amended Complaint, paragraphs 11 and 13, page 3.
[12] Amended Complaint, paragraph 11, page 3.

United States District Court
Western District of Michigan
Civil Action: 1:05CV0035
Joel Goldman v. Healthcare Management Systems, Inc. and Thomas E. Givens

458).[13]

The HIS Software was capable of producing medical records reports in a variety of formats, including by admissions, diagnosis related groups and the industry standard of producing medical records reports by discharge.[14] The HIS Software was also able to produce "original" and "unique" reports.[15]

Beginning in late 1979 Goldman provided and licensed the HIS Software to various hospitals in the United States and Puerto Rico.[16] In 1989, Goldman updated the software so that it could operate on the IBM AS400 hardware platform.[17]

The Dispute

In 1983, while Givens was employed by AMC, a meeting took place between Goldman and Givens during which Goldman demonstrated the HIS Software to Givens.[18] Goldman installed a copy of the HIS Software on a computer in Givens' office and provided another copy of the HIS Software to Givens on diskette.[19]

I understand that Goldman and Givens agreed that AMC could obtain a license to use the HIS Software in return for a $10,000 - $14,000 license fee for each AMC hospital at which the HIS Software was installed.[20] Goldman alleges that he has never been paid any license fees by Givens or AMC;[21] despite the fact that the HIS Software was subsequently installed at approximately five AMC hospitals.[22]

---

[13] Amended Complaint, paragraph 33, page 5. See also Certificate of Copyright Registration.
[14] Amended Complaint, paragraph 14, page 3.
[15] Amended Complaint, paragraph 16, page 3.
[16] Amended Complaint, paragraph 17, page 3. Goldman testified that he installed software at approximately 17 hospitals between 1979 and 1990, three hospitals between 1990 and 1999 and one hospital since 1999 (transcript of the June 14, 2006 deposition of Goldman, pages 50-52, 78, 88, 94 and 141).
[17] Amended Complaint, paragraph 12, page 3.
[18] Amended Complaint, paragraphs 20 and 22, page 4. See also transcript of the April 20, 2006 deposition of Givens, pages 50-51 and 54. See also transcript of the June 14, 2006 deposition of Goldman, page 151.
[19] Amended Complaint, paragraph 23, page 4. See also transcript of the April 20, 2006 deposition of Givens, pages 54-55. See also transcript of the June 14, 2006 deposition of Goldman, page 159.
[20] Amended Complaint, paragraph 24, page 4. See also transcript of the June 14, 2006 deposition of Goldman, page 158. Givens testified that the license fee was $14,000 per hospital (transcript of the April 20, 2006 deposition of Givens, page 55).
[21] Amended Complaint, paragraph 26, page 4. Givens testified that AMC did not provide compensation to Goldman because AMC had not acquired or purchased the software – despite installing the HIS Software at approximately five hospitals (deposition transcript page 71).
[22] Transcript of the April 20, 2006 deposition of Givens, page 47.

United States District Court
Western District of Michigan
Civil Action: 1:05CV0035
Joel Goldman v. Healthcare Management Systems, Inc. and Thomas E. Givens

As described above, in 1984 Givens left AMC and started (with Doss) AIC/HMS. Givens testified that he and HMS were provided a copy of the HIS Software by the successor owner of the former AMC hospitals so that HMS could provide services to the former AMC hospitals.[23] In 1986 AIC/HMS began selling to and installing in hospitals its own software applications based on the software that AIC/HMS had received from AMC -- including the HIS Software.[24]

Goldman alleges that during 2004 he became aware that the "information technology and software products sold, licensed and supported by HMS include Goldman HIS [Software] routines, subroutines, databases, and produce reports identical to or substantially similar to the Goldman HIS reports."[25] Goldman alleges that HMS and Givens have infringed Goldman's copyright by "writing a computer program system that contained substantial material copied from Goldman's HIS [S]oftware."[26] Goldman has filed suit against HMS and Givens alleging copyright infringement, unfair competition and removal or alteration of copyright management information and is seeking to recover his actual damages and HMS' and Givens' unjust enrichment.[27]

## Nature of Engagement

I understand that under United States copyright law the owner of an infringed copyright can recover their actual damages and/or the profits earned by the infringer from the use of the allegedly infringed copyrighted material. As such, I have been retained by Dykema Gossett PLLC, counsel for Goldman, to provide opinions regarding the damages, if any, suffered by Goldman as well as the profits earned by the Defendants as a result of the Defendants' alleged infringement of the copyright on Goldman's HIS software.

My report has been prepared in connection with the above referenced case and is to be used only for the specific purposes of this lawsuit, and is not to be used for any other purpose without the express written consent of FTI.

---

[23] Transcript of the April 20, 2006 deposition of Givens, pages 65-67.
[24] Transcript of the April 20, 2006 deposition of Givens, page 74.
[25] Amended Complaint, paragraph 30, page 5.
[26] Amended Complaint, paragraphs 35 and 36, pages 5-6.
[27] Amended Complaint, paragraphs 31-41, 42-46 and 47-55, pages 5-8.

United States District Court
Western District of Michigan
Civil Action: 1:05CV0035
Joel Goldman v. Healthcare Management Systems, Inc. and Thomas E. Givens

## Information Relied Upon

My opinions are based on my skill, knowledge, education, experience and training as well as information available to me as of the date of this report. The specific procedures performed in reaching my opinions were performed by me or by professionals working under my direct supervision. During the course of my work in this matter, I examined various pleadings that have been filed with the court and reviewed and analyzed documents produced in this litigation by the parties. A listing of all documents considered is attached as **Exhibit 2**. I also interviewed Mr. Goldman and reviewed the following deposition transcripts:

- Joel Goldman, Goldman & Goldman, Inc., President; author of the HIS Software; June 14, 2006
- Thomas E. Givens, HMS, Co-founder, Chairman and former President; April 20, 2006
- John Doss, HMS, Co-founder, Vice Chairman and former Executive Vice President; April 21, 2006
- Mark McCaghren, HMS, Programmer Analyst Team Leader; April 21, 2006

I reserve the right to supplement or update my opinions, or develop additional opinions, based on new documents or information that may become available to me between now and trial (such as, for example, information from the Defendants regarding their assessment of deductible expenses).

## Summary of Opinions

I understand that depending on the cause of action (e.g. copyright infringement or unfair competition); the defendant can be liable for the plaintiff's actual damages, the defendant's profits or a combination of both.

In my opinion Goldman has suffered actual damages of lost license and maintenance fees related to the allegedly infringing use of the HIS Software. Based on the contracts that HMS entered into with its customers, I have calculated that Goldman's actual damages related to lost license and maintenance fees to be $4,340,000 and $1,245,700, respectively. I have also calculated pre and post complaint interest of $2,312,466 (on lost license fees) and $610,405 (on lost maintenance fees), resulting in total actual damages to Goldman of $8,508,571.

It is also my opinion that the Defendants in this matter have generated an economic benefit as a

United States District Court
Western District of Michigan
Civil Action: 1:05CV0035
Joel Goldman v. Healthcare Management Systems, Inc. and Thomas E. Givens

result of the allegedly infringing use of the HIS Software that resulted from sales of HMS systems. Based on its financial statements and internal accounting records, HMS has generated $184,548,052 in revenues from the sale of software and related consulting/installation and training and maintenance services.[28]

## Basis and Reasoning – Actual Damages

Goldman has suffered actual damages as a result of the Defendants' alleged infringement and/or unfair competition because the Defendants have not paid Goldman the licensing fees and maintenance fees that he would have earned from the Defendants' licensed use of the HIS Software. As described above, during their 1983 meeting in Nashville, Goldman and Givens informally agreed that Goldman would receive a $10,000 or $14,000 license fee for each AMC hospital at which the HIS Software was installed.

Assuming that the Defendants infringed upon Goldman's copyright of the HIS software, I have concluded that it is reasonable to assume that Goldman would have been compensated by $14,000 per installation of the HIS Software.[29]  This assumption is reasonable based on the following facts and analysis:

1.     It is my understanding that a license fee of $10,000 to $14,000 is similar to the license fee that Goldman charged the hospitals to whom he licensed and installed the 1979 HIS Software.[30]

2.     As described above, Goldman revised the HIS Software in 1989 so that it could be installed on the IBM AS400 hardware platform (which replaced the IBM System 34 and 36 hardware).  After the upgrade to his software, Goldman typically charged a $25,000

---

[28] In seeking to recover these profits, I understand that it is the plaintiff's initial burden to present the revenues of the infringer (the infringer then has the burden to prove expenses incurred and the apportionment of revenues from non-infringing sources to determine the profits earned from the infringement).  Additionally, in 2000 Givens personally received economic benefit by selling his stock in HMS to the HMS ESOP for $15 million.  Givens also may have received distributions, salary and other benefits throughout his tenure at HMS.  I understand that counsel for Goldman has requested Givens' tax returns but also understand that these documents have not yet been produced.

[29] My calculation of Goldman's actual losses does not assume any increase in the per installation license fee despite the long period of time covered by this calculation.  As noted above, Goldman increased the price of his software in 1989 after he upgraded it to operate on the new IBM hardware platform.

[30] Goldman testified that under the terms of an agreement with Tom McDougal (who introduced Goldman to certain hospitals who purchased Goldman's software) Goldman received a minimum payment of $10,000 per sale (not including installation costs and expenses) for the installation of Goldman's software system (which included, among other things, the HIS Software).  See transcript of the June 14, 2006 deposition of Goldman, pages 53-54 and 61.

United States District Court
Western District of Michigan
Civil Action: 1:05CV0035
Joel Goldman v. Healthcare Management Systems, Inc. and Thomas E. Givens

license fee to hospitals using his software.[31]

3.  Based on my analysis of 136 contracts entered into by HMS that included an allocation of the sales price to the medical records module, the most frequent selling price (prior to discounts) was $25,000, the average selling price was $20,883 and the median selling price was $21,250.  Givens testified that HMS pays a license fee of 75% of the retail price of the mammography software that HMS purchases from a third party software provider.[32]  A 75% license fee on a module that sells for $20,000 to $25,000 would be $15,000 to $18,750.

4.  Based on my analysis of 157 contracts entered into by HMS that identified the total software system price, the average selling price (prior to discounts) was $267,878 and the median selling price was $233,500.  Historically, HMS has earned a 67% gross margin.[33]  Therefore, HMS' average and median gross profit on the sale of a software system would be approximately $156,000 to $179,000 – sufficient to cover the assumed $14,000 license fee to Goldman (assuming that HMS would not have increased their price to account for the license fee that HMS would have been paying had they licensed the HIS Software from Goldman).

5.  In total, HMS has earned approximately $24.8 million in operating income since 1985.[34]  My damage calculation assumes that HMS would have paid approximately $5.6 million in total to Goldman (before accounting for the potential tax benefits that HMS would realize from these additional expenses).  This represents approximately 23% of HMS' operating income.

In addition to the lost license fees, Goldman has also suffered actual damages related to lost maintenance fees.  Based on my discussions with Goldman and Givens' testimony,[35] it is my understanding that these fees are typically 10% of the license fee and are received until the software is replaced.[36]  Based on discussions with Goldman, it is my understanding that Goldman

---

[31] See draft contract between Goldman and Palm Springs General Hospital, Exhibit A (dated 1995).  The price for the "Medical Records/DRG's" module (i.e. the HIS Software) was $25,000 out of a total software price of $145,500.
[32] Transcript of the April 20, 2006 testimony of Givens, pages 169-70.
[33] See **Exhibit 3**.
[34] See **Exhibit 3**.
[35] Transcript of the April 20, 2006 testimony of Givens, page 86.
[36] Givens testified that HMS has lost approximately 10 customers (out of more than 450 [see footnote below]) who had installed the HMS software (see transcript page 172).

United States District Court
Western District of Michigan
Civil Action: 1:05CV0035
Joel Goldman v. Healthcare Management Systems, Inc. and Thomas E. Givens

would have negotiated with HMS to receive maintenance fees based on 10% of the initial license fee and that he may have agreed to an annual maximum maintenance fee of at least $100,000. For purposes of my calculation, I have assumed a $100,000 annual cap on maintenance fees.

Based on information provided by HMS, it appears that the Defendants have installed HMS software that includes the HIS Software at 310 locations.[37]  Based on the assumptions described above, I have calculated Goldman's annual license and maintenance fee revenue based on the dates that HMS entered into these contracts with their customers.[38]  Actual damages to Goldman related to license fees are $4,340,000 ($6,652,466 including interest)[39] and actual damages to Goldman related to maintenance fees are $1,245,700 ($1,856,105 including interest).[40]  Total license and maintenance fee actual damages are $5,585,700 ($8,508,571 including interest).

## Basis and Reasoning – Defendants' Profits

It is my understanding that Title 17, Chapter 5, Section 504 of the United States Code provides the remedies that are available to the owners of infringed copyrights as follows:

  (a)     In general.  Except as otherwise provided by this title, an infringer of copyright is liable for either–

    1)     The copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or

    2)     Statutory damages, as provided by subsection (c).

  (b)     Actual damages and profits.  The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.  In establishing the infringer's profits, the copyright owner is required to

---

[37] See Bates HMS-Goldman 1722-27 (list of HMS' "Medical Records Clients").  Givens testified that HMS has more than 450 customer locations (see transcript page 129) and that approximately 80% of these locations have the software module containing the HIS Software (see transcript pages 138-39).  This would suggest that approximately 360 customers have the allegedly infringing software installed.  Goldman would be due additional license fees of $700,000 (50 times $14,000 per installation) if HMS has installed the infringing software at 50 additional locations.  This amount does not include additional maintenance fees that also would have been earned as well as additional interest damages on this amount.

[38] There were 44 locations for which a date was not provided by HMS or determinable from the customer contract.  These contracts were assumed to be entered into in 2005.  To the extent that these contracts were actually entered into prior to 2005, the amount of maintenance damages may be increased and the amount of interest damages would be increased.

[39] See **Exhibits 4** and **6**.

[40] See **Exhibits 5** and **6**.

8

United States District Court
Western District of Michigan
Civil Action: 1:05CV0035
Joel Goldman v. Healthcare Management Systems, Inc. and Thomas E. Givens

> present proof only of the infringer's gross revenue, and the infringer is
> required to prove his or her deductible expenses and the elements of
> profit attributable to factors other than the copyrighted work.[41]

As described by the statute, one element of damages in copyright infringement cases can be the profits of the infringer that are attributable to the infringement that are not taken into account in computing the actual damages. The statute also states that the copyright owner's burden of proof is to present the gross revenues of the infringer. As such, I understand that the infringer then assumes the burden of proving any deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

Based on my review of the financial statements and other accounting records that have been produced by HMS in this litigation, HMS earned total revenues of approximately $277 million during the period 1985 through 2005.[42] However, given what I understand to be the typical software sale in this situation and the services that commonly accompany the sale of software products, gross revenues identified in HMS's financial statements as relating to the sale of "Software," "Consulting," "Installation/Implementation & Training" and "Maintenance Agreements" would be applicable. It is also my understanding that HMS' medical records module (which I understand to be derived from the HIS Software) is critical to HMS' ability to sell its software to hospitals.[43] Moreover, Givens and McCaghren testified that the HMS medical records module interacts with other HMS software modules.[44] Therefore, I believe that it is reasonable to assume that HMS' revenues from the four categories listed above are revenues that are reasonably attributable to the alleged infringement by the Defendants. HMS' revenues from the sale of software and related services during the period from 1985 through 2005 are $184,548,052.[45]

Please note that if the Defendants put forth an analysis of deductible expenses or elements of

---

[41] See the United States Code Title 17, Chapter 5, Section 504 (emphasis added).
[42] See **Exhibit 7**.
[43] Doss described the medical records module (among others) as a "ticket to entry" for HMS and a "minimum [software] requirement to proceed in the sales process" with prospective customers (see transcript of the April 21, 2006 deposition of Doss, pages 72-75).
[44] Transcript of the April 20, 2006 deposition of Givens, pages 142-144. See also transcript of the April 21, 2006 deposition of McCaghren, pages 11-13.
[45] See **Exhibit 7**. The allocation of revenues to these four categories in 2004 and 2005 is based on the average allocation of HMS' revenues over the period 2001-2003. It is my understanding that Goldman's counsel has requested documents providing a breakdown of revenues for 2004 and 2005 but that these documents have not yet been provided by the Defendants.

United States District Court
Western District of Michigan
Civil Action: 1:05CV0035
Joel Goldman v. Healthcare Management Systems, Inc. and Thomas E. Givens

profit attributable to other factors, I will review their calculation and further update or supplement my report, if appropriate.

Additionally, Givens received economic benefits from HMS during the period of the alleged infringement, including annual compensation (including, but not limited to, salary, employee benefits, bonuses, and distributions of profits, if any),[46] as well as $15 million from the sale of his stock to the HMS ESOP in 2000.

As described above, the HIS Software appears to have been a key part of HMS's ability to attract customers and generate revenues (a portion of which flowed to Givens in the form of annual compensation). As such, the HIS Software also played a key part in generating the value of HMS's stock that Givens was able to realize through the sale if his shares to the HMS ESOP.

## Compensation

FTI is compensated at the hourly rate of $295 per hour of time incurred for this engagement. Since our assignment is not yet complete, it is not possible to disclose the total compensation paid to my firm for this project. The firm's compensation is not dependent in any way on the outcome of this matter or the substance of my findings and conclusions.

## Exhibits

The exhibits that were developed as of the issuance of this report are attached. Additional exhibits and/or charts might be created after the issuance of this report that might be used at trial.

Respectfully submitted,

*Vincent Thomas*

Vincent A. Thomas
Senior Managing Director, FTI Consulting

---

[46] As noted above, I understand that counsel for Goldman has requested Givens' tax returns but also understand that these documents have not yet been produced.



**Vincent A. Thomas, CPA, CVA**

Senior Managing Director – Forensic and Litigation

<u>Chicago</u>
333 West Wacker Drive
Suite 600
Chicago, IL 60606
Tel: (312) 252-9329
Fax: (312) 759-8119

<u>Indianapolis</u>
450 E. 96th Street
Suite 500
Indianapolis, IN 46240
Tel: (317) 581-6302
Fax: (317) 681-6309

**Education**

MBA – Finance -Indiana University

BA – Economics (*Cum Laude*) - DePauw University

**Professional Associations**

Certified Public Accountant

Certified Valuation Analyst

**Professional Memberships**

AICPA

Indiana CPA Society

American Society of Appraisers

National Association of Certified Valuation Analysts

National Association of Certified Fraud Examiners

Licensing Executives Society

Vince is a Senior Managing Director for FTI's Forensic and Litigation practice.  Prior to joining FTI, Vince was a partner with KPMG's Dispute Advisory Services practice; and, he has also served in various management roles in distribution and high-tech organizations, including Chief Financial Officer and Director of Credit and Collections.

Vince has significant experience assisting companies and clients with complex accounting and corporate finance issues and specializes in computing damages in commercial litigation.

**Dispute Advisory Services Experience**

- Conducted numerous complex studies of financial damages in commercial litigation involving lost profits, business valuation, reasonable royalty, unjust enrichment and out of pocket costs.

- Provided expert testimony as an expert witness in over 30 matters, including testimony at both deposition and trial (bench and jury) in both federal and state court.

- Led several large projects involving the management of numerous staff over several months as well as the analysis, organization and review of large document productions.

**Financial Advisory Services Experience**

- Chief Financial Officer of a high-tech company.  Developed strategic focus and direction for all areas of the company including manufacturing, sales, operations and finance.  Managed Intellectual Property Portfolio.

- Directed the Credit and Collections department for both a start-up venture as well as an organization with revenues in excess of $200 million.  Responsibilities included managing collections staff, reducing accounts receivable days outstanding, approving credit terms, implementing information technology solutions, and cash management.

- Directed accounting and finance department for distribution company and start-up enterprise.  Responsibilities included budgeting, financial reporting, employee benefits, legal and banking relationships, development of incentive pay systems and management of an intellectual asset portfolio.



© FTI Consulting, Inc., 2003. All rights reserved.



### Expert Testimony

- Continental Sales & Engineering Corp. v. Full Service Supply, Inc.

- John Gause v. Tobias Insurance Group, Inc., et al.

- IMI South, LLC, d/b/a Irving Materials v. Hanson Aggregates Midwest, Inc., et al.

- Zenith Electronics Corp. v. PDI Communication Systems, Inc.

- Thomson, Inc. v. Praxair, Inc., et al.

- Telephia, Inc. v. Steven Cuppy et al.

- Penncro Associates, Inc. v. Sprint Corporation et al.

- MNI Technologies, Inc. v. Canal +

- Boston Scientific (NeoRx Corp) v. Cordis Corporation

- Boston Scientific  v. Cordis Corporation

- Eli Lilly v. Viking Systems, Inc.

- Boston Scientific v. Cordis Corporation

- Applied Medical Systems, Inc. v. Syntheon, Inc.

- Re-max International, Inc. v. Lending Tree, Inc.

- Wagner et al. v. Reserve Management, Inc.

- Mextel, Inc. v. Hillenbrand Industries

- Headwaters, Inc. v. AJG Financial, Inc.

- Progressive, Inc. v. World Friendship Group

- The Get Paid Corporation v. James V. Gelly, et al.

- Allen et al. v. Conseco

- Honeywell International v. The Get Paid Corporation

- Achey v. State Farm

- Grief Bros. Corporation v. American Containers



© FTI Consulting, Inc., 2003. All rights reserved.



- Total Systems Technology, Inc. v. <u>14-69 Supercenter</u>

- Con Agra v. <u>Weaver Popcorn, Inc.</u>

- <u>World Financial Group, Inc.</u> v. Ken Thornton, Robert Vaughan, Eloyd Aguilar and Mitch Helms

- Shelby Engineering v. <u>Arvin Industries</u>

- Pruett et al. v. <u>Columbia House</u>

- <u>Equal Employment Opportunity Commission</u> v. US Bell et al.

**Publications/Seminars**

- "*Calculating Damages in Commercial Litigation*", Presenter at Cleveland Bar Association, June 2003

- "*Using Your IP to Increase Shareholder Value*", Presenter at Indiana Chamber of Commerce Forum, April 24, 2002

- "*The Last 20 Years of Patent and Trademark Damages: A Litigation Evolution*", Presenter at the Midwestern Intellectual Property Symposium (sponsored by the Indiana Continuing Legal Education Forum), September 20, 2001

- "*Calculating Damages in Complex Litigation*"- Presenter at Ohio Association of Civil Trial Attorneys Meeting, April 28, 2000.

- "*Business Valuation Issues in Litigation*" - Presenter at Indiana Continuing Legal Education Forum on April 11, 2000.

- "*Damage Analysis–determining lost revenues and Daubert considerations*" – published article in <u>The Indiana Lawyer</u>, 2000.

- "*Mergers, acquisitions and divestitures – common issues in post-transaction disputes*" – The Indiana Lawyer, 1999.

- Practising Law Institute – "Pricing of Technology" – August 2005

- "*Forensic Accounting*" – Guest lecturer at Indiana University.



© FTI Consulting, Inc., 2003. All rights reserved.

**Joel Goldman v. Health Management Systems, Inc. and Thomas E. Givens**
**Exhibit 2**
**Documents Reviewed List**

**Pleadings**
1.    Complaint and Demand for Jury, filed January 13, 2005
2.    First Amended Complaint and Restated Jury Demand, filed May 25, 2006

**Depositions**
1.    Transcript of April 20, 2006 deposition testimony of Thomas E. Givens
2.    Transcript of April 21, 2006 deposition testimony of John Doss
3.    Transcript of April 21, 2006 deposition testimony of Mark McCaghren
4.    Transcript of June 14, 2006 deposition testimony of Joel Goldman

**Expert Report**
1.    Report of Norman Maron Jacobson

**HMS Documents**
1.    HMS-Gold 4.20.06 0001-1133 (various HMS financial reports and documents)
2.    HMS-Goldman 00001-134 (2002, 2003 and 2004 HMS Financial Statements and 2001, 2002 and 2003 HMS Tax Returns)
3.    HMS-Goldman 01722-27 (Medical Records Clients)
4.    HMS Financial Statements, as of November 30, 1987
5.    HMS Financial Statements, as of November 30, 1988
6.    HMS Financial Statements, as of November 30, 1989
7.    HMS Financial Statements, as of November 30, 1990
8.    HMS Financial Statements, as of November 30, 1991
9.    HMS Financial Statements, as of November 30, 1992
10.   HMS Financial Statements, as of November 30, 1993
11.   HMS Financial Statements, as of November 30, 1994 and 1993
12.   HMS Financial Statements, as of November 30, 1995 and 1994
13.   HMS Financial Statements, as of November 30, 1996 and 1995
14.   HMS Financial Statements, as of November 30, 1997 and 1996
15.   HMS Financial Statements, as of November 30, 1998 and 1997
16.   HMS Financial Statements, as of November 30, 1999 and 1998
17.   HMS Financial Statements, as of November 30, 2001 and 2000
18.   HMS Financial Statements, as of November 30, 2005 (Deposition Exhibit 57)
19.   CD containing HMS customer contracts (437 files; un-Bates numbered)

**Goldman Documents**
1.    Draft of AS/400 Software Agreement with The Palm Springs General Hospital
2.    Draft of Software Maintenance Agreement with Gillman Community Hospital
3.    Draft of Software Maintenance Agreement with Lower Florida Keys Health System
4.    Certificate of Copyright Registration (TX6-023-458).

**Websites**
1.    www.hmstn.com
2.    www.legislature.mi.gov
3.    www.courts.michigan.gov

## Joel Goldman v. Health Management Systems, Inc. and Thomas E. Givens
### Exhibit 3
### HMS Income Statements

| | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Sales | $277,829 | $482,675 | $819,060 | $891,433 | $1,178,973 | $1,202,114 | $1,431,946 | $1,811,040 | $2,809,389 | $4,743,674 | $4,378,998 | $6,146,380 |
| Cost of Sales | na | na | na | 0 | 43,563 | 54,737 | 34,799 | 92,981 | 735,188 | 1,166,908 | 1,281,204 | 1,910,809 |
| Gross Profit | 277,829 | 482,675 | 819,060 | 891,433 | 1,135,410 | 1,147,377 | 1,397,147 | 1,718,059 | 2,074,201 | 3,576,766 | 3,097,794 | 4,235,571 |
| Total Operating Expenses | 222,809 | 439,328 | 746,710 | 813,474 | 971,573 | 1,129,376 | 1,347,082 | 1,703,638 | 1,960,138 | 3,307,052 | 3,015,356 | 3,638,507 |
| Income from Operations | 55,020 | 43,347 | 72,350 | 77,958 | 163,837 | 18,001 | 50,065 | 14,421 | 114,063 | 269,714 | 82,438 | 597,064 |
| Other Income (Expenses) | | | | | | | | | | | | |
| Interest Income | 0 | 3,845 | 16,325 | 9,316 | 12,119 | 8,672 | 6,773 | 3,216 | 3,226 | 20,582 | 21,247 | 30,636 |
| Interest Expense | (1,533) | (857) | (155) | (9,108) | (16,326) | (30,709) | (24,873) | (31,228) | (26,406) | (9,428) | (14,590) | (25,008) |
| ESOP Compensation Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loss from Investment in Affiliate | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | (448) | (954) | (7,209) | (1,571) | (1,705) | 733 | (1,954) | (2,239) | (2,903) | (5,419) | (10,725) | (19,102) |
| Total Other Income (Expense) | (1,981) | 2,034 | 8,961 | (1,363) | (5,912) | (21,304) | (20,054) | (30,251) | (26,083) | 5,735 | (4,068) | (13,474) |
| Income Before Provision for Income Tax | 53,039 | 45,381 | 81,311 | 76,596 | 157,925 | (3,303) | 30,011 | (15,830) | 87,980 | 275,449 | 78,370 | 583,590 |
| Total Provision for Income Tax | 0 | 10,475 | 19,205 | 18,858 | 83,785 | (1,199) | 2,222 | (7,472) | 21,243 | 111,655 | (21,364) | 202,280 |
| Cumulative Effect of Accounting Change | 0 | 0 | 0 | 0 | 43,203 | 0 | 0 | 0 | 0 | (19,854) | 0 | 0 |
| Net Income | $53,039 | $34,906 | $62,106 | $57,738 | $117,343 | ($2,104) | $27,789 | ($8,358) | $66,737 | $143,940 | $99,734 | $381,310 |

Source: 1985 and 1986 from HMS General Ledgers; remaining years from Compiled or Audited Annual Financial Statements.
Detail of Other Income/Expense in 1992 per internal financial statements (which agree to Audited Statements)

Notes:
(1)    % of Sales calculated since 1989 when HMS began including Cost of Goods Sold in their financial statements

**Joel Goldman v. Health Management Systems, Inc. and Thomas E. Givens**

**Exhibit 3**

**HMS Income Statements**

| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total | (1) % of Sales |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Sales | $14,792,085 | $17,168,966 | $23,651,164 | $22,801,268 | $29,616,571 | $31,011,847 | $35,658,407 | $34,465,084 | $41,667,203 | $277,005,206 | 100% |
| Cost of Sales | 5,346,622 | 5,423,000 | 8,380,331 | 7,751,640 | 10,681,215 | 11,845,321 | 13,245,752 | 11,081,629 | 12,892,449 | 91,968,149 | 33% |
| Gross Profit | 9,445,463 | 11,745,966 | 15,270,833 | 15,049,628 | 18,935,356 | 19,166,526 | 22,412,655 | 23,383,455 | 28,774,754 | 185,037,057 | 67% |
| Total Operating Expenses | 7,664,800 | 9,535,317 | 10,521,040 | 13,018,535 | 17,054,067 | 17,174,359 | 19,694,753 | 21,624,960 | 24,627,105 | 160,209,979 | 58% |
| Income from Operations | 1,780,663 | 2,209,749 | 4,749,793 | 2,031,993 | 1,881,289 | 1,992,167 | 2,717,902 | 1,758,495 | 4,147,649 | 24,827,078 | 9% |
| Other Income (Expenses) | | | | | | | | | | | |
| Interest Income | 59,388 | 115,506 | 184,563 | 334,014 | 353,532 | 194,657 | 102,581 | 83,436 | 151,689 | 1,715,323 | 1% |
| Interest Expense | (33,923) | (44,419) | (40,363) | (94,122) | (1,821,679) | (1,764,430) | (1,636,013) | (1,167,093) | (1,461,053) | (8,253,316) | -3% |
| ESOP Compensation Expense | 0 | 0 | 0 | (508,751) | (267,825) | (324,558) | (384,611) | (409,402) | (566,193) | (2,461,340) | -1% |
| Loss from Investment in Affiliate | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (200,000) | (200,000) | 0% |
| Other | (12,036) | (8,170) | (16,163) | (48,908) | (123,956) | (290,345) | (74,832) | (132,027) | (59,913) | (819,846) | 0% |
| Total Other Income (Expense) | 13,429 | 62,917 | 128,037 | (317,767) | (1,859,928) | (2,184,676) | (1,992,875) | (1,625,086) | (2,135,470) | (10,019,179) | -4% |
| Income Before Provision for Income Tax | 1,794,092 | 2,272,666 | 4,877,830 | 1,713,326 | 21,361 | (192,509) | 725,027 | 133,409 | 2,012,179 | 14,807,899 | 5% |
| Total Provision for Income Tax | 694,729 | 720,933 | 1,657,007 | (197,000) | (830,799) | 0 | 0 | 0 | 0 | 2,484,558 | 1% |
| Cumulative Effect of Accounting Change | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23,349 | 0% |
| Net Income | $1,099,363 | $1,551,733 | $3,220,823 | $1,910,326 | $852,160 | $(192,509) | $725,027 | $133,409 | $2,012,179 | $12,346,690 | 4% |

Joel Goldman v. Health Management Systems, Inc. and Thomas E. Givens
Exhibit 4
Goldman License Fee Revenues

| Year | # of Contracts | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Value per Contract | | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 |
| 1985 Contracts | 0 | $0 | | | | | | | | | | |
| 1986 Contracts | 2 | | 28,000 | | | | | | | | | |
| 1987 Contracts | 0 | | | 0 | | | | | | | | |
| 1988 Contracts | 0 | | | | 0 | | | | | | | |
| 1989 Contracts | 7 | | | | | 98,000 | | | | | | |
| 1990 Contracts | 3 | | | | | | 42,000 | | | | | |
| 1991 Contracts | 0 | | | | | | | 0 | | | | |
| 1992 Contracts | 1 | | | | | | | | 14,000 | | | |
| 1993 Contracts | 7 | | | | | | | | | 98,000 | | |
| 1994 Contracts | 48 | | | | | | | | | | 672,000 | |
| 1995 Contracts | 3 | | | | | | | | | | | 42,000 |
| 1996 Contracts | 56 | | | | | | | | | | | |
| 1997 Contracts | 9 | | | | | | | | | | | |
| 1998 Contracts | 28 | | | | | | | | | | | |
| 1999 Contracts | 31 | | | | | | | | | | | |
| 2000 Contracts | 19 | | | | | | | | | | | |
| 2001 Contracts | 12 | | | | | | | | | | | |
| 2002 Contracts | 17 | | | | | | | | | | | |
| 2003 Contracts | 7 | | | | | | | | | | | |
| 2004 Contracts | 12 | | | | | | | | | | | |
| 2005 Contracts | 48 | | | | | | | | | | | |
| | (1) 310 | | | | | | | | | | | |
| Total Contracts / Lost License Fees | | $0 | $28,000 | $0 | $0 | $98,000 | $42,000 | $0 | $14,000 | $98,000 | $672,000 | $42,000 |
| Prejudgment Interest Rate | (2) | 8.08% | 8.08% | 8.08% | 9.30% | 10.06% | 9.28% | 8.99% | 7.84% | 6.56% | 6.58% | 8.10% |
| Number of Years of Prejudgment Interest | | 19.50 | 18.50 | 17.50 | 16.50 | 15.50 | 14.50 | 13.50 | 12.50 | 11.50 | 10.50 | 9.50 |
| Total Pre-judgment interest | | 0 | 41,854 | 0 | 0 | 152,735 | 56,485 | 0 | 13,722 | 73,875 | 464,038 | 32,305 |
| Total Lost Profits with Prejudgment Interest | | $0 | $69,854 | $0 | $0 | $250,735 | $98,485 | $0 | $27,722 | $171,875 | $1,136,038 | $74,305 |

Notes:

(1) Includes 44 contracts for which a date could not be determined.

(2) Pre-judgment interest rate is the average of the semi-annual interest rates set by the State of Michigan for each year. 1985 and 1986 rates are assumed to the the same as the 1987 rate.

Joel Goldman v. Health Management Systems, Inc. and Thomas E. Givens
Exhibit 4
Goldman License Fee Revenues

| Year | # of Contracts | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total License Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Value per Contract | | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | |
| 1985 Contracts | 0 | | | | | | | | | | | $0 |
| 1986 Contracts | 2 | | | | | | | | | | | 28,000 |
| 1987 Contracts | 0 | | | | | | | | | | | 0 |
| 1988 Contracts | 0 | | | | | | | | | | | 0 |
| 1989 Contracts | 7 | | | | | | | | | | | 98,000 |
| 1990 Contracts | 3 | | | | | | | | | | | 42,000 |
| 1991 Contracts | 0 | | | | | | | | | | | 0 |
| 1992 Contracts | 1 | | | | | | | | | | | 14,000 |
| 1993 Contracts | 7 | | | | | | | | | | | 98,000 |
| 1994 Contracts | 48 | | | | | | | | | | | 672,000 |
| 1995 Contracts | 3 | | | | | | | | | | | 42,000 |
| 1996 Contracts | 56 | 784,000 | | | | | | | | | | 784,000 |
| 1997 Contracts | 9 | | 126,000 | | | | | | | | | 126,000 |
| 1998 Contracts | 28 | | | 392,000 | | | | | | | | 392,000 |
| 1999 Contracts | 31 | | | | 434,000 | | | | | | | 434,000 |
| 2000 Contracts | 19 | | | | | 266,000 | | | | | | 266,000 |
| 2001 Contracts | 12 | | | | | | 168,000 | | | | | 168,000 |
| 2002 Contracts | 17 | | | | | | | 238,000 | | | | 238,000 |
| 2003 Contracts | 7 | | | | | | | | 98,000 | | | 98,000 |
| 2004 Contracts | 12 | | | | | | | | | 168,000 | | 168,000 |
| 2005 Contracts | 48 | | | | | | | | | | 672,000 | 672,000 |
| (1) | 310 | | | | | | | | | | | $4,340,000 |
| Total Contracts / Lost License Fees | | $784,000 | $126,000 | $392,000 | $434,000 | $266,000 | $168,000 | $238,000 | $98,000 | $168,000 | $672,000 | |
| (2) Prejudgment Interest Rate | | 7.06% | 7.42% | 6.76% | 5.95% | 7.11% | 6.37% | 5.25% | 3.90% | 4.33% | | |
| Number of Years of Prejudgment Interest | | 8.50 | 7.50 | 6.50 | 5.50 | 4.50 | 3.50 | 2.50 | 1.50 | 0.50 | | |
| Total Pre-judgment Interest | | 470,312 | 70,105 | 172,258 | 142,032 | 85,162 | 37,476 | 31,238 | 5,727 | 3,634 | 0 | 1,852,958 |
| Total Lost Profits with Prejudgment Interest | | $1,254,312 | $196,105 | $564,258 | $576,032 | $351,162 | $205,476 | $269,238 | $103,727 | $171,634 | $672,000 | $6,192,958 |

**Joel Goldman v. Health Management Systems, Inc. and Thomas F. Givens**
**Exhibit 5**
**Goldman Maintenance Fee Revenues**

| Value per Contract (10% of License Fee) | | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | # of Contracts | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
| 1985 Contracts | 0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 1986 Contracts | 2 | | 1,400 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 |
| 1987 Contracts | 0 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1988 Contracts | 0 | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1989 Contracts | 7 | | | | | 4,900 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 |
| 1990 Contracts | 3 | | | | | | 2,100 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 |
| 1991 Contracts | 0 | | | | | | | 0 | | 0 | | 0 |
| 1992 Contracts | 1 | | | | | | | | 700 | 1,400 | 1,400 | 1,400 |
| 1993 Contracts | 7 | | | | | | | | | 4,900 | 9,800 | 9,800 |
| 1994 Contracts | 48 | | | | | | | | | | 33,600 | 67,200 |
| 1995 Contracts | 3 | | | | | | | | | | | 2,100 |
| 1996 Contracts | 56 | | | | | | | | | | | |
| 1997 Contracts | 9 | | | | | | | | | | | |
| 1998 Contracts | 28 | | | | | | | | | | | |
| 1999 Contracts | 31 | | | | | | | | | | | |
| 2000 Contracts | 19 | | | | | | | | | | | |
| 2001 Contracts | 12 | | | | | | | | | | | |
| 2002 Contracts | 17 | | | | | | | | | | | |
| 2003 Contracts | 7 | | | | | | | | | | | |
| 2004 Contracts | 12 | | | | | | | | | | | |
| 2005 Contracts | 48 | | | | | | | | | | | |
| Total Contracts / Maintenance Fees | 310 (1) | $0 | $1,400 | $2,800 | $2,800 | $7,700 | $14,700 | $16,800 | $17,500 | $23,100 | $61,600 | $97,300 |
| Lost Maintenance Revenues ($100,000 Maximum) | | $0 | $1,400 | $2,800 | $2,800 | $7,700 | $14,700 | $16,800 | $17,500 | $23,100 | $61,600 | $97,300 |
| Prejudgment Interest Rate (2) | | 8.08% | 8.08% | 8.08% | 9.30% | 10.06% | 9.28% | 8.99% | 7.84% | 6.56% | 6.58% | 8.10% |
| Number of Years of Prejudgment Interest | | 19.50 | 18.50 | 17.50 | 16.50 | 15.50 | 14.50 | 13.50 | 12.50 | 11.50 | 10.50 | 9.50 |
| Total Pre-judgment interest | | 0 | 2,093 | 3,959 | 4,297 | 12,001 | 19,770 | 20,384 | 17,152 | 17,413 | 42,537 | 74,840 |
| Total Lost Profits with Prejudgment Interest | | $0 | $3,493 | $6,759 | $7,097 | $19,701 | $34,470 | $37,184 | $34,652 | $40,513 | $104,137 | $172,140 |

Notes:

(1) Includes 44 contracts for which a date could not be determined.

(2) Pre-judgment interest rate is the average of the semi-annual interest rates set by the State of Michigan for each year. 1985 and 1986 rates are assumed to be the be the same as the 1987 rate.

**Joel Goldman v. Health Management Systems, Inc. and Thomas E. Givens**
**Exhibit 5**
**Goldman Maintenance Fee Revenues**

| Value per Contract (10% of License Fee) | | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | |
| Year | # of Contracts | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total Maintenance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1985 Contracts | 0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 1986 Contracts | 2 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 54,600 |
| 1987 Contracts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1988 Contracts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1989 Contracts | 7 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 161,700 |
| 1990 Contracts | 3 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 65,100 |
| 1991 Contracts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1992 Contracts | 1 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 18,900 |
| 1993 Contracts | 7 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 122,500 |
| 1994 Contracts | 48 | 67,200 | 67,200 | 67,200 | 67,200 | 67,200 | 67,200 | 67,200 | 67,200 | 67,200 | 67,200 | 772,800 |
| 1995 Contracts | 3 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 44,100 |
| 1996 Contracts | 56 | 39,200 | 78,400 | 78,400 | 78,400 | 78,400 | 78,400 | 78,400 | 78,400 | 78,400 | 78,400 | 744,800 |
| 1997 Contracts | 9 | | 6,300 | 12,600 | 12,600 | 12,600 | 12,600 | 12,600 | 12,600 | 12,600 | 12,600 | 107,100 |
| 1998 Contracts | 28 | | | 19,600 | 39,200 | 39,200 | 39,200 | 39,200 | 39,200 | 39,200 | 39,200 | 294,000 |
| 1999 Contracts | 31 | | | | 21,700 | 43,400 | 43,400 | 43,400 | 43,400 | 43,400 | 43,400 | 282,100 |
| 2000 Contracts | 19 | | | | | 13,300 | 26,600 | 26,600 | 26,600 | 26,600 | 26,600 | 146,300 |
| 2001 Contracts | 12 | | | | | | 8,400 | 16,800 | 16,800 | 16,800 | 16,800 | 75,600 |
| 2002 Contracts | 17 | | | | | | | 11,900 | 23,800 | 23,800 | 23,800 | 83,300 |
| 2003 Contracts | 7 | | | | | | | | 4,900 | 9,800 | 9,800 | 24,500 |
| 2004 Contracts | 12 | | | | | | | | | 8,400 | 16,800 | 25,200 |
| 2005 Contracts | 12 | | | | | | | | | | 33,600 | 33,600 |
| | (1) 48 | | | | | | | | | | | |
| | 310 | | | | | | | | | | | |
| Total Contracts / Maintenance Fees | 310 | $138,600 | $184,100 | $210,000 | $251,300 | $286,300 | $308,000 | $328,300 | $345,100 | $358,400 | $409,400 | $3,056,200 |
| Lost Maintenance Revenues ($100,000 Maximum) | (2) | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | 1,245,700 |
| Prejudgment Interest Rate | | 7.06% | 7.42% | 6.76% | 5.95% | 7.11% | 6.37% | 5.25% | 3.90% | 4.33% | | |
| Number of Years of Prejudgment Interest | | 8.50 | 7.50 | 6.50 | 5.50 | 4.50 | 3.50 | 2.50 | 1.50 | 0.50 | | |
| Total Pre-judgment Interest | | 59,989 | 55,639 | 43,943 | 32,726 | 32,016 | 22,307 | 13,125 | 5,844 | 2,163 | 0 | 482,197 |
| Total Lost Profits with Prejudgment Interest | | $159,989 | $155,639 | $143,943 | $132,726 | $132,016 | $122,307 | $113,125 | $105,844 | $102,163 | $100,000 | $1,727,897 |

**Joel Goldman v. Health Management Systems, Inc. and Thomas E. Givens**

**Exhibit 6**

**Post-Complaint Pre-judgment Interest and Total Damages**

| Year | Rate (1) | License Fees | Maintenance Fees | Total |
|---|---|---|---|---|
| Lost Revenues through 2004 | | $3,668,000 | $1,145,700 | $4,813,700 |
| Lost Revenues in 2005 | (2) | 672,000 | 100,000 | 772,000 |
| Pre-Complaint Interest through 2004 | | 1,852,958 | 482,197 | 2,335,155 |
| Damages as of December 31, 2004 | | 6,192,958 | 1,727,897 | 7,920,855 |
| Interest for 1/1/2005 to 6/30/2005 | 4.529% | 140,240 | 39,128 | 179,368 |
| Interest for 7/1/2005 to 12/31/2005 | 4.845% | 150,024 | 41,858 | 191,883 |
| Damages as of January 1, 2006 | | 6,483,222 | 1,808,884 | 8,292,105 |
| Interest for 1/1/2006 to 6/30/2006 | 5.221% | 169,245 | 47,221 | 216,465 |
| Damages as of June 30, 2006 | | 6,652,466 | 1,856,105 | 8,508,571 |
| **Total Damages** | | **$6,652,466** | **$1,856,105** | **$8,508,571** |
| | | | | |
| Total Lost Revenue | | $4,340,000 | $1,245,700 | $5,585,700 |
| Total Interest | | 2,312,466 | 610,405 | 2,922,871 |
| **Total Damages** | | **$6,652,466** | **$1,856,105** | **$8,508,571** |

**Notes:**

(1) Post complaint interest rate as determined by the State of Michigan.

(2) It is my understanding that Michigan law provides that interest should be calculated on post-complaint damages assuming that such damages were incurred as of the date the complaint was filed.

## Joel Goldman v. Health Management Systems, Inc. and Thomas E. Givens
### Exhibit 7
### HMS Revenues

| Description | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues Related to Allegedly Infringing Software** | | | | | | | | | | | |
| Software | $4,533 | $287,682 | $501,842 | $504,834 | $555,033 | $474,592 | $512,450 | $604,112 | $748,670 | $1,003,779 | $1,162,286 |
| Consulting | 12,448 | 121,711 | 172,760 | 143,368 | 253,427 | 253,358 | 294,966 | 472,331 | 278,163 | 0 | 0 |
| Installation/Implementation & Training | 0 | 0 | 0 | 224,427 | 324,700 | 416,669 | 534,385 | 612,962 | 723,920 | 627,896 | 488,828 |
| Maintenance Agreements | 0 | 13,582 | 134,012 | 0 | 0 | 0 | 0 | 0 | 0 | 703,632 | 871,942 |
| Sub-total | 16,981 | 422,975 | 808,614 | 872,629 | 1,133,161 | 1,144,619 | 1,341,801 | 1,689,405 | 1,750,753 | 2,335,307 | 2,523,056 |
| **Other Revenues** | | | | | | | | | | | |
| Hospitals | 214,482 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Contract Programming | 24,964 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Map Fees | 0 | 17,651 | 5,421 | 17,706 | 45,712 | 50,575 | 80,620 | 110,552 | 19,899 | 20,025 | 9,818 |
| Retainer | 0 | 41,014 | 3,160 | 0 | 0 | 0 | 0 | 0 | 267,722 | 0 | 0 |
| IBM Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 667,880 | 1,042,580 | 1,348,930 |
| Other HW Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 90,257 | 181,832 | 131,462 |
| Hardware Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Programming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Technical | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Statement Processing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Product Development | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| AR Management | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 21,403 | 1,035 | 1,865 | 1,098 | 100 | 6,920 | 9,525 | 11,082 | 13,036 | 2,165 | 3,660 |
| Other Non-Sales Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,161,765 | 311,749 |
| Sub-total | 260,849 | 59,700 | 10,446 | 18,804 | 45,812 | 57,495 | 90,145 | 121,634 | 1,058,794 | 2,408,367 | 1,805,619 |
| Total HMS Revenues (2) | $277,829 | $482,675 | $819,060 | $891,433 | $1,178,973 | $1,202,114 | $1,431,946 | $1,811,039 | $2,809,547 | $4,743,674 | $4,328,675 |

Source: HMS Financial Statements and internal accounting records.

Notes:

(1) Total revenues in 2004 and 2005 are per Audited Financial Statements. Allocation of revenues to line items is based on the average allocation of revenues over the period 2001-2003. It is my understanding that Goldman's counsel has requested documents providing a breakdown of revenues for 2004 and 2005 but that these documents have not yet been provided by the Defendants.

(2) Total revenues for the period 1992-2003 per the internal accounting records used to compile this schedule are $24,153 greater than the revenues reported in the Audited Financial Statements during this period.

**Joel Goldman v. Health Management Systems, Inc. and Thomas E. Givens**
**Exhibit 7**
**HMS Revenues**

| Description | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | (1) 2004 | (1) 2005 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues Related to Allegedly Infringing Software** | | | | | | | | | | | |
| Software | $1,925,539 | $3,876,150 | $5,047,127 | $8,354,800 | $6,861,817 | $7,695,905 | $6,080,338 | $7,263,431 | $7,533,900 | $9,108,248 | $70,107,067 |
| Consulting | 0 | 525,832 | 193,061 | 146,434 | 230,933 | 283,529 | 294,196 | 581,227 | 414,998 | 501,720 | 5,174,462 |
| Installation/Implementation & Training | 777,456 | 1,733,173 | 2,319,939 | 4,054,827 | 3,980,313 | 4,498,684 | 4,718,534 | 4,993,305 | 5,088,513 | 6,151,852 | 39,433,320 |
| Maintenance Agreements | 1,180,339 | 2,122,239 | 2,853,740 | 4,004,810 | 5,591,734 | 7,355,672 | 9,241,634 | 11,052,285 | 9,900,783 | 11,969,735 | 69,833,202 |
| Sub-total | 3,883,334 | 8,257,394 | 10,413,867 | 16,560,871 | 16,664,797 | 19,833,790 | 20,334,702 | 23,890,248 | 22,938,193 | 27,731,555 | 184,548,052 |
| **Other Revenues** | | | | | | | | | | | |
| Hospitals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 214,482 |
| Contract Programming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24,964 |
| Map Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 377,979 |
| Retainer | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 311,896 |
| IBM Revenue | 1,724,217 | 5,071,597 | 5,668,392 | 5,131,050 | 4,010,874 | 7,682,345 | 8,513,523 | 8,525,450 | 8,852,225 | 10,702,062 | 68,941,125 |
| Other HW Revenue | 380,946 | 1,376,807 | 912,690 | 1,511,945 | 1,638,492 | 818,246 | 1,030,681 | 1,006,685 | 1,022,539 | 1,236,218 | 11,338,800 |
| Hardware Maintenance | 0 | 0 | 198,675 | 221,505 | 242,736 | 233,484 | 244,585 | 303,775 | 279,963 | 338,467 | 2,063,190 |
| Programming | 0 | 0 | 0 | 80,694 | 56,129 | 395,065 | 163,908 | 168,552 | 260,513 | 314,952 | 1,439,812 |
| Technical | 0 | 0 | 0 | 0 | 0 | 344,848 | 156,470 | 367,453 | 311,090 | 376,098 | 1,555,959 |
| Statement Processing | 0 | 0 | 0 | 0 | 0 | 0 | 106,029 | 406,944 | 183,686 | 222,070 | 918,729 |
| Product Development | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 105,853 | 37,904 | 45,825 | 189,582 |
| AR Management | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 67,862 | 24,300 | 29,378 | 121,540 |
| Other | 15,780 | 23,006 | 27,854 | 14,130 | 21,450 | 17,523 | 16,110 | 399,885 | 155,234 | 187,674 | 950,534 |
| Other Non-Sales Revenue | 139,059 | 63,281 | 83,936 | 126,709 | 148,381 | 248,438 | 399,648 | 467,407 | 399,436 | 482,906 | 4,032,716 |
| Sub-total | 2,260,002 | 6,534,691 | 6,891,547 | 7,086,033 | 6,118,062 | 9,739,949 | 10,630,954 | 11,819,866 | 11,526,891 | 13,935,648 | 92,481,307 |
| Total HMS Revenues (2) | $6,143,336 | $14,792,085 | $17,305,414 | $23,646,904 | $22,782,859 | $29,573,739 | $30,965,656 | $35,710,114 | $34,465,084 | $41,667,203 | $277,029,359 |