1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE WESTERN DISTRICT OF MICHIGAN

3                            SOUTHERN DIVISION

4

5    JOEL GOLDMAN,

6                         Plaintiff,

7       v.                                  CASE NO:  1:05-CV-35

8    HEALTHCARE MANAGEMENT
     SYSTEMS, INC. and THOMAS
9    E. GIVENS,

10                       Defendants.

11   _____/

12

13                             * * * *

14              TESTIMONY OF THOMAS STEPHENSON

15           DURING EVIDENTIARY HEARING 3/18/08

16                             * * * *

17

18
        BEFORE:   THE HONORABLE PAUL L. MALONEY
19                United States District Judge
                  Kalamazoo, Michigan
20                March 18, 2008

21

22

23

24

25


             KATHLEEN S. THOMAS, U.S. District Court Reporter
         410 West Michigan Avenue, Kalamazoo, Michigan  49007
                          (269)385-3050

```
 1        APPEARANCES:

 2

          APPEARING ON BEHALF OF THE PLAINTIFF:
 3
               BRADLEY L. SMITH
 4             BONNIE R. SHAW
               Brinks, Hofer, Gilson & Lione
 5             524 South Main Street, Suite 200
               Ann Arbor, Michigan  48104
 6

 7        APPEARING ON BEHALF OF THE DEFENDANTS:

 8             RICHARD A. KAY
               ADAM JOHN BRODY
 9             Varnum, Riddering, Schmidt & Howlett, LLP
               Bridgewater Place
10             333 Bridge Street,
               P.O. Box 352 N.W.
11             Grand Rapids, Michigan  49501-0352

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

```
 1                    I N D E X

 2       WITNESS:                                    Page

 3       THOMAS STEPHENSON:

 4       Direct Examination by Mr. Kay                 9

 5       Cross Examination by Mr. Smith               50

 6

 7

 8

 9       EXHIBITS:                                  Rec'd.

10       Defendants' Exhibit No. 3                    41

11       Defendants' Exhibit No. 4                    47

12       Defendants' Exhibit No. 5                    50

13

14

15

16

17

18

19

20

21

22

23

24

25
```

        KATHLEEN S. THOMAS, U.S. District Court Reporter
     410 West Michigan Avenue, Kalamazoo, Michigan  49007
                     (269)385-3050

1                    Kalamazoo, Michigan

2                    March 18, 2008

3                    at approximately 11:46 a.m.

4                         PROCEEDINGS

5          THE COURT:  All right.  Do you wish to call any live

6     witnesses on Mr. Jacobson?

7          MR. KAY:  Yes.

8          THE COURT:  Okay.  Go ahead.

9          MR. KAY:  Okay.

10         THE COURT:  We will start.

11         MR. KAY:  Mr. Stephenson.

12         Mr. Stephenson, step forward and be sworn in,

13    please.

14             THOMAS MELVIN STEPHENSON - SWORN

15         COURT CLERK:  Please state your full name and spell

16    it slowly for the record.

17         THE WITNESS:  Thomas, T-h-o-m-a-s, Melvin,

18    M-e-l-v-i-n, Stephenson, S-t-e-p-h-e-n-s-o-n.

19         THE COURT:  You may be seated, sir.

20         MR. KAY:  Your Honor, I recognize this is a horse of

21    a little bit different color in that it's a hearing--

22    evidentiary hearing and not a trial, I would move the admission

23    of Plaintiff's Exhibits 1 and 2.

24         MR. SMITH:  I object, your Honor.  I object

25    specifically to the affidavit provided by Mr. Tom Givens

1    because it contains testimony that's inadmissible under Rule

2    702.  I also object to the mass bulk offer of evidence, two

3    three-ring binders as one exhibit.  It makes it difficult to

4    sort out and keep track of what is admitted and what is not,

5    but in particular in my brief, because I did not see these

6    exhibits before this morning, in my brief perusal this morning,

7    I did find that one objectionable declaration, your Honor.

8           THE COURT:  Mr. Kay, what is your response to the

9    objection?

10          MR. KAY:  I don't understand the second objection.  I

11   think we have covered everything that's in there, it's

12   appropriate, it's authenticated, it's been a part of the case.

13   Do you want me to move it tab by tab?  I'm happy to do that.

14          The objection as to the declaration of Givens, again

15   I recognize it's a horse of a different color.  I can cover the

16   same subject matter with Mr. Stephenson.

17          THE COURT:  All right.  Well, here's what we will do

18   for now, in the interest of moving things along, I'll take

19   under advisement--  Your objection is to the Givens

20   declaration, and then--

21          MR. SMITH:  A lack of opportunity to review the

22   entirety of the materials, your Honor.  It would be, if we have

23   covered it all as Mr. Kay represents, the other exhibits, I

24   don't object to, but the Givens affidavit I do.  I do not

25   believe that Mr. Kay is accurate, however, when he says we have

1   covered every exhibit.

2          So I would agree to allow Mr. Kay to examine

3   Mr. Stephenson on exhibits, but I think it would be

4   appropriate--

5          THE COURT:  So you want some time to review all the

6   exhibits in the binders to make sure they are coincident with

7   other materials involved in the case, is that what I hear you

8   saying?

9          MR. SMITH:  That's almost exactly right.

10          THE COURT:  Okay.

11          MR. SMITH:  If I could suggest that we admit in

12   portions of Defendants' Exhibit 1 as we go along, and that

13   would permit me an opportunity to object at the time.  Pre

14   admission is usually a process that's followed when the sides

15   have exchanged exhibits and had an opportunity, so.

16          THE COURT:  Well, the other thing I can do would be

17   just to give you time to look through the materials, and then

18   recognizing that there is probably going to be, hopefully, I

19   don't know, but hopefully, a large portion of the exhibit that

20   for which there will not be any objection.  I think it probably

21   would be better use of our time if we would give you the time,

22   you know, when we are not on the record to go through the

23   exhibits.

24          So I will-- what I'll do is I'll note your objections

25   for the record and give you the opportunity to go through the

1    materials and see if there is anything in there.  Obviously

2    you've made an objection regarding the Givens' affidavit, but

3    if there are other materials you have a reservation, about

4    after you review it, then we will take the ones you've got

5    objection to as opposed to taking the time to move each sub

6    part of the exhibit which might take some time.

7              MR. SMITH:  That's fine.

8              THE COURT:  Why don't we do it that way.  I think

9    that is the most efficient way to do it.

10             MR. SMITH:  That's fine, your Honor.

11             THE COURT:  All right.  With that understanding,

12   Mr. Kay, you may inquire.

13             MR. KAY:  Let me, before I start, there actually was

14   one exhibit that was at Tab 9 that was not referenced.  The

15   exhibit at Tab 9 is another version of HMRA95 from Mr. Goldman,

16   this is a version that was produced to us in his 2005

17   production under the stipulated order.  And I have included it

18   because it is another example of HMRA95 that does not have a

19   copyright notice.

20             If you'll recall in the Goldman 1979-1988 folder that

21   was given to Mr. Jacobson, there were two versions of HMRA95,

22   one had a copyright notice, this one doesn't-- the other one

23   didn't, and now we've got yet another version in front of us

24   from a Goldman production in 2005 that does not.

25             In fact, that has one-- the version, one version out

 1   of the 1979-88 Goldman folder that Jacobson has copyright Joel

 2   Goldman 1979, that is a folder, the next one has only copyright

 3   Joel Goldman no year.  And the one that you're looking at here

 4   has no reference to copyright notice at all.  So we've got a

 5   new third version.

 6            THE COURT:  Mr. Stephenson, if you need some water.

 7            THE WITNESS:  I've got some.  Thank you.

 8            THE COURT:  Okay.

 9            MR. KAY:  I need a couple of minutes to set up.

10            THE COURT:  Do you want me to stand down for five

11   minutes or maybe everybody needs a break.

12            MR. KAY:  Sure.  How late did you want to go before

13   lunch?

14            THE COURT:  Well, we didn't start until 10:00, so I

15   planned to go until around 12:30 or so.

16            Why don't I stand down and you can do your

17   electronics in the five minute period, everybody probably needs

18   a break anyway.

19            MR. KAY:  Thank you.

20            THE COURT:  We will resume at noon.

21            You may step down for now, Mr. Stephenson.

22            COURT CLERK:  All rise.

23            Court is in recess.

24            (At 11:53 a.m., recess.)

25            (At 12:04 p.m., proceedings continued.)


                  KATHLEEN S. THOMAS, U.S. District Court Reporter
              410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

```
 1              THE COURT:  All right, Mr. Stephenson, if you want to
 2    step forward, sir.
 3              We'll go to about 12:30, 12:40, if you get a natural
 4    break, and then we will break for lunch.
 5              MR. KAY:  All right.  Great.
 6              And Mr. Smith just asked me, and I think it probably
 7    makes sense, Mr. Stephenson has some things to offer on the
 8    Daubert motion on Mr. Jacobson, and he also has some
 9    information to offer on the Thomas motion, I'm happy to put it
10    all in right now.
11              THE COURT:  Mr. Smith, what is your pleasure in that
12    regard, sir?
13              MR. SMITH:  I would prefer that as well, your Honor.
14              THE COURT:  All right.  Do it all at once?
15              MR. SMITH:  Well, for the convenience of the witness.
16              THE COURT:  All right.  That's fine.  All right.  We
17    will do it that way.
18              MR. KAY:  All right.  Great.  Thank you.
19                        DIRECT EXAMINATION
20    BY MR. KAY:
21    Q.   Mr. Stephenson, why don't you introduce yourself to Judge
22    Maloney.
23    A.   Tom Stephenson.
24    Q.   Who are you?
25    A.   I'm president and CEO of Healthcare Management Systems.
```

1   Q.   How long have you been with Healthcare Management Systems?

2   A.   It will be 23 years next month.

3   Q.   Why don't you give us your educational background?

4   A.   I graduated from Vanderbilt University in 1983 with a

5   bachelor's degree in-- with a major in math and a minor in

6   computer science.

7   Q.   When you graduated where did you go to work?

8   A.   I went to work for American Metal Centers as a computer

9   programmer.

10   Q.   What was American Medical Center?

11   A.   American Medical Centers was a small company in Nashville

12   that owned hospitals, roughly at the time I started, probably

13   12 to 15 hospitals.

14   Q.   How long were you at American Medical Centers?

15   A.   Right about a year.

16   Q.   One year?

17   A.   One year.

18   Q.   And then where did you go to work?

19   A.   I went to work for Advanced Information Concepts, which

20   later became Healthcare Management Systems.

21   Q.   And what-- Let's jump back to American Medical Centers

22   for a moment.  What did you do in the year that you were

23   employed there?

24   A.   I was a computer programmer, an RPG programmer.

25   Q.   RPG programmer.  Would you explain what RPG programming

1    is?

2    A.    RPG is just a language, Report Program Generator, and

3    basically I wrote programs using that language.

4    Q.    And then a year later you joined HMS?

5    A.    Yes.

6    Q.    And what was your job when you joined HMS?

7    A.    Same thing, I basically went to work there doing computer

8    programming as well.

9    Q.    When was HMS formed?

10   A.    Well, I went to work there in April of '85, and they had

11   been in business roughly about a year, I believe, sometime in

12   '84, I think, is when they started.

13   Q.    Who started HMS?

14   A.    Tom Givens and I think later John Doss joined Tom with the

15   company.

16   Q.    And when you joined, how many people were there at HMS?

17   A.    There was probably four or five full-time people including

18   Tom Givens and John Doss.  There may have been one or two

19   part-time people at the time.

20   Q.    Was your programming work initially at HMS again RPG

21   programming?

22   A.    Yes.

23   Q.    And how many years experience do you have in RPG

24   programming?

25   A.    I actively programmed probably around twelve years or so

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1  in different capacities, but programming would be part of my

2  responsibilities during that time.  I probably-- I stayed in

3  programming in some capacity another three or four years after

4  that before I moved into a role which-- where my programming

5  actively kind of stopped.

6  Q.   So what would be the total experience with RPG

7  programming?

8  A.   Probably 13 to 15 years, something like that.

9  Q.   Now, just as a broad question, can you, and this will take

10  some time for you to lay out, but can you describe kind of the

11  progression that you went through from when you started at HMS

12  to when you became president and CEO?

13  A.   Well, again starting there primarily as a programmer as my

14  day-to-day function during those, you know, early years, as in

15  any small company, you do just a little bit of everything, I

16  programmed, I answered the phones, whatever needed to be done.

17  Moving and programming was my primary responsibility, whether

18  it be just as a programmer or later programming and maybe

19  managing other programmers.

20          Somewhere into the early '90s and early to mid '90s,

21  we carved out our customer support function, our help desk

22  function into a separate group, and I moved over and kind of

23  started that particular function, continuing to do some

24  programming during that time, but through the mid '90s really

25  kind of worked to build up that part of the business.


KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1           Moving more into the late '90s, we separated out an

2     implementation function where we had individuals that actually

3     went out and installed the systems, and I took over kind of

4     building that up and managing that through the late '90s.

5           Somewhere around 2000, I was made chief operating

6     officer of the company which at that point my, you know, my

7     programming in the active way pretty much stopped, and I took

8     over management again of the support function, the

9     implementation function, but as well managing the development

10    or the programming area, but not actively programming.  And I

11    was COO until, I think, June of 2005, when I became president.

12    Q.   When you served as the vice president of customer services

13    and were running the support installation group, I think you

14    said the late 1990s, what was the size of the department that

15    you were managing?

16    A.   Support department, mid to late '90s, we probably had 20

17    to 30 people doing probably combination of help desk support as

18    well as at that time also doing some implementations.  We grew

19    the implementation department, particularly in the late '90s

20    and most likely-- in the 30 to 40 range in that area during

21    that particular time frame.  And from the programming

22    standpoint, during that period of time, there was again, around

23    20 to 25 programmers.

24    Q.   And then when you became the chief operating officer and

25    up until your promotion to president in 2005, what was the size

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   of the programming group and the customer support group and the

2   installation group?

3   A.   Programming grew to around 40 to 45, by the time I became

4   president it was around that number.   Implementation we

5   actually grew that particular part of the company through

6   2004-2005 to 60 to 70 people or probably around 60.   And the

7   customer support department stayed in the 30 to 40 range during

8   that particular time frame.

9   Q.   What did the customer support group do?

10  A.   They basically answered the phone.   Our customers, if a

11  customer has a question or a problem about the software or how

12  to use something, then they called our help desk or customer

13  support department and they take the phone calls and try to

14  help the customer.

15  Q.   What is the total employment of HMS today?

16  A.   We are around 375 employees today.

17  Q.   Mr. Stephenson, I asked you in preparation for today to

18  investigate the number of HMS's installations of software

19  packages including your medical records module since January of

20  2002.

21  A.   Yes.

22  Q.   Did you do that?

23  A.   Yes.

24  Q.   And how many have there been?

25  A.   143.


KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   Q.   And I also asked you to investigate the number going back

2   to 1998, did you do that?

3   A.   Yes.

4   Q.   And what is that number?

5   A.   Well, from '98 to the end of 2001, there was an additional

6   72.

7   Q.   And so the total number?

8   A.   I knew you were going to ask me that.

9   Q.   What did you say?

10  A.   143 and 72.

11  Q.   I get about 215?

12  A.   Yes.  That's correct.

13          MR. KAY:  Okay.  Now, and this relates, your Honor,

14  to the Thomas motion.

15          THE COURT:  Let's make sure I understand the

16  testimony.  The total number of installs from January of '02 to

17  date is 143?

18          THE WITNESS:  It was from January of '02 through 9/30

19  of '07.

20          THE COURT:  Okay.  Thank you.

21  BY MR. KAY:

22  Q.   And is there a reason for that date, the cut off date?

23  A.   Correct.

24  Q.   And I should have asked you about that.  What is the

25  reason for that being the cut off date?

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1  A.   We rewrote the medical records application, and October

2  1st of '07 is when that was released to the client base.

3  Q.   In Mr. Thomas' expert report, the January 2007 report,

4  which is the last supplemental report we have, he used

5  installations to calculate damages based on licensing fees, and

6  then damages based on what he concluded were profits of HMS

7  attributable to the alleged infringement of Goldman's medical

8  records programs.  And he went-- he used 358 in one instance

9  and he used 462 in a second situation.  He went all the way

10  back to 1986, according to his report.

11         Are you familiar with all of this?

12  A.   Yes.

13  Q.   Okay.  Now, if you went all the way back to 1986, would

14  those numbers of installations, 358 and 462, would that be a

15  correct assumption on Mr. Thomas' part?

16  A.   I don't believe so, no.

17  Q.   And why?

18  A.   Well, for two or three factors.  One, not all of our

19  installs from '86 forward purchased medical records,

20  particularly behavioral hospitals did not purchase medical

21  records, especially early on.

22         We also have corporate clients that kind of fall into

23  the numbers, corporate entities that may own multiple

24  hospitals, and the corporate entity itself does not use medical

25  records.  They may use our general financials, our general

1    ledger account or payroll or accounts payable, but they do not

2    use the medical records applications.  And currently we have, I

3    think, 30 of those in our client base.

4            Another factor is we have, one of our customers that

5    has what we term an enterprise license for our base

6    application, so as they add hospitals, they do not pay a

7    license fee for the additional hospitals that they add.  So I

8    think all of those would have to be taken into account.

9    Q.   In that particular instance, how many installations are

10   there covered by one license?

11   A.   I believe for that particular one there is 85 since that

12   enterprise license went into effect.

13   Q.   And so under one, if I'm understanding this right, under

14   one license and one fee, there is a perpetual license for as

15   many installations as they want?

16   A.   That is correct.

17   Q.   Okay.  There is also a reference in Mr. Thomas' report to

18   a mammography program and he uses it in his analysis.  Are you

19   familiar with that program?

20   A.   Yes.

21   Q.   Would you tell us about it?

22   A.   It's essentially a mammography reporting system and it's a

23   software application that a hospital uses to track

24   mammographies that are done at the hospital and to provide

25   reporting, and some level of governmental reporting around

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    those particular tests.

2    Q.   What does the mammography program that you use have

3    anything to do with the medical records module of HMS?

4    A.   No.

5    Q.   Do you license the mammography program?  In other words,

6    pay them a license fee?

7    A.   We do not license that particular product.  We are

8    essentially a re-seller of the product.  We essentially sell

9    their product for them.

10   Q.   And compared to the--  Well, strike that.

11          How many installations have-- has HMS installed the

12   mammography programming?

13   A.   I believe the number is 53.

14   Q.   And how does that compare with the number of installations

15   of your medical records module?

16   A.   Well, there's obviously many more medical records

17   installations.

18   Q.   Why are there so few installations of the mammography

19   program?

20   A.   Well, that particular product is a fairly specialized

21   clinical product, that it is really relevant in instances where

22   hospitals have a fairly high volume of-- do a high volume of

23   mammographies, and our client base that is not, you know, not

24   that prevalent so we don't have a lot of clients that really

25   have a need for that particular product.

1  Q.   Does HMS install the mammography program?

2  A.   No.

3  Q.   Do you maintain it?

4  A.   No.

5  Q.   Do you update it?

6  A.   No.

7  Q.   Do you service it?

8  A.   No.

9  Q.   You referenced a few minutes ago the date of September 30,

10  2007, when you implemented a rewritten medical records module?

11  A.   Yes.

12  Q.   What was the objective or objectives of that project?

13  A.   Well, our initial objective was-- or our initial intent

14  was simply to remove any question about any alleged

15  infringement that there might be on that particular module.

16  Q.   Is that all the program or is that all the project

17  actually undertook to do?

18  A.   No, we basically, in going through the process to do that,

19  decided that while we were doing that we would take the time to

20  do several other things, one was just to enhance some

21  functionality in the product itself.  We get a lot of requests

22  from the customers to do things in the applications, so we took

23  the time to improve work flow, to add some functionality into

24  the product that wasn't there.  We also took that opportunity

25  to allow for some impending governmental regulation changes

1    that are coming in the next couple of years, particularly

2    around coding, which would require some changes to the system

3    and so we kind of did all of that together in the one project.

4    Q.    Was the project completed effective September 30, 2007?

5    A.    Yes.

6    Q.    And when we say completed or you say completed, what was

7    it then implemented, I mean installed?

8    A.    We distributed it at that time to all of our customers.

9    Q.    I asked you to determine the total cost of that rewrite

10   project, have you done so?

11   A.    Yes.

12   Q.    And what is it?

13   A.    It was approximately $329,000.

14   Q.    Now, the cost of the $329,000 was for just the rewriting

15   of the medical records module or was that also to increase the

16   functionalities of the software and to update for government

17   changes?

18   A.    It was for all of that.  It covered all of that, yes.

19   Q.    And that's today's money?

20   A.    Yes.

21   Q.    Can you split it up by one, allocate it somehow between

22   the rewrite to avoid the alleged infringement on medical

23   records versus the other aspects of the project?

24   A.    Not really.  It would be very difficult because we would

25   be essentially doing several things at one time when we went in

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   to maybe modify a particular program, so it would be kind of

2   difficult to split that out.

3   Q.   Could HMS have rewritten the medical records module in

4   1986 or 1987?

5   A.   Certainly.

6   Q.   To avoid any claim of alleged infringement?

7   A.   Yes.

8          MR. SMITH:  Your Honor, I'm going to interpose an

9   objection here.  I don't know how this relates to Mr. Jackson's

10  or Mr. Thomas' report.  It appears to be getting into

11  plaintiff's motion to exclude rewrite testimony.  None of this

12  is relevant to this proceeding, and frankly, none of the

13  rewrite-- we filed a motion that none of the rewrite evidence

14  is relevant to damages.  So I understand the jury is not here.

15  I, you know, for the Court to understand things, if I could

16  not-- if I could pose an objection and then not have anybody

17  argue later on that I've waive my right to object because the

18  testimony is coming in in this proceeding, I object to the jury

19  hearing any of this stuff, but if the Court wishes to hear it

20  to get a more complete understanding of these motions, I guess

21  it's okay.  I don't see how it's relevant, however.

22          THE COURT:  All right.  Mr. Kay, what is your theory

23  that this is relevant to the Daubert motion issue?

24          MR. KAY:  The Daubert motion, I think, it's Paragraph

25  2D of the Thomas motion, deals specifically with whatever

1    actions-- alternative actions HMS has undertaken to avoid

2    infringement it's pled, this goes directly to it, the rewrite

3    costs, and other actions that HMS have taken are highly

4    relevant to that issue that was pled in the original Daubert

5    motion.

6            THE COURT:  All right.  If I recall, in the papers,

7    your argument is that the plaintiff's experts did not take this

8    into account.

9            MR. KAY:  Absolutely, your Honor, did not consider

10   option-- did not consider the steps that had been taken, many

11   steps that had been taken to avoid infringement.

12           THE COURT:  Mr. Smith, go ahead.

13           MR. SMITH:  It's our expert did not consider many

14   many many things, whether it was a full moon when this

15   happened.  But the fact that he did not consider the rewrite

16   costs does not make it any more relevant.  It's defendants have

17   moved to exclude Mr. Thomas' report, and are using this Daubert

18   hearing to inject this rewrite issue to somehow give it more

19   prominence or credibility, and apart from their motion saying

20   that they failed to-- that Mr. Thomas failed to include rewrite

21   costs, again that should have no more weight than the

22   defendants failed to include that the moon was in the lunar

23   phase on this date.  It's just not relevant.

24           THE COURT:  That latter point wouldn't go to the

25   calculation of damages, would it?


                    KATHLEEN S. THOMAS, U.S. District Court Reporter
              410 West Michigan Avenue, Kalamazoo, Michigan  49007
                              (269)385-3050

1           MR. SMITH:  Well, neither, in plaintiff's opinion,

2   does whether or not the rewrite costs were specifically

3   included.  But notwithstanding that, I would just like a ruling

4   from the Court that because it comes in this proceeding doesn't

5   mean it's admissible at trial.

6           THE COURT:  Well, that's fine.  I'll reserve on

7   that.  I'll take the testimony on the issue before me as to the

8   Daubert motion, because I think I understand the defendants'

9   theory here as to why this may or may not be admissible, and

10  I-- but I take your point, Mr. Smith, that this might be a

11  weight issue as opposed to anything else.  So although I

12  recognize you've got an umbrella legal argument that it's not

13  relevant in any case.  But for purposes of this hearing only

14  I'll take this testimony.

15          Go ahead, Mr. Kay.

16          MR. KAY:  Thank you, your Honor.

17  BY MR. KAY:

18  Q.   What would have been the differences between doing the

19  rewrite of the medical records program in 1986 or 1987 versus

20  doing it in 2007?

21  A.   It would have been a fraction of the cost and the time to

22  rewrite the code in '86 or '87 as compared to today.

23  Q.   Why?

24  A.   Just the volume of programs today and the complexity of

25  the programs today versus what was there in '86 or '87.


                    KATHLEEN S. THOMAS, U.S. District Court Reporter
               410 West Michigan Avenue, Kalamazoo, Michigan  49007
                              (269)385-3050

1   Q.   Mr. Thomas has also included in his report, at the end of

2   his report, some calculations, basically under the Digital

3   Millennium Copyright Act.  I'll bet you don't know what that

4   is?

5   A.   No.

6   Q.   But it's based on an assumption that he makes that an

7   update is a violation of the copyright laws, and that every

8   update you make, under his assumption, is a violation of the

9   copyright laws, and I want to get some facts some underlying

10   facts in that regard.

11          First of all, what is involved in an update?  I

12   assume that's an event that happens after installation of the

13   system?

14   A.   Correct.  We typically enhance our product, change the

15   product, you know, over the course of a year, over the course

16   of time, and so our customers receive those enhancements or

17   updates periodically from us, and we consider that a release or

18   an update to the product.

19          THE COURT:  Can you give me a concrete example?

20          THE WITNESS:  Well, there's lots of different things,

21   but for example, last year, the government changed the billing

22   requirements for billing for hospitals to produce bills for

23   patients.  That required us to modify our billing programs to

24   allow for the new billing requirements, and so we make those

25   programming changes and then we distribute those to the

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    clients.

2    BY MR. KAY:

3    Q.    Does an update involve adding new source code?

4    A.    Yes.

5    Q.    Is that fundamentally what happens?

6    A.    Yes, we are adding code, we may take code away, we may

7    delete code, it just depends on the particular functionality or

8    what we are doing.

9    Q.    Now, Mr. Thomas has used in his calculations the 358 and

10   462 installations going all the way back to 1986 that he

11   assumes was correct.  When you did updates in '98 or 2004 or

12   2007, did you-- did every update involve a republication, a

13   reinstallation of the medical records-- of your medical records

14   module?

15   A.    No.

16   Q.    Did updates relate to other modules?

17   A.    Yes.

18   Q.    How many other modules are there?

19   A.    We have got roughly 35 particular what we would call

20   applications or modules.

21   Q.    Of which the medical records module would be one?

22   A.    One, yes.

23   Q.    All right.  So when you did an update that didn't have

24   anything to do with medical records, you wouldn't be

25   republishing or reinstalling medical records?

1   A.   That is correct.

2   Q.   Now, did you have some updates that involved your medical

3   records modules?

4   A.   Yes.

5   Q.   And when you did an update you added a code?

6   A.   Yes.

7   Q.   Source code?

8   A.   Yes.

9   Q.   Did you ever--  When you did that, did you add, republish

10  any of Mr. Goldman's software?

11  A.   No.

12  Q.   When you did an updated medical records module, did you

13  republish the whole reinstall, the whole medical records

14  module?

15  A.   No.  We only would update programs that were changed.  So

16  if there's 800 programs in medical records and we changed one

17  for a-- for whatever reason, then that one would be the only

18  one that we would publish or release to the client.

19  Q.   And how many medical records programs were there before

20  you rewrote your program?

21  A.   I believe there was 871.

22  Q.   871.  We looked earlier today at the folder from

23  Mr. Goldman to Mr. Jacobson, and it had 822 medical records

24  programs for HMS in 2005?

25  A.   Correct.


                    KATHLEEN S. THOMAS, U.S. District Court Reporter
              410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1   Q.   Would that seem correct to you?

2   A.   Yes.

3   Q.   And are you paid for the updates?

4   A.   No, it's--  Essentially it's a part of the maintenance fee

5   that the customers pay us, a monthly-- they pay a monthly fee

6   which includes the support or the help desk support we give

7   them, and it also includes any enhancements or updates to the

8   product.

9   Q.   Mr. Thomas' calculations assume that there would be two

10  updates a year for every installation, the 358 or the 462, and

11  that there would be some violation of the copyright laws

12  related to Mr. Goldman's medical records programs.  Would you

13  agree or disagree with that assumption?

14  A.   Well, I would disagree.  We-- there is not always two

15  updates a year, sometimes there is, but there is many times

16  there is not.  And as I said earlier, we are not always

17  updating medical records or the entirety of medical records

18  when we distribute those enhancements.

19  Q.   When you make an update, one update, does it go to all

20  your installations?

21  A.   Yes.

22  Q.   Mr. Thomas assumed apparently in his calculations that

23  every time there was an update, two times a year for however--

24  how many years for ever how many installations then multiplied,

25  if you know what I mean, that every update would involve a

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    reinstallation of Goldman's or republication of Mr. Goldman's

2    programs.  I gather you would not agree with that?

3    A.   Well, again, we would only publish or deliver programs

4    that changed.  So if nothing was changed, then those programs

5    would not get distributed again.

6              MR. KAY:  This is a logical point, your Honor.

7              THE COURT:  Okay.  All right.  Great.  We will break

8    for lunch.  We will resume at 2:00 o'clock.

9              Mr. Stephenson, you may step down for now, sir.

10             THE WITNESS:  Thank you.

11             THE COURT:  Thank you.

12             COURT CLERK:  All rise.

13             Court is in recess.

14             (At 12:39 p.m., recess.)

15             (At 2:00 p.m., proceedings continued.)

16             THE COURT:  Be seated.  Thank you.

17             All right.  We are back on the record in 05-35.

18             Mr. Stephenson, if you want to resume the stand.

19   BY MR. KAY:

20   Q.   Mr. Stephenson, at my request, did you review the Jacobson

21   CD?

22   A.   Yes.

23   Q.   And this is Exhibit 1, the Binder 1-- no, Binder 2, excuse

24   me, Tab 6, and the materials in it relate to the Goldman

25   program 1979-1988 folder that was given to Mr. Jacobson?

1  A.   Yes.

2  Q.   And one page lists out those programs and then there is

3  two inches of programs attached to that?

4  A.   Yes.

5  Q.   Have you reviewed each of those programs?

6  A.   Yes.

7  Q.   Are those programs what are, in fact, contained in the

8  Goldman program folder 1979-1988?

9  A.   Yes, sir.

10  Q.   This is Tab 7, Binder 1, Exhibit 1.  And Tab 7 is the

11  opening windows of HMS programs from the Goldman CD to

12  Mr. Jacobson and of a subset QRPGLESRC, have you also looked at

13  this in the Goldman CD?

14  A.   Yes, sir.

15  Q.   And it has a list of five or six pages of those programs.

16  Do you recognize the titles on those?

17  A.   Yes, sir.

18  Q.   What are those?

19  A.   Those are the HMS medical records programs.

20  Q.   And I told the Court that there were 822 of those.  Does

21  that square with your count too?

22  A.   Yes.  From what is on the CD, yes.

23  Q.   And finally, Tab 8 of Exhibit 1 is another folder from the

24  Goldman CD to Mr. Jacobson.  Under programs is a subfolder

25  detail service, and a subfolder with HMRY50 in it, and then

```
 1    that program, that HMRY50, is presented.  Have you also looked

 2    into the Goldman CD and confirmed that this information is

 3    accurate?

 4    A.   Yes, sir.

 5              MR. SMITH:  Objection, I don't understand the

 6    question, confirm it's accurate.  What does that mean?

 7              MR. KAY:  It means this is what is in the Goldman CD.

 8              MR. SMITH:  Okay.  No objection.  I withdraw it.

 9              THE COURT:  Thank you.

10    BY MR. KAY:

11    Q.   Mr. Stephenson, I asked you when you made your inspection

12    of the Goldman CD to determine whether there were dates on the

13    programs in the 1979-88 folder?

14    A.   Yes.

15    Q.   And did you find dates?

16    A.   Yes.

17              MR. SMITH:  Objection, your Honor.

18              I think the witness is veering into testimony that's

19    not permitted.  It is inadmissible under Rule 701.

20    Mr. Stephenson has been tendered as a lay witness, and he is

21    not about to testify regarding things that are within the

22    common understanding of people-- within the common

23    understanding of a jury.

24              We filed--  In our witness list, we filed-- we cited

25    Rule 701.  We also cited the Sixth Circuit case United States
```

1   vs. Ganier, 468 F.3d 920, and we cited United States vs. White,

2   492 F.3d 380.  Both of these cases stand for the proposition

3   that a person-- that an expert, beg your pardon, a lay witness

4   is not permitted to testify regarding extrinsic evidence.  They

5   are only permitted to testify regarding things within their

6   personal knowledge.  People who--  When a lay witness is

7   solicited to express expert opinion testimony, the Sixth

8   Circuit has repeatedly ruled again and again that it's a

9   subterfuge to get around the requirements of Rule 26, and

10  disclosing expert testimony pursuant to the rule.

11          Mr. Stephenson has not submitted an expert report.

12  He has not been tendered as an expert witness.  We have not had

13  an opportunity to examine him as an expert witness.  So the

14  only thing that this Court should permit him to testify to are

15  his facts within his own personal knowledge, irrespective of

16  what he may have reviewed in terms of extrinsic evidence.

17          THE COURT:  Go ahead, sir.

18          MR. KAY:  Your Honor, expert testimony is governed by

19  702.  And expert testimony under 702 relates to the giving of

20  opinions.  "If scientific, technical or other specialized

21  knowledge will assist the trier of fact to understand the

22  evidence or determine a fact issue, a witness qualified as an

23  expert by knowledge, skill, experience, training or education

24  may testify thereto in the form of an opinion."

25          Mr. Stephenson is not testifying in the form of an

1   opinion.  Mr. Stephenson is testifying as to a matter of fact.

2   He is also taking a CD, putting it into a computer, even I can

3   do that, in fact, I have, and opening it up and looking at what

4   is in there.  And he is certainly testifying as to facts, not

5   opinions.

6           This information will be very helpful to the Court.

7   I can understand why Mr. Smith does not want this information

8   to come in.  This is a matter of fact from a CD that his client

9   provided his expert and that we obtained through discovery, and

10  what this testimony relates to is what is on that CD.

11          MR. SMITH:  If I may, your Honor.

12          THE COURT:  Sure.

13          MR. SMITH:  Here is what the Sixth Circuit would

14  respond to Mr. Kay.  "Witnesses who perform after-the-fact

15  investigations are generally not allowed to apply specialized

16  knowledge in giving lay testimony."  That is the law.  Those

17  are the rules.  And Mr. Kay is trying to circumvent those

18  rules.  And if it's so easy to open up the file and look at

19  what is in there, then fine, he should be ready to do that.  He

20  should not be using a witness to get in testimony that is

21  extrinsic.  This witness has no personal knowledge of these

22  files, none whatsoever.  If they are so simple, in fact, I

23  think Mr. Kay has done a very fine job of laboriously going

24  through every single file that was presented to Mr. Jacobson.

25  I don't see the need to do it twice.  If what's in the files is

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    what it is, as Mr. Kay represents, then why do we need another

2    witness to again go through, what is it going to take, another

3    two hours, to go through and identify exactly what was in

4    Exhibit-- Tab 7 here.  It's not necessary.

5            And number two, it's certainly prohibitive for him to

6    offer any-- to apply any specialized knowledge, any specialized

7    knowledge to Tab 6 of Defense Exhibit 1.

8            MR. KAY:  His expert isn't here.  If his expert was

9    here, I could put the CD in, in front of him, have him open it

10   up, which doesn't require any specialized knowledge at all-- my

11   grandchildren could do it, and do do it-- and look and see what

12   is in there and confirm the dates on each of these programs.

13           THE COURT:  Now, when you say the dates on the

14   programs, what do you mean?

15           MR. KAY:  Actually that was the next question I was

16   going to ask.

17   BY MR. KAY:

18   Q.    There is--  You found last written dates?

19   A.    Yes.

20   Q.    What is a last written date?

21   A.    It's actually the date modified, which is the last date

22   that that particular document or whatever it is on a CD or

23   computer was changed.

24           THE COURT:  And, Mr. Smith, your concern is?

25           MR. SMITH:  My concern is that Mr. Stephenson is

                    KATHLEEN S. THOMAS, U.S. District Court Reporter
                410 West Michigan Avenue, Kalamazoo, Michigan  49007
                               (269)385-3050

1    going to veer into the substance of the reports themselves-- or

2    not the reports, the programs themselves that Mr. Goldman

3    produced.  He is going to discuss things that are within the

4    programs, based on his background.  He's testified earlier this

5    morning that he was a programmer, that he programmed patient

6    accounting.  I think he said he had twelve years of programming

7    experience where he was directly involved in programming.

8           It is not permitted under the rules for him to apply

9    his specialized expertise as a programmer to things that he

10   finds in extrinsic evidence without complying with Rule 26, of

11   producing a report, and without being listed as an expert

12   witness.

13          Now, as Mr. Kay said, his grandchild may be able to

14   open up a file and look at a creation date.  I will permit-- or

15   I will not object, I should say, I will not object to the

16   witness testifying as to what he observed as the creation

17   date.  I would not object to the witness testifying as to what

18   he might be able to see when he reviews open, you know,

19   properties, for example, in a PC based, Windows based system,

20   you can look at properties of different files, but I would

21   strongly object to his applying his knowledge to any substance

22   within Mr. Goldman's source code.

23          THE COURT:  We are at the point of last written

24   dates.  Do you object to the last written dates?

25          MR. SMITH:  So long as they are in the form of what a

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

```
 1     normal everyday person could understand and access, I do not

 2     object to it.

 3              MR. KAY:  Okay.

 4              THE COURT:  All right.  Does anybody object to me

 5     being a reasonable person?  That would be a fairly low

 6     standard.

 7              MR. SMITH:  Your Honor, I don't know if that's a

 8     compliment if I call you normal, but I don't object.

 9              THE COURT:  No, it's intended to disclose my

10     ineptitude as far as computers is concerned.

11              All right.  So it sounds to me, Mr. Smith, you are

12     not objecting to this line of questioning as it relates to

13     determinations of last written dates, or I think you said

14     creation dates as well.  Is that-- Am I capturing your point

15     or not?  As long as your average user would be able to glean

16     that information.

17              MR. SMITH:  That is correct, with one follow-up.

18              I will be, on cross examination, I don't know what

19     Mr. Stephenson's experience or familiarity is with PC based

20     systems.  I don't know if he understands what happens when

21     files are transferred from different electronic media to PCs.

22     I don't know if he understands the finer points of how clocks

23     work within personal computers.  These are all fairly technical

24     things that affect the creation date and last written date that

25     appears on a file stamp.  So I don't know what his background
```

1    is with respect to all of that.

2            So with my-- The caveat is that he may give testimony

3    as a lay witness that raises more questions than it answers.

4    And when I attempt to cross examine him on that, he may delve

5    into expert testimony.  And so to make myself clear, his giving

6    of lay testimony, based on what Mr. Kay's grandchild could

7    ascertain--

8            THE COURT:  We will use that as a standard, okay.

9            MR. KAY:  She's bright.

10           THE COURT:  I have no doubt.

11           MR. SMITH:  But it's a bit of a subtle point, your

12   Honor.  But as he answers questions that on their face appear

13   to be straight forward, it does raise issues that lead to a

14   more technical question, a more technical inquiry, and so if on

15   cross examination--

16           Are you with me, Judge?

17           THE COURT:  Um-hmm.

18           MR. SMITH:  If on cross examination I do get into a

19   little bit more of the technical aspects of that on cross, and

20   if that opens the door to him testifying about whatever, then I

21   would object to any examination of creation dates or last

22   written dates.

23           Is that-- Did I make myself clear?

24           THE COURT:  No, I understand what you're saying.

25           Mr. Kay, what is your reaction to that?

1          MR. KAY:  I don't understand.  It sounds to me like

2     he wants to ask questions about expertise, but he doesn't want

3     any of the answers.  I don't know what to make of it.  I'm just

4     trying-- I'm just trying to get to these dates.  Can't we just

5     go ahead?

6          THE COURT:  Well, and what Mr. Smith, I appreciate

7     the argument, and he wants to make sure that the witness's

8     testimony is not based on any technical expertise he may have,

9     but is only based on what the reasonable grandchild could glean

10    from looking at the disk and looking at the information.

11         MR. KAY:  Okay.

12         MR. SMITH:  And the follow-up point, your Honor,

13    would be on cross examination, if he does delve into a bit more

14    of a technical explanation, which I anticipate he will.  I

15    presume he is familiar with personal computers and Microsoft

16    DOS.  If he does delve into some of those aspects, then that is

17    the end of it.  Those aspects should not open the door to his

18    testifying about all the finer attributes of Mr. Goldman's

19    source code just because he is answering some questions on a

20    technical basis.

21         So it's a two part-- it's a qualified objection, I

22    guess, is the right way to put it.

23         THE COURT:  All right.  Why don't we proceed from

24    there.  And I take it your cross examination would be along the

25    lines to make sure that he's not utilized his expertise in

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    delineating-- in coming up with his testimony based on his

2    review of the creation dates and the last written dates.

3            MR. SMITH:  Here would be a typical cross question,

4    your Honor.

5            THE COURT:  Okay.

6            MR. SMITH:  Mr. Stephenson, is it not true that these

7    creation dates can be altered when certain files are copied

8    from one media to another?  And that the common person doesn't

9    know, but Mr. Stephenson might know that answer.

10           Mr. Stephenson, is it true that when files are first

11   created back in the early 1980s, system clocks were less prone

12   to accuracy than they are today.  You know, that is the clock

13   that applies the stamp to the file.  So these are all fairly

14   technical questions.

15           That would be the sort of questions I would get into

16   on cross examination.

17           THE COURT:  Okay.

18           MR. SMITH:  If I could put this into big context.  I

19   believe what defendants are trying to do, is they are trying to

20   look at the creation dates, the stamped dates that are on some

21   of these files, and wave around a 1979 creation date with

22   perhaps a later copyright notice on it and say, you see how

23   messed up this is.  This is so messed up, you know, this

24   creation date doesn't match what is in the substance of the

25   file.  This doesn't make any sense with respect to this.


                    KATHLEEN S. THOMAS, U.S. District Court Reporter
              410 West Michigan Avenue, Kalamazoo, Michigan  49007
                              (269)385-3050

1   That's what they are going to try to prove, and it's all

2   premised on the accuracy of these creation dates, which are

3   notoriously inaccurate on-- especially on these old computers.

4           And so that is where defendant is going, your Honor,

5   and that is why I think all of this, we should not delve into

6   with a lay witness, because it's inevitably probably-- well,

7   it's a contradiction. It probably will delve into testimony

8   that requires Mr. Stephenson to go into an explanation on how

9   system clocks worked, how they may be inaccurate, and I don't

10  have the benefit of his expert report on that.

11          So I will stand by my qualified objection saying if

12  he wants to testify regarding creation dates, I guess that's

13  okay.  I just present for the Court that I do not want this

14  examination to start delving into a big expert examination on

15  when these files were actually created.

16          THE COURT:  Okay.  With that, Mr. Kay, are there any

17  other subject matters of this genre that you wish to go into

18  with Mr. Stephenson?

19          MR. KAY:  I'm going to go into two folders and get

20  these dates.

21          THE COURT:  Okay.

22          MR. KAY:  Out of them with him, and he is only going

23  to be testifying about what he sees there, and I think he is

24  probably going to agree with me that my ten-year-old

25  granddaughter would have the technical ability to go in and get

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    this information.

2    BY MR. KAY:

3    Q.    True?

4    A.    Yes.

5              MR. KAY:  Okay.  Now, he wasn't required to file an

6    expert report.  Only hired for the purposes of litigation are

7    experts, and he is not testifying as an expert in this regard

8    now required to file a report.  That's under Rule 26.  Okay.

9              THE COURT:  Okay.  Well, let's go ahead.

10             MR. KAY:  He can ask whatever questions he wants of

11   this witness.  If I don't like them, I'll object to them.  But

12   he is going to ask whatever he wants, and I invite him to do

13   that.  That's just fine, but ask away.

14             THE COURT:  All right.  Well, why don't we take,

15   let's take the questions and the answers and we will take it

16   from there.

17             MR. KAY:  Okay.

18   BY MR. KAY:

19   Q.    What is Exhibit 3?

20   A.    This is a listing of the file names from the 1979-1988

21   directory off the CD.

22   Q.    Does this Exhibit 3 contain all the information on it?  Is

23   this information that you observed from opening the CD and

24   looking?

25   A.    Yes.

1  Q.   And this relates to the Goldman 1979-1988 directory?

2  A.   Yes.

3  Q.   And the last written date on the right side again means

4  what?

5  A.   It's the date the file was last modified or changed.

6  Q.   Were there creation dates in there that you could find?

7  A.   I don't remember seeing those.

8  Q.   Okay.  We are going to correct a mistake that I made in my

9  presentation this morning now with the Judge.

10         MR. KAY:  I move the admission of Defendants' Exhibit

11  3.

12         MR. SMITH:  No objection.

13         THE COURT:  Exhibit 3 is received.

14         MR. KAY:  Your Honor, have you still got your binder,

15  tab-- Binder 2 with the Tab 6?

16         THE COURT:  I have it.

17         MR. KAY:  And if you would turn to the very last two

18  programs that are in there UGDRGs.

19         Tom, I've opened those.

20         THE COURT:  Way towards the back?

21         MR. KAY:  It's way at the back, it's the very last

22  two.

23         THE COURT:  All right.  About this much.

24         MR. KAY:  Is it UGDRG?

25         THE COURT:  The top line is 00011H 64.


KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1              MR. KAY:  That's one of them.  And then the one

2    before that should be another UGDRG.

3              THE COURT:  I've got HMRY80 is the next immediate one

4    towards the front.

5              MR. KAY:  Okay.  I'm sorry.  I stand corrected.

6              If you go back to the first one.  This is a program

7    without a copyright notice, the UGDRG without a copyright

8    notice at the top?

9              THE COURT:  I see no copyright notation.

10             MR. KAY:  Okay.

11   BY MR. KAY:

12   Q.   What was the date, the last written date of that program?

13   A.   That particular one is 12/31/79.

14             MR. KAY:  The point being that the UGDRG program that

15   was filed with the copyright office in 2004 had a full and

16   complete copyright notice, copyright Joel Goldman 1979.  This

17   one, which is dated December 31, 1979, has no copyright

18   notice.

19             If you would then turn to the next program at the

20   very back of that tab, it's another UGDRG program.

21             THE COURT:  This is the ".txt"?

22             MR. KAY:  That is correct, your Honor.

23             THE COURT:  Okay.  I've got that one.

24             MR. KAY:  This one--  I said this morning this one

25   did not have a copyright notice to you, and I was wrong.  I

1   mis-spoke myself, it does.  In fact, it has a full copyright

2   notice.

3   BY MR. KAY:

4   Q.   What is the last written date for this program?

5   A.   That program UGDRGN.txt was 9/2/04.

6   Q.   September 2 of '04, it has a full copyright notice.

7            Tab 5 of Binder 1 is the copyright registration, and

8   the date of that is five days later, September 7, 2004, it

9   contains UGDRG with the full copyright notice.  The point again

10  being that program with the last written date UGDRG, without

11  any copyright, is dated 12/31/79.  The UGDRG with the full

12  copyright is dated September 2, 2004, five days before

13  Mr. Goldman filed his copyright notice for registration.

14           What is Exhibit 4?

15  A.   This is a listing of the files from the directory 1989 to

16  1997 from the CD.

17  Q.   Are you familiar with all of the information that's set

18  forth in this exhibit?

19  A.   Yes.

20  Q.   And is that based on your review of the Goldman CD to

21  Mr. Jacobson?

22  A.   Yes.

23  Q.   This is from 1989-97 folder?

24  A.   Yes.

25  Q.   There are three abstract related files at the top, did you

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1  confirm they had no copyright notice?

2  A.   Yes.

3  Q.   There are three?

4        MR. SMITH:  Objection, your Honor.  That is-- I'm not

5  sure that Mr. Kay's grandchild could do that.  He opened a file

6  and he was reviewing the source code.  I think review of source

7  code is beyond the realm of a typical lay juror, your Honor.

8        THE COURT:  Sustained.

9  BY MR. KAY:

10  Q.   Did the three files up there have copyright Joel Goldman

11  1979 on them?

12  A.   No.

13        MR. SMITH:  Again, your Honor, this is getting into a

14  review of the substance of the source code, and we have not had

15  an expert report on this.  Anybody-- if he wants to display

16  these files and show that they, you know, their contents so

17  that we could all see them, fine.  But to get this information

18  in through an expert witness-- well, a lay witness who is

19  sitting there asking him opinions on the contents of source

20  code, it's, I do not believe it's proper.

21        MR. KAY:  I'm not asking about the source code.  I'm

22  asking about whether they had a copyright notice on them.

23        THE COURT:  Well, in terms of what would be shown on

24  the screen?

25        MR. KAY:  Yes, sir.


        KATHLEEN S. THOMAS, U.S. District Court Reporter
     410 West Michigan Avenue, Kalamazoo, Michigan  49007
                     (269)385-3050

file:///A|/31808TS.txt

45

```
 1              THE COURT:  As opposed to relying on any computer

 2    expertise as to why something is or isn't there.

 3              MR. KAY:  Absolutely.

 4              THE COURT:  Are you troubled by that, Mr. Smith?

 5              MR. SMITH:  I don't know whether any of this is

 6    true.  I mean I don't have these programs in front of me.  It

 7    just seems to me an odd way of going about it to have a

 8    nonexpert testifying regarding contents of programs that aren't

 9    even before the Court.

10              MR. KAY:  The CD comes from his client.

11              MR. SMITH:  I'm sorry, Mr. Kay, if I could.

12              MR. KAY:  I'm sorry, I thought you were done.  I

13    apologize.

14              MR. SMITH:  That's all right.

15              My understanding was that there were a lot more files

16    in this file folder, but I could be mistaken.  I thought this

17    '89 to '97 directory had a large number of files, so this

18    whole thrust of the examination is troubling me.

19              To answer the Court's question, I--

20              THE COURT:  If I opened the CD and presume-- let's

21    stretch my expertise, that I could open the program and view

22    the screen.

23              MR. SMITH:  I'm sure--  I'm confident you could do

24    that, Judge.

25              THE COURT:  All right.  If I understand the breadth
```

file:///A|/31808TS.txt (46 of 75) [5/5/2008 10:31:35 AM]

1    of Mr. Kay's question, that is all he is asking this witness.

2    Is whether an average computer user who could open the program

3    and view the screen, whether under those circumstances the

4    copyright notice would be present on the screen.

5              MR. SMITH:  If that's as far as he is going, then--

6              THE COURT:  Well, let's confirm that with Mr. Kay,

7    because that's where I thought we were headed.

8              MR. KAY:  That's exactly what I did.

9              THE COURT:  Okay.  So your questions are confined to

10   what your grandchild, if the person had the ability to open the

11   program, could look at the screen and observe?

12             MR. KAY:  Yes, sir.

13             THE COURT:  Okay.

14   BY MR. KAY:

15   Q.   Do you understand that, Mr. Stephenson?

16   A.   Yes.

17   Q.   Okay.  There are three HMR medical records Goldman's

18   medical records programs on this whole list at the bottom.  Do

19   you see any copyright notice for those?

20   A.   No, sir.

21   Q.   And how many of these 1989 to 1997 Goldman programs

22   actually had copyrights?

23   A.   I believe there were two.

24   Q.   That's on the second page?

25   A.   Yes.


                KATHLEEN S. THOMAS, U.S. District Court Reporter
            410 West Michigan Avenue, Kalamazoo, Michigan  49007
                          (269)385-3050

1   Q.   Thank you.

2             MR. KAY:  Move admission of Exhibit 4, your Honor.

3             THE COURT:  Mr. Smith.

4             MR. SMITH:  If Mr. Kay--  I don't want to voir dire

5    his witness, but could he confirm for me who prepared this and

6    whether it reflects a complete listing of all everything in the

7    directory.

8    BY MR. KAY:

9    Q.   Who did you get it from, Mr. Stephenson?

10   A.   I got it from you.

11   Q.   And when I gave it to you, did I ask you to check all of

12   the information and compare it against what was in the CD?

13   A.   Yes.

14   Q.   Did I do that for you?

15   A.   No.

16   Q.   Could I--  No, never mind.

17   A.   Your grandchild could, but.

18             MR. KAY:  That's all, your Honor.

19             MR. SMITH:  No objection.

20             THE COURT:  Four is received.

21   BY MR. KAY:

22   Q.   Now, in preparation for today's hearing, I also asked you

23   as the chief executive officer and president and former RPG

24   programmer of HMS to determine the total number of programs in

25   the HMS medical records module before it was rewritten, did you

1   do that?

2   A.   Yes, sir.

3   Q.   How many are there?

4   A.   Off the top of my head, I don't recall.

5          How many programs or?

6   Q.   Yes.  I asked you to look also at how many-- what the

7   number of source code lines were, did you do that?

8   A.   Yes.

9   Q.   And I asked you to look at the total number of programs in

10  the entire HMS software integrated package.

11  A.   Yes.

12  Q.   And I asked you to determine also the total number of

13  lines of code in the total HMS software package?

14  A.   Yes.

15  Q.   Did you compile something that would help you refresh your

16  recollection?

17  A.   Yes, sir.

18  Q.   What is this?

19  A.   The first page is a summary of each application or module

20  in our-- of our products where I summarized the number of

21  programs and the number of lines of codes in each one.  The

22  pages after that are the detail pages that I got the summary

23  from.  And basically running a command on our system for each

24  library called display file description over the RPG source

25  file gives these each one of these reports at the back that-.

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   Q.   How many programs in the HMS medical records file before

2   the rewrite project?

3   A.   847.

4   Q.   How many lines of code was in there?

5   A.   For the RPG programs 451,597.

6   Q.   And how many programs, software programs in the entire HMS

7   total integrated software package?

8   A.   Of RPG programs 12,705.

9   Q.   And how many lines of code in the entire HMS software

10  package?

11  A.   Total lines of RPG code were 6,918,890.

12          MR. KAY:  Pass the witness.

13          THE COURT:  Was that Exhibit 5?

14          MR. KAY:  I didn't mark it as an exhibit, I'm happy

15  to do it if you--

16          THE COURT:  Well, let's at least mark it for

17  identification.

18          MR. KAY:  Sure.

19          THE COURT:  So we know.

20          MR. KAY:  Sure.

21          MR. SMITH:  Do you still have--  Mr. Stephenson, do

22  you still have Exhibit 4 in front of you?

23          THE WITNESS:  Yes.

24          MR. KAY:  Your Honor, move admission of Exhibit 5.

25          THE COURT:  What is your position on 5, Mr. Smith?

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

```
 1   Do you want to review it at the break?  It's big.

 2             MR. SMITH:  No objection.

 3             THE COURT:  All right.  Exhibit 5 is received.

 4                      CROSS EXAMINATION

 5   BY MR. SMITH:

 6   Q.   If you could turn to Exhibit 3, Mr. Stephenson.  My

 7   understanding is that you were provided with a CD.

 8   A.   Yes.

 9   Q.   On which these directories and these files were contained;

10   is that right?

11   A.   Yes.

12   Q.   And you opened up the 1979 to 1988 directory, and this

13   Exhibit 3 is consistent with what you saw; is that right?

14   A.   Yes.

15   Q.   Are you familiar with how personal computers save date and

16   time stamps?  How they mark a file when it's opened and mark it

17   as modified?

18   A.   No.

19   Q.   So do you know whether or not these dates are accurate?

20   A.   All I know is I opened the file and these were the dates

21   that were there.

22             MR. SMITH:  We are going to get into--  This won't--

23   Judge, this will take 20 minutes is what I'm thinking.

24   BY MR. SMITH:

25   Q.   I want to--  You talked a little bit about this, the
```

1    rewrite that HMS did, where it rewrote all of the software, I

2    think your words were to remove the alleged infringement and

3    that sort of thing.  And I-- you testified that, I think I

4    heard you say that the update was released September 30th; is

5    that right?

6    A.   Well, October 1st of '07 is when it became distributed for

7    general release.  It had been released previous to that to BETA

8    sites, a certain subset of our client base.

9    Q.   HMS had started releasing it as early as August of 2007;

10   is that right?

11   A.   That sounds about right.

12   Q.   And the roll out completed around November of 2007?

13   A.   Yes.

14   Q.   And in terms of releasing this update, this would be an

15   example where the entire HIM module was replaced; is that

16   correct?

17   A.   Most likely.  I don't know that for a fact.

18          Again, only programs that we changed would have been

19   released, so if there were programs that were not changed, they

20   would not have been.  But I don't know that for a fact.  I

21   don't know if every program in there was changed or not.

22   Q.   Would it be reasonable to assume that every medical

23   records program that had formerly used the earlier version of

24   abstract would have been part of the update?

25   A.   Yes.


                KATHLEEN S. THOMAS, U.S. District Court Reporter
            410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1  Q.   Abstract was changed significantly; is that right?

2  A.   Yes.

3  Q.   And just so the Court is very aware of, tell us again what

4  abstract is, what a database structure is?

5  A.   The abstract is basically a database file that is a

6  collection of data assembled in one file.

7  Q.   And the abstract before the rewrite had been updated how

8  many times-- No, let me-- How many releases would you

9  estimate medical records went through until this latest

10  upgrade, update?

11  A.   I don't know how many it would have gone through.

12  Q.   Didn't you testify that you believed that there had been

13  25 releases of medical records prior to the update?

14  A.   Well, we were on release-- in terms of numbering our

15  releases, we were on release 25.  That again doesn't

16  necessarily mean medical records was a part of every one of

17  those releases.  But we essentially number our releases as we

18  distribute them, so we were at 25, but what-- how many medical

19  records was in as part of that, I don't know for sure.

20  Q.   We've got some high tech stuff.

21          MR. SMITH:  Could you put up Plaintiff's 67.

22          It's warming up.  I'll move on.  We will come back to

23  this.

24          THE COURT:  Just so I understand.  The total number

25  of releases up until October 1, of '07, I gather for all the

1    company's product was 25?

2              THE WITNESS:  Well, that was our major release

3    number.  We may do smaller pieces through the year of different

4    things, it could be a 25.1 or 25.2 that might be a subset of a

5    particular product.  But our major release that we would do

6    from a numbering standpoint, we were at 25.

7              THE COURT:  And what you cannot extract is the number

8    of releases confined to medical records only?

9              THE WITNESS:  I don't know that.

10             THE COURT:  Okay.

11             THE WITNESS:  That number to be exact.

12   BY MR. SMITH:

13   Q.   And up on the screen is Exhibit 67.  Do you recognize this

14   document?

15   A.   Yes.

16   Q.   What is it?

17   A.   It's a, what we call a PIF, project information form,

18   where we document projects to be done.

19   Q.   And this PIF, this project information form, related to

20   medical records, right?

21   A.   Yes.

22             MR. SMITH:  And Alfonso, could you enlarge the top

23   left corner.

24   BY MR. SMITH:

25   Q.   Up in the upper left corner, you see where it says

1    releases?

2    A.    Yes.

3    Q.    What do the numbers 231 and 240 mean?

4    A.    That would have been release 23.1 and release 24.

5              MR. SMITH:  And if you could enlarge the top right

6    corner, Alfonso.

7    BY MR. SMITH:

8    Q.    This release was received 000, but the PIF date appears to

9    be March 4, 2005, right?

10   A.    Correct.

11   Q.    As of March 4, 2005, is it fair to say that medical

12   records had been updated at least 24 times?

13   A.    I don't--  I don't know that, and I don't think you can--

14   we can't assume that from that document.  It was being modified

15   in release 23.1 and 24.  Had it been a part of all the previous

16   releases up to that point, I don't know the answer to that.

17   And most likely it would not have been.

18   Q.    When you say it, are you saying?

19   A.    Medical records.  The medical records application.

20   Q.    So this release-- this release nomenclature refers to the

21   entire suite of HMS software or medical records?

22   A.    It refers to a release of our software for that particular

23   point in time.  So release, whatever the number was, 24 would

24   be a release that we would do at a particular point in time,

25   probably in '05, that release might contain updates or

file:///A|/31808TS.txt

55

 1    enhancements for ten applications or modules, it might contain

 2    enhancements for 15, it might contain enhancements for only

 3    five, it just depends on what we are doing at that particular

 4    point in time.  I would, from this particular PIF, then I would

 5    assume those two particular releases we had medical records as

 6    an update.  I don't know, release 22 might not have had that.

 7    I just don't know the answer to that.

 8    Q.   So to make sure the Court understands your testimony, if a

 9    minor change is made in one of these 6,918,890 lines of code,

10    if a minor change is made in one of those codes lines, the next

11    version of code that's shipped out with that change, it gets a

12    new release number?

13    A.   I'm sorry, could you say that again?

14    Q.   I understood your testimony to be that a new release

15    number could be assigned even for a small change in a program

16    unrelated to medical records, is that true?

17    A.   No.  A release-- We may make changes to the application,

18    any application over the course of a year, but that doesn't--

19    and then we kind of accumulate all of those into one release

20    that we would send out at one time.  So changing one program

21    does not constitute a new release.  I would take all of the

22    accumulation of whatever changes were made over the course of

23    whatever period of time it is, might be a year, might be six

24    months, might be 18 months, and I would-- we would then package

25    those into a release and call that release 24 or whatever the

file:///A|/31808TS.txt (56 of 75) [5/5/2008 10:31:35 AM]

1  number is, and that's what we would distribute to the client.

2  Every time we, for each little change we made to a particular

3  program does not constitute a release or would not necessarily

4  be distributed, you know, at that time.  But we kind of wait

5  and do it all as a part of one release.  I don't know if that

6  makes sense, but that's--

7  Q.   And when you distribute that entire new release, do you

8  distribute a new batch of code or are you distributing bits and

9  pieces?

10  A.   We are distributing the code that has changed.  So if

11  nothing changed, we don't distribute that.

12  Q.   Medical records was part of the base five set of software

13  that HMS started out with; is that right?

14  A.   Yes, that is correct.

15  Q.   So HMS has been a part of every single-- medical records

16  has been a part of every release since the inception of these

17  release dates; is that right?

18  A.   No, that would not be correct.

19         Again, there may be--  There were releases and could

20  be releases where if we did not change medical records or

21  didn't change anything significantly, we would not include that

22  in the release.  So releases don't include every application

23  that we have every time.

24  Q.   Are you familiar with the term DRG?

25  A.   Yes.


                KATHLEEN S. THOMAS, U.S. District Court Reporter
         410 West Michigan Avenue, Kalamazoo, Michigan  49007
                         (269)385-3050

1   Q.   What does that stand for?

2   A.   Diagnostic related groups.

3   Q.   Is that a term used for Medicare reimbursement?

4   A.   Yes.

5   Q.   Also a term used for other third-party payers for such as

6   insurers?

7   A.   Yes.

8   Q.   And DRGs are promulgated-- the system of DRGs is

9   promulgated by the United States government; is that right?

10   A.   Yes.

11   Q.   Is that the Department of Health and Human Services or

12   what used to be called Health and Human Services?

13   A.   I believer so.  It's CMS now is the organization.

14   Q.   And how often are DRGs updated by the government?

15   A.   Every year, every October.

16   Q.   And that's-- Has there ever been a year where they

17   haven't upgraded DRGs?

18   A.   Not that I recall.

19   Q.   In medical records, is it not true, medical records has a

20   DRG function in it?

21   A.   Yes, our medical records does, yes.

22   Q.   Is it not true that every time DRGs are updated medical

23   records needs to be updated?

24   A.   That's true.  The extent of which that occurs depends on

25   the DRG changes.  Changes to the database files for DRGs that

1    occur where they may add diagnosis codes, take away diagnosis

2    codes, change the DRG codes themselves, those occur every year

3    which would necessitate us updating those database files.

4            The grouper itself, which is a program that creates

5    the DRGs, it generally it changes, but it doesn't always

6    change, it just depends on the nature of the changes that occur

7    that year.

8            So generally there is some update to medical records

9    for DRGs to the specific parts of it that it affects, but it

10   certainly doesn't affect the entire medical records

11   application.

12   Q.   Does HMS use its own DRG grouper or is it contracting that

13   from a third party?

14   A.   We use our own.  We receive the files, the grouper files,

15   from a third party.

16   Q.   Is that 3M?

17   A.   Yes.

18            THE COURT:  From where, I'm sorry?

19            THE WITNESS:  3M.

20   BY MR. SMITH:

21   Q.   3M is the name of the company.

22            MR. SMITH:  Could we take that down, please.

23   BY MR. SMITH:

24   Q.   There was--  You were in the courtroom when Mr. Kay was

25   talking about Mr. Jacobson's opinion regarding abstract being a

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    critical part of the medical records program.  Do you recall

2    his presentation on that?

3    A.   Yes.

4    Q.   Prior to your rewrite, isn't it true that medical records,

5    in fact, had over 300 different programs within the HMS

6    library?

7    A.   I'm sorry, say that again.

8    Q.   Prior to the rewrite, isn't it true that medical records

9    affected over 300 different programs in the HMS suite of

10   software systems?

11   A.   That medical records affected 300 programs?

12   Q.   Abstract was implicated in 300-- over 300 programs in the

13   HMS system?

14   A.   I don't know the exact number, that sounds reasonable.

15   Q.   Let's just nail it down.

16        MR. SMITH:  Could we have 66 up.

17   BY MR. SMITH:

18   Q.   You'll recognize this as a PIF.  I believe it was

19   displayed at your deposition.

20   A.   Yes.

21   Q.   At the top of the sheet it says--

22        MR. SMITH:  Could we enlarge the top half.

23   BY MR. SMITH:

24   Q.   At the top of the sheet it says that the description of

25   the project was to add some operating procedures and some other

1    things, and what is highlighted is to externalize abstract in

2    all programs.  Do you recall about when the company was doing

3    that?

4    A.   It was around the '03 time frame.

5    Q.   And the reason for that is because abstract formerly had

6    been imbedded in each of the individual programs, isn't that

7    right?

8    A.   That is correct.

9    Q.   And so when abstract was externalized, every program that

10   formerly had it embedded within the program was affected by the

11   task of externalizing abstract; is that right?

12   A.   That is correct.

13   Q.   And so if we look at this and if we count the number of

14   programs that were affected, by the management's decision to

15   externalize abstract, that would be a fair way of counting how

16   many programs abstract-- implicated abstract; is that correct?

17   A.   That is correct.

18   Q.   And I think even Mr. Kay's grandchild could probably count

19   these up and count there were over 300 here, but I won't take

20   the time to do that now.

21        Going back to your rewrite, you said that you had

22   rolled out the rewrite to some BETA sites.  Could you please

23   tell us what you mean by BETA sites?

24   A.   Well, anytime we introduce a new release or a new

25   application, whatever it might be, before we introduce it to

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    the entire customer base, we always roll it out to a certain

2    number of BETA sites that basically after we have done our

3    testing in-house, then we roll it out to sites to implement it

4    and use it and work out any bugs we may have before we

5    introduce it to the entire customer base.

6    Q.    Does that happen with every release?

7    A.    Yes.

8    Q.    And how many BETA sites typically would receive it before

9    the general distribution?

10   A.    It varies, but typically between 10 to 20.

11   Q.    And the BETA process started in the rewrite case around

12   August of 2007, then you testified that it was generally

13   distributed October 1, 2007, I believe you said; is that right?

14   A.    Yes, I believe that's right.

15   Q.    And then there were still some distributions that were

16   occurring in as late as November; is that right?

17   A.    That's possible, yes.

18   Q.    Why is that?

19   A.    Some customers may have chosen not to take it on October

20   1st, they may have wanted to wait.  I don't know the specific

21   reasons why.

22   Q.    Your contract requires them to accept updates, doesn't it?

23   A.    Yes.

24   Q.    A client can't refuse an update, can it?

25   A.    No.


                    KATHLEEN S. THOMAS, U.S. District Court Reporter
              410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1   Q.   So why would you have distributions throughout October and

2   into November?

3   A.   Well, in any release we do, the clients don't all put it

4   on in one day.  I mean it's sometimes spread out over two to

5   three months, depending on their schedule.  Sometimes we may

6   phase it in over a couple of months just to make sure that,

7   from our standpoint, that we can handle the increase in

8   support, or whatever may come out of that.  So it's not

9   uncommon for the distribution to occur over a couple of month

10  period.

11  Q.   You can't just push a button and have all of your

12  customers receive it at the same instant?

13  A.   No.  I wish I could, but no.

14  Q.   So it's typical that it occurs over-- What is a typical

15  length of time that an update would be released and occur over?

16  A.   It varies, but over a couple of month period generally

17  everyone installs the release.

18  Q.   And would HMS be involved in that installation?

19  A.   Typically not.  We may be on the BETA sites, but once it

20  goes to general release, the customer does that.

21  Q.   And you would then transmit the new replacement code to

22  them electronically or send them a floppy disk or something?

23  A.   Generally it's distributed on CDs.

24  Q.   And why is it over time?  Why don't you do it all at once?

25  A.   We may distribute them all at once, but the clients don't

1    all put it on at once.  And I don't know the exact timing of

2    when we distributed this one.  I know we started-- it was

3    available October 1st, that's when we started the

4    distribution.  I honestly don't know if we sent them all out

5    day one or if we staggered them over a couple month period in

6    terms of sending them.  I just don't know.

7    Q.   Typically, again typically, would they be sent all on one

8    day?

9    A.   At the point of general release, yes.

10   Q.   Are you familiar with the HIM manual, software manual put

11   out by HMS?

12   A.   I know we have one.  I haven't looked at it in a long

13   time.

14   Q.   You were heavily involved in patient accounting, is that

15   right?

16   A.   Yes.

17   Q.   You know the patient accounting program?

18   A.   Yes.  Again, I haven't programmed it in awhile, but yes,

19   I'm very familiar with it.

20   Q.   You spent twelve years I thought in patient accounting?

21   A.   Yes.

22   Q.   You made presentations related to patient accounting?

23   A.   Yes.

24   Q.   When HMS was marketing this to potential customers, right?

25   A.   That's correct.


                  KATHLEEN S. THOMAS, U.S. District Court Reporter
              410 West Michigan Avenue, Kalamazoo, Michigan  49007
                              (269)385-3050

1  Q.   You know how patient accounting, which is a software

2  module, interacts with abstract, don't you?

3  A.   Yes, sir.

4           MR. SMITH:  Could we put up 95.  Let's go to Page 2.

5           Is this all of 95?

6           MS. SHAW:  Uh-huh.

7           MR. SMITH:  Your Honor, I don't have a copy of what

8  is on the screen.

9           We'll just have to use what is on the screen.

10          We seem not to have the first part of 95, but we do

11  have it on the screen, your Honor, and I'll get the Court and

12  counsel a copy of 95.

13  BY MR. SMITH:

14  Q.   Do you recognize this as a page from the HIM manual,

15  Mr. Stephenson?

16  A.   Yes.

17  Q.   Did you write this?

18  A.   No.

19  Q.   Were you around to supervise its creation?

20  A.   I don't recall that particular one, being involved in

21  that.  I could have been, I don't remember.

22  Q.   Now, patient accounting on the left-hand side is the

23  program that you were most familiar with, right?

24  A.   That is correct.

25  Q.   Health Information Management, that's what HMS calls,

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   another name for its medical records program; is that right?

2   A.   Yes.

3   Q.   And so it says at the top, "Patient Accounting Health

4   Information Management Interface."  Do you believe this is an

5   accurate representation of the interface between patient

6   accounting and abstract?

7   A.   Yes.

8   Q.   Just walking down through it we see at step two there is a

9   final census step, and then an abstract is created with things

10  like patient number, patient name, history number and on down

11  the line.

12         Now, abstract is that database structure that you

13  testified to earlier, right?

14  A.   Yes.

15  Q.   And then in step three there is this optimizer function.

16  What is an optimizer function?

17  A.   It basically is the DRG calculation program that

18  essentially takes the information from the system and computes

19  a DRG, that's diagnostic related group.

20  Q.   Did HMS sell software that assisted service providers to

21  optimize their DRG reimbursement?

22  A.   The optimizer calculates the DRG, yes.

23  Q.   Did it ever-- Did it ever sell software in an attempt to

24  assist hospitals in maximizing the recovery from Medicare and

25  Medicaid through manipulating the DRGs?


KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1  A.   No.

2        MR. SMITH:  Could you go to the next page, Alfonso.

3  BY MR. SMITH:

4  Q.   So in step five, we have a final census and then abstract

5  is updated with a discharge date, and then abstract is

6  finalized.  Do you see that?

7  A.   Yes.

8  Q.   And that's accurate, right?

9  A.   Yes.

10  Q.   And at that point, then this file called patients,

11  P-A-T-I-E-N-T-S, is updated with the same information that was

12  used to update abstract, right?

13  A.   Yes.

14  Q.   Now, patients is a file within patient accounting, right?

15  A.   Correct.

16  Q.   And without this step, without patients being updated, it

17  would seriously affect the operability of patient accounting,

18  right?

19  A.   Well, the-- I guess clarifying seriously, however you said

20  that, the patient accounting can't function without medical

21  records, and so the updating of patients from medical records

22  or from the abstract would not be absolutely necessary.  In the

23  sense of using medical records in the abstracting function,

24  then yes, then that information does update the patient's

25  file.  However, patient accounting can function without that

1    component.

2    Q.    Is your testimony patient accounting as its been sold by

3    HMS for the last 20 years doesn't need abstract?

4    A.    That is correct, and has been sold that way.

5    Q.    Patient accounting is part of the base five of the five

6    main modules of software that the company initially started

7    with in 1985-1986, right?

8    A.    Yes.

9    Q.    Along with medical records, was that part of base five?

10   A.    Yes.

11   Q.    And you earlier testified that you worked on patient

12   accounting.  Tell me, was patient accounting, was that part of

13   the software that Mr. Givens brought over with him from AMC?

14   A.    I don't know whether he brought that or not.  I started

15   writing it when I came over and I was writing new code, so I

16   don't know if he did or not.

17   Q.    You were reviewing actual source code?

18   A.    I'm sorry?

19   Q.    You were reviewing actual source code when you started out

20   with AIC, weren't you?

21   A.    I was writing source code.

22   Q.    Did you review existing source code?

23   A.    I don't recall reviewing existing source code.

24   Q.    You never reviewed--  You don't recall reviewing existing

25   source code when you were writing applications for the patient

1    accounting module?

2    A.    I could have, I just don't remember.  I remember writing

3    new code, new programs, but what I looked at when I was there,

4    I don't remember.

5    Q.    And just so the Court is clear with-- there's lots of

6    acronyms floating around.  AMC was the company that Mr. Givens

7    worked at during this 1983 meeting.  He left there and started

8    a company called AIC, Advanced Information Concepts, which

9    became HMS.

10          So you don't recall reviewing patient accounting

11   source code in those early days at AIC, is that your testimony?

12   A.    I'm sure I did.  I don't remember reviewing it or what I

13   reviewed.  I remember writing new programs, because that's what

14   I did day and night, but I could have, I just don't remember

15   that.

16   Q.    Did you observe-- Did HMS put copyright notices on any of

17   its source code prior to 1994?

18   A.    I don't recall.  I don't recall that I did.

19   Q.    Did AIC put copyright notices on its source code that it

20   distributed back in the mid '80s?

21   A.    Again, I don't recall that.

22   Q.    Do you recall-- maybe this will spark your memory, do you

23   recall ever seeing any copyright notice on the source code that

24   you worked on in patient accounting?

25   A.    I don't remember seeing it.


                KATHLEEN S. THOMAS, U.S. District Court Reporter
           410 West Michigan Avenue, Kalamazoo, Michigan  49007
                          (269)385-3050

 1   Q.   Do you recall seeing a copyright notice from anybody,

 2   Mr. Goldman, IBM, anyone?

 3   A.   No, I don't remember.  I may have, I just don't remember.

 4   Q.   Earlier before we broke for lunch, you were going through

 5   the numbers of HMS clients that had medical records, and you

 6   can appreciate this is new information for the plaintiff.

 7        Since January, 2002, you testified there had been 143

 8   installations?

 9   A.   Yes.

10   Q.   And between 1998 and 2001, 72 installations?

11   A.   Yes.

12   Q.   And then you testified that there was one customer that

13   had an enterprise license covering 85 installations; is that

14   right?

15   A.   Yes.

16   Q.   So those 85 would be already included in those numbers we

17   just reviewed?

18   A.   No, they are not included.

19   Q.   So we would have--

20   A.   And I said I believe the number is 85.  That number seems

21   right to me.  It may be 84, it may be 86, I don't know, but

22   it's in that range.

23   Q.   So these numbers that add up to 215, those relate to

24   contracts, not installations; is that right?

25   A.   Those would be--  Those are installations for which we

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    receive the license fees.

2    Q.    So you could have hundreds out there that aren't paying

3    you a license fee?

4    A.    No.

5    Q.    You have more than one?

6    A.    Well, the one that has the enterprise license is the one

7    that we are not, we don't receive a license fee for any

8    additional installations of the product.

9    Q.    So my understanding is that your testimony on 215

10   installations only reflects those facilities that individually

11   pay you a license fee?

12   A.    Correct.

13   Q.    And you have others on top of that that have the software

14   installed, but for which you receive a license fee through some

15   other entity; is that right?

16   A.    Well, they purchased an enterprise license fee at a point

17   in time that then allows certain applications, then as they

18   purchase additional hospitals or they additional hospitals,

19   they install those applications and they do not pay us a

20   license fee for each one along the way.

21   Q.    And this enterprise function is a strength of HMS, isn't

22   it?

23   A.    Yes.

24   Q.    It's one of the markets that you pursue is these related

25   hospitals, right?

```
 1  A.    Correct.

 2  Q.    And in fact, you're moving towards enterprise licensing;

 3  is that right?

 4  A.    No.

 5  Q.    How many enterprise licenses does HMS have?

 6  A.    Only one.

 7  Q.    So it's your testimony that medical records is now

 8  installed in only 300 facilities?

 9  A.    I'm sorry, say that again.

10  Q.    It's your testimony that medical records, to the best of

11  your knowledge, is only installed in 300 facilities, the 215

12  plus the 85?

13  A.    No, that's not what I said.  The 215 represents what was--

14  what has been installed since '98 up through last September,

15  then there's 85 on top of that from-- or roughly the 85 number

16  from the enterprise license.  So there, you know, that starts

17  at '98, so there are others prior to '98.

18  Q.    Do you have any reason to doubt the testimony of people

19  like Tom Givens, Patricia Douglas, Paul Agee when they testify

20  regarding the number of customers, do you have any reason to

21  doubt their testimony?

22  A.    No.

23  Q.    It would have been very difficult for HMS to succeed when

24  it was starting out in the mid '80s without medical records; is

25  that right?
```

1    A.    I don't know if I could make that statement or not.

2              MR. SMITH:  Would you put up Page 134 of

3    Mr. Stephenson's deposition.

4              THE COURT:  I'm sorry, Mr. Smith, this is whose

5    deposition?

6              MR. SMITH:  Mr. Stephenson's deposition.

7              THE COURT:  Thank you.

8              MR. SMITH:  Could we go to 133, please.  Could we put

9    133 and 134 side by side, is that possible?

10   BY MR. SMITH:

11   Q.   At the bottom of Page 133:

12              "Again, Mr. Stephenson, going back to the mid to

13   late '90s time frame, could AIC and HMS have succeeded without

14   medical records program?

15              "A. I guess it depends on your definition of

16   success."

17              And then going to the middle of Page 134, you qualify

18   it with, "You would have to speculate."  But then you say, "I

19   think it would probably be very difficult."

20              Is that, as you sit here today, would that be your

21   testimony?

22   A.    It would have been more difficult.  Medical records was

23   certainly something that we-- that helped us get into the--

24   into the show when we went in to talk to people, but it was not

25   certainly wasn't the focal point of what we were selling at the

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    time, but it certainly would have made it more difficult.

2    Q.    Was patient accounting based on IBM's HFMS program?

3    A.    I believe it started that way, yes.

4    Q.    And you don't recall seeing any copyright notice from IBM

5    on the source code that you reviewed, right?

6    A.    I don't remember seeing any, no.

7              MR. SMITH:  May I have one moment?

8              (Pause in proceedings.)

9              MR. SMITH:  No further questions.

10             THE COURT:  Mr. Kay.

11             MR. KAY:  I have no redirect, your Honor.

12             THE COURT:  Thank you.

13             Mr. Stephenson, you may step down, sir, with the

14   Court's thanks.

15             (At 3:16 p.m., witness excused.)

16

17

18

19

20

21

22

23

24

25


                    KATHLEEN S. THOMAS, U.S. District Court Reporter
                 410 West Michigan Avenue, Kalamazoo, Michigan  49007
                              (269)385-3050

1

2

3

4

5                              REPORTER'S CERTIFICATE

6

7

8          I, Kathleen S. Thomas, Official Court Reporter for

9    the United States District Court for the Western District

10   of Michigan, appointed pursuant to the provisions of Title

11   28, United States Code, Section 753, do hereby certify

12   that the foregoing is a true and correct transcript of

13   proceedings had in the within-entitled and numbered cause

14   on the date hereinbefore set forth; and I do further

15   certify that the foregoing transcript has been prepared by

16   me or under my direction.

17

18

19

20
                        _____
21                      Kathleen S. Thomas, CSR-1300, RPR
                        U.S. District Court Reporter
22                      410 West Michigan
                        Kalamazoo, Michigan   49007
23

24

25


              KATHLEEN S. THOMAS, U.S. District Court Reporter
         410 West Michigan Avenue, Kalamazoo, Michigan   49007
                            (269)385-3050